## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

LEXON INSURANCE COMPANY,

                            Plaintiff,

           -against-

JAMES C. JUSTICE II,

                         Defendant.

**COMPLAINT**

Civil Action No. _____

Plaintiff Lexon Insurance Company ("**Lexon**"), by and through its undersigned counsel, on knowledge as to its own actions and otherwise on good faith information and belief, hereby alleges the following against Defendant James C. Justice II ("**Justice**" or "**Guarantor**"):

## INTRODUCTION

1.     This action arises from Justice's breach of his obligations under the terms of a personal guaranty dated as of March 26, 2018 (the "**Original Guaranty**"), as amended by agreement dated as of February 4, 2019 (as amended, the "**Guaranty**").[1]

2.     Justice is the sitting Governor of West Virginia who also owns and operates, through various subsidiaries and affiliates, coal mines in Kentucky, West Virginia, Tennessee, and Virginia.  Justice earned his fortune not only from coal but also from business interests in agriculture, real estate, and other industries.  Justice reached billionaire status in or around 2009 after he sold a number of coal mines in West Virginia to a Russian company, Mechel OAO.  Following that sale, Justice had an estimated net worth of $1.7 billion.

---

[1] True and correct copies of the Guaranty and the Original Guaranty are attached hereto as Exhibits 1 and 2, respectively, the terms of which are incorporated herein by reference.

3.      Justice executed the Original Guaranty in order to induce Lexon to make certain concessions, discussed below, with respect to surety bonds (the "**Surety Bonds**") Lexon had issued to certain subsidiaries or operating affiliates of companies owned by Justice (the "**Justice Subsidiaries**").[2] These Surety Bonds related to the Justice Subsidiaries' obligations to complete state-mandated projects at various coal mines.  Justice is the ultimate owner of and controls the Justice Subsidiaries.  As a result of executing the Guaranty, Justice committed himself to pay over $23 million owed to Lexon by certain of the Justice Subsidiaries in the event they failed to timely pay these amounts.  Those Justice Subsidiaries did in fact default on their payment obligations to Lexon, triggering Justice's obligations under the Guaranty.  Despite a clear and unambiguous obligation to make good on his companies' debts via honoring the Guaranty, to date, Justice has refused to abide by his contractual obligations to Lexon.  Following numerous attempts to resolve the issue without litigation, Lexon had no choice but to commence this action to enforce the Guaranty.

4.      By way of background, surety bonds guarantee the performance of specified obligations.  The key parties to the surety relationship are the (i) obligee, which is the entity to whom the obligation is owed (often, as here, a state or local government), (ii) principal, which is the primary party charged with performing the obligation (*e.g.*, the Justice Subsidiaries), and (iii)

---

[2]   The Justice Subsidiaries are James C. Justice Companies, Inc., Southern Coal Corporation, Justice Family Group, LLC, Mechel Bluestone, Inc., Beech Creek Coal Corp., Kentucky Fuel Corporation, Tams Management, Inc., Justice Low Seam Mining, Inc., A&G Coal Corporation, Virginia Fuel Corporation, Premium Coal Company Inc., Sequoia Energy, LLC, Four Star Resources, LLC, and Alabama Carbon, LLC.

Certain of the Justice Subsidiaries' obligations to Lexon are secured by the Guaranty, namely, those owed by James C. Justice Companies, Inc., Southern Coal Corporation, Kentucky Fuel Corporation, Justice Family Group, LLC, and Mechel Bluestone, Inc., which are collectively referred to herein as the "**Collateral Justice Companies**."  The Guaranty also covers certain obligations to Lexon of another company ultimately owned by Justice, Beech Creek Coal Corp. ("**Beech Creek**").

surety (*e.g.*, Lexon), which, according to the bond's terms, is responsible for the principal's obligations in the event of the principal's default, subject to the surety's right to seek indemnification from the principal.

5. For example, in order to obtain a coal mining permit from the West Virginia Department of Environmental Protection (obligee), a coal mining company (principal) typically is required to obtain a bond to secure its performance of the various obligations under the permit. Should the principal default on those obligations, according to the terms of the bond, the bond's issuer (surety) is responsible for arranging to fulfill the principal's obligations under the permit, as well as defending against any legal proceedings initiated by the obligee in connection with the principal's defaults.

6. The surety receives compensation in the form of premiums in exchange for undertaking these obligations, and often also requires, as Lexon did here, two forms of financial protection. First, the surety typically demands that the principal posts collateral as security should it default on its obligations. In that event, the collateral could be used towards the payment of losses, costs or expenses incurred in discharging the principal's obligations. Second, the principal agrees to indemnify the surety against losses and expenses incurred in connection with the bond, with the obligation typically memorialized in a general indemnity agreement ("**GIA**"). Interested third parties, such as the principal's individual owners (*e.g.*, Justice) or affiliate companies, may also be required to sign the GIA or personally guarantee the principal's obligation.

7. Since 2009, Lexon and its affiliate, Bond Safeguard Insurance Company ("**BSIC**"), have issued hundreds of surety bonds, with a total exposure in excess of $144 million, in connection with coal mines owned or operated by the Justice Subsidiaries. Most of the Surety Bonds at issue here are for reclamation projects, which are designed to return land that had been adversely impacted by mining or other activities to its pre-mining condition through, for example,

groundwater restoration, equipment removal and disposal, building demolition, and topsoil replacement. The federal government and certain state governments require companies to obtain these bonds before performing coal mining activities. Other bonds were issued in connection with permitting and licensing requirements. Currently, Lexon and BSIC's exposure on the Surety Bonds is approximately $112 million.

8.      Under the terms of the Surety Bonds, the Justice Subsidiaries were required to pay premiums. Premium rates are regulated by state law, but typically range from between one and three percent of the penal sum of the bond, which, in turn, is the maximum amount of the surety's liability under the bond. Premiums usually are charged annually with the initial premium payment due within 30 days of issuance of the bond. In addition, certain of the Justice Subsidiaries were required to provide Lexon with collateral as further security for their obligations. Among other considerations, the amount of collateral required is set by bond underwriters based on potential costs that could be incurred in connection with the bonded activity or gross exposure on the bond.

