UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **LEXON INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:23-cv-00772** |
| | ) | |
| **JAMES C. JUSTICE II,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**<u>MEMORANDUM OPINION</u>**

Plaintiff Lexon Insurance Company ("Lexon") brings breach of contract and declaratory judgment claims against Defendant James C. Justice II ("Governor Justice") for Governor Justice's failure to comply with his guaranty obligations. Now before the Court is Lexon's Motion for Summary Judgment (Doc. No. 52), which has been fully briefed and is ripe for review (see Doc. Nos. 52–54, 58, 61, 63, 66, 67). For the following reasons, Lexon's motion will be granted in part and denied in part.

**I.     BACKGROUND[1] AND UNDISPUTED FACTS[2]**

Lexon is an issuer of surety bonds. (Doc. No. 56 ¶ 2). It issues bonds to a principal to secure obligations that the principal owes to an oblige. (Id. ¶ 3). In exchange for issuing the bond,

---

[1] The parties, in arguing over various issues relating to the multiple agreements between them, lose sight of the fact that only one contract is at issue here—the Amended & Restated Limited Commercial Guaranty. (See Doc. No. 55-1; see also Doc. No. 1 ¶¶ 79, 89, 94 (asserting the Guaranty as the only contract at issue in all three claims)). Accordingly, the Court will primarily discuss the facts as pertaining to the Guaranty.

[2] The undisputed facts in this section are drawn from the undisputed portions of the parties' statements of facts (Doc. No. 58), the exhibits and depositions submitted in connection with the summary judgment briefing, and portions of the Complaint (Doc. No. 1) that are not contradicted by the evidence in the record.

the principal pays Lexon premiums and signs an indemnity agreement. (Id. ¶ 4). Lexon may also require a principal to deposit cash collateral if there is a large risk of exposure, or if there is concern about financial viability of the principal or the ability of the principal to perform the obligations. (Id. ¶ 5). Lexon has issued hundreds of these surety bonds on behalf of companies owned by Governor Justice. (Id. ¶¶ 9, 12–13).

On March 26, 2018, the parties and James C. Justice Companies, Inc., Southern Coal Corporation, Kentucky Fuel Corporation, Justice Family Group, LLC, and Mechel Bluestone, Inc. (collectively, "Collateral Justice Companies"), Beech Creek Coal Corp. ("Beech Creek") (collectively, with the Collateral Justice Companies, "Obligors") entered into an agreement ("Agreement"). (Doc. No. 58 ¶ 1; Doc. No. 58-3). At the time the parties executed the Agreement, the Obligors owed three million dollars of premium to Lexon. (Doc. No. 55-3 at 2). The Agreement provides for terms under which the Obligors were to pay Lexon for various obligations. (Id. at 3). The Agreement further provides: "as a condition precedent to any and all obligations of Lexon under this Agreement, [Governor Justice] shall execute and deliver a Guaranty" requiring Governor Justice to pay the Obligors' obligations in the event they default on them. (Id. at 5; Doc. No. 58 ¶ 2).

Governor Justice and Lexon executed that guaranty the same day, entitled Limited Commercial Guaranty ("Original Guaranty"), "in favor and for the benefit of Lexon[.]" (Doc. No. 58 ¶ 3). The Original Guaranty provides, in relevant part:

1. <u>Guaranty.</u>  Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Beneficiary, and its successors and assigns, as primary obligor and not merely as surety, the full and punctual payment and performance of each of the Collateral Replenishment Obligation, the Collateral Shortfall Payment Obligation and the Indebtedness Payment Obligation (collectively, the "Obligations"), plus all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder.

2

2. <u>Guaranty Absolute and Unconditional.</u>  Guarantor agrees that his obligations under this Guaranty are irrevocable, continuing, absolute and unconditional and shall not be discharged or impaired or otherwise affected by, and Guarantor hereby irrevocably waives any defenses to enforcement he may have (now or in the future) or rights of recourse against Beneficiary by reason of (i) any change in the time, place or manner of payment or performance of, or in any other term of any or all of the Obligations, or any rescission, waiver, release; assignment, amendment or other modification of the Underlying Agreement, (ii) any delay or failure of or forbearance by Beneficiary in asserting any claim or demand or in exercising or enforcing any right or remedy, whether by action, inaction or omission, under the Underlying Agreement or otherwise or (iii) any action Beneficiary may take or omit to take under the powers set forth below. Beneficiary may deal with Collateral Obligor and/or Indebtedness Obligor in the same manner as if this Guaranty did not exist without affecting or impairing Guarantor's obligations under this Guaranty.

(Doc. No. 55-2 ¶¶ 1, 2).

Lexon, Governor Justice, and the Obligors entered into the Amendment No. 1 to Agreement Dated March 26, 2018 ("Amended Agreement") on February 4, 2019.  (Doc. No. 55-4 ¶ 4).[3]  The Amended Agreement provides for a revised payment plan between Lexon and the Obligors pertaining to the Obligors' obligations.  (Doc. No. 55-4).  As with the Agreement, the Amended Agreement provides that "as a condition precedent to any and all obligations of Lexon under this Agreement, [Governor Justice] shall execute and deliver the form of Guaranty" in the event the Obligors defaulted.  (<u>Id.</u> ¶ 10).  On February 4, 2019, Governor Justice executed the Amended & Restated Limited Commercial Guaranty ("Guaranty"), again "in favor and for the benefit of [Lexon] and its affiliates and subsidiaries."  (<u>Id.</u> ¶ 11).  The Guaranty provides similar language to the Original Guaranty, in relevant part:

1. <u>Guaranty</u>. Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Beneficiary, and its successors and assigns, as primary obligor

---

[3] Some of the contracts at issue, including the Amended Agreement, repeat paragraph numbers. For the purposes of the Court's decision, in such circumstances, the Court will refer to the page number, followed by the corresponding paragraph number, when citing to the relevant contract provision.

3

and not merely as surety, the full and punctual payment and performance of each of the New Collateral Replenishment Obligation and the New Indebtedness Payment Obligation (collectively, the "Obligations"), plus all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder.

(a) <u>In case Collateral Obligor and Indebtedness Obligor shall fail to pay all or any part of the New Collateral Replenishment Obligation to Beneficiary immediately when due as provided in the Amended Underlying Agreement, Guarantor shall, within three (3) business days of Guarantor's receipt of Beneficiary's written demand therefor, pay to Beneficiary the entire amount of the New Collateral Replenishment Obligation unpaid by Collateral Obligor and Indebtedness Obligor</u>, in like manner as if such amount constituted the direct and primary obligation of Guarantor. Beneficiary shall not be required, prior to any such demand upon or payment by Guarantor, to make any demand upon or to pursue or exhaust any of its rights or remedies against Collateral Obligor, Indebtedness Obligor, or any other guarantors with respect to the payment or performance of the New Collateral Replenishment Obligation;

(b) <u>In case Collateral Obligor and Indebtedness Obligor shall fail to pay all or any part of the New Indebtedness Payment Obligation to Beneficiary immediately when due as provided in the Amended Underlying Agreement, Guarantor shall, within three (3) business days of Guarantor's receipt of Beneficiary's written demand therefor, pay to Beneficiary the entire amount of the New Indebtedness Payment Obligation unpaid by Collateral Obligor and Indebtedness Obligor</u>, in like manner as if such amount constituted the direct and primary obligation of Guarantor. Beneficiary shall not be required, prior to any such demand upon or payment by Guarantor, to make any demand upon or to pursue or exhaust any of its rights or remedies against Collateral Obligor, Indebtedness Obligor, or any other guarantors with respect to the payment or performance of the New Indebtedness Payment Obligation[.]

3. <u>Guaranty Absolute and Unconditional</u>. <u>Guarantor agrees that his obligations under this Guaranty are irrevocable, continuing, absolute and unconditional and shall not be discharged or impaired or otherwise affected by, and Guarantor hereby irrevocably waives any defenses to enforcement he may have (now or in the future) or rights of recourse against Beneficiary by reason of</u> (i) any change in the time, place or manner of payment or performance of, or in any other term of any or all of the Obligations, or any rescission, waiver, release, assignment, amendment or <u>other modification of the Amended Underlying Agreement</u>, (ii) any delay or failure of or forbearance by Beneficiary in asserting any claim or demand or in exercising or enforcing any right or remedy, whether by action, inaction or omission, under the

Amended Underlying Agreement, any GAI or otherwise, or (iii) <u>any action</u> <u>Beneficiary may take or omit to take under the powers set forth below</u>. Beneficiary may deal with Collateral Obligor and/or Indebtedness Obligor in the same manner as if this Guaranty did not exist without affecting or impairing Guarantor's obligations under this Guaranty.

(Doc. No. 55-1 ¶¶ 1, 3) (emphasis added).

The Obligors continued to struggle to make payments to Lexon after the execution of the Amended Agreement. (Doc. No. 59-2 at 180:18–181:14). The Obligors and Lexon then executed a January 30, 2020 side letter agreement ("January 2020 Side Letter Agreement") to remedy these problems, which provided the Obligors with a temporary revised payment schedule to work on past due collateral payments. (<u>Id.</u>; <u>see</u> Doc. No. 55-5). Lexon and the Obligors amended and restated the January 2020 Side Letter Agreement on March 30, 2020 ("March 2020 Side Letter Agreement"), again with temporary revised collateral payment obligations for the Obligors.[4] (Doc. No. 55-5).

Lexon declared default on the Obligors twice in 2020 and demanded payment from Governor Justice as the guarantor. (Doc. Nos. 55-6, 55-7). Governor Justice did not make any payments to Lexon in response to Lexon's demands. (Doc. No. 55-11 at RFAs 13–14). The Obligors did pay the money due in relation to one of the notices. (Doc. No. 59-3 at 170:16–173:7; Doc. No. 60-20). However, the Obligors stopped making Collateral Payments in October 2020. (Doc. No. 55-12). The Obligors also stopped making premium payments after March 2021. (Doc. No. 56 ¶ 29). To date, they still have not made the full New Collateral Payments or Total

---

[4] The Court will refer to the January 2020 Side Letter Agreement and the March 2020 Side Letter Agreement collectively as the "Side Letter Agreements."

