IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE

LEXON INSURANCE COMPANY,

                      Plaintiff,

-against-

JAMES C. JUSTICE II,

                      Defendant.

Civil Action No. 3:23-cv-0772

Chief Judge Waverly D. Crenshaw
Magistrate Judge Barbara D. Holmes

## DEFENDANT'S PRETRIAL BRIEF

Pursuant to this Court's instructions at the June 23, 2025 status conference, Defendant James C. Justice II, by counsel, respectfully submits this pretrial brief.

### I.    Factual Background and Procedural History

Lexon previously issued surety bonds to certain companies affiliated with Senator Justice. Lexon has sued Senator Justice ("Defendant") to collect on a limited commercial guaranty regarding an agreement between certain companies (the "Primary Obligors") and Lexon. The original March 2018 agreement (the "Agreement") provided that Lexon would release certain collateral and that the Primary Obligors would post $5 million in new collateral within six months, as well as take certain steps to pay past due premiums. (ECF 55-3.)

On or about February 4, 2019, the parties executed an amendment to the Agreement (the "Amended Agreement"). (ECF 55-4.) With respect to the collateral requirements, the Amended Agreement increased the amount from $5 million to $20 million but set up a payment schedule, with the final payment due April 1, 2021. (*Id.* at 2-5.) As to the premium indebtedness, the Amended Agreement added $2,513,400.75 in new debt to the $1,025,000 that remained as of the

date of amendment and designated the resulting total of $3,538,400.75 as the "Total Indebtedness." (*Id.* at 5.) Although premium payment obligations already existed independently of the Amended Agreement, the Amended Agreement required the Primary Obligors to make premium payments of $200,000 per month with no end date. (*Id.* at 5, 7.) Defendant executed an Amended and Restated *Limited* Commercial Guaranty ("Amended Limited Guaranty") regarding the collateral and premium obligations in the Amended Agreement, with defined limits. (ECF 55-1.)

Thereafter, in January and March 2020, the Primary Obligors and Lexon executed two side letter agreements ("the Side Letter Agreements"). The Side Letter Agreements (1) temporarily changed the monthly premium payments; (2) altered the payment schedule for the collateral; and (3) obligated Lexon to use collateral to fund reclamation obligations. (*See* ECF 55-5.)

In July 2023, Lexon filed this lawsuit to enforce the Amended Limited Guaranty after the Primary Obligors allegedly breached the underlying agreements. Count I seeks damages for breach of the Amended Limited Guaranty, while Counts II and III seek enforcement costs (attorney fees and other litigation expenses). Defendant opposed Lexon's claims by arguing, among other things, that Lexon breached the underlying agreements by refusing to release collateral to fund reclamation activities and otherwise undermined the Primary Obligors' ability to pay Lexon.

On December 3, 2024, the Court issued a Memorandum Opinion (ECF 68) granting partial summary judgment to Lexon (the "Summary Judgment Opinion"). The Court found Defendant liable on Counts I–III but determined that issues of material fact remained as to certain aspects of Lexon's damages under Count I.[1] Specifically, the Court held that Lexon is entitled to (1) $20

---

[1] The determination of Lexon's damages under Counts II and III had been bifurcated and therefore was not considered in the Summary Judgment Opinion. The parties have since agreed to determine Lexon's damages under Counts II and III through the post-trial process set forth in Local Rule 54.01. (*See* ECF 87.)

million in collateral, minus any collateral payments made by the Primary Obligors; plus (2) the "Total Indebtedness." (ECF 68, at 20.) The Court found that there is no genuine issue of material fact as to the collateral balance owed ($14,250,000), but that there are genuine issues of fact as to the amount of "Total Indebtedness." (*Id.* at 21.) The Court held that the "Total Indebtedness" includes the "$3,538,400.75 of Total Indebtedness described in the Amended Agreement, plus additional premiums that became due during the Amended Agreement's term," minus any premium payments made by the Primary Obligors. (*Id.* at 19-21.) The Court then held that there are genuine issues of material fact as to the "term" of the Amended Agreement (which the Court found ambiguous), the amount of premium payments made to Lexon, and, ultimately, the amount of premium owed to Lexon. (*Id.* at 19-22).

