**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

LEXON INSURANCE COMPANY,

               Plaintiff,

    v.

JAMES C. JUSTICE II,

               Defendant.

Civil Action No. 3:23-cv-00772

Judge Waverly D. Crenshaw, Jr.
Magistrate Judge Barbara D. Holmes

Trial Date:  August 19, 2025

## PLAINTIFF'S PRE-TRIAL BRIEF

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

RELEVANT BACKGROUND ................................................................................................... 4

ARGUMENT ............................................................................................................................... 7

I. THE AMENDED AGREEMENT'S TERM CONTINUES UNTIL THE OBLIGATIONS THEREUNDER ARE PAID IN FULL ............................................. 7

    A. The Amended Agreement and Guaranty are Clear and Unambiguous .................. 8

        i. The Amended Agreement is in Effect Until the Obligations are Satisfied ........................................................................................................ 9

        ii. The Amended Agreement is Not Susceptible to Multiple Interpretations ....................................................................................... 12

    B. Extrinsic Evidence Confirms that the Amended Agreement Continues Until the Obligations are Paid in Full ........................................................................ 14

        i. The Parties Situation at the Time of, and Negotiations Regarding, the Amended Agreement Establish their Intention that Premiums Continue to Accrue Until the Obligations are Satisfied ........................... 15

        ii. The Parties' Post-Execution Conduct Shows their Mutual Understanding that Premiums Continue to Accrue ................................... 17

II. THE GUARANTY ENTITLES LEXON TO ALL PREMIUM AMOUNTS INCURRED DURING THE TERM OF THE AMENDED AGREEMENT ................... 18

    A. The Premium Tracker Traces Premium Accruals and Payment Credits ............. 19

    B. Understanding the Premium Tracker ................................................................... 19

        i. Tab 1: Bond Detail ................................................................................... 19

        ii. Tab 2: Payment Summary ........................................................................ 22

III. THE APPROPRIATE RATE FOR PRE- AND POST-JUDGMENT INTEREST IS 7% ....................................................................................................................... 23

IV. DAMAGES AWARDED AND OWED TO LEXON .................................................... 24

V. THE COURT SHOULD DENY DEFENDANT'S IMPROPER REQUEST FOR RECONSIDERATION ................................................................................................. 24

CONCLUSION .......................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Antero Res. Corp. v. Directional One Servs. Inc.*,
  873 S.E.2d 832 (W. Va. 2022) ........................................................................ 9

*Bruce McDonald Holding Co. v. Addington*,
  825 S.E.2d 779 (W. Va. 2019) ................................................................... 9, 17

*Chesapeake Appalachia v. Hickman*,
  781 S.E.2d 198 (W. Va. 2015) ........................................................................ 9

*Consol. Lab'ys, Inc. v. Shandon Sci. Co.*,
  413 F.2d 208 (7th Cir. 1969) ........................................................................ 13

*Ctr. of Hope Christian Fellowship, Loc., Church of God in Christ v. Wells Fargo Bank Nevada, N.A.*,
  781 F. Supp. 2d 1075 (D. Nev. 2011) ............................................................ 12

*Freeman v. Montessori Sch. of Bowling Green*,
  1994 WL 476025 (Ohio Ct. App. Sept. 2, 1994) ............................................. 8

*Hansen-Gier Fam. Tr. of Apr. 22, 2016 v. Haywood*,
  902 S.E.2d 174 (W. Va. 2024) ........................................................................ 9

*Harbert v. Harrison Cnty. Ct.*,
  39 S.E.2d 177 (W. Va. 1946) ........................................................................ 13

*Hull Prop. Grp., LLC v. Quarrier St. LLC*,
  915 S.E.2d 11 (W. Va. Ct. App. 2025) ........................................................... 9

*M.M. & D.D. Brown v. Western Maryland Ry. Co.*,
  99 S.E. 457 (W. Va. 1919) ............................................................................. 8

*McCarthy Bldg. Companies, Inc. v. Mt. Hawley Ins. Co.*,
  2021 WL 8533897 (C.D. Cal. Feb. 24, 2021) ................................................. 8

*Miller v. WesBanco Bank, Inc.*,
  859 S.E.2d 306 (W. Va. 2021) ...................................................................... 14

*Romano v. Greve*,
  724 S.E.2d 331 (W. Va. 2012) ...................................................................... 18

*Sanchez v. Dep't of Veterans Affs.*,
  949 F.3d 734 (Fed. Cir. 2020) ...................................................................... 12

*TD Auto Fin. LLC v. Reynolds*,
  842 S.E.2d 783 (W. Va. 2020) ........................................................................ 9

*Toppings v. Rainbow Homes, Inc.*,
  490 S.E.2d 817 (W. Va. 1997) ........................................................................ 9

*Valerino v. Thompson*,
  28 F. Cas. 872 (S.D.N.Y. 1856) .................................................................... 12

*Vaughan Const. Co. v. Virginian Ry. Co.,*
  103 S.E. 293 (W. Va. 1920)...................................................................... 18

*Warrior Oil & Gas, LLC v. Blue Land Servs., LLC,*
  886 S.E.2d 336 (W. Va. 2023)................................................................. 23

*Watson v. Buckhannon River Coal Co.,*
  120 S.E. 390 (W. Va. 1923)...................................................................... 8

## Statutes

W. Va. Code Ann. § 56–6–27.................................................................... 23

W. Va. Code Ann. § 56–6–31.................................................................... 23

## Rules

Fed. R. Civ. P. 54(b).................................................................................. 25

Fed. R. Civ. P. 59(e)................................................................................. 25

L.R. 54.01................................................................................................... 1

## Other Authorities

Administrative Order re: Determination and Dissemination of the Rate of Interest on
  Judgments and Decrees for the Year 2023, Sup. Ct. of Appeals of W. Va. (Jan. 4, 2023),
  available at https://www.courtswv.gov/sites/default/pubfilesmnt/2023-
  06/interest2023_0.pdf.......................................................................... 23

## INTRODUCTION

Plaintiff Lexon Insurance Company ("Lexon") commenced this action against James C. Justice II ("Defendant"), now a U.S. Senator, as a result of his breach of a personal guaranty dated March 26, 2018, and amended February 4, 2019 (the "Guaranty"). In the Guaranty, Defendant guaranteed the payment of tens of millions of dollars owed to Lexon by certain of his family-owned companies or their operating affiliates (the "Justice Companies") and another affiliate, Beech Creek (collectively "Obligors"). In granting Lexon summary judgment on all counts in the Complaint (ECF 68), the Court found Defendant liable on Count I for breaching his contractual commitments by failing to pay amounts due under the Guaranty. The Court concluded that, at minimum, Defendant was required to pay Lexon $14,250,000 in collateral and $3,538,400.75 in outstanding premiums that were due but unpaid as of February 4, 2019.[1] The Court further found that Lexon is entitled to "additional [unpaid] premiums that became due during the Amended Agreement's term." ECF 68 at 19.

