# Exhibit 11

```
 1           IN THE UNITED STATES DISTRICT COURT FOR THE
                    MIDDLE DISTRICT OF TENNESSEE
 2
     LEXON INSURANCE COMPANY,      ) No.  3:23-CV-0772
 3             Plaintiff           )
                                   )
 4        vs.                      )
                                   )
 5   JAMES C. JUSTICE II,          )
               Defendant           )
 6

 7                DEPOSITION OF JEREMY SENTMAN

 8         Taken remotely via Zoom on Thursday, April

 9   25, 2024, commencing at 9:00 a.m., by Leandra M.

10   Stoudt, RPR, CBC, CCP, CRR, CCR, Notary Public.

11

12   APPEARANCES:

13   CADWALADER, WICKERSHAM & TAFT, LLP
     By:  Jason Halper, Esq.
14   By:  Elizabeth Moore, Esq.
     200 Liberty Street
15   New York, NY 10281
     212-504-6666
16   elizabeth.moore@cwt.com
     -- for the Plaintiff
17

18   CAREY DOUGLASS KESSLER & RUBY, PLLC
     By:  David R. Pogue, Esq.
19   901 Chase Tower
     707 Virginia Street, East
20   Charleston, WV 25323
     dpogue@cdkrlaw.com
21   -- for the Defendant

22

23

24

25
```

```
 1   A.          I am.
 2   Q.          And what's your understanding of the
 3   purpose of this document?
 4   A.          This document amended the earlier
 5   Complaint to revise some terms and pursuant to
 6   negotiations between underwriting and Jay Justice.
 7   Q.          What's your understanding of the
 8   changes?
 9   A.          I would have to see them there in
10   there.  It was -- I believe it was a fund up
11   schedule to make -- they were -- we were trying to
12   build up some collateral, and the Justice
13   companies, I believe, would make payments for
14   premium and collateral.
15   Q.          Did this agreement increase the
16   collateral obligation from 5 million to 20 million
17   and then set up a payment schedule for it?
18   A.          I believe that's correct, yes.
19   Q.          Do you understand the payment
20   schedule to be monthly payments of $250,000 plus
21   the liquidity event you mentioned earlier, and
22   then lump sum payments at certain intervals?
23   A.          Yes.  I believe that's correct.
24   Q.          Do you have an understanding as to
25   why there was increase from 5 million to 20
```

1  million for the collateral?

2  A.              It was always Lexon's.  Given the
3  nature of the bonds that were written and the
4  status of those permits being that the economic
5  life of those had been exhausted, and there were
6  significant reclamation obligations, my
7  understanding was underwriting was looking for a
8  significant amount of collateral to guarantee
9  those obligations in the event that Justice
10 companies were unable to perform the reclamation
11 obligations.

12 Q.              Did this agreement also set up a
13 payment agreement for premium?

14 A.              I believe it did.

15 Q.              Do you know if those -- if the
16 premium schedule was $200,000 a month?  Does that
17 sound right?

18 A.              I believe that was correct.  I
19 believe the premium was 200,000 and a collateral
20 fund up was 250,000.

21 Q.              Okay.

22                 MR. POGUE:  If we can pull up Exhibit
23 6.

24                 (Exhibit 6 was marked for
25 identification purposes.)

 1   commensurate reduction in our liability that
 2   matched the depletion of the collateral.
 3   Meaning, we were releasing collateral, but got no
 4   benefit from that in any reductions in the bonds.
 5   So our discussion with Jay and Steve Ball had
 6   been, yes, we can do that.
 7              But one, as a condition, it will be
 8   absolute and sole discretion of Lexon when any
 9   collateral will be released.  I think that is
10   memorialized in the agreement.  And each time was
11   acknowledged and agreed to by Steve Ball and Jay
12   Justice.
13              Second, we will not be paying the
14   Justice companies, that any payments are released
15   from collateral will be directed explicitly to a
16   contractor, who is doing the reclamation work.
17   The reason for that was, we wanted to make sure
18   there were not any liens or anything that would
19   affect the property or any issues with any of the
20   regulatory bodies and to ensure that people doing
21   the work were getting paid.
22              And then, finally, the ultimate
23   condition was, there had to be some reduction,
24   right?  So we couldn't have all of the collateral
25   going out, which is a problem we found ourselves

CERTIFICATE

I do hereby certify that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

_____
Leandra Stoudt, RPR, CRR
CBC, CCR, CCP, CBC, Notary Public