## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE

LEXON INSURANCE COMPANY,

                                Plaintiff,

          -against-

JAMES C. JUSTICE II,

                         Defendant.

Civil Action No. 3:23-cv-0772

Chief Judge Waverly D. Crenshaw
Magistrate Judge Barbara D. Holmes

## DEFENDANT'S PRETRIAL
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Court held a bench trial in this matter on August 20, 2025, which continued through August 22, 2025. After consideration of the testimony, exhibits, and written submissions of the parties, the Court hereby makes the following findings of fact and conclusions of law.

### I.      FINDINGS OF FACT

1.     The backdrop for this case involves coal industry surety bonds. As a condition precedent to issuing a mining permit, governmental regulators require coal mining companies to obtain bonds from a third-party surety to secure performance of reclamation activities (which are generally aimed at returning the land to its pre-mining condition).

2.     Lexon previously issued surety bonds to certain companies affiliated with Defendant James C. Justice II ("Defendant").

3.     Lexon has sued Defendant to collect on a limited commercial guaranty regarding an agreement between certain companies (the "Primary Obligors") and Lexon. The Primary Obligors are James C. Justice Companies, Inc.; Southern Coal Corporation; Kentucky Fuel Corporation; Justice Family Group, LLC; Mechel Bluestone, Inc.; and Beech Creek Coal Corp.

4. On March 26, 2018, the Primary Obligors and Lexon entered into an agreement (the "Agreement") under which (1) Lexon would release certain collateral valued approximately $4.4 million; (2) certain of the Primary Obligors would post $5 million in "New Collateral" by the six-month anniversary of the Agreement; and (3) the Primary Obligors would pay $3 million in premium owed as of the date of the Agreement (designated as the "Indebtedness") within five business days after the two-month anniversary of the Agreement. (Def. Ex. 1.)

5. The parties to the Agreement intended it to be fully performed within six months of March 26, 2018.

6. The Agreement provides that it shall be governed by, construed and enforced in accordance with, and subject to the laws of the State of West Virginia. (Def. Ex. 1, ¶ 5.)

7. On March 26, 2018, Defendant executed a Limited Commercial Guaranty (the "Original Limited Guaranty") in connection with the Agreement. The Original Limited Guaranty states that Defendant guarantees the full and punctual payment and performance of the "Collateral Replenishment Obligation," the "Collateral Shortfall Payment Obligation," and the "Indebtedness Payment Obligation," plus "all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder." (Def. Ex. 2, ¶ 1.)

8. The "Collateral Replenishment Obligation" and the "Collateral Shortfall Payment Obligation" refer to the Primary Obligors' obligations under the Agreement to provide or pay a total of $5 million in New Collateral by the six-month anniversary of the Agreement. The "Indebtedness Payment Obligation" refers to the Primary Obligors' obligation under Agreement to pay the unpaid balance of the $3 million premium Indebtedness within five business days after the two-month anniversary of the Agreement. (*Id.*, first "WHEREAS" clause.)

2

9.     Consistent with its title (*Limited* Commercial Guaranty), the Original Limited Guaranty placed a limit on Defendant's liability:

> Notwithstanding anything contained herein to the contrary, the obligations of Guarantor shall be limited to a total sum equal to (i) five million U.S. dollars ($5,000,000) plus (ii) the amount of the Indebtedness specified in the Underlying Agreement.

(*Id.*, ¶ 4(e).) The $5 million figure in paragraph 4(e)(i) corresponds to the amount of collateral called for in the Agreement, while paragraph 4(e)(ii) refers to the amount of premium indebtedness specified in the Agreement ($3 million).

10.     Like the Agreement, the Original Limited Guaranty provides that it shall be governed by and construed under the laws of the State of West Virginia. (*Id.*, ¶ 8.)

11.     Due to ongoing cashflow issues, the Primary Obligors were unable to come up with the $5 million in New Collateral or pay the full amount of the Indebtedness, although they did reduce the latter to about $1,025,000.  (Def. Ex. 3; *see also* S. Ball testimony).

12.     On or about February 4, 2019, the parties executed "Amendment No. 1 to Agreement Dated March 26, 2018" (the "Amended Agreement").  (Def. Ex. 3.)

13.     With respect to the collateral requirements, the Amended Agreement increased the amount of "New Collateral" from $5 million to $20 million.  The Amended Agreement also set forth a payment schedule for the New Collateral.  Under that schedule, the Primary Obligors were to pay $250,000 per month plus make larger catch-up payments at designated intervals.  The final catch-up payment—equal to $20 million less any collateral payments previously made—was due April 1, 2021.  (*Id.* at 2-5.)

14.     As to premiums, the Amended Agreement added $2,513,400.75 in new debt to the $1,025,000 of the Indebtedness that remained as of the date of amendment and designated the resulting total of $3,538,400.75 as the "Total Indebtedness":

> The Parties Agree the Remaining Indebtedness is equal to One Million Twenty-Five Thousand U.S. dollars ($1,025,000.00). The Parties also agree that in addition to the Remaining Indebtedness, additional premium of $2,513,400.75 is now due and owing (the "New Indebtedness"). The Remaining Indebtedness together with the New Indebtedness is equal to $3,538,400.75 (the "Total Indebtedness").

(*Id.* at 5, ¶ 3.)

15.     The Amended Agreement provided that the Primary Obligors were to make "Premium Payments" of $200,000 per month until the Total Indebtedness is paid in full. (*Id.,* ¶ 3(b)(i).)

16.     The Amended Agreement further provided that one of the Primary Obligors— Beech Creek Coal Corp.—was to sell certain equipment and use the proceeds to reduce the Total Indebtedness.  (*Id.* at 6, ¶ 3(b)(ii).) According to Schedule C of the Amended Agreement, the value of this equipment was $2,385,000.

