**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

LEXON INSURANCE COMPANY,

                Plaintiff,

    v.

JAMES C. JUSTICE II,

                Defendant.

Civil Action No. 3:23-cv-00772

Judge Waverly D. Crenshaw, Jr.
Magistrate Judge Barbara D. Holmes

**PLAINTIFF'S PROPOSED POST-TRIAL**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Lexon Insurance Company ("Lexon") respectfully submits the following proposed post-trial Findings of Fact and Conclusions of Law.

## SUMMARY OF THE CASE

Over two years ago, Lexon commenced this action against Defendant James C. Justice II ("Defendant"), now a U.S. Senator, due to his breach of a personal guaranty dated March 26, 2018, and amended February 4, 2019 (the "Guaranty"). Through the Guaranty, Defendant guaranteed the payment of tens of millions of dollars contractually owed to Lexon by certain of Defendant's family-owned companies and their affiliates (the "Justice Companies") and another affiliate, Beech Creek Coal Corp. ("Beech Creek," and with the Justice Companies, "Obligors"). The terms detailing Obligors' commitment to pay these amounts to Lexon are set forth in an agreement dated March 26, 2018 (the "Agreement"), as amended February 4, 2019 (the "Amended Agreement"). In Count I of its Complaint, Lexon sought to recover from Defendant, under the Guaranty, amounts due and owing but unpaid by Obligors under the Amended Agreement. In Counts II and III, Lexon sought to recover attorneys' fees and other costs it incurred to enforce the Guaranty.

On December 3, 2024, this Court granted summary judgment in favor of Lexon on all three Counts in its Complaint, including finding Defendant liable on Count I for breaching his contractual commitments under the Guaranty.[1] ECF 68 at 8–14, 40. The Court concluded that Defendant is required to pay Lexon $14,250,000 in collateral. With respect to premiums, the Court found Defendant was required to pay Lexon $3,538,400.75 in unpaid premiums due as of February 4, 2019, "plus additional [unpaid] premiums that became due during the Amended Agreement's

---

[1] In addition, this Court found that Defendant is liable under Counts II and III of the Complaint, which seek recovery of Lexon's attorney's fees and other costs to enforce the Guaranty and for indemnification. ECF 68 at 40; ECF 89. These damages will be determined through the process set forth in Local Rule 54.01 and addressed in a separate order. *See* ECF 89 (granting Joint Motion Regarding Scope of Issues for Trial (ECF 87)).

term." *Id.* at 17–21. The Court left two questions open for trial: (1) the term of the Amended Agreement, governing the period of time after February 4, 2019 that unpaid premiums owed to Lexon continue to accrue and become subject to the Amended Agreement; and (2) the amount of premiums that have accrued since February 4, 2019 and to which Lexon is entitled to payment from Defendant under the Guaranty.

On August 20 and 21, 2025, the Court conducted a bench trial on these two questions and heard testimony from Jeremy Sentman (Lexon's Senior Vice President and Head of Surety Claims), Brian Beggs (Lexon's former Chief Executive Officer), William Muller (Lexon's Vice President of North American Controls and previous Vice President of Surety Operations), and Stephen Ball (in-house counsel for the Justice Companies).

For the reasons that follow, the Court finds that Lexon proved by a preponderance of the evidence that the Amended Agreement's term continues, and, in turn, premiums continue to accrue, until Obligors satisfy their collateral and premium obligations thereunder in full. As a result, in addition to the damages already awarded at summary judgment, Lexon is entitled to recover the additional premiums that accrued after February 4, 2019 and were at least 60 days past due as of September 30, 2025. This amount totals $10,929,709.24.

### **FINDINGS OF FACT[2]**

## I.     **The Parties' Business Relationship**

1.     Surety bonds guarantee the performance of obligations that the principal (in this case, one of the Obligors) owes to an obligee (here, a government regulator). ECF 119 (Bench Trial Day 1 Transcript), Sentman 24:20–25:25. If the principal does not perform the obligations

---

[2] A more complete explanation of the facts is detailed in the December 3, 2024 summary judgment opinion. ECF 68.

subject to the bond, the surety is required to ensure performance of those obligations. *Id.* 26:11–15; 26:16–27:2.

2.    Lexon[3] issued surety bonds to Obligors guaranteeing their performance of obligations required by state and federal regulators for Obligors' coal mining operations. *Id.* 25:14–26:15. As of the date of trial, Lexon's exposure on those bonds totaled approximately $112 million. *Id.* 40:23–41:1, Beggs 116:20–23.

3.    Each of the Justice Companies and Beech Creek executed a General Agreement of Indemnity ("GAI") with Lexon. *See* JX 4 (attaching multiple GAIs executed by certain of the Justice Companies).

4.    Each GAI applies to all bonds issued on behalf of each principal. Pursuant to the GAIs, each Obligor agreed to (1) pay recurring annual premiums; and (2) upon Lexon's request, deposit cash collateral to protect Lexon against loss if Lexon is required to incur costs to perform Obligors' obligations under the bonds. *See, e.g.*, *id.* ¶ 3 at 2; ECF 119, Sentman 28:17–30:5. In that regard, unlike a typical insurance company, the "[s]urety assumes no loss." ECF 119, Sentman 27:3–28:12.

5.    Neither the surety bonds nor the GAIs have a termination date. Rather, the parties' obligations under the bonds and GAIs terminate when the principal performs the bonded obligations, in which case the bond is released and discharged, or when the Lexon bond is replaced by another surety's bond. *Id.* 27:24–28:2 (testifying that a bond "remains in full force and effect until it is either released by the obligee or the principal has basically discharged its duties").

---

[3] Sompo International, a global insurance company, acquired Lexon in a transaction that closed on June 1, 2018. This Opinion refers to pre-acquisition Lexon as "Old Lexon."

6.     Lexon cannot unilaterally terminate or otherwise release its obligations under a surety bond, even if Obligors do not perform their obligations to the obligee or Lexon under the GAI. As Mr. Sentman testified, "[r]egardless of if the principal pays premiums or not, the surety's obligation exists until the underlying obligations of the principal have been satisfied." *Id.* 33:5–21. Lexon's only compensation for this significant long-term exposure is the premium payments. *Id.* 28:22–29:5 (testifying that premiums are "the only way that [surety companies] realize any revenue"). Therefore, Obligors owe premium payments and collateral obligations to Lexon until the bond is released or replaced. *See* JX 4 ¶ 1 at 2; *see also* ECF 119, Sentman 36:22–38:6.

## II.     Old Lexon, Obligors, and Defendant Execute the Agreement and Guaranty

7.     In early 2018, Obligors requested that Old Lexon release to them $5 million of collateral it was holding in connection with certain surety bonds.

8.     To address the outstanding premium balance owed to Old Lexon and Obligors' request for Old Lexon to release collateral, the parties entered into the Agreement, dated as of March 26, 2018. ECF 103 ¶ 1; *see also* JX 3. Under the Agreement, Old Lexon agreed to release the $5 million in collateral it was holding in exchange for Obligors' promise to pay (1) $5 million in new collateral within six months of the Agreement's effective date of March 26, 2018 (*i.e.*, by September 26, 2018); and (2) $3 million in then-past due premiums within two months of March 26, 2018 (*i.e.*, by May 26, 2018). JX 3 ¶¶ 1–3.

9.     To induce Old Lexon to enter into the Agreement, Defendant agreed to execute a personal guaranty, dated as of March 26, 2018. JX 2; *see also* JX 3 ¶ 4.

## III.     Lexon, Obligors, and Defendant Negotiate the Amended Agreement and Guaranty

10.     Obligors admitted that they did not post the $5 million in new collateral or pay the full $3 million in overdue premium by the respective deadlines provided in the Agreement. *See* JX 18, Recitals at 1–2; ECF 119, Sentman 49:1–9.