9.      In or around 2016, representatives of Justice's companies told Lexon representatives that the Justice Subsidiaries and other companies owned by Justice were experiencing financial difficulties. In this same time period, the Justice Subsidiaries began not to perform at all, or in a timely manner, their state-mandated obligations secured by the Surety Bonds, and also fell behind on premium and collateral payments owed to Lexon.

10.      Between 2016 and 2018, Lexon cooperated with requests by Justice or his companies to accommodate the companies' claimed financial difficulties by, among other things, releasing collateral (which was in the form of cash or cash equivalents) held by Lexon. Even though during this time period the Justice Subsidiaries, and the Collateral Justice Companies in particular, had not been making the required collateral and premium payments to Lexon, Lexon agreed to release a certain amount of collateral every month, ultimately totaling in excess of $13

4

million. Lexon understood based on statements made by Justice or his companies' representatives that these funds would be used to pay costs related to reducing liability on Lexon-bonded obligations, including to pay expenses related to reclamation activities, judgments against certain of the Justice Subsidiaries, and outstanding premiums owed to Lexon. On information and belief, it turned out that the Justice Subsidiaries in fact did not use all of these funds to perform bonded obligations, in contravention of the representations to Lexon that were intended to and did induce Lexon to release the collateral.

11.     In early 2018, Justice's representatives requested that Lexon release the remaining cash collateral then being held by Lexon, and it was again represented that the cash would be utilized to fund the Justice Subsidiaries' reclamation efforts. At this point in time, the amount of collateral held by Lexon already was significantly depleted from the contractually required amount and the Justice Subsidiaries also owed Lexon millions of dollars in outstanding premium payments.

12.     Notwithstanding that the Justice Subsidiaries were in default of their obligations to Lexon under the Surety Bonds, Lexon did not declare a default as it was contractually entitled to do. Instead, Lexon chose to continue to work with Justice and the Justice Subsidiaries to attempt to find a consensual resolution to the situation. That ultimately led to Lexon executing an agreement dated as of March 26, 2018 (the "**Agreement**") with the Collateral Justice Companies and Beech Creek whereby Lexon released collateral to the Collateral Justice Companies and, in turn, the Collateral Justice Companies and Beech Creek promised to satisfy their premium and collateral payment obligations consistent with modified payment schedules set forth in the Agreement.[3]

---

[3] A true and correct copy of the Agreement is attached hereto as Exhibit 3, the terms of which are incorporated herein by reference.

13.     However, given the Justice Subsidiaries' (and, specifically, the Collateral Justice Companies' and Beech Creek's) history of non-payment, and representations about their strained financial condition, it was a "condition precedent to any and all" of Lexon's obligations under the Agreement that Justice execute and deliver the Original Guaranty.

14.     Pursuant to the Original Guaranty, Justice promised to "absolutely, unconditionally and irrevocably" guarantee the Collateral Justice Companies' and Beech Creek's premium and collateral payment obligations, "plus all costs, expenses and fees (including the reasonable fees and expenses of [Lexon's] counsel)" to enforce the contract and recover damages in the event that the Collateral Justice Companies and Beech Creek defaulted on their obligations under the Agreement.

15.     Despite Lexon accommodating Justice's request by releasing collateral and deferring payment of past due premiums—consistent with the terms of the Agreement—the Collateral Justice Companies and Beech Creek did not fulfill their contractual payment obligations over the course of the next year, continuing to profess ongoing financial difficulties as the reason for their non-payment.

16.     Whatever the merits (or lack thereof) of their claims of financial hardship and despite Justice's apparent ample ability to fund the Collateral Justice Companies' and Beech Creek's obligations, in or around early 2019 Justice's representatives again asked for accommodations from Lexon that it was not contractually obligated to provide.

17.     Ultimately, Lexon opted to continue to attempt to work with Justice, the Collateral Justice Companies, and Beech Creek, although the companies clearly were in breach of the Agreement throughout 2018 and early 2019.

18.     On February 4, 2019, the parties agreed to amend the Agreement (the "**Amended Agreement**").[4]   The Amended Agreement provided a two-year payment schedule for the Collateral Justice Companies and Beech Creek to pay $20 million in collateral and allowed for the Collateral Justice Companies and Beech Creek to pay off the balance of the past-due premium and additional premiums that would come due following execution of the Amended Agreement in $200,000 monthly installments.

19.     As a condition of entering into the Amended Agreement, Lexon again required Justice, and Justice agreed, to guarantee the Collateral Justice Companies' and Beech Creek's obligations under the Amended Agreement.   Because of the increased collateral and premium payment obligations under the Amended Agreement, in the event of a default by the Collateral Justice Companies and Beech Creek, Justice became obligated under the Guaranty to pay Lexon in excess of $23.5 million, as explained further below.

20.     From February 4, 2019 through December 31, 2019, the Collateral Justice Companies and Beech Creek missed certain payment deadlines under the amended payment schedules in the Amended Agreement, but otherwise made regular monthly payments pursuant to the amended schedule.

21.     In January 2020, however, the Collateral Justice Companies and Beech Creek sought to restructure the payment schedule to allow for additional time to pay outstanding balances.   The parties then yet again renegotiated the payment schedule in the Amended Agreement by extending the payment date deadlines, as set forth in the Surety Side Letter Agreements dated January 30, 2020 and March 30, 2020 (the "**Letter Agreements**").[5]

---

[4]  A true and correct copy of the Amended Agreement is attached hereto as Exhibit 4, the terms of which are incorporated herein by reference.

[5]  True and correct copies of the Letter Agreements are attached hereto as Exhibit 5, the terms of which are incorporated herein by reference.

Nonetheless, the Collateral Justice Companies and Beech Creek continued to breach their obligations under the Amended Agreement, even as further amended at the companies' request by the Letter Agreements.

22.     Accordingly, by letters dated September 25 and October 12, 2020 (the "**September 2020 Demand**" and the "**October 2020 Demand**," respectively), Lexon informed Justice, the Collateral Justice Companies, and Beech Creek that the companies were in default of their obligations to pay premiums and collateral and demanded payment under the Amended Agreement and/or the Guaranty.[6]  Under the terms of the Guaranty, Justice had three business days to pay the amounts due.  However, he did not make, nor to date has he made, any payments pursuant to the Guaranty.