Indebtedness payments provided for in the Amended Agreement and Guaranty.[5] (Doc. No. 55-11 at RFAs 6–11).

On July 24, 2023, Matt Curran, the EVP Head of Surety for North America for Lexon, sent Governor Justice a letter entitled "Notice of Default & Demand for Payment" ("Notice of Default"). (Doc. No. 55-8). The Notice of Default indicated that the Obligors were again in default and demanded Governor Justice pay as the guarantor.[6] (Id. at 2). The Notice of Default states that, pursuant to the Amended Agreement and Guaranty:

> The Collateral Justice Companies and Beech Creek, jointly and severally, are in default under the Agreement due to their failure to timely pay Lexon the (i) New Collateral in the amount of Twenty Million U.S. dollars ($20,000,000); and (ii) Total Indebtedness in the amount of $6,724,138.66 U.S. dollars (as of June 30, 2023), which, pursuant to Paragraph 3 of the Agreement, continues to accrue.
>
> Therefore, in accordance with the Guaranty, demand is hereby made on You for payment of $26,724,138.66, plus any additional amount of Total Indebtedness that has accrued as of the date hereof, no later than July 27, 2023.

(Id. at 2). Despite the Notice of Default, Governor Justice did not pay Lexon. (Doc. No. 55-11 at RFA 15).

Lexon then filed suit against Governor Justice on July 28, 2023, asserting "breach of contract—collateral and premium obligations," "breach of contract—attorneys' fees and other enforcement-related costs," and "declaratory judgment—indemnification" claims. (Doc. No. 1 ¶¶ 78–101). The Court bifurcated the determination of the "amount of attorneys' fees, costs, expenses, and any other damages" Lexon is entitled to recover pursuant to Counts II and III from

---

[5] Where the Court uses capitalized terms defined in the Guaranty and Amended Agreement, such as "Total Indebtedness," the terms should be given their meaning as defined in the applicable contract.

[6] The Notice of Default is on Sompo International Insurance letterhead. (See Doc. No. 55-8 at 2). Sompo International Insurance is the parent company of Lexon. (See Doc. No. 59-2 at 178:12–179:4).

"all other questions of liability and damages on the claims asserted in the Complaint." (Doc. No. 50). Lexon has now moved for summary judgment on all three claims. (Doc. Nos. 52–53).

## II.    LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (internal citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (internal citation and quotation marks omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" Miller v. Maddox, 866 F.3d 386, 389 (6th Cir. 2017) (quoting Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993)).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there

7

must be evidence on which a trier of fact could reasonably find for the non-moving party.  Rodgers, 344 F.3d at 595.

## III.  ANALYSIS

Lexon argues that it is entitled to summary judgment on three grounds: (1) there is no genuine dispute of material fact that Governor Justice materially breached the Guaranty; (2) Lexon has a contractual right to recover attorney's fees, costs, and expenses in bringing this action; and (3) Lexon has a contractual right to indemnification.  (Doc. No. 53 at 8–12).  Rather than directly responding to Lexon's arguments in its brief, Governor Justice responds by arguing Lexon is precluded from summary judgment because of his affirmative defenses.  (Doc. No. 61 at 8–19).  The Court will first address Lexon's breach of contract claims, followed by its declaratory relief claim.

### 1.  Breach of Contract (Counts I and II)

Lexon first moves for summary judgment on its breach of contract claims. [7]  (Doc. No. 53 at 8).  While Lexon asserts there are no genuine disputes of material fact that it has established all elements of its breach of contract claims, Governor Justice contends his affirmative defenses preclude summary judgment.  The Court will address each issue in turn.

---

[7] The Court construes Counts I and II of the Complaint as largely duplicative of one another.  (See Doc. No. 1 ¶¶ 78–92 (both claims based on Governor Justice's alleged breached of paragraph 1 of the Guaranty through his failure to timely pay the Obligors' debts upon demand)).  However, Governor Justice has not raised this issue, so the Court need not opine on this further.  See Coley v. Lucas County, Ohio, 799 F.3d 530, 537 (6th Cir. 2015) (it is the defendant's burden to show plaintiff does not state a claim for relief).  Still, because Counts I and II are premised on the same contract, alleged breach, and resulting harm, the Court will analyze these claims together for the purposes of summary judgment.

8

A. Breach of Contract Claim

The parties agree that the contracts between them, including the Guaranty, are governed by West Virginia law. (Doc. No. 53 at 8 n.12; Doc. No. 61 at 9 n.5; see Doc. No. 55-1 ¶ 9). "In West Virginia, the elements of breach of contract are (1) a contract exists between the parties; (2) a defendant failed to comply with a term in the contract; and (3) damage arose from the breach." Nance v. Huntington W. Virginia Hous. Auth., 2017 WL 2210152, at *5 (W. Va. May 19, 2017) (quoting Wittenberg v. Wells Fargo Bank, N.A., 852 F. Supp. 2d 731, 749 (N.D.W. Va. 2012)).

1. First Element: A Valid Contract Exists

As to the first element of Lexon's breach of contract claim, that a valid contract exists, the parties have failed to define what exactly the contract at issue is. The parties spill substantial ink explaining Lexon's and the Obligors' relations under the Agreement, Amended Agreement, and Side Letter Agreements. (See Doc. Nos. 53, 61, 63). What they fail to focus their attention on, however, are the parties and contract before this Court—Lexon, Governor Justice, and the Guaranty. (See Doc. No. 1 ¶ 79 ("The Guaranty is a valid, binding and enforceable contract."), ¶ 89 (same), ¶ 94 (same)). The parties do not dispute that they entered into the Guaranty, nor do they dispute its validity. (See Doc. No. 58 ¶ 11). In looking at the facts in the light most favorable to Governor Justice, see Matsushita, 475 U.S. at 587, the Court cannot find any evidence in the record indicating otherwise. Accordingly, there is no genuine dispute of material fact that the Guaranty is a valid, binding contract between the parties.

2. Second Element: Governor Justice Breached the Contract

The second element of Lexon's breach of contract claim, that Governor Justice failed to comply with a term of the contract, is also undisputed. Lexon asserts that Governor Justice materially breached the Guaranty when he failed to pay Lexon the amount it demanded in its

9

Notice of Default within three days of his receipt of the Notice of Default, as required by the Guaranty. (Doc. No. 53 at 7–8). Governor Justice does not directly dispute this point, instead arguing various reasons why Governor Justice's performance was excused. (Doc. No. 61 at 8–18). The Court finds that Governor Justice's silence speaks for itself—indeed, he did materially breach the Guaranty.

As relevant here, Lexon asserts that Governor Justice breached three clauses of the Guaranty, which required payment on his part after Lexon informed him that the Obligors had defaulted on their payments in July 2023.[8] (See Doc. No. 1 ¶¶ 86, 91). These include: (1) paragraph 1, stating that he "absolutely, unconditionally and irrevocably guarantee[d] to [Lexon], and its successors and assigns," the "full and punctual payment and performance" of the "New Collateral Replenishment Obligation and the New Indebtedness Payment Obligation," plus "all costs, expenses and fees" (Doc. No. 55-1 ¶ 1); (2) paragraph 1(a), providing that Governor Justice must pay "the entire amount of the" New Collateral Replenishment Obligation unpaid by the Obligors in the event the Obligors fail to pay all or part of it (id. ¶ 1(a)); and (3) paragraph 1(b), providing that Governor Justice must pay "the entire amount of the" New Indebtedness Payment Obligation unpaid by the Obligors in the event the Obligors fail to pay all or part of it (id. ¶ 1(b)).[9] (See Doc. No. 1 ¶¶ 80–86). Paragraphs 1(a) and 1(b) provide that Governor Justice must make

---

[8] Lexon also alleges that Governor Justice did not make any payments in response to the September 2020 (Doc. No. 55-6) and October 2020 (Doc. No. 55-7) demands. However, because Lexon hinges its breach of contract claims on Governor Justice's failure to make payments in relation to the Notice of Demand (see Doc. No. 1 ¶ 86), the Court need not evaluate whether he also breached the Guaranty in relation to the September and October 2020 demands.

[9] Because the parties do not dispute that Governor Justice breached the Guaranty by not paying Lexon after the Obligors defaulted, the definitions of New Collateral Replenishment Obligation and New Indebtedness Payment Obligation are not pertinent to the Court's analysis here. Both terms are discussed in depth as related to damages, below. See infra, Section III.1.A.3.b.

such payments within three business days upon Governor Justice's receipt of Lexon's demand for payment. (Doc. No. 55-1 ¶ 1; see Doc. No. 1 ¶ 86).

In determining whether there is genuine dispute of material fact as to whether Governor Justice materially breached these contract terms, the Court must interpret these provisions of the Guaranty. "The question as to whether a contract is ambiguous is a question of law to be determined by the court." Syl. Pt. 4, Blake v. State Farm Mut. Auto. Ins. Co., 685 S.E.2d 895 (W. Va. 2009). In interpreting the contract, the Court is required to construe the terms in question based upon the plain and unambiguous language used. See id. at 901. Further, "[w]hen a court interprets a contract, it reads it as a whole, with all policy provisions given effect." Lopez v. Erie Ins., -- S.E.2d --, 2024 WL 4500977, at *4 (W. Va. Ct. App. Oct. 16, 2024). After reading the plain terms of the contract, as a whole, a court should find language ambiguous only when "it is reasonably susceptible to more than one meaning in light of the surrounding circumstances and after applying the established rules of construction." FOP, Lodge No. 69 v. City of Fairmont, 468 S.E.2d 712, 716 (W. Va. 1996). Thus, "[t]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous." Syl. Pt. 4, Blake, 685 S.E.2d 895.