At a status conference on June 23, 2025, the Court instructed the parties to submit pretrial briefs on or before July 28, 2025 discussing (1) the areas where the parties agree and disagree; and (2) anything that a party believes the Court got wrong or missed in its Summary Judgment Opinion with respect to the damages issues for trial. Defendant now submits this brief in accordance with the Court's instructions.

## II. Points of Agreement and Disagreement

Upon information and belief, the parties agree on the amount of premium payments that the Primary Obligors made to Lexon after the execution of the February 4, 2019 Amended Agreement. Defendant previously submitted documentation of the premium payments it made to Lexon after February 4, 2019, which total $4,210,000. (*See* ECF 60-21.) Upon information and belief, Lexon does not dispute that the Primary Obligors made these payments.

The parties disagree, however, on the term of the Amended Agreement and the ultimate amount of premium that Defendant is liable for under the Amended Limited Guaranty. The parties

3

also disagree on Lexon's entitlement to prejudgment interest and the calculation of pre- and post-judgment interest. Defendant's positions on these issues are discussed below.

## III. Defendant's Positions on the Points of Disagreement

### A. The documents at issue limit Lexon's "Total Indebtedness" damages in this lawsuit to $3,538,400.75.

Although the Court's Summary Judgment Opinion held that Lexon's "Total Indebtedness" damages include both the $3,538,400.75 of Total Indebtedness specified in the Amended Agreement and additional premiums that became due during the term of the Amended Agreement, the Court instructed the parties at the June 23, 2025 status conference to include in their pretrial briefing anything that a party believes the Court got wrong or missed in its Summary Judgment Opinion with respect to damages.

In accordance with that instruction, Defendant respectfully submits that the documents at issue define "Total Indebtedness" as—and limit Defendant's liability for the "Total Indebtedness" to—the specified sum of $3,538,400.75. To elaborate, the Amended Agreement defines "Total Indebtedness" as follows:

> The Parties Agree the Remaining Indebtedness is equal to One Million Twenty-Five Thousand U.S. dollars ($1,025,000.00). The Parties also agree that in addition to the Remaining Indebtedness, additional premium of $2,513,400.75 is now due and owing (the "New Indebtedness"). The Remaining Indebtedness together with the New Indebtedness is equal to ***$3,538,400.75 (the "Total Indebtedness")***.

(ECF 55-4, at p.5, emphasis added.) Although the Amended Agreement subsequently states that the "New Indebtedness" shall be increased by premiums that become due during the term of the Amended Agreement (*id.* at pp. 6-7), the Amended Agreement does not define "Total Indebtedness" as the sum of the "Remaining Indebtedness" and the "New Indebtedness" in the abstract, whatever those amounts may be. Rather, as illustrated by the language quoted above, the

4

Amended Agreement defines "Total Indebtedness" as $3,538,400.75. (*Id.* at p.5.) To the extent that the third "WHEREAS" clause in the preamble to the Amended Limited Guaranty indicates that the "Total Indebtedness" includes new premiums becoming due during the term of the Amended Agreement (ECF 55-1, at 1), that is at best an inconsistency that conflicts with the actual terms of the Amended Agreement. And any ambiguity or uncertainty in a contract should be resolved against the drafter (here, Lexon). *CONSOL Energy, Inc. v. Hummel*, 792 S.E.2d 613, 620 (W. Va. 2016); *Jochum v. Waste Mgmt. of W. Va., Inc.*, 680 S.E.2d 59, 64 (W. Va. 2009).