Only two questions remain for trial: (i) the period of time after February 4, 2019 during which additional premiums accrue pursuant to the Amended Agreement underlying the Guaranty; and (ii) the amount of such premiums. Lexon will establish at trial that Defendant is obligated under the Guaranty for all unpaid premiums that accrued after February 4, 2019 until the outstanding past-due premium balance is $0, and that as of June 30, 2025, those past-due unpaid premium obligations totaled $10,389,090.81 ($3,538,400.75 of which was already awarded).

The facts are familiar from the summary judgment briefing. *See* ECF 53–54. Over the course of a decade, Lexon issued more than $100 million in surety bonds to the Justice Companies.

---

[1] The Court also found that Defendant was liable under Counts II and III, which seek recovery of the attorney's fees and other costs to enforce the Guaranty and for indemnification. Those damages will be determined through the post-trial process set forth in Local Rule 54.01. *See* ECF 89 (granting Joint Motion Regarding Scope of Issues for Trial (ECF 87)).

In exchange for these bonds, the Justice Companies made two promises: (1) to pay recurring premiums until each bond is released; and (2) to post collateral demanded by Lexon to secure Lexon's risk under the bonds. When the Justice Companies failed to stay current on those obligations, the parties memorialized two agreements—the March 26, 2018 Agreement (the "Original Agreement") and a February 4, 2019 amendment (the "Amended Agreement")—that operated as payment plans to bring the accounts current over time by paying off past-due premiums ("New Indebtedness Payment Obligation") and replenishing collateral ("New Collateral Replenishment Obligation," and collectively the "Obligations"). Defendant executed the Guaranty to induce Lexon to enter into the Original Agreement and Amended Agreement.

Lexon's position on the term of the Amended Agreement is based on the clear language of the contract: the Amended Agreement "continues until the New Collateral Replenishment Obligation and New Indebtedness Payment Obligation are paid off completely." While the Amended Agreement does not have a discrete provision titled "Term," or "Duration," it does address the term by explicit reference (as quoted above) to the time when the New Collateral Replenishment and New Indebtedness Payment Obligations are "paid in full." That makes sense because, as the documentary evidence and testimony will establish, the Amended Agreement and Guaranty were intended to establish a schedule for payment of all unpaid obligations to Lexon. Indeed, the underlying premium payment obligations arise from General Agreements of Indemnity (the "GAIs") executed in connection with Lexon's issuance of the surety bonds. The GAIs make clear that premium continues to accrue until a bond is released or discharged (which, in turn, does not occur on a date certain, but rather only upon replacement of a Lexon bond with another surety's bond or satisfaction of the bonded obligations). Just as Obligors' premium obligations and Lexon's exposure under its bonds continue without a specific end date articulated in the GAIs, the

associated New Indebtedness Payment Obligation reflected in the Amended Agreement and Guaranty continues without a firm end date until that obligation is fulfilled.

This is consistent with the parties' course of dealing over time. Defendant and Obligors repeatedly acknowledged by words and actions their responsibility for premiums that continue to accrue until paid in full. Indeed, Defendant's Response to Plaintiff's Statement of Undisputed Material Facts did not dispute Plaintiff's statements that "[t]he Amended Agreement provides for the Obligors to pay Lexon $200,000 per month 'until the Total Indebtedness is paid in full (the 'Premium Payments')'" and "[t]he Amended Agreement further provides that 'additional amounts for premium may become due during the term of this Agreement' and that the amount of premiums constituting Total Indebtedness 'shall be increased in like amount.'" ECF 58 ¶¶ 8–9. And, the parties' email negotiations as far back as January 2019 reflect a mutual understanding that monthly premium payments due under the Amended Agreement would continue "until all premiums are current." Similarly, Obligors affirmatively asked to have additional premiums that became due following execution of the Amended Agreement convert to "New Indebtedness" once they were 60 days past due, thereby acknowledging the continued accrual of premiums subject to the Amended Agreement and, thus, the Guaranty. The parties never discussed or agreed to a specified end date for the conversion of newly accrued and past-due premiums into New Indebtedness.

As for the amount of premiums owed, Lexon's records—which are maintained in the ordinary course of business and remain undisputed—demonstrate that, as of June 30, 2025, the balance of unpaid premiums covered by the Guaranty was $10,389,090.81 ($3,538,400.75 of which has already been awarded to Lexon by the Court). That figure reflects all 60-day-past-due accrued premium obligations that the Amended Agreement itself characterizes as "New Indebtedness." For ease of reference, Lexon refers to these business records as the "Premium

Tracker"—a ledger that reflects all premiums accrued, and any payments by the Justice Companies credited against those obligations.

Lexon seeks only to be made whole consistent with its contractual rights. Lexon respectfully submits that the evidence will show that (i) the Amended Agreement's term (and thus the Guaranty) continues until Lexon receives payment of all premiums at least 60 days outstanding; and (ii) as of June 30, 2025, Obligors' unpaid premium totals $10,389,090.81, exclusive of pre- and post-judgment interest, fees, and costs. The Court should find that Lexon is entitled to $10,389,090.81, plus interest. An award of anything less would reward Defendant's breach, rewrite contracts, and deprive Lexon of the amounts to which it is entitled under the Amended Agreement and Guaranty.

## RELEVANT BACKGROUND

Lexon and its affiliates have issued over $100 million in surety bonds to Obligors. *See* ECF 55-10. The surety bonds guarantee the performance of reclamation obligations imposed by various state and federal regulators as reflected in permits the Justice Companies were required to obtain to run their coal mining operations. In exchange for the issuance of the surety bonds, Obligors are required to pay premiums and provide cash collateral as security for Lexon. *See* ECF 68 at 1–2. Once Lexon issues a surety bond, it remains obligated to the regulator pursuant to the terms of the bond until the bond is released or discharged. *See, e.g.*, Ex. 1 ¶ 3 at 11. Discharge or release occurs only if the Justice Companies replace the Lexon bonds with bonds from another surety or upon certification from the regulator that the underlying reclamation obligations have been performed. Lexon has no unilateral ability to terminate its obligations under, or to release, a bond. In fact, notwithstanding that Obligors and Defendant have not paid Lexon premiums in over four years and owe over $10 million in outstanding premium, Lexon's bonds—and, thus, its potential liability to perform should Obligors fail to fulfill their reclamation obligations—remain outstanding.

4

Lexon's only compensation for this significant long-term exposure is the premium and collateral payments Obligors have failed to make.