17.     If the Primary Obligors paid $200,000 per month as contemplated in the Amended Agreement, the specified amount of Total Indebtedness ($3,538,400.75) would have been paid in full in August 2020.   And if Beech Creek had been able to sell the equipment as contemplated in the Amended Agreement and use the proceeds to reduce the Total Indebtedness, that would have decreased the number of monthly $200,000 payments needed to pay the Total Indebtedness.

18.     Ultimately, the Primary Obligors made premium payments totaling more than $3,538,400.75 by October 6, 2020.  (Def. Ex. 14.)

19.     The Amended Agreement recognized that additional bond premiums may become due during the term of the Amended Agreement and provided that "the New Indebtedness shall be

4

increased in like amount . . . ." (Def. Ex. 3 at 6-7, ¶ 3(c).) The Amended Agreement does not say that the "Total Indebtedness" shall be increased.

20. The Amended Agreement then provided that after the Total Indebtedness is paid in full, the Primary Obligors shall continue to pay a minimum of $200,000 per month to Lexon:

> At such time as the Total Indebtedness is paid in full, the Collateral Justice Companies and Beech Creek shall pay Lexon (i) any additional premium due, or (ii) Two Hundred Thousand U.S. dollars ($200,000.00) per month, whichever is greater. Such payments shall be due on the last day of each month.

(*Id.* at 7, ¶ 3(d).) The Amended Agreement contains no language regarding the duration of the obligation to make these monthly payments.

21. The obligation to pay bond premiums existed independently of the Amended Agreement. The Amended Agreement does not state the amount of the bond premiums or the rate at which they accrue.

22. The Amended Agreement provides that "[t]he Parties agree time is expressly made of the essence with respect to each and every provision of this Amendment and the documents and instruments entered into in connection herewith." (*Id.* at 8, ¶ 7.)

23. On or about February 7, 2019, Defendant executed an Amended and Restated Limited Commercial Guaranty ("Amended Limited Guaranty") relating to the Amended Agreement. (Def. Ex. 4.)

24. The Amended Limited Guaranty states that Defendant guarantees the "New Collateral Replenishment Obligation" and the "New Indebtedness Payment Obligation," plus enforcement costs:

> <u>Guaranty</u>. Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Beneficiary, and its successors and assigns, as primary obligor and not merely as surety, the full and punctual payment and performance of each of the New Collateral Replenishment Obligation and the New Indebtedness Payment

5

Obligation (collectively, the "Obligations"), plus all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder. . . .

(*Id.* at 2, ¶ 1.)

25. The recitals to the Amended Limited Guaranty define the "New Collateral Replenishment Obligation" by reference to the Primary Obligors' obligations to pay $20 million in New Collateral under the terms and schedule stated in the Amended Agreement. (*Id.* at 1.)

26. The recitals to the Amended Limited Guaranty define the "New Indebtedness Payment Obligation" as the Primary Obligors' obligation "to pay the unpaid balance of the Total Indebtedness . . . ." (*Id.* at 1-2.)

27. Although the recitals to the Amended Limited Guaranty describe the Total Indebtedness as "including any new premiums becoming due during the term of the Amended Underlying Agreement," the Amended Limited Guaranty does not purport to define "Total Indebtedness" or to alter the definition of Total Indebtedness that is set forth in the Amended Agreement. (*Id.* at 1.)

28. Further, to the extent the recitals to the Amended Limited Guaranty indicate that the obligation in paragraph 3(b)(i) of the Amended Agreement to pay $200,000 per month "until the Total Indebtedness is paid in full" includes new premiums beyond the specified amount of Total Indebtedness ($3,538,400.75), the recitals are in conflict not only with the Amended Agreement's definition of "Total Indebtedness" but also the construction given to the Amended Agreement by Lexon in its pre-lawsuit correspondence:

   a. In a February 25, 2019 email, Lexon's then-Senior Vice President, Kieran Moran, explained the Amended Agreement's monthly premium payment obligations with reference only to the "Total Indebtedness" of $3,538,400.75 and without any

6

mention of new or additional premiums that become due during the term of the Amended Agreement being added to the "Total Indebtedness."  (Def. Ex. 8.)

b.  In an October 29, 2019 email, Lexon's then-CEO, Brian Beggs, stated that "Justice has met their installment obligations (with a little arm twisting) to pay down overdue past premiums," but that "[t]hey have not paid their renewal premiums for 2019 and are $2mm plus in the hole[.]"  (Def. Ex. 9.)  This indicates that Lexon considered the obligation in the Amended Agreement to pay monthly installments until the "Total Indebtedness" is paid in full to apply only to the specified overdue premium amount of $3,538,400.75, and that Lexon viewed the obligation to pay 2019 renewal premiums that became due *after* the date of the Amended Agreement as separate and apart from the obligation to pay monthly $200,000 installments toward the Total Indebtedness.

c.  In another October 29, 2019 email, Lexon Senior Underwriter Jack Genet stated that "while Justice has made recent payments for collateral and past due premium as required under the 2/4/2019 Amendment agreement, I want to point out that they have not made any payments on new premiums."  (Def. Ex. 10.)  This too indicates that Lexon viewed the obligation in the Amended Agreement to pay $200,000 per month until the Total Indebtedness is paid in full as applying only to the past-due "Total Indebtedness" of $3,538,400.75, and that Lexon viewed the obligation to pay new premiums as separate and apart from the obligation to pay $200,000 per month toward the Total Indebtedness.

d.  In a subsequent email in the same chain, Mr. Beggs stated that "the installment deal was for over 90 premiums and completely separate from their obligations to pay

7

renewal premiums." (Def. Ex. 10.) This too indicates that Lexon viewed the obligation to pay renewal premiums as separate and apart from the Amended Agreement and the obligation therein to pay $200,000 per month until the Total Indebtedness is paid in full.

e.   Perhaps most tellingly, in an October 31, 2019 email, Mr. Beggs stated as follows:

> *The installments were to catch up on late premiums from 2018.* I specifically stated in our May meetings that the installments were for overdue premiums and *we expected the 2019 renewal premiums to be paid, outside of the installments.* Otherwise, we will never catch up. Normal renewal payments are not "additional payments", we expect payment at renewal.