4

11.     To address Obligors' outstanding obligations, Lexon, under new management following the Sompo acquisition, agreed to negotiate an amendment to the Agreement rather than taking legal action under the GAIs. JX 6 at 2; ECF 119, Beggs 123:19–22, 126:20–127:2.

12.     However, Messrs. Beggs and Sentman credibly testified that, throughout the negotiations leading to the Amended Agreement, they and other Lexon representatives consistently took the position that, as part of any new agreement, Obligors would have to replenish their collateral account to $20 million; pay outstanding premiums due at the time of amendment; and remain current on premiums that would continue to accrue under the GAIs. *See id.* Sentman 60:17–61:2, Beggs 120:11–21.

13.     In addition, Messrs. Beggs and Sentman confirmed that Lexon would not have entered into the Amended Agreement if Defendant had not executed the Guaranty. *See id.* Sentman 54:6–15, Beggs 131:1–3; *see also* JX 17, Recitals at 2 ("Guarantor understands and acknowledges that Beneficiary has agreed to enter the Amended [] Agreement in reliance upon this Guaranty.").

14.     At trial, Defendant did not proffer any evidence to the contrary regarding Lexon's position during these negotiations. Nor could he. Obligors' agent, Clinton Diers, acknowledged in contemporaneous emails the importance of paying outstanding and newly accruing premiums to Lexon.

15.     For example, on January 2, 2019, Mr. Diers reiterated to James C. Justice III ("Jay Justice")—Defendant's son and the President of the Justice Companies[4]—and Mr. Ball that "outstanding premium balances [were] a huge factor" for Lexon, and that "[o]ne way or another the premiums need[ed] to be paid before [Lexon] ma[d]e any further agreements." JX 10; *see also*

---

[4] Jay Justice also owns Beech Creek.

JX 11 (January 2, 2019 email from Mr. Diers to Jay Justice, conveying Lexon's "position that they can't do anything further bond wise until the premiums are paid up").

16.     Mr. Beggs confirmed at trial that this was Lexon's position and explained that premiums are Lexon's "lifeblood," meaning that if Lexon does not "collect that premium . . . it strains Lexon's cash flow." ECF 119, Beggs 135:19–136:13; *see also id.* 121:11–16.

17.     Documentary evidence of the parties' negotiating history supports Messrs. Beggs and Sentman's testimonies. JX 7 at 4 (November 17, 2018 email from Jay Justice proposing a plan to pay outstanding premiums owed, stay current on premiums that continue to accrue, build up the collateral account, and for Defendant to execute a new personal guaranty); *see also* JX 6 at 2 (September 27, 2018 email from Jay Justice proposing that the parties group newly accruing premiums "into a new box," which Obligors would "keep . . . paid and current").

18.     With respect to ongoing premiums, in particular, Jay Justice proposed that Obligors would "agree that going forward [they would] keep newly billed premium payments at 75 day terms or less[.]"[5] JX 7 at 4; *see also id.* at 1–3. Obligors later proposed 60 days, which, like the other terms discussed above, is reflected in the Amended Agreement. JX 15 at 4.

## IV.     The Parties Execute the Amended Agreement and the Guaranty

19.     Under the Amended Agreement, Obligors are required to "deliver to Lexon new collateral in the total sum of Twenty Million U.S. dollars ($20,000,000.00) (the 'New Collateral')." JX 18 ¶ 2 at 2–5.[6]

---

[5] Under the GAIs, premium payments were due within 30 days. Therefore, Jay Justice's 75-day proposal would give the Justice Companies an additional 45 days to pay newly accrued premiums. ECF 119, Sentman 56:11–13.

[6] As discussed *infra* 59, the Guaranty defines this obligation as the "New Collateral Replenishment Obligation." JX 17, Recitals ¶ (i).

20.     The Amended Agreement provides three ways for Obligors to satisfy their New Collateral Replenishment Obligation: (1) monthly $250,000 payments ("Collateral Payments"), (2) proceeds from the anticipated sale of certain of Obligors' entities (the "Liquidity Event"), and (3) milestone payments every six months ("Additional Collateral Payments"). *See* JX 18 ¶ 2 at 2–5; ECF 119, Sentman 51:3–25, 52:3–15.

21.     With respect to premiums (referred to as "Total Indebtedness" in the Amended Agreement), Obligors are required to "pay Lexon the sum of Two Hundred Thousand U.S. dollars ($200,000) per month until the Total Indebtedness is paid in full (the 'Premium Payments')." JX 18 ¶ 3(b)(i) (emphasis added).[7] Alternatively, the parties agreed that the proceeds from the anticipated sale of certain equipment would be used to reduce the Total Indebtedness.[8] *Id.* ¶ 3(b)(ii).

22.     Total Indebtedness is defined as the sum of: (i) the outstanding premiums due to Lexon as of March 26, 2018 (the "Remaining Indebtedness") *plus* (ii) premiums that accrued between March 26, 2018 (date of the original Agreement) and February 4, 2019 (date of the Amended Agreement) *plus* (iii) premiums that *continue to accrue* after February 4, 2019 and remain unpaid for 60 days or more (with premiums described in (ii), "New Indebtedness"). JX 18 ¶ 3 at 5–7.

---

[7] As explained *infra* 60, the Guaranty defines this obligation as the "New Indebtedness Payment Obligation." JX 17, Recitals ¶ (i). The Guaranty defines the New Collateral Replenishment Obligation and New Indebtedness Payment Obligation collectively as the "Obligations." *Id.* ¶ 1.

[8] As Mr. Beggs testified at trial, this provision was a carry-over from the Agreement. *See* ECF 119, Beggs 154:10–23; *see also* JX 3 ¶ 3. Only one piece of equipment was sold between the execution of the Agreement and the execution of the Amended Agreement. *Compare* JX 3, Ex. C, *with* JX 18, Ex. C.

23. Specifically, the Amended Agreement provides:

The Parties agree the Remaining Indebtedness is equal to One Million Twenty Five Thousand U.S. dollars ($1,025,000.00). The Parties also agree that in addition to the Remaining Indebtedness, additional premium of $2,513,400.75 is now due and owing (the "New Indebtedness"). The Remaining Indebtedness together with the New Indebtedness is equal to $3,538,400.75 (the "Total Indebtedness").

**\*\*\*\***

The [] Justice Companies and Beech Creek recognize that ***additional amounts for premium*** may become due during the term of this Agreement and they hereby agree that the New Indebtedness shall be increased in like amount (e.g., if new premium is due on March 2, 2019 in the amount of $10,000.00, the New Indebtedness is increased by $10,000.00). Additional amounts for premiums under this sub-paragraph are those premiums that are sixty (60) days or more past due.

*Id.* ¶¶ 3, 3(c) (emphasis added).

24. Lexon's witnesses credibly testified that, under the Amended Agreement, Obligors must make Premium Payments until the Total Indebtedness, including additional premiums that accrue after February 4, 2019 and remain unpaid for more than 60 days, is paid in full, and that the Guaranty applies to all such Obligations. In other words, the Total Indebtedness is not a fixed figure of $3,538,400.75 (as Defendant advocates), but rather increases as new premiums become due and are not paid within 60 days, until the Obligations are paid in full.

25. For instance, Mr. Beggs testified that he understood Total Indebtedness to include "the original 1,025,000; the additional 2.5 million, and, going forward, any items that became due during the term of this agreement." ECF 119, Beggs 200:16–23. Mr. Beggs further explained that Lexon "had an expectation that [Obligors] would pay their currents, because if they didn't, those would be added to the overdue premium balance." *Id.* 139:24–140:5; *see also id.* 145:17–23 (explaining that Lexon would never waive Obligors' obligation to pay premiums as that is Lexon's sole source of revenue in connection with the bonds issued for Obligors). Mr. Sentman likewise testified that "Total Indebtedness was the amount of premium that was past due that was owed,

and the accruing premium that was due and owing." *Id.* Sentman 57:2–9; *see also* ECF 68 at 19 (concluding that Total Indebtedness owed to Lexon includes "additional premiums that became due during the Amended Agreement's term").