23.     Notwithstanding these notices, which are not waived, Lexon sent Justice another notice of default effective July 24, 2023 demanding payment of all amounts owed under the Guaranty (the "**July 2023 Demand**").[7]  Under the terms of the Guaranty, Justice was obligated to pay Lexon the full amount by July 27, 2023, but he has not done so.

24.     Meanwhile, Lexon and BSIC remain saddled with the Justice Subsidiaries' obligations.  Currently, Lexon is adjusting 246 open claims made against the Justice Subsidiaries with a combined penal sum of $45 million.  Lexon expects an additional approximately $13.5 million in claims relating to reclamation of coal mines in Tennessee.

25.     In part due to its significant exposure via a penal sum that exceeds $100 million and in part due to their long-standing relationship, Lexon has gone to great lengths to seek a consensual resolution of this dispute, including executing not only the Original Guaranty with

---

[6] True and correct copies of the September 2020 Demand and October 2020 Demand are attached hereto as Exhibits 6 and 7, respectively, the terms of which are incorporated herein by reference.

[7] A true and correct copy of the July 2023 Demand is attached hereto as Exhibit 8, the terms of which are incorporated herein by reference.

Justice when companies he owns defaulted on their obligations to Lexon, but then by executing subsequent agreements with Justice, the Collateral Justice Companies and Beech Creek over a *five-year period* following their repeated failure to honor the terms of prior agreements. Justice's repeated breaches of his agreements with Lexon and ongoing failure to pay amounts due under the Guaranty make clear that he does not intend to honor his contractual commitments. Thus, Lexon has no choice but to bring this action to recover damages against Justice for his breach of the Guaranty.

## PARTIES

26. Lexon is a Texas corporation with its principal place of business in Mount Juliet, Tennessee. Lexon together with its affiliates comprise one of the top 10 sureties in the United States. Lexon and its affiliate BSIC issue, underwrite, and guarantee surety bonds for companies operating in a wide range of industries, including construction contractors and sub-contractors; home builders and developers; financial services companies; service companies with an emphasis on transportation, waste, and security; renewable energy as well as oil and gas companies; and hard rock mining and waste companies. Lexon is an indirectly wholly owned subsidiary of Sompo International, a global specialty provider of property and casualty insurance and reinsurance.

27. Justice is a citizen of West Virginia, who, upon information and belief, currently resides at 208 Dwyer Lane in Lewisburg, West Virginia. Justice is the current governor of the State of West Virginia. He, either directly or indirectly, owns, operates, and/or controls more than 100 companies engaged in coal mining, agriculture, real estate, and other industries. Justice and his companies own an extensive portfolio of coal properties, land, and related assets, including thousands of acres of farmland throughout West Virginia, Virginia, North Carolina, and South Carolina, as well as the historic Greenbrier resort in West Virginia.

9

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Lexon and Justice and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

29.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to Lexon's claims occurred within this District. Venue is also proper pursuant to Paragraph 10 of the Guaranty. (*See* Ex. 1 at ¶ 10.)

30.     This Court has personal jurisdiction over Justice because (i) he has consented to jurisdiction in the State of Tennessee with respect to any suit, action or proceeding relating to or in connection with the Guaranty (*see* Ex. 1 at ¶ 10), and (ii) pursuant to Tennessee's long-arm statute, Tenn. Code § 20-2-223(a)(1), because Lexon's claims and the relief it seeks in this action arise out of Justice's intentional acts of transacting business in Tennessee.

## FACTUAL BACKGROUND

**I.      Justice and the Justice Subsidiaries' History of Breaching Contractual Commitments and Disregarding Regulatory Requirements**

31.     It appears to be tantamount to a business practice for the Justice Subsidiaries and other companies owned by Justice not to honor their obligations. In addition to their conduct with respect to Lexon, Justice-owned companies appear regularly to disregard federal, state and local regulations in conducting business and fail to remedy regulatory violations, pay penalties or honor administrative determinations by state and federal regulatory agencies. To cite just a few examples, Kentucky agencies cited Southern Coal Corporation (a Collateral Justice Company) with 427 regulatory violations from 2012 to 2014, which were described by a Kentucky regulatory official as "among the most egregious we have seen in nearly a decade." In 2014, the company reached a settlement with the Kentucky Energy and Environment Cabinet (the "**Cabinet**") relating to these regulatory violations whereby it agreed to post additional surety bonds in the amount of

$10.5 million, and Jay Justice (Justice's son) provided a personal guaranty, assuring that the company would complete reclamation work, in order to reduce the fines imposed against the company from $4.5 million to $1.5 million.[8]  Additionally, the Justice Subsidiaries, particularly Kentucky Fuel Corporation (a Collateral Justice Company), have had to pay fines and civil penalties to the Cabinet due to their various and repeated failures to comply with applicable regulations on reclamation projects.

32.     Just two months ago, the United States Department of Justice (the "**DOJ**") filed a civil action against Jay Justice and certain of Justice's family-owned coal companies alleging that they failed to pay upward of $5 million in penalties assessed for over 130 violations of federal law.[9]  According to the DOJ's press release accompanying the filing, "the total amount of the penalties and [Abandoned Mine Land] fees, plus interest, penalties and administrative expenses, owed by [the Justice family's companies] is approximately $7.6 million."[10]

33.     Apart from reclamation activities, federal and state agencies also have imposed substantial fines and penalties against the Justice Subsidiaries for mine safety and environmental law violations.  For example, in 2016, Southern Coal Corporation and 26 affiliated companies entered into a consent decree with the U.S. Environmental Protection Agency (the "**EPA**") and several states stemming from the companies' 23,693 violations of the Clean Water Act (the "**CWA**") over the prior five years, largely related to pollution discharge into waterways, as well

---

[8]  Taylor Kuykendall, *Jim Justice settles with Ky. regulators over coal mine violations*, SNL DAILY COAL REPORT, Aug. 20, 2014.

[9]  Complaint, *United States v. A & G Coal Corp. et al.*, No. 7:23-cv-000318 (W.D. Va. May 31, 2023).