The Court finds that all three clauses of the Guaranty are unambiguous. The plain language of the Guaranty speaks for itself. See Blake, 685 S.E.2d at 901. Under the terms of the Guaranty, in the event that the Obligors failed to pay all or part of the New Collateral Replenishment Obligation or the New Indebtedness Payment Obligation, Governor Justice had an "absolute[], unconditional[] and irrevocabl[e]" obligation to pay the "the entire amount" of each unpaid by the Obligors within three days of demand from Lexon. (Doc. No. 55-1 ¶¶ 1, 1(a), 1(b)). Governor Justice does not argue that this language is reasonably susceptible to another meaning, (see Doc No. 61), nor can the Court conjure any other reasonable interpretation of this language. In fact,

11

the only evidence in the record speaking to Governor Justice's interpretation of these clauses suggests that he does not find these terms ambiguous. Indeed, he admits the Guaranty includes the applicable terms in paragraph 1, and objects to them only to the extent that he "maintains that any obligations under the Guaranty were subject to legal defenses." (Doc. No. 58 ¶¶ 12, 14). The Court finds that paragraphs 1, 1(a) and 1(b) of the Guaranty are unambiguous, in that in the event the Obligors fail to pay all or part of the New Collateral Replenishment Obligation or the New Indebtedness Payment Obligation, Governor Justice is required to pay the full amount of those obligations to Lexon within three business days upon Governor Justice's receipt of Lexon's demand. (See Doc. No. 55-1 ¶ 1).

Having interpreted paragraphs 1, 1(a), and 1(b) of the Guaranty, the Court must next determine whether Governor Justice breached these terms. Here, there is no genuine dispute of material fact that he did. First, Governor Justice concedes that the Obligors had not paid the entirety of the New Collateral Replenishment Obligation or the Total Indebtedness, as memorialized by the Notice of Default.[10] (Doc. No. 55-11 at RFAs 8–11; see Doc. No. 55-8). Governor Justice even concedes that the Obligors did not make collateral or premium payments to Lexon after early 2021, when they ceased performance. (Doc. No. 61 at 8; Doc. No. 56 ¶ 29). This is supported by Lexon's premium and collateral tracking spreadsheets. (See Doc. Nos. 55-12, 55-13). There is no evidence in the record to the contrary. Ultimately, Governor Justice does not dispute that these obligations remain unpaid. (Doc. No. 55-10 ¶¶ 73–74, 77; Doc. No. 55-11 at RFAs 6–11). Therefore, there is no genuine dispute of material fact that the Obligors "failed to pay all" of their New Collateral Replenishment Obligation and New Indebtedness Payment

---

[10] By the Guaranty's and Amended Agreement's definitions, an admission that part of the Total Indebtedness is unpaid is an admission that part of the New Indebtedness Payment Obligation remains unpaid. See infra, Section III.1.A.3.b.

Obligation by July 2023, when Lexon sent the Notice of Default. (Doc. No. 55-1 ¶¶ 1(a), (b); see Doc. No. 55-8). Second, despite Governor Justice's concessions that the Obligors failed to pay their debts, Governor Justice repeatedly acknowledges that he did not make any payments to Lexon in response to the Notice of Default, much less within three business days of receipt of it. (Doc. No. 55-11 at RFAs 12, 15; Doc. No. 58 ¶ 24). Accordingly, these undisputed facts establish that there is no genuine dispute of material fact that Governor Justice materially breached his obligations of payment under paragraphs 1, 1(a), and 1(b) under the Guaranty.

### 3. Third Element: Governor Justice's Breach Caused Lexon Harm

On the last element of Lexon's claim, that damages arose from Governor Justice's breach, the parties discuss Lexon's alleged harm, and the damages it is entitled to, simultaneously. However, for the Court's purposes here, these issues are distinct. The Court will first address whether there is a genuine dispute of material fact that Governor Justice's breach caused Lexon harm, followed by the amount of damages owed to Lexon.

#### a. Whether Governor Justice's Breach Caused Lexon Harm

As to the first issue, whether Governor Justice's breach caused Lexon harm, the Court finds there is no genuine dispute of material fact that it did. Lexon does not argue how Governor Justice's breach caused damages. Instead, it asserts that it is "entitled to payment of the obligations." (Doc. No. 53 at 11; Doc. Nos. 55-12, 55-13). As with the other elements of Lexon's claim, Governor Justice again fails to address this element, instead arguing that Lexon is wrong about the amount of damages it is entitled to. (Doc. No. 61 at 19; Doc. No. 60-21). Although the parties' briefing leaves something to be desired, one thing is clear—they agree that if the Court finds as a matter of law that Governor Justice breached the Guaranty, and it does, that Lexon is entitled to some amount of damages for the breach. (See Doc. No. 61 at 19 ("Even if Lexon were

13

entitled to enforce the Amended Guaranty, it would not be entitled to recover $20 million in New Collateral."); see also Doc. Nos. 55-12, 55-13, 60-21). Even viewing these facts in the light most favorable to Governor Justice, see Matsushita, 475 U.S. at 587, there is still no genuine dispute of material fact that Lexon suffered harm from Governor Justice's failure to comply with the Guaranty's terms.

b. Damages Owed to Lexon

Although Lexon's harm is undisputed, there is a genuine dispute of material fact as to the amount of damages it is entitled to. While Lexon contends that it is entitled to $28,378,775.94 for Count I, (Doc. No. 63 at 1), Governor Justice asserts that his damages should be reduced by the collateral and premium payments that Lexon did not account for.[11] (Doc. No. 61 at 8 n.4, 19). In making these assertions, neither party describes the specific damages provisions in the Guaranty and Amended Agreement. Therefore, to determine the damages owed to Lexon, the Court must first identify the various applicable damages provision in the Guaranty and Amended Agreement itself. The Court will start where the parties do: with paragraph 5(e) of the Guaranty. Paragraph 5(e) of the Guaranty states:

> (e) Notwithstanding anything contained herein to the contrary, the obligations of Guarantor shall be limited to a total sum equal to (i) fifteen million U.S. dollars ($15,000,000.00) plus (ii) the amount of the Total Indebtedness specified in the Amended Underlying Agreement; (ii) provided that, in the event of any default by Collateral Obligor and/or Indebtedness Obligor with respect to the New Collateral Replenishment Obligation or the New Indebtedness Payment Obligation, including without limitation any failure to timely pay any payment due under either such Obligation, the obligations of Guarantor shall instead be limited to a total sum equal to (i) twenty million U.S. dollars ($20,000,000.00) plus (ii) the amount of the Total Indebtedness specified in the Amended Underlying Agreement.

---

[11] The issue of the amount of damages owed to Lexon for Count II has already been bifurcated and is not at issue in this motion. (See Doc. No. 50).

14

(Doc. No. 55-1 ¶ 5(e)) (emphasis added). The plain text of paragraph 5(e) places a limit on the damages Governor Justice is responsible for, stating that his obligations after the Obligors' default are "limited to a total sum equal to" $20 million plus the amount of the Total Indebtedness. (See Doc. No. 55-1 ¶ 5(e)(ii)(ii)). But that is not the whole story, as paragraph 5(e) does not itself define what Governor Justice's referenced "obligations" are. Those are defined in paragraph 1 of the Guaranty, which states:

> Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Beneficiary, and its successors and assigns, as primary obligor and not merely as surety, the full and punctual payment and performance of each of the New Collateral Replenishment Obligation and the New Indebtedness Payment Obligation (collectively, the "Obligations"), plus all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder.

(Doc. No. 55-1 ¶ 1) (emphasis added). Giving all of the terms in paragraph 1 their ordinary meaning, Governor Justice's obligations are comprised of two items: the New Collateral Replenishment Obligation and the New Indebtedness Payment Obligation. (See id.). The New Collateral Replenishment Obligation is defined in the first recitation of the Guaranty, which states in relevant part:

> In substitution for Collateral (as defined in the Amended Underlying Agreement) previously released by Beneficiary, Collateral Obligor and Indebtedness Obligor shall provide to Beneficiary New Collateral (as defined in the above-referenced Amendment No. 1) in the total sum of twenty million U.S. dollars ($20,000,000.00) by means of: (i) partial payments of two hundred fifty thousand U.S. dollars ($250,000.00) per month, due and payable commencing on February 28, 2019 and on the last day of each month thereafter; (ii) upon the closing of the Liquidity Event (as defined in the above-referenced Amendment No. 1), a payment on the day of closing in the amount of twenty million U.S. dollars ($20,000,000.00) less any partial payments previously received under item (i); and (iii) to the extent the New Collateral has not been delivered to Lexon, such Additional Collateral Payments (as defined in the above-referenced Amendment No. 1) necessary to bring the total amount of the New Collateral to twenty million U.S. dollars ($20,000,000.00) (such obligations of Collateral Obligor and Indebtedness Obligor are referred to herein collectively as the "New Collateral Replenishment Obligation")[.]

15

(Doc. No. 55-1 ¶ (i)) (emphasis added).  The New Collateral Replenishment Obligation implicates two additional values: the New Collateral and Additional Collateral Payments.   Under the Amended Agreement, New Collateral is defined as "the total sum of Twenty Million U.S. dollars," (Doc. No. 55-4 at 2 ¶ 2), and "Additional Collateral Payment" is defined as:

> d) Notwithstanding anything to the contrary and notwithstanding the failure of the Liquidity Event to occur, the Collateral Justice Companies and Beech Creek, jointly and severally, agree to deliver to Lexon additional payments as follows (each payment an "Additional Collateral Payment"):
>
> iv.    To the extent that the New Collateral has not been fully delivered to Lexon on or before March 31, 2021, the Collateral Justice Companies and Beech Creek, jointly and severally, agree to pay Lexon an amount equal to Twenty Million U.S. dollars ($20,000,000) less any Collateral Payments previously made including any partial Collateral Payment, less any Additional Collateral Payment previously made. Such payment shall be due on or before April 1, 2021.