But even if the Amended Agreement did define "Total Indebtedness" as the abstract sum of the "Remaining Indebtedness" and the "New Indebtedness" instead of the specified amount of $3,538,400.75, the Amended Limited Guaranty caps Defendant's liability at the specified amount:

> ***Notwithstanding anything contained herein to the contrary***, the obligations of Guarantor ***shall be limited to*** a total sum equal to (i) fifteen million U.S. dollars ($15,000,000.00) plus (ii) the ***amount*** of the Total Indebtedness ***specified*** in the Amended Underlying Agreement; (ii) provided that, in the event of any default by Collateral Obligor and/or Indebtedness Obligor with respect to the New Collateral Replenishment Obligation or the New Indebtedness Payment Obligation, including without limitation any failure to timely pay any payment due under either such Obligation, the obligations of Guarantor ***shall*** instead ***be limited to*** a total sum equal to (i) twenty million U.S. dollars ($20,000,000.00) plus (ii) the ***amount*** of the Total Indebtedness ***specified*** in the Amended Underlying Agreement.

(ECF 55-1, at pp. 4-5, ¶ 5(e), emphasis added.) There is only one "amount" of the Total Indebtedness "specified" in the Amended Agreement: $3,538,400.75. (ECF 55-4, at p.5.) Thus, the Amended Limited Guaranty limits the "Total Indebtedness" damages for which Defendant is responsible to the specified amount of $3,538,400.75.

This is consistent with the manifest purpose of paragraph 5(e) of the Amended Limited Guaranty, which is to put a hard limit on Defendant's responsibility as guarantor. It would make no sense to "limit" Defendant's exposure to a nebulous, potentially limitless amount—*e.g.*, the

5

amount of additional premiums that continue to become due independently of the Amended Agreement until the Primary Obligors have paid off all sums owed to Lexon, which may never happen. The language in paragraph 5(e) purporting to "limit" Defendant's exposure as guarantor would be meaningless and superfluous if it imposed no discernable limit short of the maximum, unspecified amount that the Primary Obligors could potentially owe. *See* Syl. Pt. 1, *Wood v. Sterling Drilling & Prod. Co.*, 422 S.E.2d 509 (W.Va. 1992) (The language of a contract "must be considered and construed as a whole, giving effect, if possible, to all parts of the instrument," and "specific words or clauses of an agreement are not to be treated as meaningless, or to be discarded, if any reasonable meaning can be given them consistent with the whole contract.").

Since the Primary Obligors made premium payments totaling $4,210,000 after February 4, 2019—which is more than the amount of the Total Indebtedness specified in the Amended Agreement ($3,538,400.75)—Lexon should not be entitled to recover any damages for the Total Indebtedness from Defendant as guarantor. But to the extent Lexon is entitled to recover any amount of Total Indebtedness, paragraph 5(e) of the Amended Limited Guaranty caps Lexon's recovery at $3,538,400.75, which is "the amount of the Total Indebtedness specified in the Amended Underlying Agreement."

### B. To the extent the term of the Amended Agreement controls, it should be defined to have ended no later than October 1, 2021.

The original Agreement had three main components: (1) Lexon would release approximately $4.4 million in collateral; (2) the Primary Obligors would post new collateral with a value of $5 million within six months; and (3) certain equipment would be sold to satisfy the then-outstanding premium balance of $3 million. (ECF 55-3.) By February 4, 2019, the Primary

Obligors had paid the premium balance down to $1,025,000 but sought new bonds from Lexon. These and other circumstances led to the execution of the Amended Agreement.

Under the Amended Agreement, the Primary Obligors agreed to deliver $20 million in collateral to Lexon on a schedule that ended in April 2021. (ECF 55-4, at 2-5.) They also agreed to pay $3,538,400.75 in premium indebtedness (the "Total Indebtedness") on a schedule that would last approximately 18 months at most. (*Id.* at 5.) More specifically, they agreed to pay $200,000 per month ($3,538,400.75 divided by $200,000 is approximately 18) *and* to sell certain equipment with the proceeds to be used to reduce the Total Indebtedness, which would decrease the number of $200,000 payments needed to eliminate the Total Indebtedness. (*Id.* at 5-6.) So, nobody intended for any amount of the Total Indebtedness to remain past August 2020 (18 months from February 2019). The fact that this payoff did not happen as contemplated may mean that the Amended Agreement was breached, but it does not change the intended term of the payments toward the Total Indebtedness. Because the Primary Obligors agreed to pay $20 million in collateral on a schedule that ended April 1, 2021 and to pay the Total Indebtedness on a schedule that would end by August 2020, the original "term" of the Amended Agreement should be defined to end on April 1, 2021—the latest date referenced and contemplated in the Amended Agreement.