The premium payment obligation for each bond is set forth in the plain language of the GAI executed at the time of the bond's issuance. *See* Ex. 1. For instance, paragraph 3 of a March 30, 2016 GAI between Lexon and one of the Justice Companies, Southern Coal Company, states:

> The Indemnitor(s) [the Justice Companies] shall pay the premiums and renewal premiums for each Bond issued hereunder, inclusive of initial, fully earned, premium and all subsequent renewals, extensions or modifications until the Surety [Lexon] has received written legal evidence, satisfactory to the Surety, of its discharge from any and all such Bond(s) and all liability related thereto[.]

*Id*. ¶ 3 at 11. In other words, the Justice Companies owe premium payments to Lexon until they provide to Lexon evidence that the bond has been released by the relevant regulator.

The GAIs also outline the collateral obligation applicable to the relevant bond. For example:

> If Surety establishes a reserve account, the Indemnitor(s) [the Justice Companies] shall immediately upon demand provide Surety with collateral acceptable to Surety equal to the reserve set and any future reserve increases, whether or not Surety has yet made a payment or incurred a loss, or at any given point that Surety determines collateralization is required for any reason. Surety may retain the collateral until all actual and potential claims and losses of any type against the Bond(s) are exonerated and all loss is fully reimbursed[.]

*Id*. ¶ 5 at 11. Accordingly, when Lexon issues a bond, it reserves the right—and, in this case, exercised that right—to require and hold collateral to protect itself against actual or potential claims or losses against the relevant bonds.[2]

In 2018, Lexon, Defendant, and the Justice Companies, entered into the Original Agreement, dated March 26, 2018, whereby, among other things, certain of the Justice Companies

---

[2] As surety, Lexon issues bonds to a principal (*i.e.*, coal mine operator) to secure obligations (*i.e.*, pursuant to a permit to conduct mining operations) that the principal owes to an obligee (*i.e.*, state regulator that issued the permit). The bond guarantees the performance of the principal's obligations to the obligee. Thus, if the principal fails to perform its obligations to the obligee, Lexon is responsible for the performance of those obligations under certain circumstances. *See* ECF 56 ¶ 3.

5

and Beech Creek (defined above as Obligors), which were in default of their premium obligations and sought the release of collateral held by Lexon, committed to pay their overdue premium and replenish their collateral obligations on a payment schedule set forth in the Agreement. *See* ECF 68 at 2; *see also* Ex. 2. On February 4, 2019, the parties entered into the Amended Agreement. *See* ECF 68 at 3; *see also* Ex. 3.

Neither the Original Agreement nor the Amended Agreement excuse any past due or future payments owed under the GAIs. They simply restructured the payment schedules to provide Obligors with additional time to catch up on payment of their Obligations. The Amended Agreement refers to the premiums owed to Lexon as the "Total Indebtedness," which is the sum of the outstanding premiums due to Lexon as of March 26, 2018 ("Remaining Indebtedness") and premiums that accrued between March 26, 2018 and February 4, 2019 *and that continue to accrue* for the term of the Amended Agreement ("New Indebtedness"). Ex. 3. Together, these three terms—Total Indebtedness, Remaining Indebtedness, and New Indebtedness—comprise the New Indebtedness Payment Obligation defined in the Guaranty. Specifically, the Amended Agreement accounts for premiums as follows:

- Remaining Indebtedness is a stipulated amount: $1,025,000.00. *Id.* ¶ 3 at 5–7.

- New Indebtedness as of February 4, 2019, when the Amended Agreement was signed, is also a stipulated amount: $2,513,400.75. *Id.*

- New Indebtedness that accrues after February 4, 2019. *Id.* ¶ 3(c).

- Total Indebtedness is equal to the Remaining Indebtedness plus the New Indebtedness, including the additional premium that accrues as New Indebtedness. *Id.* ¶¶ 3, 3(c).

Defendant "absolutely, unconditionally and irrevocably guarantee[d]" the payment and punctual performance of (i) the New Collateral Replenishment Obligation and (ii) the New Indebtedness Payment Obligation, defined by the Guaranty as the obligation to pay "the Total Indebtedness (including any new premiums becoming due during the term of the Amended []

6

Agreement)." Ex. 4, Recitals at 1 (amending the original Guaranty, attached hereto as Ex. 5). The Guaranty provides that, if Obligors fail to pay any or all of their Obligations under the Amended Agreement, Defendant "shall" pay to Lexon "the entire amount" of the Obligations unpaid by Obligors within three business days of receipt of Lexon's written demand "as if such amount constituted the direct and primary obligation of [Defendant]." Ex. 4 ¶¶ 1(a)–(b). Likewise, the Guaranty also provides that, if Obligors "fail to pay any amounts due under any GAI," Defendant "shall" pay to Lexon "the entire amount of the amount remaining unpaid" by Obligors within ten business days of receipt of Lexon's written demand "as if such amount constituted the direct and primary obligation of [Defendant]." *Id.* ¶ 1(c).

Lexon is entitled to the full amount of the New Indebtedness Payment Obligation: the Remaining Indebtedness and the New Indebtedness that had accrued by the time the Amended Agreement was executed, totaling $3,538,400.75, ***"plus additional premiums that became due during the Amended Agreement's term, minus any payments made."*** ECF 68 at 19 (emphasis added).

The evidence at trial will establish that additional premiums continue to accrue through trial because Defendant has not paid the Total Indebtedness, which as of June 30, 2025, amounts to $10,389,090.81.

## ARGUMENT

### I. THE AMENDED AGREEMENT'S TERM CONTINUES UNTIL THE OBLIGATIONS THEREUNDER ARE PAID IN FULL

At summary judgment, the Court found that "the Total Indebtedness owed to Lexon is $3,538,400.75 of Total Indebtedness described in the Amended Agreement, ***plus additional premiums that became due during the Amended Agreement's term***," but that the "term" of the Amended Agreement is "unclear." ECF 68 at 19 (emphasis added). The fact that neither party

addressed the term of the Amended Agreement suggests that both parties understood that it only terminates upon full performance of both Obligations. *See infra* Section I.A.ii. The plain and unambiguous language of the Amended Agreement and Guaranty reflects the parties' intent that Obligors' Obligations thereunder (and thus Defendant's obligations under the Guaranty) continue "until the Total Indebtedness [New Indebtedness Payment Obligation] is paid in full" and the New Collateral Replenishment Obligation is paid. Ex. 3 ¶¶ 2, 3(b)(i); *see M.M. & D.D. Brown v. Western Maryland Ry. Co.*, 99 S.E. 457, 459 (W. Va. 1919) ("The normal end or termination of every contract is performance in accordance with the agreement, and such a consummation should be the presumptive one."); *Freeman v. Montessori Sch. of Bowling Green*, 1994 WL 476025, at *2 (Ohio Ct. App. Sept. 2, 1994) ("A binding contract continues in effect until [] there [is] a full performance of the obligation therein set forth."); *McCarthy Bldg. Companies, Inc. v. Mt. Hawley Ins. Co.*, 2021 WL 8533897, at *4 (C.D. Cal. Feb. 24, 2021) (concluding that the plain meaning of the term "life of this Agreement" was "until performance by both parties is complete").