(Def. Ex. 11, emphasis added.) This plainly indicates that Lexon considered the obligation in the Amended Agreement to pay installments of $200,000 per month until the Total Indebtedness is paid in full to apply only to the specified overdue premium amount of $3,538,400.75, and that Lexon viewed the obligation to pay renewal premiums as separate and apart from the Amended Agreement and the obligation therein to pay $200,000 per month until the Total Indebtedness is paid in full.

29.   The Amended Limited Guaranty, like the Original Limited Guaranty, placed a hard limit on Defendant's liability:

Notwithstanding anything contained herein to the contrary, the obligations of Guarantor shall be limited to a total sum equal to (i) fifteen million U.S. dollars ($15,000,000.00) plus (ii) the amount of the Total Indebtedness specified in the Amended Underlying Agreement; (ii) provided that, in the event of any default by Collateral Obligor and/or Indebtedness Obligor with respect to the New Collateral Replenishment Obligation or the New Indebtedness Payment Obligation, including without limitation any failure to timely pay any payment due under either such Obligation, the obligations of Guarantor shall instead be limited to a total sum equal to (i) twenty million U.S. dollars ($20,000,000.00) plus (ii) the amount of the Total Indebtedness specified in the Amended Underlying Agreement.

8

(Def. Ex. 4 at 4-5, ¶ 5(e).) The $20 million figure in paragraph 5(e)(i) corresponds to the amount of collateral called for in the Amended Agreement, while paragraph 5(e)(ii) refers to the amount of Total Indebtedness specified in the Agreement ($3,538,400.75).

30.     Like the Original Limited Guaranty, the Amended Limited Guaranty provides that it shall be governed by and construed under the laws of the State of West Virginia. (*Id.* at 6, ¶ 9.)

31.     On or about January 30, 2020, the Primary Obligors and Lexon executed a side letter agreement (the "January 2020 Side Letter Agreement") that, among other things, extended the Amended Agreement's payment schedule for the New Collateral. (Def. Ex. 5.)

32.     More specifically, the Amended Agreement set forth the following schedule: (i) if the full $20 million in New Collateral has not been paid by September 30, 2019, then the Primary Obligors pay $5 million (less payments previously made) on October 1, 2019; (ii) if the full $20 million has not been paid by March 31, 2020, then the Primary Obligors pay $10 million (less payments previously made) on April 1, 2020; (iii) if the full $20 million has not been paid by September 30, 2020, then the Primary Obligors pay $15 million (less payments previously made) on October 1, 2020; and (iv) if the full $20 million has not been paid by March 31, 2021, then the Primary Obligors pay $20 million (less payments previously made) on April 1, 2021. (Def. Ex. 3 at 3-4, ¶ 2(d)(i)-(iv).) The January 2020 Side Letter Agreement extended all the unexpired dates by six months. (Def. Ex. 5 at 2, ¶ 3.)

33.     Although the final payment date was stated as October 1, 2022 rather than October 1, 2021 in the January 2020 Side Letter Agreement, the Court finds that this was a mere typographical error and that the parties plainly intended the final payment date to be October 1, 2021 (six months from the final payment date in the Amended Agreement).

34.     Indeed, in an email dated January 31, 2020, Lexon's then-CEO stated—in reference to the January 30, 2020 Sider Letter Agreement's extension of the Amended Agreement's collateral payment schedule—that "we have agreed to push everything out six months[.]" (Def. Ex. 7.)

35.     On or about March 30, 2020, the parties entered into another side letter agreement (the "March 2020 Side Letter Agreement"). The March 2020 Side Letter Agreement did not purport to further extend any of the deadlines extended by the January 2020 Side Letter Agreement. (Def. Ex. 6.)

36.     Lexon drafted the Agreement, the Amended Agreement, the Amended Limited Guaranty, and both Side Letter Agreements. (Def. Ex. 15, 16, 17, 18; *see also* S. Ball testimony.)

37.     In July 2023, Lexon filed this lawsuit to enforce the Amended Limited Guaranty. Count I seeks damages for breach of the Amended Limited Guaranty, while Counts II and III seek enforcement costs (attorney fees and other litigation expenses).

38.     Defendant opposed Lexon's claims by arguing, among other things, that Lexon breached the Side Letter Agreements by refusing to release collateral to fund reclamation activities and otherwise undermined the Primary Obligors' ability to pay Lexon.

39.     On December 3, 2024, the Court issued a Memorandum Opinion (ECF 68) granting partial summary judgment to Lexon (the "Summary Judgment Opinion"). The Court found Defendant liable on Counts I–III but determined that issues of material fact remained as to certain aspects of Lexon's damages under Count I.[1]

---

[1] The determination of Lexon's damages under Counts II and III had been bifurcated and therefore was not considered in the Summary Judgment Opinion. The parties have since agreed to determine Lexon's damages under Counts II and III through the post-trial process set forth in Local Rule 54.01. (*See* ECF 87.)

40.     Specifically, the Court held that Lexon is entitled to (1) $20 million in collateral, minus any collateral payments made by the Primary Obligors; plus (2) the "Total Indebtedness." (ECF 68, at 20-21.) The Court found that there is no genuine issue of material fact as to the collateral balance owed ($14,250,000), but that there are genuine issues of fact as to the amount of "Total Indebtedness" owed. (*Id.* at 21.)