26. Defendant likewise acknowledged in his Response to Plaintiff's Statement of Undisputed Material Facts that it is "[u]ndisputed" that "[t]he Amended Agreement [] provides that 'additional amounts for premium may become due during the term of this Agreement' and that the amount of premiums constituting Total Indebtedness 'shall be increased in like amount.'" ECF 58 ¶ 9.

27. Moreover, it was Obligors who proposed the timeline under which additional amounts of unpaid premiums accruing after February 4, 2019 would convert to New Indebtedness, and in turn, Total Indebtedness. In a January 30, 2019 email from Mr. Ball to Messrs. Diers and Moran, Mr. Ball wrote that "[f]or purposes of what is current on premium payments, 60 days will be deemed current on premium payments." JX 15 at 4. Mr. Ball confirmed during his deposition that, pursuant to this provision of the Amended Agreement, "[j]ust as additional premiums come due those get added to the definition of 'New Indebtedness.'" ECF 120 (Bench Trial Day 2 Transcript), Ball 149:6–149:20, 152:24–153:16; JX 75 at 162:2–4, 256:3–9.

28. There exists only one conceivable purpose for this 60-day provision set forth in Paragraph 3(c) of the Amended Agreement: to ensure that new premiums that continue to come due after the execution of the Amended Agreement, and which remain unpaid for 60 days, accrue as Total Indebtedness and become subject to the payment terms of the Amended Agreement.

29. Pursuant to the Guaranty, Defendant "absolutely, unconditionally and irrevocably guarantee[d]," the payment and punctual performance of (i) the New Collateral Replenishment Obligation and (ii) the New Indebtedness Payment Obligation, defined by the Guaranty as

Obligors' obligation to pay "the Total Indebtedness (including any new premiums becoming due during the term of the Amended [] Agreement)." JX 17, Recitals ¶ (ii); *see also, e.g.*, *id.* ¶ 1 (providing that if Obligors fail to pay any or all of their Obligations under the Amended Agreement or "any amounts due under any GAI," Defendant "shall" pay Lexon "the entire amount . . . as if such amount constituted the direct and primary obligation of [Defendant]"), ¶ 8. Defendant's obligations under the Guaranty are "continuing in nature and appl[y] *until the . . . payment and satisfaction in full of <u>all of the Obligations</u>.*" *Id.* ¶ 5(a) (emphasis added).

30.     Also, while Defendant's liability for the New Collateral Replenishment Obligation is "limited" under the Guaranty (*id.* ¶ 5(e)), there is no such cap on Defendant's liability with respect to Total Indebtedness, *i.e.*, premiums. *See generally* JX 18 ¶ 3 at 5–7.

## V.     The Parties' Post-Execution Communications Regarding Premiums

31.     The parties' communications and conduct following execution of the Amended Agreement provide additional evidence of their understanding and intent that premiums accruing after February 4, 2019 and remaining unpaid for more than 60 days are subject to the Amended Agreement and Guaranty.

32.     Lexon consistently made clear to Obligors during this time that premiums accruing after February 4, 2019 are subject to the Amended Agreement and Guaranty if not paid within 60 days. Obligors never took any contrary position and, in fact, acknowledged that these premium obligations became subject to the Amended Agreement. *See, e.g.*, *supra* ¶ 27; *infra* ¶¶ 33–37.

33.     For instance, the Justice Companies sought to persuade Lexon to issue a new bond in October 2019, approximately six months after the Amended Agreement was signed, by pointing out that they had been paying the $200,000 monthly installments. JX 23 at 2. In response, Mr. Beggs clarified by email that, despite making these Premium Payments, Obligors were not in compliance with the Amended Agreement because they were not paying newly accrued premiums.

10

JX 23 at 1; *see also* JX 22 at 1; JX 24 (October 31, 2019 email to Mr. Diers noting that "installments were for overdue premiums" and that Lexon "expected [] renewal premiums to be paid, outside of the installments."); JX 29 at 1–2 (January 16, 2020 email from Mr. Beggs to Mr. Diers, asserting that "[t]he installment agreement was always about overdue premium."). At trial, Mr. Beggs testified that Obligors' failure to pay newly accruing premiums undermined the express terms and very purpose of the Amended Agreement—to eliminate overdue premiums. ECF 119, Beggs 138:8–139:5; *see also id.* 167:4–168:7, 139:22–140:5 (explaining that he was "conveying . . . our eventual goal was to pay down all the overdue premiums" and that "[t]he installment plan was specifically designed to address overdue premiums").

34.     Mr. Beggs reiterated Lexon's position during the parties' communications in January and March 2020 regarding two agreements referred to as the "Side Letters," which adjusted the Amended Agreement's payment schedule to allow Obligors additional time to pay the collateral and premium due. *See* JX 26; JX 31; JX 36–37.

35.     In January 2020 emails, Mr. Beggs conveyed that, in connection with the Side Letters, Lexon "want[ed] to increase the premium installment" because the $200,000 installments were "too low" and not "closing the gap[.]" JX 26 at 2; JX 29 at 2; *see also* JX 25; ECF 119, Beggs 194:25–195:19. At trial, Mr. Beggs confirmed his concern as expressed in these communications: "if we went at that clip of 200,000 per month, we weren't going to make any real inroads on reducing the overdue balance." ECF 119, Beggs 143:2–11. Neither Obligors nor Defendant ever challenged Lexon's interpretation that overdue premiums continue to accrue under the Amended Agreement until the Obligations are satisfied or disputed that the purpose of the Amended Agreement was to bring the premiums current. Instead, Obligors agreed to increase their monthly Premium Payments from $200,000 to $250,000 per month through June 2020 and revert to

$200,000 in July 2020 in the January 2020 Side Letter.[9] JX 31 ¶ 1.

36.     In October 2020, Obligors confirmed their understanding that overdue premiums continue to accrue under the Amended Agreement until the Obligations are satisfied when they sought to modify their collateral and premium obligations under the Amended Agreement. *See* JX 45 at 3 (October 8, 2020 letter from Jay Justice proposing that Obligors would continue to make reduced "monthly payments through the end of the year" and "[a]n additional balloon payment . . . at the end of the year to bring all outstanding premiums to an aging of sixty (60) days"); *see also id.* at 4.

37.     Perhaps most tellingly, on July 24, 2023, Lexon delivered to Defendant a Notice of Default & Demand for Payment (the "Demand") under the Guaranty. *See* JX 66. The Demand notified Defendant that Obligors were in default of the Amended Agreement "due to their failure to timely pay Lexon the (i) New Collateral in the amount of Twenty Million U.S. dollars ($20,000,000); and (ii) Total Indebtedness in the amount of $6,724,138.66 U.S. dollars (as of June 30, 2023), which, pursuant to Paragraph 3 of the [Amended] Agreement, continues to accrue." JX 66 at 1. In addition, the Demand made clear that Lexon sought payment of these amounts "in accordance with the Guaranty." *Id.* In his July 27, 2023 response, Mr. Ball recognized that "there are premiums continuing to accrue on the bonds" and, notably, did not argue that those premiums are not subject to the terms of the Amended Agreement or the Guaranty. JX 67 at 3.

38.     Together, all of these post-execution communications demonstrate the parties

---

[9] It is also worth noting that, as of the signing of the January 2020 Side Letter, the Justice Companies had paid a total of $2,200,000 toward the Total Indebtedness. *See* JX 73 (adding premium payments made from 02/28/2019 to 12/31/2019). By committing under the January 2020 Side Letter to pay five installments of $250,000—$1,500,000 total—the Justice Companies agreed to pay at least a total of $3,700,000 toward the Total Indebtedness which is greater than the $3,538,400.75 Total Indebtedness cap which is the basis for Defendant's argument.

intended for the Amended Agreement to address past due premiums as well as ongoing premiums that accrued but were not timely paid.[10]

## VI. **The Term of the Amended Agreement**

39. Based on the evidence, the Court finds that the parties intended for and understood the Amended Agreement to remain in effect until Obligors' Obligations are satisfied.