[10]  Press Release, *United States Files Civil Action to Collect Unpaid Civil Penalties and Reclamation Fee Debts: Complaint Names 13 Coal Companies Owned or Operated by James Justice III*, May 31, 2023, https://www.justice.gov/opa/pr/united-states-files-civil-action-collect-unpaid-civil-penalties-and-reclamation-fee-debts.

as the companies' failure to provide certain reports and information to regulatory agencies in Kentucky, Tennessee, Virginia, Alabama, and West Virginia pursuant to the National Pollutant Discharge Elimination System (the "**NPDES**").[11]  Recently, the Fourth Circuit Court of Appeals affirmed a district court's order granting a motion to compel compliance with the EPA consent decree in light of Southern Coal and another Justice Subsidiary defaulting on their obligations to maintain NPDES permits.  The court also upheld the lower court's order imposing fines against the companies in the amount of $2.5 million related to the CWA violations.[12]  In 2020, the DOJ and nearly two dozen coal companies owned by or affiliated with Justice settled the DOJ's lawsuit against them for failure to pay fines stemming from more than 2,000 violations of the Federal Mine Safety and Health Act.[13]  Prior to the settlement, NPR reported that Justice's companies had amassed "the highest delinquent mine safety debt in the U.S. mining industry."[14]

34.  It also appears that Justice and his companies habitually breach their contractual obligations to private parties, not just government agencies.  Investigative news outlet *ProPublica* reported in 2020 that Justice and his companies had been involved in over 600 lawsuits in which the plaintiffs alleged nonpayment of various contractual obligations.  Those suits reportedly resulted in judgments or settlements of approximately $128 million.[15]

---

[11] Bill Estep, *Jim Justice company agrees to pay $900K fine, spend $5M on pollution control*, THE LEXINGTON HERALD LEADER, Sept. 30, 2016; *see also United States v. S. Coal Corp.*, 64 F.4th 509, 512 (4th Cir. 2023).

[12] *See generally*, *S. Coal Corp.*, 64 F.4th 509.

[13] Jeff Sturgeon, *Coal mine operator, feds reach settlement; Justice coal companies, feds reach settlement over safety violations*, THE ROANOKE TIMES, Apr. 2, 2020.

[14] Alexandra Kanik and Brittany Patterson, *W.Va. Governor's Family Owes Millions In Mining Violations, Despite Promises To Pay*, NPR, Apr. 10, 2019, https://www.npr.org/2019/04/10/711361672/governor-and-his-family-owe-millions-in-mining-violations-despite-promises-to-pa.

[15] Ken Ward, Jr., *The Billionaire Governor Who's Been Sued Dozens of Times for Millions in Unpaid Bills*, PROPUBLICA, May 27, 2020, https://www.propublica.org/article/the-billionaire-

## II. Justice Breaches His Promise to Lexon to Pay Delinquent Premium and Collateral Balances

35.     In or around 2016, faced with mounting judgments, fines, and other costs associated with reclamation or coal mine operation activities, Justice's or his companies' representatives told Lexon that the Justice Subsidiaries were experiencing financial difficulties and would not pay amounts due to Lexon.

36.     As the surety that ultimately was responsible (subject to the bonds' terms) for the Justice Subsidiaries' obligations relating to the Surety Bonds, Lexon discussed with Justice's representatives an arrangement that sought to facilitate the Justice Subsidiaries' ability to perform their bonded obligations.  Accordingly, Lexon and the Justice Subsidiaries worked out an arrangement whereby the Justice Subsidiaries would submit a monthly statement of expenses specifically related to projects secured by the Surety Bonds, and Lexon agreed to release collateral in the amount of those expenses.  Throughout 2016 and 2017, Lexon released nearly 25 tranches of collateral, amounting to more than $13 million, with the expectation—formed based on Justice's or his companies' representatives' assurances—that the funds would be used to pay the identified costs.  On information and belief, Justice and the Justice Subsidiaries often did not in fact use collateral released by Lexon to fund the identified expenses on projects covered by the Surety Bonds, which not only was contrary to the statements by Justice and his representatives, but also undermined the premise of this arrangement.

37.     By March 2018, the Justice Subsidiaries' collateral balance had dwindled to approximately $4.43 million, down nearly 75% since Lexon began its business relationship with Justice and the Justice Subsidiaries.  Meanwhile, by that time, the Justice Subsidiaries' overdue

governor-whos-been-sued-dozens-of-times-for-millions-in-unpaid-bills; Ken Ward, Jr., *See Who's Taken Gov. Jim Justice to Court Over Unpaid Bills*, PROPUBLICA, May 27, 2020, https://www.propublica.org/article/see-whos-taken-billionaire-gov-jim-justice-to-court-over-unpaid-bills.

premiums amounted to approximately $3 million on over 600 bonds. As Lexon's gross exposure in the form of the overall penal sum associated with Justice-related bonds grew over time, the delinquent premium and collateral balances also continued to increase.

38.     Around this time, Justice approached Lexon with a request that it release the collateral it still retained at that point because, Justice again represented, the Justice Subsidiaries supposedly needed the funds for their operations and to perform bonded obligations. Justice made this request, which Lexon had no obligation to satisfy, at a time when his companies were two years in arrears on contractual obligations to Lexon.

39.     Rather than declaring a default, in order to help facilitate the Justice Subsidiaries' performance of obligations secured by the Surety Bonds, Lexon attempted to reach a more formal, negotiated arrangement whereby the Justice Subsidiaries would bring their delinquent premium and collateral balances current over time, thereby helping those companies conserve financial resources that could be used to perform their obligations secured by the Surety Bonds.

40.     Accordingly, Lexon, Justice, the Collateral Justice Companies, and Beech Creek entered into the Agreement dated as of March 26, 2018 (the "**Effective Date**").

41.     The Agreement addressed four primary aspects of the parties' relationships by: (i) requiring Lexon to release collateral it was holding; (ii) extending or setting deadlines for payment of new collateral to Lexon; (iii) extending or setting deadlines for payment of outstanding premiums owed to Lexon; and (iv) requiring Justice to guarantee the Collateral Justice Companies' and Beech Creek's obligations with respect to (ii) and (iii) above.

42.     In particular, upon execution of the Agreement, Lexon committed to "diligently pursue the liquidation/release of the Collateral," which had a value of approximately $4.43 million, "and deliver the Collateral to the respective Collateral Justice Companies." (*See* Ex. 3 ¶ 1.)