(Doc. No. 55-4 at 2 ¶ 2(d)(iv)) (emphasis added).

The second item encompassed in Governor Justice's obligations, the New Indebtedness Payment Obligation, is defined in the second recitation of the Guaranty.  (Doc. No. 55-1 ¶ (ii)). That states in relevant part:

> … Collateral Obligor and Indebtedness Obligor shall pay to Beneficiary in cash or its equivalent the sum of two hundred thousand U.S. dollars ($200,000.00) per month, due and payable commencing on February 28, 2019 and on the last day of each month thereafter, until the Total Indebtedness (including any new premiums becoming due during the term of the Amended Underlying Agreement) is paid in full (such obligation of Collateral Obligor and Indebtedness Obligor to pay the unpaid balance of the Total Indebtedness is referred to herein as the "New Indebtedness Payment Obligation").

(Id.) (emphasis added).  The New Indebtedness Payment Obligation implicates another term: Total Indebtedness.  (See id.).  Total Indebtedness is defined on page 5, paragraph 3 of the Amended Agreement, which states in relevant part:

> The Parties Agree the Remaining Indebtedness is equal to One Million Twenty Five Thousand U.S. dollars ($1,025,000.00). The Parties also agree that in addition to the Remaining Indebtedness, additional premium of $2,513,400.75 is now due and

owing (the "New Indebtedness"). <u>The Remaining Indebtedness together with the New Indebtedness is equal to $3,538,400.75 (the "Total Indebtedness").</u>

(Doc. No. 55-4 at 5 ¶ 3) (emphasis added). The Amended Agreement provides that the New Indebtedness described on page 5, paragraph 3 could be increased during the term of the Amended Agreement, stating: "additional amounts for premium may become due during the term of this Agreement and they hereby agree that the New Indebtedness shall be increased in like amount[.]" (Doc. No. 55-4 at 2 ¶ 3(c)).

Now that the Court had identified the relevant contract provisions, it must interpret them together to determine whether they are ambiguous under the legal principles set forth above. <u>See supra</u>, Section III.1.A.2; <u>see also</u> Syl. Pt. 4, <u>Blake</u>, 685 S.E.2d 895. While the parties do not fully address the applicable provisions at issue, they do present different arguments as to how to construe the starting point, paragraph 5(e) of the Guaranty. Lexon contends that under paragraph 5(e) of the Guaranty, it is owed "$20 million in New Collateral set forth in the Guaranty, plus premium payments due and owing as of February 4, 2019 ($3,538,400.75), plus 'new premiums becoming due' following execution of the Amended Agreement" for a total of $28,378,775.94, plus pre- and post-judgment interest. (Doc. No. 53 at 11; Doc. No. 63 at 1). Governor Justice contends that, under the Guaranty and paragraph 3(iii) of the Side Letter Agreements, his obligations are reduced by past collateral payments of $5,750,000.00 as well as premium payments already made to Lexon. (Doc. No. 61 at 8 n.4, 19). Despite the parties' disagreement, all relevant contractual provisions, including paragraph 5(e) of the Guaranty, are unambiguous. <u>See</u> Syl. Pt. 4, <u>Blake</u>, 685 S.E.2d 895.

As discussed above, the Amended Agreement and Guaranty provide for two distinct payment obligations—the New Collateral Replenishment Obligation and the New Indebtedness Payment Obligation. As to the New Collateral Replenishment Obligation, the Amended Agreement and Guaranty provide that Lexon is entitled to the "total sum" of $20 million, paid

17

through three means: (1) partial payments; (2) a payment after the close of the Liquidity event; and (3) to the extent the New Collateral had not been delivered, Additional Collateral Payments "necessary to bring the total amount of the New Collateral to twenty million U.S. dollars." (Doc. No. 55-4 at 2 ¶ 2; Doc. No. 55-1 ¶ (i)). Additional Collateral Payments are defined in the Amended Agreement as tiered lump sum payments that must be paid if "the New Collateral has not been fully delivered to Lexon" before respective dates, the maximum payment of which is $20 million. Each respective lump sum is reduced by any payments already made. (Doc. No. 55-4 2 ¶¶ 2, 2(d)(iv); Doc. No. 55-1 ¶ (i)). Reading the plain language of these provisions together, the total amount of New Collateral owed to Lexon in the event the Obligors default is $20 million less any collateral payments previously made by the Obligors. See Syl. Pt. 3, Moore v. Johnson Serv. Co., 219 S.E.2d 315 (1975) (The language of an "agreement must be considered and construed as a whole, giving effect, if possible, to all parts of the instrument. Accordingly, specific words or clauses of an agreement are not to be treated as meaningless, or to be discarded, if any reasonable meaning can be given them consistent with the whole contract.").

Lexon's assertion that the "Obligors' default entitled Lexon to $20 million from [Governor Justice] without deductions for collateral previously paid" is not convincing. (Doc. No. 63 at 1). Rather than look at all of the contractual provisions to determine the collateral amount owed, Lexon looks at paragraph 5(e) of the Guaranty in a vacuum, asserting its language entitling Lexon to "a total sum equal to (i) twenty million U.S. dollars ($20,000,000.00)" dictates that it is entitled to $20 million in collateral, irrespective of past collateral payments by the Obligors. (See Doc. No. 55-1 ¶ 5(e)). But this ignores the terms defining Governor Justice's obligations in the first recitation of the Guaranty, paragraph 1 of the Guaranty, and 2 ¶ 2(d) of the Amended Agreement. Giving reasonable meaning to every word in the Guaranty and Amended Agreement, see Syl. Pt.

3, Moore, 219 S.E.2d 315, the Court finds the relevant provisions describing the New Collateral Replenishing Obligation owed to Lexon dictate that it is entitled to $20 million minus any collateral payments previously made by Obligors, including partial collateral payments and Additional Collateral Payments previously made.

As to the New Indebtedness Payment Obligation, the Guaranty provides that Lexon is entitled to $200,000.00 per month until the Total Indebtedness (including any new premiums) is paid in full. (Doc. No. 55-1 ¶ (ii)). Paragraph 5(e) of the Guaranty plainly states that Lexon is entitled to the amount of "Total Indebtedness specified in the Amended [] Agreement." (Doc. No. 55-1 ¶ 5(e)). Looking to the definition of "Total Indebtedness" in the Amended Agreement, it provides that the Obligors had accrued, in combining the Remaining Indebtedness with the New Indebtedness, a total of $3,538,400.75 of Total Indebtedness as of February 4, 2019. (Doc. No. 55-4 at 5 ¶ 3). The Amended Agreement provides that "additional amounts of premium" that became due during the term of the Amended Agreement increased the "New Indebtedness" in "like amount." (Doc. No. 55-4 at 2 ¶ 3(c)). In giving these terms their plain and ordinary meaning, the Court finds that they are unambiguous, and provide for one clear meaning: the Total Indebtedness owed to Lexon is $3,538,400.75 of Total Indebtedness described in the Amended Agreement, plus additional premiums that became due during the Amended Agreement's term, minus any payments made of the New Indebtedness Payment Obligation by the Obligors.[12] (Doc. No. 55-4 at 2 ¶ 3(c)).

_____

[12] While the parties do not address the issue directly, the "term" of the Amended Agreement (Doc. No. 55-4) is unclear. Nowhere in the Amended Agreement is the "term" defined, nor do the parties offer their own competing positions on their understandings of the Amended Agreement's length. The Guaranty does not provide clear insight to this question, either. (See Doc. No. 55-1). The Court can imagine various reasonable interpretations of the Amended Agreement's term length: until the New Collateral Replenishment Obligation and New Indebtedness Payment Obligation are paid off completely; until April 1, 2021, the latest date referenced in the Amended Agreement; or until Lexon declares the Obligors in default and demands payment from Governor Justice under the Guaranty. Considering there are many reasonable interpretations of the Amended Agreement's

19

Taking these two payment obligations together, the meaning behind paragraph 5(e) of the Guaranty remains clear. It does not serve as a stand-alone term, as Lexon suggests. Rather, paragraph 5(e) provides that, under these circumstances (i.e., where the Obligors have defaulted on their obligations), Governor Justice's obligations remain limited to "twenty million U.S. dollars" plus "the amount of the Total Indebtedness specified in the" Amended Agreement. (Doc. No. 55-1 ¶ 5(e)). The ordinary meaning of these terms indicates that Lexon is entitled to a maximum of $20 million of the sum of New Collateral Replenishment Obligation owed, the New Indebtedness Payment Obligation owed, and "all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights." (Doc. No. 55-1 ¶ 1). Separately, Lexon is also entitled to the Total Indebtedness owed.[13] Reading the first and second recitations of the Guaranty, paragraphs 1 and 5(e) of the Guaranty, and paragraphs 2 ¶ 2(d) and 2 ¶ 2(d)(iv) of the Amended Agreement together, Lexon is entitled to (1) $20 million in collateral payment, less any collateral payments made by the Obligors; plus (2) the Total Indebtedness, which takes into account the New Indebtedness Payment Obligation and any additional premiums that became due during the

_____

length, and the parties have provided no meaningful argument on this issue, the Court finds the term is sufficiently ambiguous as to warrant a jury's determination on its meaning at trial. See FOP, Lodge No. 69, 468 S.E.2d at 716 (language reasonable susceptible to more than one meaning is ambiguous); Miller, 859 S.E.2d at 328.