Defendant recognizes, however, that the first Side Letter Agreement extended the collateral payment schedule. The Amended Agreement set forth the following schedule: (i) if the full $20 million has not been paid by September 30, 2019, then the Primary Obligors pay $5 million (less payments previously made) on October 1, 2019; (ii) if the full $20 million has not been paid by March 31, 2020, then the Primary Obligors pay $10 million (less payments previously made) on April 1, 2020; (iii) if the full $20 million has not been paid by September 30, 2020, then the Primary Obligors pay $15 million (less payments previously made) on October 1, 2020; and (iv) if the full

7

$20 million has not been paid by March 31, 2021, then the Primary Obligors pay $20 million (less payments previously made) on April 1, 2021. (ECF 55-4, at 3-5.)  The first Side Letter Agreement extended all the unexpired dates by six months, except that, due to a typographical error, the final date was stated as October 1, 2022 rather than October 1, 2021.  (*See* ECF 55-5.)  Nevertheless, it is clear from context that the parties intended the final date to be October 1, 2021.  Thus, the term of the Amended Agreement should be defined as ending October 1, 2021 at the latest.

Upon information and belief, Lexon contends that the term of the Amended Agreement is defined by the obligation to pay $200,000 per month until the Total Indebtedness—which Lexon defines to include new premiums that become due during the term of the Amended Agreement—is paid in full.  But there are several reasons why the Court should not adopt this interpretation.

The first is that it's circular: Lexon proposes to define the term of the Amended Agreement based on the payment in full of all premiums that become due during the term of the Amended Agreement.

Second, to the extent Lexon contends the term of the Amended Agreement lasts until the Primary Obligors pay their premium balance down to zero, this would result in no end date because the Primary Obligors (none of which have the ability to pay any significant amount) may never accomplish this.  Thus, Lexon's interpretation would result in a potentially never-ending obligation to pay $200,000 per month toward an ever-growing premium balance.[2]  *See M & G Polymers USA,*

---

[2] In fact, according to the Amended Agreement, the obligation to make $200,000 monthly premium payments does not terminate when the Total Indebtedness (regardless of how that term is defined) is paid in full.  Rather, the Amended Agreement states that "[a]t such time as the Total Indebtedness is paid in full, the Collateral Justice Companies and Beech Creek shall pay Lexon (i) any additional premium due, or (ii) Two Hundred Thousand U.S. dollars ($200,000.00) per month, whichever is greater." (ECF 55-4, at 7.)  Thus, using the duration of the $200,000 payments to define the term of the Amended Agreement would result in an infinite term.

*LLC v. Tackett*, 574 U.S. 427, 441 (2015) (recognizing "the traditional principle that courts should not construe ambiguous writings to create lifetime promises").

Third, while the obligation to deliver $20 million in collateral was created by the Amended Agreement, the Primary Obligors would have the obligation to pay premiums for their surety bonds even if the Amended Agreement were never executed. And Defendant anticipates that the evidence at trial will show that premiums accrued independently of the Amended Agreement in amounts approximating or exceeding the $200,000 monthly payments set forth in the Amended Agreement. It is far more reasonable to define the term of the Amended Agreement by reference to the collateral payment schedule created therein than by potentially never-ending payments toward premium obligations that exist independently of the Amended Agreement.

Ultimately, as Defendant will show at trial, nobody intended this agreement to last over six years and counting or to obligate Defendant to cover the Primary Obligors' ongoing premium payments in perpetuity.