Even if the term of the Amended Agreement were ambiguous (it is not), extrinsic evidence confirms the parties' intention that premiums continue to accrue under the Amended Agreement (and, in turn, the Guaranty) until Obligors have satisfied their premium and collateral Obligations under the Amended Agreement. *See Watson v. Buckhannon River Coal Co.*, 120 S.E. 390, 394 (W. Va. 1923) ("Where the intent is not clear from the [contract] alone, it is proper that the court should have aid from the situation of the parties, the surrounding circumstances, and the acts of the parties as indicative of the intent.").

A. **The Amended Agreement and Guaranty are Clear and Unambiguous**

Under West Virginia law, contracts are enforced according to the parties' intent, as

expressed in the plain and unambiguous written terms of the contract. [3] *Hansen-Gier Fam. Tr. of Apr. 22, 2016 v. Haywood*, 902 S.E.2d 174, 180 (W. Va. 2024). The function of the courts is to interpret and enforce contracts; not to "extend or limit" them. *Toppings v. Rainbow Homes, Inc.*, 490 S.E.2d 817, 822 (W. Va. 1997); *see also Hull Prop. Grp., LLC v. Quarrier St. LLC*, 915 S.E.2d 11, 18 (W. Va. Ct. App. 2025) ("It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them.") (citation omitted).

In addition, contractual provisions "should be [] construed, if possible, as to give meaning to every word, phrase and clause and also render all its provisions consistent and harmonious." *Antero Res. Corp. v. Directional One Servs. Inc.*, 873 S.E.2d 832, 842 (W. Va. 2022); *see also Chesapeake Appalachia v. Hickman*, 781 S.E.2d 198, 213 (W. Va. 2015) (recognizing "[t]he general state law rule" that contract terms "are not to be construed in a vacuum, but are to be read in their context"). A contract is ambiguous only if its terms, when read together as a whole, are inconsistent or susceptible to multiple *reasonable* interpretations. *See Bruce McDonald Holding Co. v. Addington*, 825 S.E.2d 779, 785 (W. Va. 2019); *see also Haywood*, 902 S.E.2d at 180 (defining ambiguity as "language reasonably susceptible of two different meanings or language of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning").

### i. The Amended Agreement is in Effect Until the Obligations are Satisfied

The Amended Agreement and Guaranty, which should be construed as a single agreement, express the parties' intent for the Obligations to remain in effect until they are satisfied in full. *See TD Auto Fin. LLC v. Reynolds*, 842 S.E.2d 783, 788 (W. Va. 2020) ("written instruments executed

---

[3] The Amended Agreement and the Guaranty are governed by West Virginia law. *See, e.g.*, ECF 68 at 9 ("The parties agree that the contracts between them, including the Guaranty, are governed by West Virginia law.").

at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument, even though they do not by their terms refer to each other"); Ex. 3 ¶ 8 (stating that the Guaranty was executed "[c]ontemporaneously" with the Amended Agreement, and "as a condition precedent to any and all obligations of Lexon" under the Amended Agreement); Ex. 4 ¶ 14 (the "Guaranty, together with the Amended [] Agreement, constitutes the sole and entire agreement of the parties thereto with respect to the subject matter hereof").

The Amended Agreement and Guaranty create "two distinct payment obligations—the New Collateral Replenishment Obligation and the New Indebtedness Payment Obligation." ECF 68 at 17. First, Obligors were required by April 1, 2021 to "deliver to Lexon new collateral in the total sum of Twenty Million U.S. dollars ($20,000,000.00) (the 'New Collateral')." Ex. 3 ¶ 2 at 2–5; *see also* Ex. 4, Recitals ¶ (i) (defining this obligation as the New Collateral Replenishment Obligation). Second, Obligors were required to "pay Lexon the sum of Two Hundred Thousand U.S. dollars ($200,000) per month *until* the Total Indebtedness is paid in full." Ex. 3 ¶ 3(b)(i) (emphasis added); *see also* Ex. 4, Recitals ¶ (ii) (defining this obligation as the New Indebtedness Payment Obligation). Instead of setting a certain date by which Obligors must satisfy the New Indebtedness Payment Obligation, the Amended Agreement requires Obligors to make these payments **"*until the Total Indebtedness is paid in full.*"** Ex. 3 ¶ 3(b)(i) (emphasis added). Consistent with the Amended Agreement, the Guaranty states that Obligors "shall pay to [Lexon] in cash or its equivalent the sum of two hundred thousand U.S. dollars ($200,000.00) per month, due and payable commencing on February 28, 2019 and on the last day of each month thereafter, *until the Total Indebtedness* (including any new premiums becoming due during the term of the Amended Underlying Agreement) *is paid in full*[.]" Ex. 4, Recitals ¶ (ii) (emphasis added).

The Amended Agreement defines the Total Indebtedness as the sum of the Remaining Indebtedness and the New Indebtedness, and provides that the New Indebtedness, and in turn, Total Indebtedness, increases as premiums *continue to accrue* for the term of the Amended Agreement. Ex. 3 ¶ 3(c). Specifically, the Amended Agreement provides:

> The Collateral Justice Companies and Beech Creek recognize that **additional amounts for premium** may become due during the term of this Agreement and they hereby agree that the New Indebtedness shall be increased in like amount (e.g., if new premium is due on March 2, 2019 in the amount of $10,000.00, the New Indebtedness is increased by $10,000.00). Additional amounts for premiums under this sub-paragraph are those premiums that are sixty (60) days or more past due.

*Id.* (emphasis added). In short, once 60 days past due, "additional amounts for premium" convert to New Indebtedness. *Id.* Any New Indebtedness increases the balance of Total Indebtedness. *Id.*

When read together, these provisions make clear that the parties intended for the Amended Agreement to remain in effect, and for premiums to continue to accrue, until Obligors satisfy both Obligations. Although April 1, 2021 has long passed, Obligors have not satisfied the New Collateral Replenishment Obligation, or paid the Total Indebtedness "in full." *Id.* ¶ 3(b)(i); Ex. 4 ¶ 5(a). The Guaranty's stated duration—*i.e.*, that the Guaranty remains in effect until both Obligations are satisfied—would have little meaning if the Amended Agreement terminated prior to Obligors' satisfaction of the Obligations. *See* Ex. 4 ¶ 5(a). Therefore, the only reasonable interpretation of the Amended Agreement's term is that it remains in effect until the Obligations are fully satisfied.