41.     The Court held—without the benefit of briefing focused on this issue—that the "Total Indebtedness" includes the $3,538,400.75 of Total Indebtedness described in the Amended Agreement *plus* additional premiums that became due during the Amended Agreement's term. (*Id.* at 19, 20-21.) The Court further held that the "term" of the Amended Agreement was ambiguous:

> While the parties do not address the issue directly, the "term" of the Amended Agreement (Doc. No. 55-4) is unclear. Nowhere in the Amended Agreement is the "term" defined, nor do the parties offer their own competing positions on their understandings of the Amended Agreement's length. The Guaranty does not provide clear insight to this question, either. (See Doc. No. 55-1). The Court can imagine various reasonable interpretations of the Amended Agreement's term length: until the New Collateral Replenishment Obligation and New Indebtedness Payment Obligation are paid off completely; until April 1, 2021, the latest date referenced in the Amended Agreement; or until Lexon declares the Obligors in default and demands payment from Governor Justice under the Guaranty. Considering there are many reasonable interpretations of the Amended Agreement's length, and the parties have provided no meaningful argument on this issue, the Court finds the term is sufficiently ambiguous as to warrant a jury's determination on its meaning at trial.

(*Id.* at 19-20, n.12; *see also id.* at 21-22 ("[T]he Court has already explained that the term of the Amended Agreement, which impacts the length of time in which additional premiums may accrue, is sufficiently ambiguous that it can only be resolved by the trier of fact.").

42.     The Court then held that there are genuine issues of material fact as to the "term" of the Amended Agreement, the amount of premium payments made to Lexon, and, ultimately, the amount of premium owed to Lexon. (*Id.* at 22.)

11

43.     At a status conference on June 23, 2025, the Court instructed the parties to submit pretrial briefs by July 28, 2025, discussing (1) the areas where the parties agree and disagree; and (2) anything that a party believes the Court got wrong or missed in its damages-related rulings in the Summary Judgment Opinion. (June 23, 2025 Tr. at 4:8-20, 11:16-12:3.) The Court specifically stated that the parties could raise disagreements with the Court's analysis in their pretrial briefs and did not need to file motions to reconsider. (*Id.* at 12:1-3.)

44.     On July 28, 2025, both parties filed pretrial briefs disagreeing in some respects with the Court's rulings in the Summary Judgment Opinion.

45.     Defendant's pretrial brief submitted that (1) Amended Agreement defines "Total Indebtedness" as $3,538,400.75, not as the abstract sum of the "Remaining Indebtedness" and the "New Indebtedness"; and (2) even if the Amended Agreement did define "Total Indebtedness" as the abstract sum of the "Remaining Indebtedness" and the "New Indebtedness" instead of the specified amount of $3,538,400.75, the Amended Limited Guaranty caps Defendant's liability at the specified amount. (ECF 93 at 4-6.)

46.     Lexon's pretrial brief submitted that, contrary to the Court's rulings, the term of the Amended Agreement is not ambiguous and is susceptible to only one reasonable interpretation. (ECF 94 at 8-14.)

## II.     CONCLUSIONS OF LAW

### A.     The amount of "Total Indebtedness" damages Lexon is entitled to recover from Defendant under the Amended Limited Guaranty

#### 1.  The definition of "Total Indebtedness" in the Amended Agreement

Although the Court's Summary Judgment Opinion held that Lexon's "Total Indebtedness" damages include both the $3,538,400.75 specified in the Amended Agreement and additional

12

premiums that became due during the term of the Amended Agreement, the Court instructed the parties at the June 23, 2025 status conference to include in their pretrial briefing anything that a party believes the Court got wrong or missed in its Summary Judgment Opinion with respect to damages. Upon consideration of the parties' pretrial briefs and the evidence at trial, the Court concludes that the documents at issue define "Total Indebtedness" as—and limit Defendant's liability for the "Total Indebtedness" to—the specified amount of $3,538,400.75.

The Court begins with the Amended Agreement, which defines "Total Indebtedness" as follows:

> The Parties Agree the Remaining Indebtedness is equal to One Million Twenty-Five Thousand U.S. dollars ($1,025,000.00). The Parties also agree that in addition to the Remaining Indebtedness, additional premium of $2,513,400.75 is now due and owing (the "New Indebtedness"). The Remaining Indebtedness together with the New Indebtedness is equal to **$3,538,400.75 (the "Total Indebtedness")**.

(Def. Ex. 3 at 5, ¶ 3, emphasis added.) Although the Amended Agreement later states that the "New Indebtedness" shall be increased by new premiums that become due during the term of the Amended Agreement (*id.* at 6-7, ¶ 3(c)), the Amended Agreement does not define "Total Indebtedness" as the sum of the "Remaining Indebtedness" and the "New Indebtedness" in the abstract, whatever those amounts may be. Rather, as illustrated by the language quoted above, the Amended Agreement defines "Total Indebtedness" as $3,538,400.75. (*Id.* at 5, ¶ 3.)

To the extent that the third "WHEREAS" clause in the preamble to the Amended Limited Guaranty indicates that the "Total Indebtedness" includes new premiums becoming due during the term of the Amended Agreement (Def. Ex. 4 at 1), that is at best an inconsistency that conflicts with the actual terms of the Amended Agreement. The Court concludes that this inconsistency does not expand the Amended Agreement's definition of "Total Indebtedness" beyond the specified amount of $3,538,400.75. First, any ambiguity or uncertainty in a contract should be

13

resolved against the drafter (here, Lexon).  *See CONSOL Energy, Inc. v. Hummel*, 792 S.E.2d 613,

620 (W. Va. 2016); *Jochum v. Waste Mgmt. of W. Va., Inc.*, 680 S.E.2d 59, 64 (W. Va. 2009).