40. Defendant did not proffer evidence of any discussion or agreement among the parties for a fixed end-date for newly accrued and past-due premiums to stop converting into New Indebtedness and, in turn, Total Indebtedness.[11] As discussed, although Mr. Ball testified that premiums that continued to accrue did not become subject to the Amended Agreement, the Court does not find his trial testimony on this point credible in light of Defendant's prior admissions and Mr. Ball's own deposition testimony acknowledging that Total Indebtedness continues to accrue. *Supra* ¶¶ 26–27.

## VII. **The Amount of Premium Owed by Defendant under the Guaranty.**

41. The Court found at summary judgment that Defendant owes Lexon $3,538,400.75 in unpaid premiums due as of February 4, 2019, "plus additional [unpaid] premiums that became due during the Amended Agreement's term." ECF 68 at 17–21.

---

[10] At trial, Defendant pointed the Court to certain communications in which the parties distinguish between the monthly Premium Payments and payments towards the newly accrued premiums, arguing that the distinction between these two types of payments indicate that the Amended Agreement and Guaranty were only designed to cover the monthly Premium Payments but not the new premiums that accrued. *See* ECF 105 ¶ 28 (citing JX 21–24); *see also* ECF 119, Beggs 165:19–168:9, 170:21–171:8, 173:18–175:13. As the Court indicated at trial, the evidence that Defendant relies upon, and corresponding testimony presented at trial, does not support Defendant's position; rather, it is consistent with Lexon's position that renewal premiums are subject to the Amended Agreement and Guaranty when they are 60 days or more past due. *Id.* 175:21–176:24.

[11] It is also worth noting that the positions Defendant has taken in this litigation support this finding. Until trial, Defendant never argued that premiums that accrued after February 4, 2019 were excluded from the Amended Agreement.

42.     It is undisputed that Obligors have not made any Premium Payments under the Amended Agreement since March 2021. ECF 103 ¶ 11; *see also* ECF 120, Muller 61:11–13 (testifying that the Justice Companies stopped paying premium in March 2021); JX 72 (Payment Summary Pivot Table reflecting the Justice Companies' last premium payment on March 1, 2021). It also is undisputed that Obligors made a total of $4,210,000.00 in Premium Payments after the execution of the Amended Agreement. ECF 103 ¶ 18. Thus, Obligors have not paid in full the additional Total Indebtedness that has accrued since February 4, 2019.[12] *See* ECF 68 at 12 ("Governor Justice concedes that [] Obligors had not paid the entirety of . . . the Total Indebtedness"); *see also* ECF 55-11 at RFAs 8–9 (admitting that Obligors "have not paid the Total Indebtedness to Lexon").

43.     At trial, Mr. Muller credibly testified that Lexon's business records demonstrate that, as of June 30, 2025, the balance of unpaid premiums was $11,120,949.85—$10,389,090.81 of which was 60 days past due. ECF 120, Muller 26:3–11. The latter figure reflects all 60-day-past-due accrued premiums that constitute "New Indebtedness" under the Amended Agreement. *See* JX 18 ¶ 3(c).

44.     To support this calculation, Mr. Muller explained in detail Lexon's comprehensive report that tracks the bond-by-bond accrual of premiums—and credits for payments made—over

---

[12] Defendant also admits that he has not paid Lexon any amounts pursuant to the Guaranty. ECF 103 ¶ 13. Defendant further admitted that Obligors have not satisfied the New Collateral Replenishment Obligation or paid the Total Indebtedness "in full." *See* ECF 68 at 5–6 ("To date, [Obligors] have not made the full New Collateral Payments or Total Indebtedness payments provided for in the Amended Agreement and Guaranty.") (citing ECF 55-11 at RFAs 6–11). As noted above, Defendant never claimed that the Total Indebtedness has already been paid in full until after the Court found on summary judgment that he breached the Guaranty.

time. Lexon refers to this comprehensive report as the "Premium Tracker."[13] ECF 120, Muller 11:25–12:1.

45.     Referring to the Premium Tracker, Mr. Muller explained how Lexon's records support his testimony that $10,389,090.81 of over 60-day unpaid premiums accrued since February 4, 2019. Mr. Muller also credibly testified that Lexon credited Obligors for the $4,210,000 in undisputed premium payments made by Obligors after February 4, 2019.[14] ECF 103 ¶ 18; ECF 120, Muller 54:2–4, 55:7–56:1 (all payments shown in the Payment Summary tab were "credited to reduce the amount of premium owed by the Justice Companies").

46.     Defendant did not present any evidence to contradict Mr. Muller's testimony or the accuracy of the Premium Tracker. The Court therefore finds Lexon's Premium Tracker and the evidence adduced by Lexon at trial to be credible and convincing. Accordingly, the Court finds that $10,389,090.81 in unpaid premiums had accrued from February 4, 2019 to June 30, 2025.

47.     Because the Court recognizes that premiums have continued to accrue after June 30, 2025, the Court asked Lexon to submit an updated amount with Lexon's post-trial findings of fact and conclusions of law. *See* ECF 120 at 35:12–41:14. Lexon submits that this updated amount is $10,929,709.24 as of September 30, 2025. JX 77. Defendant has not offered any evidence to

---

[13] The Premium Tracker is composed of two spreadsheets: (1) the Bond Detail tab, which "shows all the bonds that were outstanding during [the relevant] period of time and the remaining outstanding current past due balances and balance dues," ECF 120, Muller 15:5–17, and (2) the Payment Summary tab, which shows "by bond term how much [payment] was applied and which date [a payment] was applied" to outstanding premium amounts, *id.* 44:5–9.

[14] During trial, Mr. Muller pointed out that there is a small variance between the total sum of post-February 4, 2019 Premium Payments reflected in Lexon's Payment Summary tab, $4,203,086.76, and the amount of post-February 4, 2019 Premium Payments to which the parties stipulated, $4,210,000. *Id.* 57:1–5. This difference resulted from the inadvertent exclusion of a bond issued to the Justice Companies from the Premium Tracker, but did not impact the total balance owed by the Justice Companies because "any premium that accrued on this bond [wa]s not added to the balance owed by the Justice Companies." *Id.* 58:24–60:3.

contradict the amount of premium that Lexon says has accrued. The Court finds that $10,929,709.24 in unpaid premiums accrued from February 4, 2019 to September 30, 2025.

## CONCLUSIONS OF LAW

**I.    The Amended Agreement Remains In Effect Until the Obligations are Satisfied**

48.    The parties agree that the Amended Agreement and the Guaranty are governed by West Virginia law. ECF 68 at 9; *see also* ECF 17 ¶ 9.

49.    Under West Virginia law, contracts are enforced according to the parties' intent, as expressed in the plain and unambiguous written terms of the contract. *Hansen-Gier Fam. Tr. of Apr. 22, 2016 v. Haywood*, 902 S.E.2d 174, 180 (W. Va. 2024). The function of the courts is to interpret and enforce contracts; not to "extend or limit" them. *Toppings v. Rainbow Homes, Inc.*, 490 S.E.2d 817, 822 (W. Va. 1997); *see also Hull Prop. Grp., LLC v. Quarrier St. LLC*, 915 S.E.2d 11, 18 (W. Va. Ct. App. 2025) ("It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them.") (citation omitted).

50.    Contracts "should be [] construed, if possible, as to give meaning to every word, phrase and clause and also render all its provisions consistent and harmonious." *Antero Res. Corp. v. Directional One Servs. Inc. USA*, 873 S.E.2d 832, 842 (W. Va. 2022); *see also Chesapeake Appalachia v. Hickman*, 781 S.E.2d 198, 213 (W. Va. 2015) (recognizing "[t]he general state law rule" that contract terms "are not to be construed in a vacuum, but are to be read in their context").