43.     For their part, the Collateral Justice Companies agreed in "substitution for the Collateral released," to "post new collateral with [a] value of $5,000,000.00 by providing Lexon with an Irrevocable Letter of Credit" or other form of collateral acceptable to Lexon in its sole discretion (the "**New Collateral**").  (*See* Ex. 3 ¶ 2.)

44.     If the total amount of New Collateral was not provided to Lexon within six (6) months of the Effective Date (*i.e.*, by September 26, 2018), the Collateral Justice Companies were required *immediately*, without demand or notice from Lexon, to pay Lexon $5 million in cash or its equivalent, to be held by Lexon as collateral, less the amount of any New Collateral that had been provided by the Collateral Justice Companies, if any, prior to September 26, 2018 (the "**New Collateral Shortfall**").  (*See* Ex. 3 ¶ 2.)

45.     With respect to outstanding premiums owed in the amount of approximately $3 million (the "**Indebtedness**"), the Agreement provided that upon execution, title and ownership of certain construction equipment owned by Beech Creek, which Beech Creek represented had an "approximate value . . . equal to the amount of the Indebtedness," was to be transferred to Lexon. (*See* Ex. 3 ¶ 3.)  The Agreement contemplated that Beech Creek would market the equipment for sale, with the proceeds being paid to Lexon.  The Collateral Justice Companies agreed that if the Indebtedness was not paid in full within two (2) months of the Effective Date, or by May 26, 2018, then the Collateral Justice Companies would pay the balance owed to Lexon within five business days.  (*See* Ex. 3 ¶ 3(d).)

46.     Finally, the Agreement required, upon its execution and "as a condition precedent to any and all obligations of Lexon under this Agreement," that Justice execute and deliver the Original Guaranty.   (*See* Ex. 3 ¶ 4.)   Under the Original Guaranty, Justice "absolutely, unconditionally and irrevocably" guaranteed "as primary obligor" the Collateral Justice Companies' obligations under the Agreement with respect to payment of the New Collateral and

New Collateral Shortfall and the Collateral Justice Companies' and Beech Creek's obligations under the Agreement with respect to the Indebtedness. Justice also agreed to pay "all costs, expenses and fees (including the reasonable fees and expenses of [Lexon's] counsel) in any way relating to the enforcement or protection of [Lexon's] rights hereunder." (*See* Ex. 2 ¶ 1.)

47. Consistent with the unconditional and absolute nature of Justice's obligation, the Original Guaranty provided that if the Collateral Justice Companies failed to pay all or any part of the New Collateral Shortfall by the deadline of September 26, 2018, then Justice, within three days of receipt of Lexon's written demand, promised to pay Lexon the entire amount of the New Collateral Shortfall. (*See* Ex. 2 ¶ 1(a).) Likewise, if Beech Creek failed to pay all or any part of the Indebtedness within five business days after May 26, 2018, then Justice, within three days of receipt of Lexon's written demand, promised to pay the Indebtedness outstanding. (*See* Ex. 2 ¶ 1(b).)

48. Incredibly, Justice and the other Justice-related parties to the Agreement breached almost immediately. The Collateral Justice Companies failed to provide Lexon with the New Collateral and the New Collateral Shortfall by September 26, 2018, as they were obligated to do under the Agreement, and Beech Creek failed to satisfy its Indebtedness obligation by the contractual deadline.

49. Justice, the Collateral Justice Companies, and Beech Creek have still not paid the balance of their contractual obligations, even following Lexon's demands that they do so.

50. Justice's failure to pay amounts due to and demanded by Lexon under the Original Guaranty constituted a material breach of the Original Guaranty. Despite Justice's agreement to satisfy the Collateral Justice Companies' payment obligations for the New Collateral and New Collateral Shortfall and the Collateral Justice Companies' and Beech Creek's obligations to pay the Indebtedness under the Original Agreement, Justice never made any such payments to Lexon.

16

## III. Justice Again Promises to Pay Lexon Outstanding Amounts Owed under the Bonds

51. Notwithstanding that Justice was in breach of the Original Guaranty, approximately one year after entering into the Agreement and Original Guaranty, he or his representatives requested that Lexon issue new bonds with a penal sum of $3.5 million to Kentucky Fuel Corporation, A&G Coal Corporation, and Infinity Energy, Inc. (the "**New Kentucky Bonds**") as principals, with the Commonwealth of Kentucky as obligee. On February 4, 2019, Lexon entered into the Amended Agreement with Justice, the Collateral Justice Companies and Beech Creek. As part of that Amended Agreement, Lexon agreed to issue the New Kentucky Bonds.

52. In the Recitals to the Amended Agreement, Justice, the Collateral Justice Companies, and Beech Creek admitted their multiple breaches of the Agreement and Justice's breach of the Original Guaranty: (1) More than $1,025,000 of the Indebtedness remained unpaid by Beech Creek (the "**Remaining Indebtedness**"); (2) The "Collateral Justice Companies failed to provide New Collateral to Lexon under the terms of the Agreement;" (3) "[A]s of February 4, 2019, the Remaining Indebtedness and New Collateral remained unpaid in breach of the Agreement;" (4) Justice had entered into the Original Guaranty, pursuant to which he personally guaranteed "payment of the Indebtedness and the New Collateral," which remained unpaid; and (5) Justice "has breached the terms of the [Original] Guaranty." (*See* Ex. 4 at 1–2.)

53. Pursuant to the Amended Agreement, the Collateral Justice Companies and Beech Creek, jointly and severally, agreed to deliver to Lexon new collateral in the sum of $20 million (the "**Amended New Collateral**"), through monthly installment payments of $250,000 to begin on February 28, 2019 (each a "**Collateral Payment**") and ending when Lexon received the full sum of the Amended New Collateral. (*See* Ex. 4 at 2–3.)

54. However, at that payment schedule, it would take years before the Collateral Justice Companies paid the $20 million owed to Lexon. Moreover, the Collateral Justice Companies and

Beech Creek "represent[ed] to Lexon" in the Amended Agreement that "they are in the process of selling certain entities (the 'Liquidity Event')." (*See* Ex. 4 at 3.) The Amended Agreement provided that the full $20 million would be paid upon consummation of a transaction: "Upon the closing of the Liquidity Event, the Collateral Justice Companies and Beech Creek shall . . . make a direct payment to Lexon from the sale proceeds in an amount equal to Twenty Million U.S. dollars ($20,000,000.00) less any Collateral Payments previously made, including any partial Collateral Payments." (*See* Ex. 4 at 3.)