[13] The parties have not briefed how the New Indebtedness Payment Obligation impacts the balance of the Total Indebtedness. Based on the plain language of the Guaranty and Amended Agreement, the New Indebtedness Payment Obligation reduces the unpaid balance of the Total Indebtedness. (See Doc. No. 55-1 ¶ (ii); Doc. No. 55-4 at 2 ¶ 3(c)). Because there is a genuine dispute of material fact as to how much the Obligors paid in premiums toward the New Indebtedness Payment Obligation, a genuine dispute of fact remains as to the amount of Total Indebtedness owed to Lexon. (See supra, Section III.1.A.3.b.n.12; see also infra, Section III.1.A.3.b at 21–22).

Amended Agreement term.[14]  To interpret paragraph 5(e) as emplacing a blanket $20 million payment on Governor Justice does not account for the clauses defining the terms within it, would fail to account for the Guaranty and Amended Agreement as a whole, and would render the provisions defining those terms utterly meaningless.  See Lopez, 2024 WL 4500977, at *4.

While the Court has determined the Guaranty's and Amended Agreement's relevant damages provisions are unambiguous, a genuine dispute of material fact remains as to the total amount of damages owed to Lexon.  Governor Justice has provided a spreadsheet of collateral and premium payments made from the Obligors to Lexon, showing collateral payments totaling $5,750,000.00.  (Doc. No. 60-21).  Rather than disputing the collateral amount paid, Lexon merely contends it should not be included in the damages amount based on a flawed interpretation of the Guaranty.  (Doc. No. 53 at 11 n.16).  Accordingly, there is no genuine dispute of material fact that the Obligors have paid $5,750,000.00 in collateral that should be reduced from the $20 million collateral total.   Therefore, Lexon is entitled to $14,250,000.00 in outstanding New Collateral.

However, there is a genuine dispute of material fact as to the amount of Total Indebtedness owed to Lexon under paragraph 5(e) of the Guaranty.  As an initial matter, the Court has already

_____

[14] Governor Justice relies on the Side Letter Agreements to support his position on collateral damages owed to Lexon.  (See Doc. No. 61 at 19).  The Side Letter Agreements and the Guaranty provide that Lexon is entitled to the same amount of damages in collateral.  Paragraph 3(iii) of the Side Letter Agreement states in relevant part:

> To the extent that the New Collateral has not been fully delivered to Lexon on or before September 30, 2021, the Collateral Justice Companies and Beech Creek, jointly and severally, agree to pay Lexon an amount equal to Twenty Million U.S. dollars ($20,000,000) less any Collateral Payments previously made including any partial Collateral Payment, less any Additional Collateral Payment previously made. Such payment shall be due on or before October l, 2022.

(Doc. No. 55-5 at 3 ¶ 3(iii), 6 ¶ 3(iii)) (emphasis added).

explained that the term of the Amended Agreement, which impacts the length of time in which additional premiums may accrue, is sufficiently ambiguous that it can only be resolved by the trier of fact. See supra, Section III.1.A.3.b.n.12. Perhaps as evidenced by this ambiguity, the parties dispute the amount of Total Indebtedness owed. Lexon claims that it is entitled to $8,378,775.94 in premium payments, including missed payments "throughout 2020[,]" in January 2021, and incomplete payments in February and March 2021, (Doc. No. 53 at 7, 9, 11). (See Doc. No. 55-13 (detailing premium payments for Obligors)). Governor Justice contends that the Obligors made "all or substantially all of the agreed upon" premium payments in 2020 and in January of 2021, and have paid $5,555,000.00 in premiums in total (Doc. No. 61 at 8 n.4). (See Doc. No. 60-21 (spreadsheet and transaction documents showing debit confirmations of payments from 2018 to 2021)). While Lexon implies that the evidence Governor Justice presents is unreliable, in that the "Justice Companies do not track premium" payments made to Lexon, (Doc. No. 53 at 11 n.16), the Court is not the proper party to judge the credibility or truth of this evidence. See Anderson, 477 U.S. at 249. Viewing the evidence in the record in the light most favorable to Governor Justice, as this Court is required to do, see Matsushita, 475 U.S. at 587, there are genuine disputes of material fact as to: (1) the term of the Amended Agreement governing how long premiums accrue; and (2) which past premium payments have not been paid by the Obligors. Therefore, there is a genuine dispute of material fact as to the amount of Total Indebtedness owed to Lexon. Accordingly, Lexon's motion will be denied as to damages for Count I.[15]

---

[15] Lexon requests that the Court award "pre- and post-judgment interest" to its award of damages under Count I, pursuant to W. Va. Code Ann. §§ 56–6–27 and 56–6–31. Because the total damages Lexon is entitled to under Count I are in dispute, the Court need not determine the applicable amount of pre- and post-judgment interest owed in resolving this motion.

## B. <u>Waiver of Affirmative Defenses</u>

Governor Justice raises a host of affirmative defenses that he asserts preclude Lexon's entitlement to summary judgment on its breach of contract claims. He brings these defenses in relation to Lexon's conduct under the Side Letter Agreements, asserting arguments (among others) that: (1) Lexon cannot recover under the first breach doctrine because it breached the Side Letter Agreements before the Obligors did; (2) Governor Justice was released from his duties as a Guarantor when Lexon breached its duty to release collateral; and (3) Lexon breached the covenant of good faith and fair dealing in the Side Letter Agreements. (Doc. No. 61 at 20). While Lexon provides a host of reasons as to why Governor Justice's affirmative defenses fail, one controls: its assertion that Governor Justice waived all his affirmative defenses against Lexon in the Guaranty. (Doc. No. 53 at 14). Because the waiver issue is dispositive here, the Court will address only that dispute below.

As an initial matter, "[a] guarantor may validly waive rights and defenses in the guaranty contract." <u>PITA, LLC v. Segal</u>, 894 S.E.2d 379, 394 (W. Va. 2023) (internal citation omitted). As relevant here, "guaranty language which waives the right to assert a defense based on impairment of collateral by the lender is enforceable." <u>Id.</u> at 394–95 (collecting cases). Whether Governor Justice waived his right to raise affirmative defenses under the Guaranty is subject to the same legal principles of contract interpretation as above, Syl. Pt. 4, <u>Blake</u>, 685 S.E.2d 895. <u>See</u> <u>supra</u>, Section III.1.A.2.

Lexon argues that Governor Justice's affirmative defenses fail because the "plain language and unambiguous terms of the Guaranty" waive all of Governor Justice's "defenses concerning conduct related to the Side Letters." (Doc. No. 53 at 14). Governor Justice contends the waiver language does not mean that he waived his affirmative defenses completely, but rather "that the

parties don't need to execute a new guaranty every time they amend the underlying agreement."
(Doc. No. 61 at 9). While the parties point to various clauses in the Guaranty and Side Letter
Agreements they contend support a finding of waiver (Doc. No. 53 at 14–15; Doc. No. 61 at 9–
12), the Court finds the waiver language in paragraphs 3, 4, and 5 of the Guaranty of greatest
import. Paragraphs 3, 4 and 5 of the Guaranty state, in relevant part:

> 3. <u>Guaranty Absolute and Unconditional.</u> <u>Guarantor agrees that his obligations</u>
> <u>under this Guaranty are irrevocable, continuing, absolute and unconditional</u> and
> <u>shall not be discharged or impaired or otherwise affected by, and Guarantor</u>
> <u>hereby irrevocably waives any defenses to enforcement he may have (now or</u>
> <u>in the future) or rights of recourse against Beneficiary by reason of</u> (i) any
> change in the time, place or manner of payment or performance of, or in any
> other term of any or all of the Obligations, or any rescission, waiver, release,
> assignment, amendment or other modification of the Amended Underlying
> Agreement, (ii) any delay or failure of or forbearance by Beneficiary in
> asserting any claim or demand or in exercising or enforcing any right or remedy,
> whether by action, inaction or omission, under the Amended Underlying
> Agreement, any GAI or otherwise, or (iii) <u>any action Beneficiary may take or</u>
> <u>omit to take under the powers set forth below.</u> Beneficiary may deal with
> Collateral Obligor and/or Indebtedness Obligor in the same manner as if this
> Guaranty did not exist without affecting or impairing Guarantor's obligations
> under this Guaranty.

> 4. <u>Powers of Beneficiary.</u> <u>Guarantor hereby grants Beneficiary full power, in its</u>
> <u>uncontrolled discretion and without notice to Guarantor, and subject to the</u>
> <u>provisions of any agreement between any party and Beneficiary at the time in</u>
> <u>force, to deal in any manner with any or all of the Obligations</u> including, without
> limitation, the following powers:

>> (a) To modify or otherwise change any terms of all or any part of the
>> Obligations, to grant any extension or renewal thereof and any other
>> indulgence with respect thereto and to effect any release, compromise or
>> settlement with respect thereto;

>> (b) To enter into any agreement of forbearance with respect to any or all of
>> the Obligations and to change the terms of any such agreement; or

>> (c) To consent to the substitution, exchange, <u>surrender or release of all or</u>
>> <u>any part of any New Collateral received by Beneficiary</u> under the Amended
>> Underlying Agreement, whether or not collateral, if any, received by
>> Beneficiary upon any such substitution, exchange, surrender or release shall

24

be of the same or of a different character or value than the New Collateral surrendered by Beneficiary.

5. <u>Certain Waivers; Acknowledgements</u>. Guarantor further acknowledges and agrees as follows:

(h) <u>No waiver, modification, extension, forbearance or delay on the part of Beneficiary with respect to any Obligation or collateral and no act or thing which might, but for this provision of this Guaranty, be deemed as a legal or equitable discharge of a surety, shall operate to release the obligations of Guarantor under this Guaranty</u>, and no delay on the part of Beneficiary in exercising any of its options, powers or rights hereunder, or a partial or single exercise thereof, shall constitute a waiver of any other rights of Beneficiary under this Guaranty.