    **C.**    **Lexon is not entitled to 7% pre- and post-judgment interest.**

Upon information and belief, Lexon contends that it is entitled to pre- and post-judgment interest at the West Virginia statutory rate of 7%. Although it appears that Lexon bases this position on W. Va. Code 56-6-31, it is W. Va. Code § 56-6-27 that governs prejudgment interest in contract cases. *See* Syl. Pt. 1, *Miller v. WesBanco Bank, Inc.*, 859 S.E.2d 306 (W. Va. 2021) ("West Virginia Code section 56-6-27 (eff. 1923) provides the exclusive means by which to obtain prejudgment interest in any action founded on contract."). Under W. Va. Code § 56-6-27, prejudgment interest is not mandatory but a matter of discretion. *See Velasquez v. Roohollahi*, No. 13-1245, 2014 WL 5546140, at *3-4 (W. Va. Nov. 3, 2014); *Leyzorek v. Pocahontas Cnty. Solid Waste Auth.*, No. 13-1160, 2014 WL 2922803, at *4 (W. Va. June 27, 2014).

9

Although W. Va. Code § 56-6-27 does not prescribe how to decide whether to award prejudgment interest or how to calculate it, federal courts have focused on the loss of use of the money owed and the injured party's borrowing costs. *See Com. Builders, Inc. v. McKinney Romeo Props., LLC*, No. 1:20CV62, 2022 WL 16706973, at *14 (N.D.W. Va. May 18, 2022). Here, no prejudgment interest should be awarded on the collateral portion of the judgment because collateral exists for security, not for the holder's use. Further, any prejudgment interest award should not be calculated at 7%. Rather, the Court should look to Treasury yields as an indicator of borrowing costs. *See id.* (using the one-year constant maturity Treasury yield, averaged on a weekly basis).

Turning to post-judgment interest, even in contract cases where prejudgment interest is governed by W. Va. Code § 56-6-27, post-judgment interest is governed by federal law in accordance with 28 U.S.C. § 1961. *See Ferguson Enters., LLC v. Wolfe Constr. Co., Inc.*, No. 2:20-CV-00439, 2021 WL 2877604, at *3 (S.D.W. Va. July 8, 2021). Under § 1961, post-judgment interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding [ ] the date of the judgment." 28 U.S.C. § 1961(a).

Respectfully submitted,

JAMES C. JUSTICE II,

By Counsel:

*/s/ Peter C. Robison*
Peter C. Robison (No. 27498)
LEWIS THOMASON, P.C.
427 Church Street, Suite 2500
Nashville, TN 37219
(615) 259-1366
probison@lewisthomason.com

*/s/ David R. Pogue*

10

David R. Pogue (admitted *pro hac vice*)
Raymond S. Franks II (admitted *pro hac vice*)
CAREY DOUGLAS KESSLER & RUBY PLLC
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone:    (304) 345-1234
Facsimile:    (304) 342-1105
drpogue@cdkrlaw.com
rfranks@cdkrlaw.com

11

Case 3:23-cv-00772   Document 93   Filed 07/28/25   Page 11 of 12 PageID #: 1317

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 28, 2025, the foregoing document was filed via the Court's ECF system, which will send a notice of electronic filing to all ECF-registered counsel of record listed below:

| | |
|---|---|
| Jason M. Halper (*admitted pro hac vice*) | W. Brantley Phillips, Jr. (BPR# 018844) |
| Sara E. Brauerman *(admitted pro hac vice)* | Garrah Carter-Mason (BPR# 037518) |
| Timbre Shriver (*admitted pro hac vice*) | BASS, BERRY & SIMS PLC |
| VINSON & ELKINS LLP | 150 Third Avenue South, Suite 2800 |
| The Grace Building | Nashville, TN 37201 |
| 1114 Avenue of the Americas | Tel: (615) 742-6200 |
| 32nd Floor | Fax: (615) 742-6293 |
| New York, NY 10036 | bphillips@bassberry.com |
| Phone: 212-237-0000 | garrah.cartermason@bassberry.com |
| Email: jhalper@velaw.com | |
| sbrauerman@velaw.com | |
| tshriver@velaw.com | |

*/s/ Peter C. Robison*
Peter C. Robison