This interpretation is consistent with the stated purpose of the Amended Agreement and Guaranty. As discussed above, Obligors' Obligations to pay collateral and premium arise from the GAIs, which continue until the bond is released or discharged. *See, e.g.*, Ex. 1 ¶¶ 3, 5 at 11. The purpose of the Amended Agreement and Guaranty was to provide a payment plan whereby Obligors and Defendant would bring those collateral and premium accounts current. ECF 68 at 3.

11

Indeed, like the GAIs, Defendant's obligations under the Guaranty "appl[y] ***until the . . . payment and satisfaction in full of all of the Obligations***." Ex. 4 ¶ 5(a) (emphasis added). It follows that the Amended Agreement does not terminate until Obligors have satisfied their Obligations thereunder. *See, e.g.*, *Sanchez v. Dep't of Veterans Affs.*, 949 F.3d 734, 737 (Fed. Cir. 2020) ("[I]f no date is fixed by the contract for its termination, the agreement remains in force until its purpose is accomplished[.]"); *Ctr. of Hope Christian Fellowship, Loc., Church of God in Christ v. Wells Fargo Bank Nevada, N.A.*, 781 F. Supp. 2d 1075, 1080 (D. Nev. 2011) (recognizing that "contracts to repay debt . . . terminate only when the debt is satisfied"); *Valerino v. Thompson*, 28 F. Cas. 872, 872 (S.D.N.Y. 1856) (explaining that "indebtment is not extinguished until the entire debt is satisfied").

### ii. The Amended Agreement is Not Susceptible to Multiple Interpretations

In its summary judgment opinion, the Court suggested three possible interpretations of the term of the Amended Agreement. The first aligns completely with Lexon's position as articulated herein: Obligors' Obligations continue, as do Defendant's obligations under the Guaranty, "until the New Collateral Replenishment Obligation and New Indebtedness Payment Obligation are paid off completely." ECF 68 at 19 n.12. The other dates—"until April 1, 2021, the latest date referenced in the Amended Agreement," or "until Lexon declares the Obligors in default and demands payment from Governor Justice under the Guaranty" (*id.*)—do not align with the plain language of the Amended Agreement.

It is undisputed that April 1, 2021 was the original deadline for Obligors to satisfy the New Collateral Replenishment Obligation. This specific deadline stands in stark contrast with the New Indebtedness Payment Obligation, which continues to accrue (without an end date) "until the Total Indebtedness is paid in full." Ex. 3 ¶¶ 3(b)(i), (e); *see also* Ex. 4, Recitals ¶ (ii). Likewise, the

Guaranty provides that Defendant's obligations under the Guaranty are expressly "continuing in nature and appl[y] ***until the . . . payment and satisfaction in full of all of the Obligations***." Ex. 4 ¶ 5(a) (emphasis added).

If anything, the fact that the parties clearly understood how to express deadlines in the Amended Agreement (albeit for payments), but did not provide a termination date for the Amended Agreement itself, implies that the parties did not intend for the Amended Agreement to terminate on a specific date. *See also Harbert v. Harrison Cnty. Ct.*, 39 S.E.2d 177, 186 (W. Va. 1946) (explaining that "the well recognized and long established principle of interpretation of written instruments that the express mention of one thing implies the exclusion of another, expressio unius est exclusio alterius, . . . extends to all instruments requiring judicial construction," including contracts); *see also Consol. Lab'ys, Inc. v. Shandon Sci. Co.*, 413 F.2d 208, 212 (7th Cir. 1969) ("[A] contract which is terminable upon the occurrence of an event is . . . to be enforced according to its terms and the reasonable implication thereof."). And, it would be commercially unreasonable to conclude that the parties intended to end the Amended Agreement on a date when Obligors were supposed to (but did not) satisfy their New Collateral Replenishment Obligation given that the Amended Agreement was intended to address Obligors' checkered payment history. *See* Ex. 3, Recitals at 1–2 (acknowledging that Obligors breached the Original Agreement and that Defendant breached the original Guaranty).

The same principles apply to the Court's reference to an end date tied to "Lexon declar[ing] the Obligors in default and demand[ing] payment from Governor Justice under the Guaranty," ECF 68 at 19–20, n.12. The Amended Agreement does not provide for such an end date even though it is replete with other date-specific deadlines. Likewise, there would be no commercial purpose or protection in Lexon agreeing to end Obligors' obligation to pay premiums when Lexon

makes a demand under the Guaranty, given Defendant's and Obligors' history of non-payment. *See* Ex. 3, Recitals at 1–2. Nothing in the Amended Agreement supports a contrary conclusion.

Moreover, the parties' actions following Lexon's notices of default and demand served in October 2020 and July 2023 demonstrate that they did not interpret the Amended Agreement to terminate upon Lexon's demand under the Guaranty. *See* Ex. 6–7. After Lexon's October 2020 notice of default and demand on the Guaranty, Ex. 6, Obligors continued to make payments due under, and attempted to renegotiate, the Amended Agreement's payment schedule, Ex. 8. And, in his response to Lexon's July 2023 notice of default and demand under the Guaranty, the Justice Companies' General Counsel, Steven Ball conveyed Defendant's and the Justice Companies' "understand[ing] [that] there are premiums continuing to accrue on the bonds." Ex. 9 at 3.

Accordingly, consistent with the first potential term suggested by the Court on summary judgment (ECF 68 at 19, n.12), Lexon submits that the only reasonable interpretation of the Amended Agreement's term is that it continues until both the New Collateral Replenishment Obligation and the New Indebtedness Payment Obligation are completely paid.

### B. Extrinsic Evidence Confirms that the Amended Agreement Continues Until the Obligations are Paid in Full

Even if the Court determines that the Amended Agreement is ambiguous, extrinsic evidence demonstrates that the parties intended for the Amended Agreement (and thus the Guaranty) to continue until the Obligations are paid in full. "[W]here the meaning [of a writing] is uncertain and ambiguous, parol evidence is admissible to show the situation of the parties, the surrounding circumstances when the writing was made, and the practical construction given to the contract by the parties themselves either contemporaneously or subsequently." *Miller v. WesBanco Bank, Inc.*, 859 S.E.2d 306, 328 (W. Va. 2021). At trial, Lexon's former CEO, Brian Beggs, will testify that the very purpose of the Amended Agreement was to bring Obligors current on payments

owed under the GAIs, and the contemporaneous documentary evidence will show that the Justice Companies repeatedly acknowledged that the Amended Agreement would continue until Obligors were caught up on those payments.