Second, Lexon's own pre-litigation correspondence indicates that Lexon understood and intended

the Amended Agreement's requirement to pay $200,000 per month until the "Total Indebtedness"

is paid in full to apply only to the payment of the specified then-due amount of $3,538,400.75.  *See*

*Miller v. WesBanco Bank, Inc.*, 859 S.E.2d 306, 328 (W. Va. 2021) ("[W]here the meaning [of a

writing] is uncertain and ambiguous, parol evidence is admissible to show the situation of the

parties, the surrounding circumstances when the writing was made, and the practical construction

given to the contract by the parties themselves either contemporaneously or subsequently[.]").

To elaborate, paragraph 3(b)(i) of the Amended Agreement states that "[o]n the last day of

each month, the Collateral Justice Companies and Beech Creek, jointly and severally, agree to pay

Lexon the sum of Two Hundred Thousand U.S. dollars ($200,000.00) per month until the Total

Indebtedness is paid in full (the 'Premium Payments')." (Def. Ex. 3 at 5, ¶ 3(b)(i).)  Less than a

month after the Amended Agreement was executed, Lexon's Senior Vice President, Kieran Moran,

sent an "update" to other Lexon officers regarding the Amended Agreement.  (Def. Ex. 8.)  In that

"update," Mr. Moran explained that the Primary Obligors agreed to pay $200,000 per month until

the "Total Indebtedness" of  $3,538,400.75 is paid in full.  Mr. Moran's update says nothing about

new premiums that become due during the term of the Amended Agreement being added to the

"Total Indebtedness."

Further, in a series of emails, Lexon's then-CEO, Brian Beggs, made clear that Lexon *did*

*not* intend the installment payment language in paragraph 3(b)(i) of the Amended Agreement—

requiring the Primary Obligors to pay $200,000 per month until the "Total Indebtedness" is paid

in full—to apply to new premiums becoming due after the date of the Amended Agreement:

14

- In an October 29, 2019 email, Mr. Beggs stated that "Justice *has met their installment obligations* (with a little arm twisting) to pay down overdue past premiums," but that "*[t]hey have not paid their renewal premiums for 2019* and are $2mm plus in the hole[.]" (Def. Ex. 9, emphasis added.)

- In another October 29, 2019 email, Lexon Senior Underwriter Jack Genet stated that "while Justice *has made recent payments* for collateral and past due premium *as required under the 2/4/2019 Amendment agreement*, I want to point out that *they have not made any payments on new premiums*." (Def. Ex. 10, emphasis added.) Later in the same email chain, Mr. Beggs stated that "*the installment deal was* for over 90 premiums and *completely separate from their obligations to pay renewal premiums*." (*Id.*, emphasis added)

- In an October 31, 2019 email, Beggs stated as follows: "*The installments were to catch up on late premiums from 2018.* I specifically stated in our May meetings that the installments were for overdue premiums and *we expected the 2019 renewal premiums to be paid, outside of the installments*. Otherwise, we will never catch up. *Normal renewal payments are not "additional payments"*, we expect payment *at renewal*." (Def. Ex. 11, emphasis added.)

Lexon's repeated recognition that the Primary Obligors made the installment payments required by the Amended Agreement *but did not make* payments for "new premiums" or "renewal premiums" demonstrates that Lexon viewed the obligation to pay "new premiums" or "renewal premiums" as separate from and not included in the Amended Agreement's requirement to pay monthly installments of $200,000 until the "Total Indebtedness" is paid in full. (Def. Ex. 9; Def. Ex. 10.) The same is true of Mr. Beggs' express statements that "the installment deal" was "completely separate from [the Primary Obligors'] obligations to pay renewal premiums," that "[t]he installments were to catch up on late premiums from 2018," and that Lexon expected 2019 renewal premiums to be paid "outside of the installments." (Def. Ex. 10; Def. Ex. 11.) Plainly, Lexon intended the term "Total Indebtedness," as used in the Amended Agreement's requirement to pay $200,000 per month until the "Total Indebtedness" is paid in full, to mean only the specified amount of $3,538,400.75 that was due as of the date of the Amended Agreement, and intended for

15

new or renewal premiums to be paid "at renewal" independently of the Amended Agreement. (Def. Ex. 11.) Lexon cannot now claim that renewal premiums accruing during the term of the Amended Agreement became part of the "Total Indebtedness" after repeatedly insisting that the Primary Obligors must pay those renewal premiums outside of the installment payments for the "Total Indebtedness."

This conclusion does not render paragraph 3(c) of the Amended Agreement meaningless. Rather, paragraph 3(c) serves to "recognize" that additional premiums may independently become due during the term of the Agreement and that the Primary Obligors are ultimately responsible for those premiums as "New Indebtedness." (Def. Ex. 3 at 6-7, ¶ 3(c).) This is consistent with paragraph 3(d) of the Amended Agreement, which states that even after the Total Indebtedness is paid in full, the Primary Obligors must still pay "any additional premium due" or $200,000 per month, "whichever is greater." (*Id.* at ¶ 3(d).) And this understanding of paragraphs 3(c) and 3(d) of the Amended Agreement is consistent with Mr. Begg's 2019 emails, wherein he indicated that the installment payments were to catch up on past premiums whereas new or renewal premiums were to be paid at the time of renewal. (Def. Ex. 9, 10, 11.)

In summary, based on the language of the Amended Agreement and the extrinsic evidence discussed above, the Court concludes that the term "Total Indebtedness," as used in the Amended Agreement, means the specified amount of $3,538,400.75. This means that Defendant owes no money to Lexon for premium-related obligations under the Amended Limited Guaranty. With respect to premiums, the Amended Limited Guaranty guarantees payment of the "New Indebtedness Payment Obligation," which the Amended Limited Guaranty defines as the Primary Obligors' obligation "to pay the unpaid balance of the Total Indebtedness . . . ." (Def. Ex. 4 at 1-2.) Because the Court has concluded that the "Total Indebtedness" is the specified amount of

16

$3,538,400.75, the "New Indebtedness Payment Obligation" is the Primary Obligors' obligation to pay $3,538,400.75, to the extent that it remains unpaid. As Defendant demonstrated at trial, the Primary Obligors made premium payments totaling more than $3,538,400.75 by October 6, 2020. (Def. Ex. 14.) Thus, there is no unpaid balance of the Total Indebtedness, and Defendant therefore owes no money to Lexon for the "New Indebtedness Payment Obligation" under the Amended Limited Guaranty.