51.    A contract is ambiguous only if its terms, when read together as a whole, are inconsistent or susceptible to multiple reasonable interpretations. *See Bruce McDonald Holding Co. v. Addington Inc.*, 825 S.E.2d 779, 785 (W. Va. 2019); *see also Haywood*, 902 S.E.2d at 180 (defining ambiguity as "language reasonably susceptible of two different meanings or language of

such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning").

52. In their summary judgment briefing, the parties did not address the length of the "Amended Agreement term," or, in other words, when the Obligations under the Amended Agreement, and therefore the Guaranty, terminate. The Court found ambiguity in the Amended Agreement regarding this issue. ECF 68 at 21–22. The parties therefore addressed the meaning of "the Amended Agreement term" in pre-trial briefing and submitted evidence on this issue at trial.

53. Lexon contends that the unambiguous terms of the Amended Agreement and Guaranty express the parties' intent for the Amended Agreement to remain in effect—and, in turn, for premiums to continue to accrue—until Obligors satisfy the Obligations in full. Alternatively, Lexon asserts that, to the extent the Amended Agreement's term is ambiguous, extrinsic evidence confirms the parties' intent for the Amended Agreement to continue until the Obligations are satisfied in full.

54. Meanwhile, Defendant argues that the term of the Amended Agreement is irrelevant because, despite this Court's contrary holding at summary judgment, Total Indebtedness as defined in the Amended Agreement and Guaranty is a fixed figure, equal to $3,538,400.75. *See* ECF 105 at 12–18. Alternatively, Defendant advocates for a fixed end-date for his obligations under the Guaranty—*e.g.*, October 1, 2021, which represents the deadline by which Obligors were supposed to, but did not, satisfy the New Collateral Replenishment Obligation. *Id.* at 18–23.

55. As explained below, now that the parties have briefed and presented evidence on the term of the Amended Agreement, the Court concludes that the terms of the Amended Agreement and Guaranty are unambiguous and provide that the Amended Agreement's term, like the Guaranty's term, continues until the Obligations are paid in full. Even if the Amended

17

Agreement were ambiguous, the documentary and testimonial evidence adduced at trial lead the Court to this interpretation.

### A.  The Amended Agreement and Guaranty are Unambiguous

56.  The Amended Agreement and Guaranty should be construed as a single agreement. *See TD Auto Fin. LLC v. Reynolds*, 842 S.E.2d 783, 788 (W. Va. 2020) ("written instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument, even though they do not by their terms refer to each other"); JX 18 ¶ 8 (stating that the Guaranty was executed "[c]ontemporaneously" with the Amended Agreement, and "as a condition precedent to any and all obligations of Lexon" under the Amended Agreement); JX 17 ¶ 14 (the "Guaranty, together with the Amended [] Agreement, constitutes the sole and entire agreement of the parties thereto with respect to the subject matter hereof").

57.  The plain and unambiguous language of the Amended Agreement and Guaranty reflects the parties' intent that Obligors' Obligations under the Amended Agreement (and, thus, Defendant's obligations under the Guaranty) remain in effect until they are satisfied in full. Indeed, the Guaranty expressly provides that Defendant's obligations thereunder "appl[y] *until the . . . payment and satisfaction in full of all of the Obligations*." JX 17 ¶ 5(a) (emphasis added). The Guaranty's stated duration would have little meaning if the Amended Agreement terminated prior to Obligors' satisfaction of the Obligations.

58.  The Amended Agreement and Guaranty create "two distinct payment obligations." ECF 68 at 17.

59.  First, the Amended Agreement provides that Obligors must "deliver to Lexon new collateral in the total sum of Twenty Million U.S. dollars ($20,000,000.00) (the 'New Collateral')," and Obligors' obligation to pay $250,000 monthly Collateral Payments towards the New Collateral

"end[s] on the date that Lexon confirms it has received [the] New Collateral." JX 18 ¶ 2 at 2–5. The Guaranty defines this obligation as the New Collateral Replenishment Obligation. JX 17, Recitals ¶ (i).

60. Second, the Amended Agreement provides that Obligors must "pay Lexon the sum of Two Hundred Thousand U.S. dollars ($200,000) per month *until* the Total Indebtedness is paid in full (the 'Premium Payments')." JX 18 ¶ 3(b)(i) (emphasis added). The Guaranty defines this obligation as the New Indebtedness Payment Obligation. JX 17, Recitals ¶ (ii).

61. When read together, the Amended Agreement and Guaranty make clear that the parties intended for the Amended Agreement to remain in effect until Obligors satisfy both Obligations in full. *See M.M. & D.D. Brown v. Western Maryland Ry. Co.*, 99 S.E. 457, 459 (W. Va. 1919) ("The normal end or termination of every contract is performance in accordance with the agreement, and such a consummation should be the presumptive one."); *Freeman v. Montessori Sch. of Bowling Green*, 1994 WL 476025, at *2 (Ohio Ct. App. Sept. 2, 1994) ("A binding contract continues in effect until [] there [is] a full performance of the obligation therein set forth."); *McCarthy Bldg. Companies, Inc. v. Mt. Hawley Ins. Co.*, 2021 WL 8533897, at *4 (C.D. Cal. Feb. 24, 2021) (concluding that the plain meaning of the term "life of this Agreement" was "until performance by both parties is complete").

62. As with the Obligors' Obligations under the Amended Agreement, Defendant's obligations under the Guaranty "appl[y] *until the . . . payment and satisfaction in full of all of the Obligations*." JX 17 ¶ 5(a) (emphasis added). It follows that the Amended Agreement, which sets forth the Obligations covered by Defendant's Guaranty, also do not terminate until Obligors have satisfied their Obligations thereunder. *See, e.g.*, *Sanchez v. Dep't of Veterans Affs.*, 949 F.3d 734, 737 (Fed. Cir. 2020) ("[I]f no date is fixed by the contract for its termination, the agreement

remains in force until its purpose is accomplished[.]"); *Ctr. of Hope Christian Fellowship, Loc., Church of God in Christ v. Wells Fargo Bank Nevada, N.A.*, 781 F. Supp. 2d 1075, 1080 (D. Nev. 2011) (recognizing that "contracts to repay debt . . . terminate only when the debt is satisfied").

63.     Defendant asserted for the first time at trial that the Amended Agreement and Guaranty define Total Indebtedness as the fixed figure of $3,538,400.75.[15] But the plain text of the Amended Agreement and Guaranty contradict Defendant's construction of the term Total Indebtedness. The Amended Agreement defines Total Indebtedness as the sum of the Remaining Indebtedness *plus* any New Indebtedness. JX 18 ¶ 3 at 5–7. Pursuant to Paragraph 3(c) of the Amended Agreement, New Indebtedness increases as "additional amounts for premium" continue to accrue for the term of the Amended Agreement. *Id.* ¶ 3(c) (Obligors "recognize that additional amounts for premium may become due and they hereby agree that the New Indebtedness shall be increased in like amount."). The term "additional amounts for premium" in Paragraph 3(c) is defined as premiums that are 60 days or more past due. *Id.* If the New Indebtedness increases, it follows that the Total Indebtedness increases. *See id.* ¶ 3 at 5 (defining Total Indebtedness as "[t]he Remaining Indebtedness together with the New Indebtedness"); *id.* ¶ 3(c) (explaining, for example, that "if new premium is due on March 2, 2019 in the amount of $10,000.00, the new New Indebtedness is increased by $10,000.00"); *see also Lopez v. Erie Ins.*, 908 S.E.2d 508, 515 (W.