55. Recognizing, however, that the Liquidity Event had not yet occurred, Lexon required, and the Collateral Justice Companies and Beech Creek agreed, jointly and severally, to make lump sum payments (an "**Additional Collateral Payment**") toward the $20 million Amended New Collateral payment obligation on specified dates. In particular, to the extent the Amended New Collateral had not been paid by (1) September 30, 2019, the Collateral Justice Companies and Beech Creek agreed to pay Lexon $5 million less any Collateral Payments previously made; (2) March 31, 2020, the Collateral Justice Companies and Beech Creek agreed to pay Lexon $10 million less any Collateral Payments previously made; (3) September 30, 2020, the Collateral Justice Companies and Beech Creek agreed to pay Lexon $15 million less any Collateral Payments previously made; and (4) March 31, 2021, the Collateral Justice Companies and Beech Creek agreed to pay Lexon $20 million less any Collateral Payments previously made. (*See* Ex. 4 at 3–5.)

56. The Amended Agreement also addressed the ongoing failure to pay Lexon premiums owed. Under the Amended Agreement, the Collateral Justice Companies and Beech Creek, jointly and severally, agreed to pay Lexon an amount equal to $3,538,400.75 (the "**Total Indebtedness**"). (*See* Ex. 4 at 5.) The Collateral Justice Companies and Beech Creek agreed to make monthly payments of $200,000 toward satisfaction of the Total Indebtedness, beginning

February 28, 2019 (the "**Premium Payments**").  (*See* Ex. 4 at 5.)  Beech Creek also agreed to attempt to sell the same equipment that was transferred to Lexon's ownership pursuant to the Agreement, with the proceeds to be used to reduce the Total Indebtedness.  (*See* Ex. 4 at 6.)

57.     The parties also recognized that "additional amounts for premium may become due during the term" of the Amended Agreement, and those amounts were to be added to the Total Indebtedness and subject to the payment obligations set forth in the Amended Agreement.  (*See* Ex. 4 at 6–7.)  The parties further agreed that in "the event Lexon does not receive the payments described in . . . the [Amended] Agreement as required herein, such failure shall constitute a material breach of this Agreement and Lexon may exercise any and all rights it may have under the law, the Agreement (including any amendments thereto) and the Guaranty."  (*See* Ex. 4 at 7.)

58.     As with the Agreement, Lexon required Justice to personally guarantee the obligations of the Collateral Justice Companies and Beech Creek under the Amended Agreement regarding premium and collateral payment obligations.  (*See* Ex. 4 at 5, 7, 8.)

59.     Consistent therewith, Justice and Lexon entered into the Guaranty, which again was a condition precedent to Lexon's obligations under the Amended Agreement, and Justice represented in the Guaranty's Recitals that he "understands and acknowledges that [Lexon] has agreed to enter the Amended Underlying Agreement in reliance upon this Guaranty."  (*See* Ex. 1 at 2.)

60.     The scope of Justice's obligations under the Guaranty were once again absolute and unconditional.  Specifically, Paragraph 1 of the Guaranty provided that Justice "hereby absolutely, unconditionally and irrevocably guarantees to [Lexon], and its successors and assigns, as primary obligor and not merely as surety, the full and punctual payment and performance of each of the" collateral and premium payment obligations under the Amended Agreement, "plus all costs,

expenses and fees (including the reasonable fees and expenses of [Lexon]'s counsel) in any way relating to the enforcement or protection of [Lexon]'s rights hereunder." (Ex. 1 ¶ 1.)[16]

61.     Justice further agreed that his obligations under the Guaranty were "irrevocable, continuing, absolute and unconditional" and he "irrevocably waive[d] any defenses to enforcement he may have (now or in the future) or rights of recourse against [Lexon] . . . ." (*See* Ex. 1 ¶ 3.)

62.     In the event the Collateral Justice Companies or Beech Creek failed to pay all or any part of the Amended New Collateral to Lexon immediately when due under the Amended Agreement, then Justice, within three days of receipt of Lexon's written demand, personally guaranteed and agreed to pay Lexon the entire unpaid amount of that obligation "as if such amount constituted the direct and primary obligation of Guarantor." (*See* Ex. 1 ¶ 1(a).)

63.     Similarly, if the Collateral Justice Companies or Beech Creek failed to pay to Lexon all or any part of the Total Indebtedness immediately when due under the Amended Agreement, then Justice, within three days of receipt of Lexon's written demand, personally guaranteed and agreed to pay Lexon the entire unpaid amount of that separate obligation "as if such amount constituted the direct and primary obligation of Guarantor." (*See* Ex. 1 ¶ 1(b).)

64.     Justice acknowledged that the Guaranty was a "guarantee of payment and performance and not of collection" (*see* Ex. 1 ¶ 5(c)), and that Lexon was not "required, prior to any such demand upon or payment by Guarantor," to pursue, enforce or "exhaust any of its rights or remedies" against the Collateral Justice Companies or Beech Creek for payment of the collateral and premium obligations. (*See* Ex. 1 ¶¶ 1(a) and (b), 5(b) and (c).) Rather, the Guaranty expressly

---

[16] For purposes of the Guaranty, Justice's obligations with respect to payment of Amended New Collateral are defined as the "**New Collateral Replenishment Obligation**" and his obligations with respect to payment of Total Indebtedness are defined as the "**New Indebtedness Payment Obligation**." The New Collateral Replenishment Obligation and New Indebtedness Payment Obligation are defined collectively as the "**Obligations**." (*See* Ex. 1 at 1–2.)

provided (i) that it "is a direct guaranty and independent" of the Collateral Justice Companies' and Beech Creek's obligations; and, (ii) that Lexon had the right to proceed against Justice whether or not it proceeded against the Collateral Justice Companies and/or Beech Creek, and Lexon could do so without having first obtained a judgment against those entities. (*See* Ex. 1 ¶ 5(d).)