(Doc. No. 55-1 ¶¶ 3–5) (emphasis added). Lexon interprets the first sentence of paragraph 3 of the Guaranty to contain two separate clauses, wherein the Guaranty states that Governor Justice's duties as the guarantor are: (1) "irrevocable, continuing, absolute and unconditional[;]" and (2) unwaivable and not subject to affirmative defenses, including those "by reason of" any "amendment or other modification" of the Amended Agreement. (See Doc. No. 53 at 14; Doc. No. 55-1 ¶ 3). By contrast, Governor Justice interprets paragraph 3 to mean that he only waived any defenses against Lexon on account of the parties' modifying the Amended Agreement, defenses that he says he does not raise here. (See Doc. No. 61 at 10).

Neither party addresses all of the relevant language in paragraph 3 or paragraph 5 of the Guaranty. These omissions result in both parties failing to properly interpret the full scope of these unambiguous contract provisions. Reading paragraphs 3, 4 and 5 of the Guaranty together, the Guaranty's express terms waive all defenses Governor Justice may bring against Lexon. The Guaranty explicitly provides for this extensive waiver at various junctures. First, paragraph 3 states that Governor Justice's "obligations under this Guaranty are irrevocable, continuing, absolute and unconditional." (Doc. No. 55-1 ¶ 3). This language establishes that there are no set of circumstances under which Governor Justice could be relieved of his obligations under the

25

Guaranty—it is not susceptible to any other reasonable interpretation.  See FOP, Lodge No. 69, 468 S.E.2d at 716.

Second, paragraph 3 continues by providing an additional, rather than qualifying, set of examples under which Governor Justice's guarantor obligations "shall not be discharged or impaired or otherwise affected by[.]"  (See Doc. No. 55-1 ¶ 3 (connecting the two clauses with "and" rather than "or")).  The second clause of paragraph 3 provides that Governor Justice "waives any defenses to enforcement he may have" by reason of: (1) changes or modifications to the Amended Agreement; (2) inaction by Lexon in enforcing the Amended Agreement; and (3) any action Lexon may take under the powers set forth below in the Guaranty, which include  under paragraph 4 the "full power, in [Lexon's] uncontrolled discretion and without notice to [Governor Justice] . . . to deal in any manner with any or all of the Obligations" and to "surrender or release [] all or any part of the New Collateral."  (Id. ¶¶ 3–4).  The plain text of these provisions demonstrates that Governor Justice waived all defenses pertaining to modification of the Amended Agreement and Lexon's actions under the Amended Agreement, including those are related to Lexon's handling of the Obligations and collateral.  See Blake, 685 S.E.2d at 901.  To come to any other result would render the plain language of these clauses empty.  See Syl. Pt. 3, Moore, 219 S.E.2d 315.

Third, paragraph 5 of the Guaranty plainly states that no "waiver, modification, extension, forbearance or delay" on Lexon's part "with respect to any Obligation or collateral" "shall operate to release the obligations of [Governor Justice] under this Guaranty."  (Doc. No. 55-1 ¶ 5).  The clearest reading of this language is to honor exactly what the text says—no forbearance or delay on Lexon's part with respect to collateral can release Governor Justice of his guarantor obligations. In fact, West Virginia courts have found similar Guaranty clauses to constitute waiver as to any

affirmative defenses pertaining to impairment of collateral. PITA, 894 S.E.2d at 385 n.7.[16] There

is no plausible alternative meaning such that a jury need determine this clause's interpretation. See

FOP, Lodge No. 69, 468 S.E.2d at 716; see also Miller v. WesBanco Bank, Inc., 859 S.E.2d 306,

328 (W.Va. 2021) (only ambiguous terms present a question of fact for the factfinder). Under the

plain terms of paragraph 5, the primary affirmative defenses Governor Justice relies on here, rooted

in Lexon's handling of collateral, are explicitly waived.[17]

The rest of the language in the Guaranty supports the conclusion that Governor Justice's

guarantor obligations are absolute. Take, for instance, these examples in the Guaranty:

- Paragraph 1, which again states that Governor Justice "absolutely, unconditionally and irrevocably guarantees" to Lexon "the full and punctual payment and performance" of the New Collateral Replenishment Obligation and the New Indebtedness Payment Obligation (Doc. No. 55-1 ¶ 1); and

---

[16] The Guaranty language in PITA provides, in pertinent part: "the liability of the Undersigned shall not be affected or impaired by . . . any failure to obtain collateral security . . . for indebtedness, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure, or enforce any collateral security; or any release, modification, substitution, discharge, impairment, deterioration, waste, or loss of any collateral security[.]" PITA, 894 S.E.2d at 385 n.7.

[17] Governor Justice contends that his affirmative defense is based on "Lexon's breach of its contractual duty to release collateral," as established by the January 2020 Side Letter Agreement, not its discretionary power to release collateral. (Doc. No. 61 at 11). The Court need not decide whether Governor Justice is correct that Lexon had a separate "duty" to release collateral under the Side Letter Agreements versus discretion to do so under the Guaranty and Amended Agreement; the waiver language in the Guaranty waives all of Governor Justice's affirmative defenses against Lexon, regardless. However, should there remain any doubt as to the scope of the Guaranty's waiver, the unambiguous text of the Side Letter Agreements confirms that nothing in them impacts the Guaranty. (See Doc. No. 55-5 at 3–4 ("[N]othing herein shall be considered an amendment or waiver of any of the rights and obligations of James C. Justice II and Lexon under the [Guaranty[.]"), 7 (same)). Governor Justice's argument that this is a red herring because "Lexon never had a right under the [Guaranty] to breach its underlying contract" or "to refuse to provide bond continuation letters" again ignores the breadth of the waiver language he agreed to in the Guaranty. (See Doc. No. 61 at 11).

- Paragraph 5(a), stating that Governor Justice "unconditionally and irrevocably waives any right to revoke this Guaranty, and acknowledges that this Guaranty is continuing in nature" (id. ¶ 5(a)).

Qualifying language, where it exists in the Guaranty, further demonstrates that this complete waiver of affirmative defenses was intentional. For instance, paragraph 5(b) provides that Governor Justice waived any right to require Lexon to give notice "[e]xcept with respect to the written demand specified" under separate subsections of the Guaranty. (Doc. No. 55-1 ¶ 5(b)). The parties' ability to contract for exceptions to waiver where they agreed to it demonstrates the Guaranty's terms as to waiver of defenses is intentional and clear. See Lopez, 2024 WL 4500977, at *4.

Governor Justice contends that this interpretation is unreasonable, in that it gives Lexon "license to breach negotiated amendments to the agreement without consequence." (Doc. No. 61 at 10). The Court disagrees. Governor Justice's narrow interpretation of the waiver language in the Guaranty does not make sense considering the various waiver provisions in the contract, nor does it properly give weight to each of the Guaranty's waiver clauses. See Lopez, 2024 WL 4500977, at *4. Rather, the Court's finding that the waiver in the Guaranty is expansive is consistent with West Virginia courts interpreting similar insurance contracts, as guarantors frequently waive rights and defenses under these circumstances. See PITA, 894 S.E.2d at 394. In fact, parties often contract to waive the right for guarantors to assert defenses based on impairment of collateral, the factual basis Governor Justice bases his affirmative defenses on here, see id. at 394–95 (citing cases), likely because these waivers serve as an assurance to the beneficiary. See id. (citing Restatement (Third) of Suretyship & Guaranty § 6, Comment (a) (Am. L. Inst. 1996) ("Agreements between the secondary obligor and the obligee as to the availability and scope of suretyship defenses are typically incorporated into the contract creating the secondary obligation")

and Peter Alces & Susan Sieger-Grimm, The Law of Suretyship and Guaranty § 2.5 Westlaw (database updated June 2023) ("The contract establishing the suretyship may provide that the creditor's rights against the surety are not prejudiced by any actions of the creditor that impair the surety's recourse against the primary obligor.")).

As West Virginia courts have opined, the "mere fact that parties do not agree on the construction" of a contract does not render it ambiguous. Syl. Pt. 4, Blake, 685 S.E.2d 895. This is one such case. The Court finds as a matter of law that paragraphs 3, 4, and 5 of the Guaranty waived all of Governor Justice's affirmative defenses to the Guaranty.[18]  See Miller, 859 S.E.2d at 328. Accordingly, Lexon's motion is granted with respect to its breach of contract claims as to Governor Justice's liability. However, given there is a genuine dispute of material fact as to the damages Lexon is entitled to, summary judgment will be denied as to the damages owed to Lexon under Count I. See Americredit Fin. Servs., Inc. v. Lyons, 2022 WL 135420, at *10 (M.D. Tenn. Jan. 13, 2022) (granting summary judgment as to breach of contract liability, but denying it as to damages); see also Orlowski v. Bates, 146 F. Supp. 3d 908, 930 (W.D. Tenn. 2015) (same); Michigan Millers Mut. Ins. Co. v. Lancer Ins. Co., 23 F. Supp. 3d 850, 853 n.1, 860 (E.D. Mich. 2014) (same).

_____

[18] Because of this waiver, the Court need not address multiple disputes pertaining to Governor Justice's affirmative defenses that the parties raise, including: whether Governor Justice waived the affirmative defense that "a guarantor may be released from a guaranty when the beneficiary commits a breach of duty that increases the guarantor's risk or otherwise injures his rights" by not including it in his responsive pleading or motion to dismiss (see Doc. No. 61 at 17–18); whether Lexon allegedly breaching the implied covenant of good faith and fair dealing is a valid defense (see Doc. No. 53 at 19); and whether the Side Letter Agreements lacked consideration and are thus unenforceable (see id. at 15).