### i. The Parties Situation at the Time of, and Negotiations Regarding, the Amended Agreement Establish their Intention that Premiums Continue to Accrue Until the Obligations are Satisfied

The Original Agreement arose, in part, out of Obligors' failure to make timely premium payments pursuant to each GAI. *See* Ex. 1 ¶ 3 at 11 (setting forth the Justice Companies' obligations to make premium payments for each bond). The Original Agreement set forth a payment plan under which Obligors were to pay Lexon for two obligations: (1) the obligation to post $5,000,000 in New Collateral within six months of the Agreement's Effective Date; and (2) the obligation to pay $3,000,000 in then-past due premium payments under the GAIs (defined as the "Indebtedness") within two months of the Agreement's Effective Date. Ex. 2 ¶¶ 2–3. To induce Lexon to agree to this payment plan and to "diligently pursue the liquidation/release of [old] Collateral," Defendant agreed to execute the original Guaranty. *Id.* ¶ 1. As they acknowledged in the Amended Agreement, Obligors failed to comply with the terms of the Original Agreement, and Defendant "breached the terms of the [original] Guaranty." *See* Ex. 3, Recitals at 1–2; *see also* Ex. 10 at 140:21–141:6 (recognizing that "premiums weren't being paid").

The parties eventually executed the Amended Agreement, which "provides for a revised payment plan." ECF 68 at 3. As explained by Jeremy Sentman, Lexon's Head of Claims, Lexon was concerned at the time that all of the collateral it held before 2018 had been depleted because of the bonds' "significant reclamation obligations," and "was looking for a significant amount of collateral to guarantee those obligations in the event that [the] Justice companies were unable to perform." Ex. 11 at 40:24-41:11; *see also id.* at 44:3–4 (Lexon was "releasing collateral, but got no benefit from that in any reductions in the bonds."). Accordingly, Lexon expressly negotiated

for an increase in Obligors' New Collateral Payment Obligation from $5,000,000 to $20,000,000 and set a deadline for Obligors to comply. *Id.*; *see also* Ex. 3 ¶ 2(e).

Obligors' outstanding premium balance (*i.e.*, the Total Indebtedness) also was a significant factor for Lexon in negotiating the terms of the Amended Agreement. Understanding that Obligors did not pay the premiums owed under the Original Agreement (*i.e.*, the Remaining Indebtedness), and that Obligors had failed to make premium payments due after the execution of the Original Agreement (*i.e.*, the New Indebtedness), Lexon sought to ensure that Obligors' New Indebtedness Payment Obligation would continue until the premium payments were current. Indeed, in a January 30, 2019 email from Mr. Ball, the Justice Companies unequivocally "[a]greed" to Lexon's proposal that the Justice Companies would "pay $200,000 per month for premium payments until such times as the equipment is liquidated and/or all premiums are current." Ex. 12 at 4. Notably, it was the Obligors who proposed specific language to clarify when premium shall be considered "current." *Id.* (reflecting the Obligors' proposal that "[f]or purposes of what is current on premium payments, 60 days will be deemed current on premium payments, the $200,000"). This meeting of the minds then was reflected in the signed Amended Agreement, in which Obligors acknowledged "that additional amounts for premium may become due" before the Total Indebtedness could be paid in full, and "agree[d] that the New Indebtedness shall be increased in like amount." Ex. 3 ¶ 3(c). In fact, Mr. Ball has testified that, pursuant to the terms of the Amended Agreement, "[j]ust as additional premiums come due those get added to the definition of 'New Indebtedness.'" Ex. 10 at 162:2–4.

In sum, prior to signing, and as reflected in its express terms, the parties clearly expected the Amended Agreement to continue until "premiums are current," *i.e.*, until the New Indebtedness Payment Obligation is paid in full. *Compare* Ex. 12 at 4, *with* Ex. 3 ¶ 3 at 5–7 (requiring Obligors

to pay Lexon $200,000 per month "until the Total Indebtedness is paid in full").

> ### ii. The Parties' Post-Execution Conduct Shows their Mutual Understanding that Premiums Continue to Accrue

The parties' post-execution conduct is consistent with Lexon's position that premiums continue to accrue under the Amended Agreement until those amounts are paid in full. *See Bruce McDonald Holding Co. v. Addington, Inc.*, 825 S.E.2d 779, 785 (W. Va. 2019) (recognizing that the parties' "practical interpretation . . . as shown by their acts and conduct, is entitled to great, if not controlling, weight") (citation omitted). For example, in January 2020, the Justice Companies once again asked to revise the payment plan for their collateral and premium Obligations in light of their failure to abide by the terms of the Amended Agreement. Mr. Ball has testified that, when this request was made, the Justice Companies understood that Lexon's principal concern was "get[ting] the premium caught up." Ex. 10 at 183:3–15. Similarly, in March 2020, when the Justice Companies sought to suspend the Total Indebtedness Payment Obligation, Lexon made clear that it would "not agree to suspend the premium payments" and that "[s]uspension of the payments not only stops progress towards reducing overdue amounts but actually adds to the balance as renewal premiums become due." Ex. 13 at 2. Although Lexon ultimately agreed to temporarily reduce the New Indebtedness Payment Obligation to $135,000 per month, Lexon made clear it would "not be receptive to any further amendments that defer or change [its] goals of getting [its] premium payments brought current or restoring the collateral account."[4] Ex. 13 at 1. Simply stated, Obligors were repeatedly informed of and agreed with Lexon's position that premium would continue to accrue under the Amended Agreement until the premium balance is "brought current." *Id.*

Indeed, Jay Justice, the President of each of the Justice Companies and Defendant's son,

---

[4] The parties also "agree[d] that all outstanding Total Indebtedness continue[d] to remain due and owing." Ex. 15 ¶ 1 at 4–5.

testified in this litigation "that there is premium accruing" pursuant to the terms of the Amended Agreement. Ex. 14 at 99:4–5. And, Defendant never objected to Lexon's statements that "[t]he Amended Agreement provides for the Obligors to pay Lexon $200,000 per month 'until the Total Indebtedness is paid in full (the 'Premium Payments')'" and "[t]he Amended Agreement further provides that 'additional amounts for premium may become due during the term of this Agreement' and that the amount of premiums constituting Total Indebtedness 'shall be increased in like amount.'"[5] *Compare* ECF 54 ¶¶ 8–9 *with* ECF 58 ¶¶ 8–9.

Defendant "cannot now advocate a different interpretation of the parties' agreement." *Romano v. Greve*, 724 S.E.2d 331, 343 (W. Va. 2012) (concluding that, "to the extent that [the plaintiff] previously has contributed to the promulgation of these standards and has acquiesced in their application, he cannot now advocate a different interpretation of the parties' agreement"); *see also Vaughan Const. Co. v. Virginian Ry. Co.*, 103 S.E. 293, 296 (W. Va. 1920) (finding that contractors' acquiescence by acceptance without question of monthly estimates of chief engineer precluded contractors "from afterwards putting a different construction on the contract").