### 2. The limit of liability in the Amended Limited Guaranty

Even if the Amended Agreement did define "Total Indebtedness" as the abstract sum of the "Remaining Indebtedness" and the "New Indebtedness" instead of the specified amount of $3,538,400.75, the Amended Limited Guaranty caps Defendant's liability at the specified amount:

> *Notwithstanding anything contained herein to the contrary*, the obligations of Guarantor *shall be limited to* a total sum equal to (i) fifteen million U.S. dollars ($15,000,000.00) plus (ii) the *amount* of the Total Indebtedness *specified* in the Amended Underlying Agreement; (ii) provided that, in the event of any default by Collateral Obligor and/or Indebtedness Obligor with respect to the New Collateral Replenishment Obligation or the New Indebtedness Payment Obligation, including without limitation any failure to timely pay any payment due under either such Obligation, the obligations of Guarantor *shall* instead *be limited to* a total sum equal to (i) twenty million U.S. dollars ($20,000,000.00) plus (ii) the *amount* of the Total Indebtedness *specified* in the Amended Underlying Agreement.

(Def. Ex. 4 at 4-5, ¶ 5(e), emphasis added.) There is only one "amount" of the Total Indebtedness "specified" in the Amended Agreement: $3,538,400.75. (Def. Ex. 3 at 5, ¶ 3.) Thus, the Amended Limited Guaranty limits the "Total Indebtedness" damages for which Defendant is responsible to the specified amount of $3,538,400.75.

This is consistent with the manifest purpose of paragraph 5(e) of the Amended Limited Guaranty, which is to put a hard limit on Defendant's responsibility as guarantor. It would make no sense to "limit" Defendant's exposure to a nebulous, potentially limitless amount—*e.g.*, the

17

amount of additional premiums that continue to become due independently of the Amended Agreement until the Primary Obligors have paid off all sums owed to Lexon, which may never happen. And the language in paragraph 5(e) purporting to "limit" Defendant's exposure as guarantor would be meaningless and superfluous if it imposed no discernable limit short of the maximum, unspecified amount that the Primary Obligors could potentially owe. *See* Syl. Pt. 1, *Wood v. Sterling Drilling & Prod. Co.*, 422 S.E.2d 509 (W.Va. 1992) (The language of a contract "must be considered and construed as a whole, giving effect, if possible, to all parts of the instrument," and "specific words or clauses of an agreement are not to be treated as meaningless, or to be discarded, if any reasonable meaning can be given them consistent with the whole contract.").

The Court has already concluded that Lexon is not entitled to recover any damages for the Total Indebtedness from Defendant as guarantor. But even if the Court had concluded otherwise, paragraph 5(e) of the Amended Limited Guaranty limits Lexon's maximum conceptual recovery to $3,538,400.75, which is "the amount of the Total Indebtedness specified in the Amended Underlying Agreement." Paragraph 5(e) of the Amended Limited Guaranty does not permit Lexon to recover over $10 million in premium indebtedness from Defendant, as Lexon has attempted to do in this case.

## B. The term of the Amended Agreement

The Court has already determined that the term of the Amended Agreement is ambiguous. (ECF 68 at 19-22.) As the United States Supreme Court has observed, courts should not construe ambiguous writings to create lifetime promises, and contracts of unspecified duration should ordinarily be treated not as "operative in perpetuity" but as "operative for a reasonable time." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441 (2015). Similarly, West Virginia's

18

Supreme Court of Appeals has observed that "[w]here a contract provides no definite time for performance, the law implies a reasonable time," and that "[w]hat is a reasonable time is to be determined in the light of all the circumstances attending the transaction." Syl. Pt. 1, *Huminsky v. Gary Nat. Bank*, 150 S.E. 9 (W. Va. 1929). Here, the Amended Agreement has no end date: it provides that even after the Total Indebtedness is paid in full, the Primary Obligors shall pay any additional premium due or $200,000.00 per month, whichever is greater. (Def. Ex. 3 at 7, ¶ 3(d).) Thus, the Court will determine a reasonable term in light of the circumstances surrounding the Amended Agreement.

The original March 26, 2018 Agreement had three main components: (1) Lexon would release approximately $4.4 million in collateral; (2) the Primary Obligors would post "New Collateral" with a value of $5 million; and (3) the Primary Obligors would, through the sale of certain equipment would or otherwise, pay the then-outstanding premium balance (or "Indebtedness") of $3 million. (Def. Ex. 1.) The first component was to be performed "immediately upon execution" of the Agreement. (*Id.*, ¶ 1.) The second component was to be performed by the six-month anniversary of the Agreement. (*Id.*, ¶ 2.) And the third component was to be performed within five business days after the two-month anniversary of the Agreement. (*Id.*, ¶ 3(d).) Thus, the plain language of the original Agreement shows that the parties intended it to be fully performed within six months.

The Primary Obligors were unable to post the New Collateral or pay the Indebtedness by the deadlines in the Agreement. As of February 4, 2019, however, they had reduced the "Indebtedness" to $1,025,000. (Def. Ex. 3.) They also sought new bonds from Lexon. These circumstances led to the execution of the Amended Agreement.