---

[15] The Court found at summary judgment that the Total Indebtedness owed to Lexon is $3,538,400.75 "plus additional premiums that became due during the Amended Agreement's term, minus any payments made of the New Indebtedness Payment Obligation by [] Obligors." ECF 68 at 19. The Court rejects Defendant's attempt to relitigate already-decided issues. Also, Defendant has admitted in this litigation that the definition of Total Indebtedness includes "additional amounts for premium." ECF 58 ¶ 9 (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts) (quoting JX 18 ¶ 3(c)). Defendant "cannot now advocate a different interpretation of the parties' agreement." *See Romano v. Greve*, 724 S.E.2d 331, 343 (W. Va. 2012) (concluding that, "to the extent that [the plaintiff] previously has contributed to the promulgation of these standards and has acquiesced in their application, he cannot now advocate a different interpretation of the parties' agreement").

Va. Ct. App. 2024) ("It is well-settled that contracts should be read as a whole, with all the policy provisions given effect."). Indeed, the parties would have no reason to define "additional amounts for premium" in Paragraph 3(c) unless those premiums convert into New Indebtedness (and, in turn, Total Indebtedness).

64.     The Guaranty confirms that Total Indebtedness "includ[es] any new premiums becoming due during the term of the Amended [] Agreement." JX 17, Recitals ¶ (ii); *see also, e.g.*, *Martin v. Rothwell*, 95 S.E. 189, 190 (W. Va. 1918) (explaining that recitals can "aid in interpreting any ambiguous language used in expressing [contractual] obligation[s]"); *United States v. Cmty. Health Sys., Inc.*, 666 F. App'x 410, 417 (6th Cir. 2016) (recognizing that recitals "may have a material influence in construing the contract and determining the intent of the parties") (quoting 17A Am. Jur. 2d Contracts § 373). Defendant's construction would therefore render this language in the Guaranty, as well as Paragraph 3(c) of the Amended Agreement, meaningless. *See Antero Res. Corp.*, 873 S.E.2d at 842 (Contracts "should be [] construed, if possible, as to give meaning to every word, phrase and clause and also render all its provisions consistent and harmonious.")

65.     Defendant nonetheless argues that Paragraph 3(d) of the Amended Agreement supports his interpretation that the Total Indebtedness is a fixed amount. Paragraph 3(d) of the Amended Agreement provides:

> At such time as the Total Indebtedness is paid in full, the [] Justice Companies and Beech Creek shall pay Lexon (i) any additional premium due, or (ii) Two Hundred Thousand U.S. dollars ($200,000.00) per month, whichever is greater. Such payments shall be due on the last day of each month.

JX 18 ¶ 3(d).

66.     The Court rejects this argument. *See* ECF 119 at 182:23–185:6 (stating that the phrase "[a]t such time as the Total Indebtedness is paid in full" tells the Court "[w]hen the obligation ends"). Had Obligors consistently made their monthly Premium Payments and paid

21

their renewal premiums as they became due, they would have paid the Total Indebtedness in full in August 2020—several months before the deadline for Obligors to satisfy their New Collateral Replenishment Obligation. *See id.* Beggs 153:18–154:8 (agreeing that Obligors would have paid the Total Indebtedness as of the date of the Amended Agreement within 18 months). The function of Paragraph 3(d) was to bridge any gap in time between Obligors' satisfaction of the New Indebtedness Payment Obligation and New Collateral Replenishment Obligation.[16] *See id.* Sentman 63:22–64:18 (agreeing that he viewed sub-paragraph (d) as bridging a gap in time between satisfaction of the premium obligation and the collateral obligation).

67.     Defendant's alternative argument that "the term of the Amended Agreement should be defined as ending October 1, 2021 at the latest" is similarly unconvincing. ECF 93 at 7–8. The fact that the parties did not include in the Amended Agreement a fixed end-date for the Obligations, especially when the Amended Agreement has multiple specific payment due dates, evidences that the parties did not intend for the Amended Agreement to terminate on a specific date. *See Harbert v. Harrison Cnty. Ct.*, 39 S.E.2d 177, 186 (W. Va. 1946) (explaining that "the well recognized and long established principle of interpretation of written instruments that the express mention of one thing implies the exclusion of another, *expressio unius est exclusio alterius*, . . . extends to all instruments requiring judicial construction," including contracts) (emphasis added); *see also Consol. Lab'ys, Inc. v. Shandon Sci. Co.*, 413 F.2d 208, 212 (7th Cir. 1969) ("[A] contract which is terminable upon the occurrence of an event is . . . to be enforced according to its terms and the reasonable implication thereof.").

---

[16] In any event, Paragraph 3(d) never came into play because Obligors have not paid the entirety of the Total Indebtedness to Lexon. *See* ECF 68 at 12 ("Governor Justice concedes that [] Obligors had not paid the entirety of . . . the Total Indebtedness"); *see also* ECF 55-11 at RFAs 8–9 (admitting that the Justice Companies and Beech Creek "have not paid the Total Indebtedness to Lexon").

**B.** **Extrinsic Evidence Confirms that the Amended Agreement Continues Until the Obligations are Satisfied**

68.     As a threshold matter, Defendant argues that any ambiguity should be construed against the drafter, Lexon. Because the Court finds that the Amended Agreement and Guaranty are unambiguous, the principle of *contra proferentum* does not apply.

69.     Also, the principle of *contra proferentum* does not apply where, as here, the contract was negotiated between sophisticated parties who had the opportunity to negotiate. *See generally Elkland Holdings LLC v. Eagle Mining LLC*, 2015 WL 13037115, at *15 (S.D. W. Va. July 29, 2015). The parties agree that, while Lexon drafted the Amended Agreement and Guaranty, "Obligors, Defendant, and their counsel had the opportunity to review, and propose revisions." ECF 103 ¶ 20. Mr. Ball confirmed at trial that Jay Justice—who Defendant did not call to testify at trial—negotiated the commercial terms of the Amended Agreement and Guaranty on behalf of Obligors and Defendant, and that Mr. Ball was responsible for reviewing the contracts to make sure they reflect those negotiated terms. ECF 120, Ball 141:22–142:21, 142:24–143:6. Mr. Ball also confirmed that he was involved in finalizing the Amended Agreement and Guaranty. *Id.* 145:3–9. In fact, Mr. Ball testified that he was confident that Senator Justice would not have signed the Amended Agreement and Guaranty unless he had been assured that Mr. Ball had looked at them and blessed them. *Id.* 145:10–14, 121:3–22 (responding "Yes" when asked by the Court, "regardless of who wrote [the Guaranty], you would not let [Defendant] sign it unless you thought it was appropriate?"). Accordingly, the Court declines to construe any ambiguity against Lexon and, instead, turns to the content of the parties' negotiations.

1. **The Parties' Relationship at the Time of, and Negotiations Regarding, the Amended Agreement Support Lexon's Position that Premiums Continue to Accrue Until the Obligations are Satisfied**

70.     The context in which the parties negotiated the Amended Agreement supports a finding that the parties intended for the Amended Agreement to continue until the Obligations are paid in full.

71.     The Obligations arise from the GAIs, which continue without a fixed end date until the bond is released or discharged, or replaced with another surety's bond. *See, e.g.*, JX 4 ¶¶ 1, 3 at 2. However, Obligors failed to satisfy their collateral and premium obligations under the GAIs. *See* JX 3, Recitals at 1 (noting that Lexon previously executed bonds on behalf of Obligors and that Obligors "currently owe premium to Lexon"). In light of their continuing relationship, the parties negotiated the terms reflected in the Amended Agreement and Guaranty to address Obligors' failure to meet those obligations. It follows that, just as Obligors' underlying collateral and premium obligations continue until they satisfy the obligations secured by a bond, the Amended Agreement and Guaranty continue until Obligors or Defendant satisfy the Obligations thereunder. *See* ECF 119 at 189:9–10 ("So there is no term. It depends on defendant.").