65.     Justice further acknowledged and agreed that the Guaranty "is continuing in nature and applies until the complete, irrevocable and indefeasible payment and satisfaction in full of all of the" Collateral Justice Companies' and Beech Creek's obligations under the Amended Agreement. (*See* Ex. 1 ¶ 5(a).)  Under the Amended Agreement, Total Indebtedness "shall be increased" as additional premiums become due under the Amended Agreement. (Ex. 4 at 6–7.)

66.     Once again, with the exceptions of the written demand by Lexon for payment from Justice contemplated by Paragraphs 1(a) and 1(b) of the Guaranty, Justice waived any right to require Lexon "to make or give any presentment, protest, demand, or notice of any kind, including notice of any nonpayment or nonperformance of any or all of the" obligations under the Amended Agreement. (*See* Ex. 1 ¶ (5(b).)

67.     The Guaranty further provided the following:

> No waiver, modification, extension, forbearance or delay on the part of [Lexon] with respect to any Obligation or collateral and no act or thing which might, but for this provision of this Guaranty, be deemed as a legal or equitable discharge of a surety, shall operate to release the obligations of Guarantor under this Guaranty, and no delay on the part of [Lexon] in exercising any of its options, powers or rights hereunder, or a partial or single exercise thereof, shall constitute a waiver of any other rights of [Lexon] under this Guaranty.

(Ex. 1 ¶ 5(h).)  A similar provision was contained in the "No Waiver" Paragraph of the Guaranty. (*See* Ex. 1 ¶ 13.)

68.     The Guaranty also included an indemnification provision, which provided:

The Guarantor shall, upon demand from [Lexon], ***promptly indemnify, exonerate, reimburse and hold [Lexon] harmless from and against any and all liability, damage, cost and expense of whatsoever kind or nature*** (cumulatively, "Loss") and pay [Lexon] for any Loss sustained or incurred (i) in connection with or arising out of any of [Lexon's] obligations under the Amended Underlying Agreement or any GAI, (ii) ***by reason of the failure of the Guarantor to perform or comply with the covenants and conditions of this Guaranty***, and (iii) **enforcing any of the covenants and conditions of this Agreement**. An itemized statement of Loss by [Lexon], sworn to by an officer of [Lexon], shall be prima facie evidence of the fact and amount of the liability of the Guarantor to [Lexon]. [Lexon] shall be entitled to receive interest at the rate of six percent per annum from the date of its payment of each Loss.

(Ex. 1 ¶ 2 (emphases added).)

69.     The indemnification provision, as well as Paragraph 1 of the Guaranty, clearly and unequivocally afford Lexon the right to indemnification for and recovery of "any and all" costs, fees, and other expenses—including attorneys' fees—incurred as a result of Justice's, the Collateral Justice Companies', and Beech Creek's failure to perform obligations under the Agreement, Amended Agreement, Original Guaranty, and Guaranty, including but not limited to costs and fees arising out of this lawsuit.

**IV.     Justice Materially Breaches the Guaranty**

70.     Lexon immediately performed its obligations by issuing $3.5 million in new surety bonds—the New Kentucky Bonds.  True to form, however, within weeks of signing the Amended Agreement, the Collateral Justice Companies and Beech Creek breached the contract.  The Collateral Justice Companies and Beech Creek informed Lexon that they would not make the Additional Collateral Payment or the Premium Payment due on February 28, 2019, as required under the Amended Agreement.

71.     Rather than declare a default and commence litigation, Lexon yet again attempted to find a consensual resolution to the ongoing non-payment problem and resulting continuing

breaches of the Amended Agreement and Guaranty. To that end, Lexon agreed to allow the Collateral Justice Companies and Beech Creek more time to pay additional collateral by executing the Letter Agreements.

72.     Importantly, the Letter Agreements *did not* "amend[] or waive[] . . . any of the rights and obligations of James C. Justice II and Lexon under the [Guaranty]," or "otherwise modify the duties and obligations of [the] Collateral Justice Companies, Beech Creek and James C. Justice II or Lexon's rights[.]" The Letter Agreements also did not "constitute a waiver of any of the rights and obligations of the Parties" under the Amended Agreement or the Guaranty. (*See* Ex. 5.)

73.     Despite Lexon's multiple attempts to work with the Collateral Justice Companies and Beech Creek to allow additional time to pay outstanding collateral and premium balances, those companies and Justice did not satisfy their payment obligations under the Amended Agreement or the Letter Agreements.

74.     Thus, approximately two and a half years after the parties executed the Agreement and Original Guaranty, Lexon sent the September and October 2020 Demands. None of the Collateral Justice Companies, Beech Creek, or Justice made the required payments in response to the September and October 2020 Demands.

75.     Lexon sent to Justice the July 2023 Demand in connection with the Collateral Justice Companies' and Beech Creek's failures to (i) pay Lexon $20 million in additional collateral and (ii) make premium payments to satisfy the $6,724,138.66 in outstanding Total Indebtedness as of June 30, 2023—which continues to accrue—as specified in the Amended Agreement. Lexon demanded that Justice pay these amounts, plus Lexon's "costs, expenses and fees (including the reasonable fees and expenses of [Lexon's] counsel)" incurred in connection with enforcing the terms of the Guaranty, as well as interest on all amounts owed.

76.     Under the Guaranty, Justice was required to pay the amounts demanded in the July 2023 Demand within three business days.

77.     To date, Justice has not made any payments to Lexon in response to the July 2023 Demand, in material breach of the Guaranty.

## COUNT I
### (BREACH OF CONTRACT – COLLATERAL AND PREMIUM OBLIGATIONS)

78.     Lexon incorporates and re-alleges each of the preceding paragraphs of the Complaint as if fully set forth herein.

79.     The Guaranty is a valid, binding and enforceable contract.

80.     Under the Guaranty, Justice "absolutely, unconditionally and irrevocably guarantee[d] . . . the full and punctual payment and performance of each of" the Collateral Justice Companies' and Beech Creek's collateral and premium obligations under the Amended Agreement.

81.     The Guaranty further provides that if the Collateral Justice Companies and/or Beech Creek fail to pay any or all of their collateral and premium obligations under the Amended Agreement, Justice shall, within three business days of Justice's receipt of Lexon's written demand, pay to Lexon the entire amount outstanding of those obligations.

82.     On September 25, 2020, Lexon sent the September 2020 Demand for payment by Justice of the outstanding premiums due no later than September 30, 2020, pursuant to Paragraph 1(a) of the Guaranty.