## 2. Declaratory Relief

Lexon next moves for summary judgment on its declaratory judgment claim that it brings pursuant to the Federal Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201. Lexon requests a declaration of its rights and Governor Justice's obligations under paragraph 2 of the Guaranty, its indemnification provision. (Doc. No. 55-1 ¶ 2). Lexon contends it is entitled to declaratory judgment that, because Governor Justice materially breached the Guaranty, it is entitled to "recover its Loss sustained or incurred" and that it is entitled to "interest at the rate of six percent per annum from the date of its payment of each Loss." (Doc. No. 1 ¶¶ 97–101). Governor Justice, surprisingly, does not respond to Lexon's argument. (See Doc. No. 61). Because neither party addressed a threshold issue in their briefing, whether this Court should exercise its jurisdiction over it under the Declaratory Judgment Act, the Court ordered further briefing from the parties. (Doc. No. 65). The Court will first address the issue of its jurisdiction, followed by the merits of Lexon's claim.

### A. Jurisdiction

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The Supreme Court has indicated that this Act "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995). In passing the Act, Congress "created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." Id. at 288. District courts are afforded substantial discretion to exercise jurisdiction "in the first instance, because facts bearing on the usefulness of the declaratory

judgment remedy, and fitness of the case for resolution, are peculiarly within their grasp." Id. at 289. In considering whether a district court has properly exercised its discretion in this regard, the Sixth Circuit has traditionally focused on five factors:

> (1) whether the declaratory action would settle the controversy;
> (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata";
> (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and
> (5) whether there is an alternative remedy which is better or more effective.

Grand Trunk W. R.R. Co. v. Consol. Rail Co., 746 F.2d 323, 326 (6th Cir. 1984). Governor Justice asserts Lexon's declaratory judgment claim is not appropriate and that the Court should not exercise its jurisdiction over it, given the first, second, and fifth factors counsel against exercising its jurisdiction. (Doc. No. 67 at 2, 4). Lexon contends that the Court should exercise its discretion to exercise jurisdiction over its declaratory judgment claim because all five factors weigh in favor of exercising jurisdiction. (Doc. No. 66 at 2–5). Upon balancing the five Grand Trunk factors, the Court agrees with Lexon and finds the circumstances warrant the Court exercising its jurisdiction here.

### 2. Settlement of Controversy and Clarification of Legal Relations

The parties address the first two Grand Trunk factors together, so the Court will as well. In evaluating the first Grand Trunk factor, whether the declaratory action would resolve the dispute between the parties, courts consider whether it is an "independent dispute" such that its resolution would settle the controversy between the parties. Grand Trunk, 746 F.2d at 326. In evaluating the second Grand Trunk factor, whether a declaratory judgment would clarify the legal relations at issue, courts consider whether "the declaratory judgment [would] provide a final resolution of the discrete dispute presented." Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 557 (6th Cir. 2008).

31

This factor "is closely related to the first factor and is often considered in connection with it." Id. The parties disagree as to whether these factors counsel for or against the Court exercising its jurisdiction over Lexon's claim. Governor Justice contends these factors weighs against the Court exercising jurisdiction, given Lexon is already seeking to recover its alleged damages and enforcement costs in connection with Counts I and II. (Doc. No. 67 at 3). Lexon counters that these factors weigh in favor of exercising jurisdiction, as Count III is broader than Count II, in that it expressly entitles Lexon to interest. (Doc. No. 66 at 3). Lexon concludes that a declaratory judgment in its favor would therefore settle the controversy between the parties by determining Governor Justice's liability under the Guaranty. (Id.).

The Court agrees with Lexon. While Lexon's declaratory judgment action is not entirely an "independent dispute," its resolution will still resolve the controversy between Lexon and Governor Justice. See Grand Trunk, 746 F.2d at 326. Lexon's declaratory judgment claim is rooted in the Court's interpretation of the Guaranty's indemnification provision, which provides for indemnification and payment for Lexon for any Loss sustained or incurred "by reason of failure of [Governor Justice] to perform or comply with the covenants and conditions of this Guaranty" or Lexon's enforcement of "any of the covenants and conditions" of the Guaranty. (Doc. No. 55-1 ¶ 2). Because its claim arises from the same factual circumstances underlying its suit against Governor Justice for breach of contract (Doc. No. 1 ¶¶ 78–101 (asserting Governor Justice breached the Guaranty, in part, by not paying Lexon after receipt of the Notice of Default for all three claims)), should the Court grant Lexon the declaratory relief it seeks and find that Governor Justice did not "perform or comply" with the Guaranty, it would also largely resolve the the breach of contract disputes, which have already been decided in Lexon's favor as to liability. See supra, Section III.1.

In fact, a declaratory judgment that Governor Justice failed to comply with the Guaranty by not paying Lexon upon receipt of the Notice of Default would settle the controversies between the parties as to Governor Justice's liability and would be consistent with the Court's determination as to summary judgment on Lexon's breach of contract claims, see supra, Section III.1. See Grand Trunk, 746 F.2d at 326. Governor Justice does not cite any authority to the contrary. See MedApproach Holdings, Inc. v. Hawkins, 2013 WL 3789515, at *6 (M.D. Tenn. July 18, 2013) (declining to exercise jurisdiction over broad request for declaratory judgment that was not based on any contractual right, and breach of contract, fraud, and civil conspiracy claims were already presented). Because a declaratory judgment would settle the controversy between Lexon and Governor Justice, would provide a final resolution to this dispute, and would honor the Court's findings above, see supra, Section III.1, the Court finds the first and second Grand Trunk factors counsel for exercising jurisdiction. See Western World Ins. Co. v. Hoey, 773 F.3d 755, 760 (6th Cir. 2014); see also Flowers, 513 F.3d at 557.

### 3. Procedural Fencing or Race for *Res Judicata*

On the third Grand Trunk factor, whether the plaintiff is seeking declaratory relief for "procedural fencing" or to win a race for *res judicata*, "[t]he question is. . . whether the declaratory plaintiff has filed in an attempt to get her choice of forum by filing first." AmSouth Bank v. Dale, 386 F.3d 763, 788 (6th Cir. 2004). Indeed, when plaintiffs file their declaratory judgment claim after state court litigation has begun, courts generally give them "the benefit of the doubt that no improper motive fueled the filing of [the declaratory judgment] action." Bituminous Cas. Corp. v. J&L Lumber Co., Inc., 373 F.3d 807, 814 (6th Cir. 2004). Lexon contends this factor is supportive in determining whether the Court exercise its jurisdiction over its claim, given there is no evidence of procedural fencing or racing for *res judicata*, particularly given the parties agreed

33

to file suits in this venue and Lexon brings other claims that the Court has proper jurisdiction over. (Doc. No. 66 at 3–4). Governor Justice contends this factor is neutral, given "there is no evidence of procedural fencing." (Doc. No. 67 at 3).

The Court agrees with the parties that the third <u>Grand Trunk</u> factor is at least neutral, if not slightly in favor of, exercising jurisdiction. <u>See</u> <u>Travelers Indem. Co. v. Bowling Green Pro. Assocs., PLC</u>, 495 F.3d 266, 272 (6th Cir. 2007) ("Although no improper motive prompted this action, this factor is neutral."). This case is different from <u>AmSouth</u> and <u>Bituminous</u>, in that there is no related state court action to consider here. Still, the Court finds the logic in those cases supports a finding here that Lexon is not attempting to procedurally fence or race with Governor Justice for *res judicata*. Lexon filed its declaratory judgment claim in federal court without the presence of any preexisting state court case, suggesting it did not file its claim in an attempt to get a more favorable forum. <u>See</u> <u>AmSouth</u>, 386 F.3d at 788 (procedural fencing evaluated by, in part, whether plaintiff filed first). This is supported by Lexon's point that the parties contracted to file suits in "any state or federal court of competent jurisdiction in Wilson County, Tennessee[,]" such as this one. (Doc. No. 66 at 4; Doc. No. 55-1 ¶ 10). And because there is no evidence indicating improper intent on Lexon's part in filing its declaratory judgment claim, the Court must give Lexon the benefit of the doubt. <u>See</u> <u>Bituminous</u>, 373 F.3d at 814; <u>see also</u> <u>United Specialty Ins. Co. v. Cole's Place, Inc.</u>, 936 F.3d 386, 399 (6th Cir. 2019). Accordingly, the Court finds the third <u>Grand Trunk</u> factor is at least neutral. <u>See</u> <u>Travelers Indem. Co.</u>, 495 F.3d at 272; <u>see also</u> <u>United Specialty Ins. Co.</u>, 936 F.3d at 399 ("If there is no evidence of procedural fencing, we often find that the factor is "neutral[.]").

4.   Increased Friction Between Federal and State Courts

The Sixth Circuit uses three factors to evaluate the fourth Grand Trunk factor, whether exercising jurisdiction would increase friction between state and federal courts.  These factors include:

> (1) whether the underlying factual issues are important to an informed resolution of the case;
> (2) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and
> (3) whether there is a close nexus between the underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.

Bituminous, 373 F.3d at 814–15 (citing Flowers, 211 F.3d at 968).  Governor Justice concedes that this factor weighs in favor of exercising jurisdiction.  (See Doc. No. 67 at 3).  Lexon does not address the Bituminous factors, instead contending this factor is not relevant to the analysis because there is no corresponding pending state court action.  (Doc. No. 66 at 5).

The Court agrees with Governor Justice that this factor weighs in favor of exercising jurisdiction.  As to the first and second Bituminous factors, there are no underlying factual issues relating to Lexon's declaratory judgment claim that are also pending before a state court.  See Bituminous, 373 F.3d at 815 (evaluating the first factor in the context of underlying state court actions).  Given there is no state action the Court would be interfering with by exercising its jurisdiction over Lexon's claim, these factors counsel towards exercising jurisdiction.  As to the third factor, the legal issue presented in the declaratory judgment action is a straightforward contract interpretation issue, and does not implicate any undetermined questions of state law.  Accordingly, the Court finds the fourth Grand Trunk factor weighs in favor of the Court exercising its jurisdiction over Lexon's claim.  See Grand Trunk, 746 F.2d at 326.