## II.  THE GUARANTY ENTITLES LEXON TO ALL PREMIUM AMOUNTS INCURRED DURING THE TERM OF THE AMENDED AGREEMENT

Because the Amended Agreement does not terminate until all Obligations, including the New Indebtedness Payment Obligation, are paid in full, premium has continued to accrue through the present. The Court already concluded that Lexon is entitled to "$3,538,400.75 of Total Indebtedness described in the Amended Agreement, ***plus additional premiums that became due during the Amended Agreement's term, minus any payments made of the New Indebtedness Payment Obligation by the Obligors***." ECF 68 at 19 (emphasis added). To calculate the remaining

---

[5] At no time during the six years that the Amended Agreement has been in place have Obligors or Defendant ever claimed or suggested that the Obligations thereunder terminate at some fixed point in time other than when "paid in full."

amount of damages owed to Lexon under Count I, the Court must determine the amount of unpaid premium that has accrued since the execution of the Amended Agreement on February 4, 2019.

### A. The Premium Tracker Traces Premium Accruals and Payment Credits

Throughout its business relationship with Obligors, Lexon has tracked via its information systems (the "Policy Administrative Systems"), among other data, all bonds it has issued to Obligors, the premium accrual for each bond, and payments received and allocated to each bond. The Premium Tracker, attached as Exhibit 16, is generated from the Policy Administrative Systems and provides a comprehensive summary of Lexon's record of all premiums that have accrued since February 4, 2019 and all payments that Obligors have made to reduce that accrued amount. This evidence shows that, as of June 30, 2025, the Total Indebtedness equalled $10,389,090.81, inclusive of the $3,538,400.75 that the parties agreed was owed on February 4, 2019 and all payments made by Obligors. *See* Ex. 16. This balance already accounts for all premium payments that Defendant claims were made. *See* Ex. 17. After taking into account the $3,538,400.75 already awarded by the Court, the additional New Indebtedness that has accrued during the term of the Amended Agreement and owed by Defendant is $6,850,690.06. William Muller, Vice President of Insurance Operations and Controls at Lexon, will testify at trial to further explain these records.

### B. Understanding the Premium Tracker

#### i. Tab 1: Bond Detail

The first tab of the Premium Tracker, "Bond Detail," reflects Lexon's tracking of premium payments in the ordinary course of business. It provides all information relevant to the Justice Companies' account and is organized as follows.

**Columns A–E: Identifying Information.** The bond number and term are expressed as a 7-digit bond number followed by the number of years in which the bond has been in effect (XXXXXXX-YY). The ultimate parent name and internally assigned identification number

("BPID"), and principal name and BPID indicate which of the Justice Companies is the "principal."



| A | B | C | D | E |
|---|---|---|---|---|
| Bond Number | Ultimate Parent BPID | Ultimate Parent Name | Principal BPID | Principal Name |

**Columns F–K: Relevant Dates and Obligee.** The relevant dates for each bond include the effective date (the date the bond was last renewed), the expiration date (the date that bond term must be renewed and, thus, additional premium accrues), and the original effective date (the date on which the bond was originally issued). Each bond that Lexon issues renews annually until the bond is released (Columns F and G). *See, e.g.*, Ex. 1. The obligee name and division name identify the regulatory entity to which the bond guarantees performance.

| F | G | H | I | J | K |
|---|---|---|---|---|---|
| Effective Date | Expiration Date | Original Effective Date | Obligee Name ID | Obligee Name | Obligee Division Name |

**Columns L–O: Bond Amount and Premium Owed.** The bond amount represents the maximum amount potentially payable by Lexon under the bond in the event the principal on the bond (*i.e.*, one of the Justice Companies) defaults on its obligations to the obligee (*i.e.*, a regulator). The total premium amount is the amount of premium due to Lexon upon annual renewal of the bond, and the Kentucky state tax for the term of the bond (if applicable) is due at the same time as the total premium amount. If Obligors paid the premium due on a bond, Column O includes a payment date. If Obligors did not pay the premium due, Column O lists "None."



| L | M | N | O |
|---|---|---|---|
| Bond Amount | Total Premium | KY Tax | Paid Date |

**Columns X and Y: Gross Balance and New Indebtedness.** The remaining columns track

payments credited to Obligors. Of these columns, only X and Y are relevant to the amount of premiums currently owed to Lexon.[6] If Obligors made a premium payment, the balance in Column X is reduced by the amount paid—if paid in full, the balance is recorded as 0. The Amended Agreement states that additional premiums accrue as New Indebtedness when the premium becomes 60 days past due. Ex. 3 ¶ 3(c). Column Y tracks the New Indebtedness accrual by including all premiums 60 days past due as of June 30, 2025. Therefore, the total balance (Column Y, Row 3817) reflects the New Indebtedness Payment Obligation owed under the Amended Agreement and, in turn, the Guaranty ($10,389,090.81).



While all balances in Column X are due as of June 30, 2025 pursuant to the relevant GAI, those amounts do not count as New Indebtedness under the Amended Agreement and Guaranty until they are 60 days *past* due. Ex. 3 ¶ 3(c). Once those amounts are 60 days past due, they accrue as New Indebtedness and are eligible for collection under the Amended Agreement and Guaranty (Column Y). Therefore, there exists a 60-day period after a bond renews and premium is due during which the Justice Companies owe premium to Lexon under the relevant GAI, but premium has not yet accrued as New Indebtedness owed under the Amended Agreement. This explains the

---

[6] Columns P through W track the gross balance and gross balance over 60 days (New Indebtedness) as of certain dates throughout this litigation: Column Q (6/30/2023) represents the amount demanded before the filing of the Complaint, Column S (3/30/2024) represents the balance of New Indebtedness near the close of discovery, Column U (6/30/2024) represents the balance of New Indebtedness included in Lexon's motion for summary judgment, and Column W (3/31/2025) represents the amount of New Indebtedness that accrued by the date of the parties last mediation on May 12, 2025. These amounts were generated in connection with various deadlines in this litigation, are included here for convenience and completeness only, and do not represent, and should not be construed as, an alternative position on the part of Lexon as to the term of the Amended Agreement.

differences in the total amounts of Columns X and Y. (X3817; Y3817.)

    **ii.**    **Tab 2: Payment Summary**

The second tab of the Premium Tracker, "Payment Summary," provides an alternative view of the bond-by-bond allocation of each payment credited to Obligors. This view shows the same payment information provided in Column A (bond number), the sum of Columns M and N (total premium plus KY tax, if applicable), and Column O (paid date, if any) of the Bond Detail tab.

| A | B | C |
|---|---|---|
| Bond Number-Term | Applied Date | Sum of Applied Amount Gross |

For example, on May 1, 2020, a payment for $1,514.78 on bond number 1069862-6 was credited to Obligors. The Payment Summary tab shows the total amount of the payment credit (Column C: $1,514.78), while the Bond Detail tab shows the breakdown of the amount of premium (Column M: $1,488.00) and amount of KY tax (Column N: $26.78) covered by that credit as well as the remaining balance of premium owed on bond number 1069862-6 (Columns P–Y: $0).

**Payment Summary:**

| A | B | C |
|---|---|---|
| Bond Number-Term | Applied Date | Sum of Applied Amount Gross |
| 1069862-6 | 5/1/2020 | $1,514.78 |

**Bond Detail:**

| A | M | N | O | X | Y |
|---|---|---|---|---|---|
| Bond Number | Total Premium | KY Tax | Paid Date | Gross Balance 6/30/2025 | Gross Balance Over 60 6/30/2025 |
| 1069862-6 | $1,488.00 | $26.78 | 5/1/2020 | 0.00 | 0.00 |

Obligors do not maintain an independent record of the premium balance and have not contested the accuracy of Lexon's records.[7] The Premium Tracker, thus, serves as the sole source of evidence of premium accrual and further confirms that each of Obligors' payments were already applied to reduce the amount of premium owed to Lexon. Accordingly, the Court need not engage in further accounting to determine the amount of Total Indebtedness owed to Lexon.

## III.    THE APPROPRIATE RATE FOR PRE- AND POST-JUDGMENT INTEREST IS 7%

In granting summary judgment, the Court agreed that Lexon is entitled to pre- and post-judgment interest on damages owed to Lexon under Count I, but did not determine the applicable rate. ECF 68 at 22 n.15. Lexon respectfully submits that it is entitled to pre- and post-judgment interest at a yearly rate of 7%. *See* W. Va. Code Ann. §§ 56–6–27 and 56–6–31.[8] West Virginia law authorizes prejudgment interest in breach of contract actions even if the case was not tried before a jury. *See* W. Va. Code Ann. § 56–6–27 ("The jury, in any action founded on contract, may allow interest on the principal due."); *see also Warrior Oil & Gas, LLC v. Blue Land Servs., LLC*, 886 S.E.2d 336, 345 (W. Va. 2023) (rejecting petitioner's argument that the lower court could not award prejudgment interest because the case was not tried before a jury). West Virginia Code § 56–6–27 governs post-judgment interest and provides that "every judgment or decree for the payment of money . . . shall bear simple, not compounding interest." W. Va. Code Ann. § 56–6–31. The applicable interest rate for both pre- and post-judgment interest in West Virginia is equal to "7.00% per year." *See supra* n.8. Here, Lexon is entitled to an award of damages equal to

---

[7] Defendant did not produce any records indicating that Obligors tracked the premium balance. Lexon will show at trial that all premium payments made were credited to Obligors.

[8] *See also* Administrative Order re: Determination and Dissemination of the Rate of Interest on Judgments and Decrees for the Year 2023, Sup. Ct. of Appeals of W. Va. (Jan. 4, 2023), available at https://www.courtswv.gov/sites/default/pubfilesmnt/2023-06/interest2023_0.pdf [hereinafter Administrative Order].

$24,639,090.81. Accordingly, Lexon is entitled to 7% on the principal amount of $24,639,090.81 in pre-judgment interest, running from July 27, 2023 to at least August 19, 2025: $3,562,880.04.

## IV.    DAMAGES AWARDED AND OWED TO LEXON

Pursuant to the Court's request during the parties' June 23, 2025 status conference, Lexon provides the following chart tracking the categories of damages that the Court has already awarded as well as those that Lexon contends should be awarded.

| Obligation | Amount | Already Awarded/Owed |
|---|---|---|
| New Collateral Replenishment Obligation | $14,250,000.00 | Already Awarded |
| Remaining Indebtedness | $1,025,000.00 | Already Awarded |
| New Indebtedness accrued between execution of Original Agreement and Amended Agreement | $2,513,400.75 | Already Awarded |
| Additional Premium that has accrued as New Indebtedness since Amended Agreement | $6,850,690.06 | Owed |
| Pre- and Post-Judgment Interest | Pre-judgment interest: $3,562,880.04<br><br>Post-judgment interest: To be determined post-trial | Owed |
| Fees, Costs, and Expenses | To be determined post-trial | Owed |

## V.    THE COURT SHOULD DENY DEFENDANT'S IMPROPER REQUEST FOR RECONSIDERATION

In the parties Joint [Proposed] Pre-Trial Order ("JPPO"), Defendant raised for the first time what appears to be a request to relitigate the Court's summary judgment holding that "Lexon is entitled to (1) $20 million in collateral payment, less any collateral payments made by the Obligors; plus (2) the Total Indebtedness, which takes into account the New Indebtedness Payment Obligation and any additional premiums that became due during the Amended Agreement term." ECF 68 at 20–21. The time to request reconsideration of the Court's order has long passed, and—in any event—Defendant's position does not meet the high standard required to justify such relief.

*See* Fed. R. Civ. P. 54(b), 59(e). Indeed, the Court rejected any such request for reconsideration of the Court's holding at the June 2025 status conference. Lexon respectfully asks the Court to preclude Defendant from advancing this belated theory and is prepared to address this at the August 4, 2025 pre-trial conference.

**CONCLUSION**

For the foregoing reasons, the Court should find that the term of the Amended Agreement continues until all Obligations thereunder are satisfied and that Lexon is entitled to $10,389,090.81 ($6,850,690.06 for additional premiums that accrued during that term), as well as pre- and post-judgment interest on the principal amount of $24,639,090.81 at 7% per annum.

Dated: July 28, 2025          Respectfully submitted,

*/s/ Jason Halper*
Jason Halper
Sara Brauerman
Timbre Shriver
**VINSON & ELKINS LLP**
1114 Avenue of the Americas
New York, New York 10036
212.237.0000
jhalper@velaw.com
sbrauerman@velaw.com
tshriver@velaw.com

W. Brantley Phillips, Jr.
Garrah Carter-Mason
**BASS, BERRY & SIMS PLC**
21 Platform Way South, Suite 3500
Nashville, TN 37203
(615) 742-6200
bphillips@bassberry.com
garrah.cartermason@bassberry.com

*Attorneys for Plaintiff Lexon Insurance Company*

25

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on July 28, 2025, the foregoing document was filed via the Court's ECF system, which will send a notice of electronic filing to all ECF-registered counsel of record.

*/s/ W. Brantley Phillips, Jr.*