19

Under the Amended Agreement, the Primary Obligors agreed to deliver $20 million in "New Collateral" to Lexon on a schedule that ended in April 2021. (Def. Ex. 3 at 2-5, ¶ 2.) They also agreed to pay $3,538,400.75 in "Total Indebtedness"—representing the remaining $1,025,000 of the "Indebtedness" from the original Agreement plus $2,514,400.75 of additional premium that was due and owing as of the date of the Amended Agreement— on a schedule that would last approximately 18 months at most. (*Id.* at 5-6, ¶ 3.) More specifically, they agreed to pay $200,000 per month ($3,538,400.75 divided by $200,000 is approximately 18) *and* to sell certain equipment with the proceeds to be used to reduce the Total Indebtedness, which would decrease the number of monthly $200,000 payments needed to eliminate the Total Indebtedness. (*Id.*)

This language indicates that the parties intended the Total Indebtedness to be paid by August 2020 (18 months from February 2019). The fact that this payoff did not happen as contemplated does not change the intended term of the payments toward the Total Indebtedness. Because the Primary Obligors agreed to pay $20 million in collateral on a schedule that ended April 1, 2021, and to pay the Total Indebtedness on a schedule that would end by August 2020, the Court concludes that the original "term" of the Amended Agreement should be defined as ending on April 1, 2021—the latest date referenced and contemplated in the Amended Agreement. The Court recognizes, however, that the January 2020 Side Letter Agreement extended the collateral payment schedule by six months. Thus, the Court concludes that term of the Amended Agreement should be defined as ending October 1, 2021, at the latest.

The Court declines to hold, as Lexon urges, that the term of the Amended Agreement extends until all collateral and premiums obligations have been paid in full.

First, if completion of performance always governed the term of a contract, then every contract that is breached through nonperformance would have an infinite term. Although Lexon

argues that it would be commercially unreasonable to determine the term of the Amended Agreement based on a date when the Primary Obligors were supposed to, but did not, satisfy their obligations, this conflates the Primary Obligors' *liability for the debt* created by the Amended Agreement with *the term* of the Amended Agreement. To illustrate, suppose the original Agreement were never amended. The Agreement called for payment of $3 million in premium "Indebtedness" within two months and $5 million in "New Collateral" within six months. The failure to pay those obligations in full by the contractual deadlines may mean that the Primary Obligors breached the Agreement and became liable to Lexon for the unpaid balance, and the Primary Obligors' *liability* may continue after the six-month deadline, but that does not mean that the *term* of the Agreement has been extended. Performance was due within six months. It would defy logic to hold that a contract requiring performance within six months has an infinite and ongoing term.

Second, if the Court were to hold, as Lexon urges, that the "Total Indebtedness" is increased by additional premiums that become due during the term of the Amended Agreement, then defining the term of the Amended Agreement by the obligation to pay the Total Indebtedness would be circular. The *term of the Amended Agreement* would depend on the payment in full of all premiums that become due during the *term of the Amended Agreement*. The term to be defined cannot be part of the definition.

Third, to the extent Lexon contends the term of the Amended Agreement lasts until the Primary Obligors pay their premium balance down to zero, this is not only contrary to the plain language of the Amended Agreement, but also would result in no end date because the Primary Obligors may never be able to pay off the balance. Again, according to the Amended Agreement, the Primary Obligors must pay a minimum of $200,000 per month even *after* the Total

Indebtedness (regardless of how that term is defined) is paid in full. (Def. Ex. 3 at 7, ¶ 3(d).) Further, as Steve Ball (General Counsel for the Primary Obligors and Executive Vice President of most of them) and Jay Justice (President of the Primary Obligors) testified at trial, the Primary Obligors do not have the ability to pay the amount of premium that Lexon claims is owed. Likewise, Lexon recognized in multiple emails that paying $200,000 per month under the Amended Agreement would never eliminate the Primary Obligors' premium balance. (Def. Ex. 11, 12, 13.) Thus, Lexon's interpretation would result in a potentially never-ending obligation to pay $200,000 per month toward an ever-growing premium balance. *See M & G Polymers*, 574 U.S. at 441 (recognizing "the traditional principle that courts should not construe ambiguous writings to create lifetime promises").

Fourth, while the obligation to deliver $20 million in New Collateral was created by the Amended Agreement, the Primary Obligors would have the obligation to pay premiums for their surety bonds even if the Amended Agreement never existed. Lexon acknowledges that premiums accrued before the original Agreement was ever executed. Further, Mr. Beggs' emails make clear that renewal premiums accrued independently of the Amended Agreement in amounts approximating or exceeding the monthly $200,000 payments called for in the Amended Agreement, and that the payments called for in the Amended Agreement were insufficient to eliminate the independently accruing premium balance. (*See* Def. Ex. 9 (distinguishing between the Primary Obligors' installment obligations under the Amended Agreement and their obligation to pay renewal premiums); Def. Ex. 10 (stating that "the installment deal" was "completely separate" from the obligation to pay renewal premiums); Def Ex. 11 (stating that Lexon expected "[n]ormal renewal premiums" to be paid "outside of the installments," and that "[o]therwise, we will never catch up"); Def. Ex. 12 (stating that "premium installments at $200,000 isn't closing

the gap").)  The Court concludes that it is more reasonable to define the term of the Amended Agreement based on the collateral payment schedule created therein than to define it based on potentially never-ending payments toward premium obligations that exist independently of the Amended Agreement.

Ultimately, it is clear to the Court that nobody intended the Amended Agreement to last over six years and counting, or to obligate Defendant to cover the Primary Obligors' ongoing premium payments in perpetuity.  Indeed, the Amended Agreement provides that "[t]he Parties agree time is expressly made of the essence with respect to each and every provision of this Amendment and the documents and instruments entered into in connection herewith." (Ex. 3 at 8, ¶ 7.)  For all of the foregoing reasons, the Court finds it most reasonable to define the term of the Amended Agreement by the parties' intended timeline for payment of the New Collateral, which, as explained, ended on October 1, 2021.[2]

**C.    The amount of pre- and post-judgment interest**

West Virginia Code § 56-6-27 governs prejudgment interest in contract cases.  *See* Syl. Pt. 1, *Miller v. WesBanco Bank, Inc.*, 859 S.E.2d 306 (W. Va. 2021) ("West Virginia Code section 56-6-27 (eff. 1923) provides the exclusive means by which to obtain prejudgment interest in any action founded on contract.").  Under § 56-6-27, prejudgment interest is not mandatory but a matter of discretion. *See Velasquez v. Roohollahi*, No. 13-1245, 2014 WL 5546140, at *3-4 (W. Va. Nov.

---

[2] Even if the Court had found that Lexon were entitled to recover premiums that accrued during the term of the Agreement, its recovery would not have exceeded $3.25 million.  The testimony of Lexon Senior Vice President Patrick Hennesy indicated that the premium balance as of the end of August 2021 was approximately $2.75 million, and that the balance would not have exceeded $3.25 million by October 1, 2025.

3, 2014); *Leyzorek v. Pocahontas Cnty. Solid Waste Auth.*, No. 13-1160, 2014 WL 2922803, at *4 (W. Va. June 27, 2014).

Although W. Va. Code § 56-6-27 does not prescribe how to decide whether to award prejudgment interest or how to calculate it, federal courts have focused on the loss of use of the money owed and the injured party's borrowing costs. *See Com. Builders, Inc. v. McKinney Romeo Props., LLC*, No. 1:20CV62, 2022 WL 16706973, at *14 (N.D.W. Va. May 18, 2022). Here, the Court concludes that no prejudgment interest should be awarded on the collateral portion of the judgment because collateral exists for security, not for the holder's use.[3]

Turning to post-judgment interest, even in contract cases where *prejudgment* interest is governed by W. Va. Code § 56-6-27, *post-judgment* interest is governed by federal law in accordance with 28 U.S.C. § 1961. *See Ferguson Enters., LLC v. Wolfe Constr. Co., Inc.*, No. 2:20-CV-00439, 2021 WL 2877604, at *3 (S.D.W. Va. July 8, 2021). Under § 1961, post-judgment interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the

---

[3] Even if the Court were to award pre-judgment interest, the Court would not calculate that interest at 7% (the rate Lexon claimed was appropriate in its pretrial brief). That would be the applicable statutory rate if this case were governed by W. Va. Code § 56-6-31. *See* W. Va. Code § 56-6-31; *see also* https://www.courtswv.gov/sites/default/pubfilesmnt/2023-06/interest2023_0.pdf. But § 56-6-31 does not apply in cases founded on contract; rather, W.Va. Code § 56-6-27 provides the exclusive means to obtain prejudgment interest in contract cases. *See Miller*, 859 S.E.2d at 319-22. In cases governed by § 56-6-27, federal courts have looked to treasury yields as an indicator of borrowing costs. *See Com. Builders*, 2022 WL 16706973 at *14 (using the one-year constant maturity Treasury yield, averaged on a weekly basis, as the rate of prejudgment interest); *see also Richards v. EQT Prod. Co.*, No. 1:17CV50, 2019 WL 4120819, at *7 (N.D.W. Va. Aug. 29, 2019).

24

calendar week preceding [ ] the date of the judgment." 28 U.S.C. § 1961(a).   Here, the applicable

rate is _____.[4]

### III.   RULING

For the foregoing reasons, the Court hereby ORDERS as follows:

1)   Lexon is not entitled to recover any amount of Total Indebtedness from Defendant;

2)   Lexon is not entitled to prejudgment interest on the $14,250,000 in outstanding New

Collateral that the Court determined in its Summary Judgment Opinion;

3)   Lexon is entitled to post-judgment interest at the rate of _____.

An appropriate final judgment order will be entered after Lexon's damages under Counts

II and III are determined through the post-trial procedure set forth in Local Rule 54.01.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE

---

[4] *See* https://www.federalreserve.gov/releases/h15/. (The weekly average 1-year constant maturity
Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the
week of July 28 through August 1, 2025, was 4.05%.  Defendant cannot predict what the weekly
average 1-year constant maturity Treasury yield will be for the week preceding the eventual
judgment in this case.)

Respectfully submitted,

JAMES C. JUSTICE II,

By Counsel:

*/s/ Peter C. Robison*
Peter C. Robison (No. 27498)
LEWIS THOMASON, P.C.
427 Church Street, Suite 2500
Nashville, TN 37219
(615) 259-1366
probison@lewisthomason.com

*/s/ David R. Pogue*
David R. Pogue (admitted *pro hac vice*)
Raymond S. Franks II (admitted *pro hac vice*)
CAREY DOUGLAS KESSLER & RUBY PLLC
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone:     (304) 345-1234
Facsimile:      (304) 342-1105
drpogue@cdkrlaw.com
rfranks@cdkrlaw.com

26

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 11, 2025, the foregoing document was filed via the Court's ECF system, which will send a notice of electronic filing to all ECF-registered counsel of record listed below:

| | |
|---|---|
| Jason M. Halper (*admitted pro hac vice*) | W. Brantley Phillips, Jr. (BPR# 018844) |
| Sara E. Brauerman (*admitted pro hac vice*) | Garrah Carter-Mason (BPR# 037518) |
| Timbre Shriver (*admitted pro hac vice*) | BASS, BERRY & SIMS PLC |
| VINSON & ELKINS LLP | 150 Third Avenue South, Suite 2800 |
| The Grace Building | Nashville, TN 37201 |
| 1114 Avenue of the Americas | Tel: (615) 742-6200 |
| 32nd Floor | Fax: (615) 742-6293 |
| New York, NY 10036 | bphillips@bassberry.com |
| Phone: 212-237-0000 | garrah.cartermason@bassberry.com |
| Email: jhalper@velaw.com | |
| sbrauerman@velaw.com | |
| tshriver@velaw.com | |

*/s/ Peter C. Robison*
Peter C. Robison

27