72.     Understanding that Obligors did not pay the premiums owed under the Agreement (*i.e.*, the Remaining Indebtedness), and that Obligors had failed to make premium payments due after the execution of the Agreement (*i.e.*, the New Indebtedness), Lexon sought to ensure that Obligors' New Indebtedness Payment Obligation would continue until the premium account was made current. *See supra* ¶¶ 10–17. The terms of the Amended Agreement and Guaranty discussed above in Section IV, and the evidence presented at trial, demonstrate that Lexon understood that it would take some time for Obligors to satisfy their Obligations. Therefore, Lexon wanted to ensure that any additional premiums that accrued during that period would be covered by the parties' agreements. ECF 119, Sentman 60:17–61:12. Indeed, the Amended Agreement provides

24

"that additional amounts for premium may become due" before the Total Indebtedness is paid in full, and Obligors "agree[d] that the New Indebtedness shall be increased in like amount." JX 18 ¶ 3(c). Lexon's goals in entering the Amended Agreement, as demonstrated by the undisputed contemporaneous evidence from the parties' negotiations, would not have been served if the Amended Agreement terminated before payment of all outstanding Obligations. *Supra* ¶¶ 10–17 (describing evidence of the parties' mutual understanding that Obligors would bring past-due premiums current *and* stay current on renewal premiums).

73.     Defendant points to no evidence during the parties' negotiations that supports his claim that Total Indebtedness is a fixed amount. At trial, Mr. Ball—Defendant's only witness—attempted to disown his prior deposition testimony that, pursuant to this provision of the Amended Agreement, "[j]ust as additional premiums come due those get added to the definition of 'New Indebtedness.'" JX 75 at 162:2–4; *see also id.* 256:16–19 (responding "Yes" when asked "Do you understand that the premiums that comprised the total indebtedness, those continued to accrue?"), ECF 120, Ball 152:24–153:19 (responding "No" when asked whether his deposition testimony "confirm[s] that Total Indebtedness is growing"). The Court does not credit Mr. Ball's attempt to recast his prior testimony.

74.     Defendant's alternative argument that the Amended Agreement terminated on October 1, 2021 is similarly unsupported by the context in which the parties negotiated the Amended Agreement. It would be commercially unreasonable to conclude that the parties intended to end the Amended Agreement on a date when Obligors were supposed to, but did not, satisfy their New Collateral Replenishment Obligation, given that the Amended Agreement was intended to address Obligors' checkered payment history. *See* JX 18, Recitals at 1–2 (acknowledging that Obligors breached the Agreement and that Defendant breached the original Guaranty); *see also*

*Haywood*, 902 S.E.2d at 180 (emphasizing "that a term is not ambiguous merely because the parties disagree as to its meaning" and that contractual language is ambiguous only if there are multiple reasonable interpretations).

75.     By contrast, it is commercially reasonable to conclude that the parties intended for the Amended Agreement to continue until the Obligations were paid in full without a specific end date. Indeed, the GAIs, which set forth Obligors' obligations under the bonds, have no termination date; they continue until the bond is released or replaced. *See supra* ¶¶ 3–5. And, Lexon's obligations under the bonds do not terminate on a specific date; rather, they continue until the bond is released or replaced, even if Obligors fail to pay premiums. *Id.*

### 2.     The Parties' Post-Execution Conduct Shows their Mutual Understanding that Premiums Continue to Accrue until Obligors Satisfy their Obligations

76.     As explained above in Section V, the parties' conduct following the signing of the Amended Agreement also evidences that they understood premiums would continue to accrue under the Amended Agreement until those premiums are paid in full. *See Bruce McDonald Holding Co.*, 825 S.E.2d at 785 (recognizing that the parties' "practical interpretation . . . as shown by their acts and conduct, is entitled to great, if not controlling, weight") (citation omitted). In summary, that evidence shows that Lexon repeatedly conveyed to Obligors' representatives that premiums accruing after February 4, 2019 and that remain unpaid for more than 60 days are subject to the Amended Agreement. Not once did Defendant or Obligors object to that position. *See supra* ¶¶ 31–37.

77.     Perhaps the clearest example of Obligors' course of conduct is their response to Lexon's July 2023 Demand under the Guaranty. In that Demand, Lexon sought "Total Indebtedness in the amount of $6,724,138.66 U.S. dollars (as of June 30, 2023)," or nearly twice the approximately $3.5 million in Total Indebtedness outstanding when the Amended Agreement

was executed. JX 66 at 1. Far from objecting to that amount or suggesting that a significant portion was not subject to the Guaranty, Mr. Ball's July 27 response letter on behalf of Defendant and Obligors acknowledges their "understand[ing] [that] there are premiums continuing to accrue on the bonds." JX 67 at 3.

78.     Likewise, Defendant's Response to Plaintiff's Statement of Undisputed Material Facts did not dispute Lexon's statements that "[t]he Amended Agreement provides for the Obligors to pay Lexon $200,000 per month 'until the Total Indebtedness is paid in full (the 'Premium Payments')'" and "[t]he Amended Agreement further provides that 'additional amounts for premium may become due during the term of this Agreement' and that the *amount of premiums constituting Total Indebtedness 'shall be increased in like amount*.'" ECF 58 ¶¶ 8–9 (emphasis added).

79.     This post-execution conduct undermines each of Defendant's arguments. If Obligors intended for the Amended Agreement and Guaranty to cover only $3,538,400.75 in Total Indebtedness, they would not have proposed modifications to their monthly Premium Payments that would have required Obligors to pay Lexon more than $3,538,400.75. *See supra* ¶¶ 34–36. Nor would they have continued making Premium Payments through February 2021, and ultimately made Premium Payments totaling $4,210,000, *i.e.*, approximately $700,000 more than the $3,538,400.75 of Total Indebtedness existing as of February 4, 2019.[17] ECF 103 ¶ 18; JX 73.

80.     Likewise, if the parties intended for the Amended Agreement to terminate on October 1, 2021, regardless of whether Obligors satisfied their Obligations, Obligors would not

---

[17] Indeed, by October 2020, Obligors had already paid Lexon $3,538,400.75, which exceeds the amount Defendant now claims was due under the Amended Agreement (and is therefore covered by the Guaranty). ECF 120, Ball 92:15–20. Thus, under Defendant's theory, Obligors had no Obligation to continue making the monthly Premium Payments under the Amended Agreement.

have offered a payment plan proposing payments through December 31, 2021. JX 45 at 2 (October 8, 2020 letter from Jay Justice and Mr. Ball proposing a "workable solution that addresses Sompo's collateral request").

81. Obligors' post-execution statements and conduct together indicate that Obligors recognized a continuing Obligation to pay $200,000 per month until the premium account is brought current.

82. Therefore, this Court finds that the Amended Agreement does not terminate until Obligors have paid both collateral and premium Obligations in full—*i.e.*, until Lexon receives $20 million in collateral and payment of all premiums at least 60-days past due. *See, e.g., Sanchez v. Dep't of Veterans Affs.*, 949 F.3d 734, 737 (Fed. Cir. 2020) ("[I]f no date is fixed by the contract for its termination, the agreement remains in force until its purpose is accomplished[.]"); *Ctr. of Hope Christian Fellowship, Loc., Church of God in Christ v. Wells Fargo Bank Nevada, N.A.*, 781 F. Supp. 2d 1075, 1080 (D. Nev. 2011) (recognizing that "contracts to repay debt . . . terminate only when the debt is satisfied").

## II.  The Award of Premiums Due and Owing to Lexon by Defendant

83. Following summary judgment, this Court awarded Lexon the following amounts: (1) New Collateral Replenishment Obligation: $14,250,000.00; (2) Remaining Indebtedness: $1,025.000.00; and (3) New Indebtedness that accrued between the execution of the Agreement and the Amended Agreement: $2,513,400.75.

84. Thus, for the New Indebtedness Payment Obligation, this Court found on summary judgment that Lexon is entitled to at least $3,538,400.75 (Remaining Indebtedness plus New Indebtedness that accrued between the execution of the Agreement and Amended Agreement). ECF 68 at 19. According to this Court's summary judgment decision, that amount is owed to Lexon "*plus additional premiums that became due during the Amended Agreement's term, minus*

*any payments made of the New Indebtedness Payment Obligation by the Obligors*." *Id.* (emphasis added).

85.     As demonstrated by Lexon at trial and confirmed by this Court's review of the Premium Tracker, other evidence, and testimony, the additional New Indebtedness that has accrued during the term of the Amended Agreement and is owed by Defendant—after accounting for the $3,538,400.75 already awarded by this Court—totals $7,391,308.49.

86.     The Court's overall determination of outstanding premiums was made by subtracting $3,538,400.75 (the Total Indebtedness amount this Court already awarded) from the Total Indebtedness owed as of September 30, 2025 as indicated by the Premium Tracker, $10,929,709.24. JX 76.

87.     Therefore, this Court determines the amount due to Lexon by Defendant under the Guaranty by adding $10,929,709.24 (New Indebtedness Payment Obligation) plus $14,250,000.00 (New Collateral Replenishment Obligation), which equals $25,179,709.24.

88.     Defendant is responsible for that unpaid amount in its entirety under the Guaranty. *Supra* ¶ 29 ("Defendant's obligations under the Guaranty are 'continuing in nature and appl[y] until the . . . payment and satisfaction in full of *all of the Obligations*.'") (quoting JX 17 ¶ 5(a)); *see also supra* ¶ 30 ("There is no [] cap on Defendant's liability with respect to Total Indebtedness, i.e., premiums") (citing JX 18 ¶ 5(e)).

## III.     The Award of Pre- and Post-Judgment Interest

89.     At summary judgment, this Court found that Lexon is entitled to pre- and post-judgment interest on damages owed to Lexon under Count I. ECF 68 at 22 n.15.

90.     West Virginia law affords this Court discretion to award pre-judgment interest. *See* W. Va. Code Ann. § 56–6–27; *see also Warrior Oil & Gas, LLC v. Blue Land Servs., LLC*, 886

S.E.2d 336, 345 (W. Va. 2023) ("West Virginia Code § 56-6-27 [] provides the exclusive means by which to obtain prejudgment interest in any action founded on contract.").

91.     As an initial matter, the Court finds unpersuasive Defendant's argument that "no prejudgment interest should be awarded on the collateral portion of the judgment because collateral exists for security, not for the holder's use." ECF 93 at 10. As Mr. Sentman explained at trial, "collateral is held to pay for any claims or any issues that come up during the term of the bond," ECF 119, Sentman 29:12–22, and if the collateral is depleted, Lexon "would have to come out of pocket" to pay for those claims. *Id.* 44:16–23. An award of pre-judgment interest on the collateral portion of the judgment therefore compensates Lexon for its loss of the use of the collateral. *See, e.g.*, *Potts v. Maryland Games, LLC*, 2019 WL 4750339, at *4 (D. Md. Sept. 27, 2019) (explaining that "an award of pre-judgment interest" covered plaintiff's missed "use of the Collateral").[18] Accordingly, the Court finds that Lexon is entitled to pre-judgment interest on the principal amount of $25,179,709.24.

92.     West Virginia law instructs the administrative office of the Supreme Court of Appeals of West Virginia to "annually determine the prejudgment interest rate to be *paid upon judgment or decrees for the payment of money*." W. Va. Code Ann. § 56-6-31(b)(1) (emphasis added); *see also Branch Banking & Tr. Co. v. Logan Oncology Care Assocs., LLC*, 2019 WL 3928678, at *3 (S.D. W. Va. Aug. 19, 2019) ("Under West Virginia law, prejudgment interest must be awarded on contractual obligations at a rate set in the agreement or at the legal rate set by statute."); *W. Virginia Mut. Ins. Co. v. Matulis*, 910 S.E.2d 777, 789, 807 (W. Va. Ct. App. 2024) (affirming circuit court's calculation of prejudgment interest on damages for breach of contract

---

[18] For instance, Mr. Sentman testified at trial that Lexon has received, and continues to receive, claims on bonds issued on behalf of Obligors. ECF 119, Sentman 43:3–10.

pursuant to W. Va. Code § 56-6-31). In July 2023, when Lexon filed its Complaint, the applicable interest rate was "7.00% per year." [19] Accordingly, Lexon is entitled to pre-judgment interest at an annual rate of 7%.

93.     As explained above, Lexon is entitled to an award of damages equal to $25,179,709.24. Accordingly, Lexon is entitled to 7% in pre-judgment interest annually on the principal amount of $25,179,709.24, running from July 27, 2023 to the date judgment is entered. As of October 8, 2025, this amount is equal to $3,887,333.19.

94.     Under federal law, which controls post-judgment interest, the applicable rate is 5% per annum. 28 U.S.C. § 1961; *see also Jack Henry & Assocs., Inc. v. BSC, Inc.*, 487 F. App'x 246, 260 (6th Cir. 2012) (recognizing the default rule that, "federal law [*i.e.*, § 1961] controls post-judgment interest even while state law governs awards of prejudgment interest") (internal quotation marks omitted).

95.     Lexon is also entitled to 5% post-judgment interest, running from the date of entry of the judgment "to the date of payment," and compounded annually. 28 U.S.C. §§ 1961(a)–(b). [20]

96.     This Court retains jurisdiction to entertain such further proceedings and enter such further orders as may be necessary or appropriate to implement and enforce these findings and conclusions, including discovery in aid of enforcement or collection from Defendant. *See, e.g.*, Fed. R. Civ. P. 69(a)(2) (permitting judgment creditors to obtain discovery "[i]n aid of the

---

[19] *See* Press Release, Admin. Off. of the Sup. Ct. of Appeals of W. Va., 2023 Interest Rate on Judgments and Decrees (Jan. 4, 2023), available at https://www.courtswv.gov/sites/default/pubfilesmnt/2023-08/jan4_23.pdf.

[20] As discussed above, Lexon's damages under Counts II and III of the Complaint will be determined through the process set forth in Local Rule 54.01. *See infra* n.1. Through that process, the Court will also determine the amount of post-judgment interest applicable to those damages. *See Associated Gen. Contractors of Ohio, Inc. v. Drabik,* 250 F.3d 482, 485 (6th Cir. 2001) (holding that a party may recover post-judgment interest on a judgment awarding attorneys' fees).

judgment or execution"); *Peacock v. Thomas*, 516 U.S. 349, 356 (1996) ("We have reserved the use of ancillary jurisdiction in subsequent proceedings for the exercise of a federal court's inherent power to enforce its judgments."); *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 208 (2d Cir. 2012) ("[T]he district court's power to order discovery to enforce its judgment does not derive from its ultimate ability to attach the property in question but from its power to conduct supplementary proceedings, involving persons indisputably within its jurisdiction, to enforce valid judgments."), *aff'd sub nom. Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134 (2014).

Dated: October 8, 2025

Respectfully submitted,

*/s/ W. Brantley Phillips, Jr.*
W. Brantley Phillips, Jr.
Garrah Carter-Mason
**BASS, BERRY & SIMS PLC**
21 Platform Way South, Suite 3500
Nashville, TN 37203
(615) 742-6200
bphillips@bassberry.com
garrah.cartermason@bassberry.com

Jason Halper
Sara Brauerman
Timbre Shriver
**VINSON & ELKINS LLP**
1114 Avenue of the Americas
New York, NY 10036
(212) 237-0000
jhalper@velaw.com
sbrauerman@velaw.com
tshriver@velaw.com

*Attorneys for Plaintiff Lexon Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on October 8, 2025, the foregoing document was filed via the Court's ECF system, which will send a notice of electronic filing to all ECF-registered counsel of record.

<u>*/s/ W. Brantley Phillips, Jr.*</u>