83.     On October 12, 2020, Lexon sent the October 2020 Demand for payment by Justice of the outstanding collateral due no later than October 15, 2020, pursuant to Paragraph 1(a) of the Guaranty.

84.     Justice never made any payments in response to the September and October 2020 Demands in material breach of the Guaranty.

85.     Lexon sent to Justice the July 2023 Demand notifying him of the material defaults by the Collateral Justice Companies and Beech Creek in failing to satisfy their collateral and premium obligations under the Amended Agreement, and demanding that Justice pay the entire amount outstanding of those obligations, and reserving all rights concerning, among other things, Lexon's entitlement to reasonable attorneys' fees incurred in connection with enforcing the Guaranty.  (*See* Ex. 8.)

86.     Justice materially breached the Guaranty by, among other things, failing to make the foregoing payments within three days of receipt of the July 2023 Demand, or by July 27, 2023. Justice has yet to make any payment under the Guaranty in response to the July 2023 Demand.

87.     As a direct and proximate result of Justice's material breach of the Guaranty, Lexon has suffered and will continue to suffer damages.

## COUNT II
## (BREACH OF CONTRACT – ATTORNEYS' FEES AND OTHER ENFORCEMENT-RELATED COSTS)

88.     Lexon incorporates and re-alleges each of the preceding paragraphs of the Complaint as if fully set forth herein.

89.     The Guaranty is a valid, binding and enforceable contract.

90.     Under the Guaranty, Justice "absolutely, unconditionally and irrevocably guarantee[d] . . . the full and punctual payment and performance of each of" the Collateral Justice Companies' and Beech Creek's collateral and premium obligations under the Amended Agreement "*plus* all costs, expenses and fees (including the reasonable fees and expenses of [Lexon's]

counsel) in any way relating to the enforcement or protection of [Lexon's] rights [under the Guaranty]" (emphasis added).

91.    Lexon has incurred and continues to incur costs, expenses, and fees, including attorney's fees, as a result of Justice's material breach of the Guaranty, including his failure to ensure "the full and punctual payment and performance of each of" the Collateral Justice Companies' and Beech Creek's collateral and premium obligations under the Amended Agreement.

92.    As a direct and proximate result of Justice's material breach of the Guaranty, Lexon has suffered and will continue to suffer damages, including having incurred and continuing to incur the costs, fees and expenses referred to herein.

<u>**COUNT III**</u>
<u>**(DECLARATORY JUDGMENT – INDEMNIFICATION)**</u>

93.    Lexon incorporates and re-alleges each of the preceding paragraphs of the Complaint as if fully set forth herein.

94.    The Guaranty is a valid, binding and enforceable contract.

95.    Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, Lexon requests that the Court enter an order declaring its rights with respect to the Guaranty's indemnification provision.  (*See* Ex. 1 ¶ 2.)

96.    Under the Guaranty's indemnification provision, Justice shall "promptly indemnify, exonerate, reimburse and hold [Lexon] harmless from and against any and all liability, damage, cost and expense of whatsoever kind or nature (cumulatively, 'Loss') and pay [Lexon] for any Loss sustained or incurred (i) in connection with or arising out of any of [Lexon's] obligations under the Amended Underlying Agreement or any GIA, (ii) by reason of the failure of

[Justice] to perform or comply with the covenants and conditions of this Guaranty, and (iii) enforcing any of the covenants and conditions of this Agreement."

97.     Justice materially breached the Guaranty by, among other things, failing to ensure "the full and punctual payment and performance of each of" the Collateral Justice Companies' and Beech Creek's collateral and premium obligations under the Amended Agreement and failing to make payment within three days of Justice's receipt of the September 2020, October 2020, and July 2023 Demands.

98.     As a result of Justice's material breaches of the Guaranty, Lexon has incurred and continues to incur costs, expenses, and fees, including in connection with this action.

99.     Justice disputes that he "currently owes Lexon[] anything," including indemnification, under the Guaranty.

100.     An actual and justiciable controversy has arisen and presently exists concerning Lexon's rights and Justice's obligations under the Guaranty's indemnification provision.

101.     Accordingly, the Court should declare that Lexon is entitled to recover its Loss sustained or incurred "[(i)] by reason of the failure of [Justice] to perform or comply with the covenants and conditions of this Guaranty, and [(ii)] enforcing any of the covenants and conditions of this Agreement," and that Lexon is entitled to "interest at the rate of six percent per annum from the date of its payment of each Loss."

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Lexon Insurance Company respectfully requests relief and judgment as follows:

A.     Awarding Lexon compensatory damages in amounts to be determined at trial;

B.      Awarding Lexon the costs, expenses and fees (including the reasonable fees and expenses of its counsel) that it has incurred and continues to incur in any way relating to the enforcement or protection of its rights under the Guaranty;

C.      Awarding Lexon pre- and post-judgment interest;

D.      Declaring, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, that Lexon is entitled to indemnification for any Loss sustained or incurred: (i) by reason of the failure of Justice to perform or comply with the covenants and conditions of the Guaranty, and (ii) enforcing any of the covenants and conditions of the Guaranty, plus interest from the date of payment of each such Loss at the rate of six percent per annum; and

E.      Granting any such other and further relief as the Court may deem just and proper.


Dated:  July 28, 2023


                              BASS, BERRY & SIMS PLC


                              By: */s/ Overton Thompson III*
                              Overton Thompson III (BPR# 011163)
                              W. Brantley Phillips, Jr. (BPR# 018844)
                              Garrah Carter-Mason (BPR# 037518)
                              150 Third Avenue South
                              Suite 2800
                              Nashville, TN 37201
                              Tel:  (615) 742-6200
                              Fax:  (615) 742-6293
                              othompson@bassberry.com
                              bphillips@bassberry.com
                              garrah.cartermason@bassberry.com

CADWALADER, WICKERSHAM & TAFT LLP

Jason M. Halper*
Sara E. Bussiere*
200 Liberty Street
New York, NY 10281
Tel.:  (212) 504-6000
Fax:  (212) 504-6666
jason.halper@cwt.com
sara.bussiere@cwt.com

*Attorneys for Plaintiff*

*\*Pro hac vice motion forthcoming*