35

5. <u>Availability of Alternative Remedy</u>

As to the fifth <u>Grand Trunk</u> factor, courts may "deny declaratory relief if an alternative remedy is better or more effective."  <u>Id.</u>  Governor Justice argues this factor weights against the Court exercising jurisdiction, as Lexon's declaratory judgment claim is duplicative of more effective and appropriate remedies, Lexon's breach of contract claims.  (Doc. No. 67 at 4).  Lexon, however, contends that declaratory judgment would provide clarity as to the "full scope of" Governor Justice's liability under the provisions of the Guaranty. (Doc. No. 66 at 5).

This factor is a close call.  Governor Justice is largely correct that Lexon's declaratory judgment and breach of contract claims are essentially the same.  For instance, both are rooted in the same allegation that Governor Justice breached the Guaranty by failing to pay Lexon upon receipt of its Notice of Default.  (Doc. No. 1 ¶¶ 78–101).  Both claims even seek relief relating to Lexon's indemnification: Lexon's breach of contract claims request damages for Lexon's losses (Doc. No. 1 ¶ A (prayer for relief requesting "compensatory damages"), ¶ B (prayer for relief requesting "costs, expenses, and fees that it has incurred and continues to incur in any way relating to the enforcement or protection of its rights under the Guaranty") and its declaratory judgment claim requests a declaration that it is entitled to indemnification for "any Loss sustained or incurred . . . by reason of the failure of [Governor] Justice to perform or comply with the covenants and conditions of the Guaranty[.]"  (<u>Id.</u> ¶ D).

However, Lexon's declaratory judgment claim, although very similar to its breach of contract claims, ultimately seeks a different form of relief, as the former seeks a declaration, and the latter seek damages.  (<u>See</u> <u>id.</u> ¶¶ 87, 92 (breach of contract claims seeking damages); <u>id.</u> ¶ 101 (declaratory relief claim seeking declaration of liability)).  And Lexon is correct that the indemnification provision of the Guaranty entitles it to "six percent [interest] per annum," while

36

the other clauses in the Guaranty provide no such recovery. (Doc. No. 55-1 ¶ 2). Further, given the lengthy relationship between the parties, a declaration as to the Guaranty's indemnification provision could provide further clarity as to the parties' respective rights and duties under the Guaranty moving forward. The Court is therefore not convinced these claims are entirely duplicative of one another. See Dolencorp, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh Pennsylvania, 2018 WL 3753157, at *2 (M.D. Tenn. Aug. 8, 2018) (declaratory relief that overlaps with breach of contract claim is not duplicative because it could affect future relations of parties); but see Malibu Media, LLC v. Redacted, 705 F. App'x 402, 407 (6th Cir. 2017) (upholding dismissal of claim for declaratory judgment that did not add something to a substantive dispute because it was already addressed by another claim).

Considering the similarity of Lexon's claims, the undisputed factual circumstances, and that issuing a declaratory judgment here will settle the parties' controversies or fully clarify their legal relations, the Court finds in its discretion that Lexon's declaratory judgment claim does not have a better or more effective remedy in Lexon's breach of contract claims. See Grand Trunk, 746 F.2d at 326. As to Lexon's breach of contract claims, it will be able to obtain damages from Governor Justice that would compensate it for his failure to timely pay the Obligors' remaining obligations. However, Lexon would not necessarily be entitled to damages at a rate of six percent interest per annum for these claims. (See Doc. No. 55-1 ¶ 5(a) (providing for the "obligations the Guarantor" shall pay under the Guaranty, not accounting for an interest rate of six percent annum)). And there are no factual issues for the jury to determine here as to Governor Justice's liability such that exercising jurisdiction over Lexon's declaratory judgment claim would usurp the jury's factfinding role. See supra, Section III.1. Accordingly, the fifth Grand Trunk factor weighs in favor of exercising jurisdiction.

37

Ultimately, the Court exercising its jurisdiction over Lexon's declaratory judgment claim will "serve a useful purpose in clarifying and settling the legal relations [at] issue," and will "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." Grand Trunk, 746 F.2d at 326. With this in mind, and weighing the Grand Trunk factors together, the Court elects to exercise its jurisdiction over Lexon's declaratory judgment claim.[19] See id.

## B. The Merits of Lexon's Declaratory Judgment Claim

Having decided to exercise jurisdiction over Lexon's declaratory judgment claim, the Court must now address its claim on the merits. Under West Virginia law, where there are no facts in dispute, as is the case here, the determination of the proper coverage of an indemnification provision is a question of law. See Blankenship v. City of Charleston, 679 S.E.2d 654, 657 (W. Va. 2009) ("Determination of the proper coverage of an insurance contract when the facts are not in dispute is a question of law.") (internal citation omitted). This includes whether the indemnification provision is ambiguous. See id. As described above, see supra, Section III.1.A.2, where an indemnification provision is "clear and unambiguous, [it is] not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." Syl. Pt. 1, Christopher v. U.S. Life Ins. Co., 116 S.E.2d 864 (W. Va. 1960).

The indemnification provision at issue states:

2. <u>Indemnification</u>. The Guarantor shall, upon demand from the Beneficiary, promptly indemnify, exonerate, reimburse and hold the Beneficiary harmless

---

[19] Governor Justice repeatedly suggests that this Court should follow its recent decision in Edmondson v. Nissan N. Am., Inc., 2024 WL 4715808, at *4 (M.D. Tenn. Nov. 6, 2024), where the Court in its discretion declined to exercise jurisdiction over Nissan's declaratory judgment claim. Governor Justice's reliance on Edmondson is misplaced, particularly considering: the myriad of factual disputes that remain between those parties; the three consolidated cases at issue there; and the various claims that could not be resolved at summary judgment. See Edmondson v. Nissan N. Am., Inc., 2024 WL 4635051 (M.D. Tenn. Oct. 30, 2024).

38

> from and against any and all liability, damage, cost and expense of whatsoever kind or nature (cumulatively, "Loss") and pay the Beneficiary for any Loss sustained or incurred (i) in connection with or arising out of any of the Beneficiary's obligations under the Amended Underlying Agreement or any GAI, (ii) by reason of the failure of the Guarantor to perform or comply with the covenants and conditions of this Guaranty, and (iii) enforcing any of the covenants and conditions of this Agreement. An itemized statement of Loss by the Beneficiary, sworn to by an officer of the Beneficiary, shall be prima facie evidence of the fact and amount of the liability of the Guarantor to the Beneficiary. The Beneficiary shall be entitled to receive interest at the rate of six percent per annum from the date of its payment of each Loss.

(Doc. No. 55-1 ¶ 2) (emphasis added). Lexon requests that the Court declare that it is entitled to recover: (1) "any 'Loss' sustained or incurred 'by reason of' [Governor Justice's] failure to comply with the Guaranty and/or in Lexon enforcing the terms of the Guaranty[;]" and (2) "interest at the rate of six percent per annum from the date of its payment of each Loss." (Doc. No. 53 at 13). As discussed above, Governor Justice does not respond directly to this argument, instead resting his whole brief on his flawed assumption that his affirmative defenses would prevail. (See Doc. No. 61).

Even assuming that Governor Justice did not implicitly concede Lexon is correct in its interpretation of the indemnification provision by not responding to Lexon's arguments (which the Court is not convinced of), the Court still agrees with Lexon's interpretation. Upon giving the indemnification terms their plain and ordinary meaning, see Blankenship, 679 S.E.2d at 659, the Court finds that the first and third clauses of paragraph 2 means exactly what they say: (1) that Governor Justice must indemnify and pay Lexon for any "Loss," meaning "any and all liability, damage, cost and expense of whatsoever kind or nature," that was "sustained or incurred by way of" (2) "the failure of [Governor Justice] to perform or comply with the covenants and conditions of this Guaranty" or by Lexon's "enforcing of any of the covenants and conditions" of the Guaranty. (Doc. No. 55-1 ¶ 2). Where this occurs, paragraph 2 provides for Lexon to be entitled

39

to "receive interest at the rate of six percent per annum from the date of its payment of each Loss." (Id.). In reading this plain language, Lexon is entitled to compensation for its Loss relating to Governor Justice's failure to abide by the Guaranty, or Lexon's enforcement of the Guaranty, at a rate of six percent interest per year. This language cannot be subject to any other reasonable interpretation. See FOP, Lodge No. 69, 468 S.E.2d at 716. Perhaps that is why Governor Justice did not put one before the Court.

Because the Court has already determined that there is no genuine dispute of material fact that Governor Justice breached the Guaranty by failing to make payment upon Lexon's demand, and that Lexon has sustained damages because of that breach, see supra, Section III.1.A, the Court finds as a matter of law that Governor Justice has failed to perform or comply "with the covenants and conditions of this Guaranty" and Lexon has sustained Loss "enforcing" the Guaranty such that Governor Justice must indemnify Lexon for its Loss at a rate of "six percent per annum from the date of its payment of each Loss." (See Doc. No. 55-1 ¶ 2). While Lexon has provided evidence of its Loss, (see, e.g., Doc. Nos. 55-12, 55-13), the Court need not determine the amount of damages Lexon is entitled to here because the parties have agreed to bifurcate the issue of damages as to this claim (see Doc. No. 50). Accordingly, Lexon's motion will be granted on its declaratory judgment claim.

## IV.     CONCLUSION

For the foregoing reasons, Lexon's Motion for Summary Judgment (Doc. No. 52) will be granted as to Governor Justice's liability on Counts I and II; denied as to Count I's damages; and granted as to Count III. Disputes between damages owed to Lexon under all three counts remain.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE