## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE

LEXON INSURANCE COMPANY,

                    Plaintiff,

          -against-

JAMES C. JUSTICE II,

                    Defendant.

Civil Action No. 3:23-cv-0772

Chief Judge Waverly D. Crenshaw

## DEFENDANT'S AMENDED POST-TRIAL
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Court held a bench trial in this matter on August 20, 2025, which continued through August 21, 2025. After consideration of the testimony, exhibits, and written submissions of the parties, the Court hereby makes the following findings of fact and conclusions of law.

### I.       FINDINGS OF FACT

1.     This case involves coal industry surety bonds. As a condition precedent to issuing a mining permit, governmental regulators require coal mining companies to obtain bonds from a third-party surety to secure performance of reclamation activities (which are generally aimed at returning the land to its pre-mining condition). (Tr. vol. 1, at 24-25.)

2.     Lexon previously issued surety bonds to certain companies affiliated with Defendant James C. Justice II ("Defendant"). (*See id.* at 39-40, 116.)

3.     Lexon has sued Defendant to collect on a limited commercial guaranty regarding an agreement between certain companies (the "Primary Obligors") and Lexon. (*See generally* ECF 1.) The Primary Obligors are James C. Justice Companies, Inc.; Southern Coal Corporation;

Kentucky Fuel Corporation; Justice Family Group, LLC; Mechel Bluestone, Inc.; and Beech Creek Coal Corp. (*See* JX 2 at 1; JX 3 at 1; JX 17 at 1; JX 18 at 1; *see also* ECF 1, n.2.)

4. On March 26, 2018, the Primary Obligors and Lexon entered into an agreement (the "Agreement") under which (1) Lexon would release certain collateral valued at approximately $4.4 million; (2) certain of the Primary Obligors would post $5 million in "New Collateral" by the six-month anniversary of the Agreement; and (3) the Primary Obligors would pay $3 million in premium owed as of the date of the Agreement (designated as the "Indebtedness") within five business days after the two-month anniversary of the Agreement. (*See* JX 3.)

5. The Agreement does not contain any payment deadlines that are more than six months from the date of the Agreement. (*See id.*; *see also* Tr. vol. 1, at 149-150; Tr. vol. 2, at 83-84.) It is therefore clear that the parties to the Agreement intended it to be fully performed within six months of March 26, 2018. (*See* Tr. vol. 2, at 84.)

6. The Agreement provides that it shall be governed by, construed and enforced in accordance with, and subject to the laws of the State of West Virginia. (JX 3, ¶ 5.)

7. Defendant executed a Limited Commercial Guaranty (the "Original Limited Guaranty") in connection with the Agreement. The Original Limited Guaranty states that Defendant guarantees the full and punctual payment and performance of the "Collateral Replenishment Obligation," the "Collateral Shortfall Payment Obligation," and the "Indebtedness Payment Obligation," plus "all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder." (JX 2, ¶ 1.)

8. The "Collateral Replenishment Obligation" and the "Collateral Shortfall Payment Obligation" refer to the Primary Obligors' obligations under the Agreement to provide or pay a

2

total of $5 million in New Collateral by the six-month anniversary of the Agreement. The "Indebtedness Payment Obligation" refers to the Primary Obligors' obligation under Agreement to pay the balance of the $3 million premium Indebtedness within five business days after the two-month anniversary of the Agreement. (*See id.,* first "WHEREAS" clause.)

9.      Consistent with its title (*Limited* Commercial Guaranty), the Original Limited Guaranty placed a limit on Defendant's liability:

> Notwithstanding anything contained herein to the contrary, the obligations of Guarantor shall be limited to a total sum equal to (i) five million U.S. dollars ($5,000,000) plus (ii) the amount of the Indebtedness specified in the Underlying Agreement.

(*Id.*, ¶ 4(e); *see also* Tr. vol. 2, at 85-86.) The $5 million figure in paragraph 4(e)(i) corresponds to the collateral called for in the Agreement. (Tr. vol. 2, at 86-87.) The "Indebtedness" referenced in paragraph 4(e)(ii) is defined in the underlying Agreement as the $3,000,000 in premium that the Primary Obligors owed to Lexon as of the date of the Agreement. (*See* JX 3.)

10.     Stephen Ball, who is General Counsel for the Primary Obligors and Executive Vice President of most of them, and who also served as counsel to Defendant in connection with this guaranty, testified that he would not have recommended that Defendant sign the guaranty if it did not contain the $3,000,000 limit in paragraph 4(e)(ii). (Tr. vol. 2, at 77, 86-87.)

11.     Like the Agreement, the Original Limited Guaranty provides that it shall be governed by and construed under the laws of the State of West Virginia. (JX 2, ¶ 8.)

12.     Due to ongoing cashflow issues, the Primary Obligors were unable to come up with the $5 million in New Collateral or pay the full amount of the Indebtedness, although they did reduce the latter to about $1,025,000. (*See* Tr. vol. 1, at 47-48, 54-55, 57-58; Tr. vol. 2, at 87-89; *see also* JX 18 at 1, 5.)

3

13. On or about February 4, 2019, the parties executed "Amendment No. 1 to Agreement Dated March 26, 2018" (the "Amended Agreement"). (JX 18.)

14. With respect to the collateral requirements, the Amended Agreement increased the amount of the "New Collateral" from $5 million to $20 million. (JX 18; Tr. vol. 1, at 151.) The Amended Agreement also set forth a payment schedule for the New Collateral. Under that schedule, the Primary Obligors were to pay $250,000 per month plus make larger catch-up payments at designated intervals. The final catch-up payment—equal to $20 million less any collateral payments previously made—was due April 1, 2021. (JX 18 at 2-5; Tr. vol. 1, at 151; Tr. vol. 2, at 94-95.)

15. Lexon designed the catch-up payment schedule so that it would be paid in full within approximately two years because it was unwilling to wait longer than that. (*See* Tr. vol. 1, at 52.)

16. As to premiums, the Amended Agreement added $2,513,400.75 in premiums that had come due between March 26, 2018 and February 4, 2019 to the remaining $1,025,000 balance of the original Indebtedness and designated the resulting total of $3,538,400.75 as the "Total Indebtedness":

> The Parties Agree the Remaining Indebtedness is equal to One Million Twenty-Five Thousand U.S. dollars ($1,025,000.00). The Parties also agree that in addition to the Remaining Indebtedness, additional premium of $2,513,400.75 is now due and owing (the "New Indebtedness"). The Remaining Indebtedness together with the New Indebtedness is equal to $3,538,400.75 (the "Total Indebtedness").

(JX 18 at 5, ¶ 3; *see also* Tr. vol. 1, at 151-153.)

17. Because the term "Total Indebtedness" is capitalized and appears in parentheses immediately after the number "$3,538,400.75," Mr. Ball, as counsel for the Primary Obligors, understood the term "Total Indebtedness" to be defined as $3,538,400.75. (Tr. vol. 2, at 90, 98-

99.)  He would not have recommended that the Primary Obligors sign the Amended Agreement if the "Total Indebtedness" were not a fixed, known number. (*Id.* at 91.)  Nor would he have recommended that Defendant sign a guaranty covering the "Total Indebtedness" if it were not a fixed, known number. (*Id.*)

18.    The Amended Agreement provided that the Primary Obligors were to make "Premium Payments" of $200,000 per month until the "Total Indebtedness" is paid in full. (JX 18 at 5, ¶ 3(b)(i); *see also* Tr. vo1. 1, at 153.)

19.    The Amended Agreement further provided that one of the Primary Obligors (Beech Creek Coal Corp.) was to sell certain equipment and use the proceeds to reduce the Total Indebtedness.  (JX 18 at 6, ¶ 3(b)(ii).)  According to Schedule C of the Amended Agreement, the value of this equipment was $2,385,000.  (JX 18, at 11.)

20.    If the Primary Obligors had paid $200,000 per month as contemplated in the Amended Agreement, then the specified amount of Total Indebtedness ($3,538,400.75) would have been paid in full in August 2020—which was 18 months from the execution of the Amended Agreement. (Tr. vol. 1, at 153-154; Tr. vol. 2, at 92.)

21.    If Beech Creek had been able to sell the equipment as contemplated in the Amended Agreement and use the proceeds to reduce the Total Indebtedness, then that would have decreased the number of monthly $200,000 payments needed to pay the Total Indebtedness, meaning that the Total Indebtedness would have been paid sooner than August 2020.  (Tr. vol. 1, at 154-157.)

22.    Thus, the obligation to pay the "Total Indebtedness" was designed and intended to be fully performed within 18 months (or by August 2020), and the obligation to pay the "New Collateral" was designed and intended to be fully performed within 26 months (or by April 1,

5

2021).  There were no deadlines in the Amended Agreement later than April 1, 2021.  (*See* JX 18; *see also* Tr. vol. 2, at 95.)

23.  The Primary Obligors' financial challenges prevented them paying the $3,538,400.75 in full by August 2020 as intended, but they made premium payments totaling more than $3,538,400.75 by October 6, 2020.  (*See* Tr. vol. 2, at 91-92, 129-130; *see also* JX 73.)  In other words, the Primary Obligors paid the specified amount of Total Indebtedness within about 20 months of the effective date of the Amended Agreement.

24.  The obligation to pay bond premiums existed independently of, and premiums continue to accrue independently of, the Amended Agreement. (Tr. vol. 1, at 67, 83, 102-103, 177-178, 180.)  Indeed, the Amended Agreement does not state the amount of the bond premiums or the rate at which they accrue. (*See* JX 18.)

25.  Although Lexon cites certain general indemnity agreements, or "GAIs," as the source of the Primary Obligors' premium obligations, the GAIs likewise do not contain the premium rates. (*See* Tr. vol. 1, at 32-39, 72; *see also* JX 4.)[1] Rather, the premium rates are set individually for each bond at the time the bond is issued.  (Tr. vol. 1, at 72, 177.)  Most of the bonds involved in this case were issued well before the parties entered into the original March 2018 Agreement.  (Tr. vol. 1, at 178; Tr. vol. 2, at 68-69.)  Renewal premiums accrue each year on the anniversary of the date that each bond was issued.  (Tr. vol. 1, at 31, 38, 103-104, 178.)

26.  The Amended Agreement recognized that additional bond premiums may become due during the term of the Amended Agreement and provided that "the New Indebtedness shall be

---

[1] The Court also notes that many of the GAIs state that they can be terminated upon 10 days' written notice to Lexon.  (*See* JX 4, at LEXON-00003308, 00003312, 00003322, 00003326, 00003329, 00003334.)

increased in like amount . . . ." (JX 18 at 6-7, ¶ 3(c).) The Amended Agreement does not say that the "Total Indebtedness" shall be increased. (*See id.*; *see also* Tr. vol. 1, at 162; Tr. vol. 2, at 92-93, 99, 102.)

27. The Amended Agreement then provided that after the Total Indebtedness is paid in full, the Primary Obligors shall continue to pay a minimum of $200,000 per month to Lexon:

> At such time as the Total Indebtedness is paid in full, the Collateral Justice Companies and Beech Creek shall pay Lexon (i) any additional premium due, or (ii) Two Hundred Thousand U.S. dollars ($200,000.00) per month, whichever is greater. Such payments shall be due on the last day of each month.

(*Id.* at 7, ¶ 3(d).) The phrase "additional premiums due" is a reference to independently accruing premiums, like renewal premiums. (Tr. vol. 1, at 181-182.) The Amended Agreement contains no language regarding the duration of the obligation to make payments under paragraph 3(d). (*See* JX 18; *see also* Tr. vol. 1, at 187.)

28. The Amended Agreement provides that "[t]he Parties agree time is expressly made of the essence with respect to each and every provision of this Amendment and the documents and instruments entered into in connection herewith." (JX 18 at 8, ¶ 7.)

29. Defendant executed an Amended and Restated Limited Commercial Guaranty ("Amended Limited Guaranty") contemporaneously with the Amended Agreement. (JX 17.)

30. Mr. Ball, who served as Defendant's counsel in connection with this Amended Limited Guaranty, testified that the word "Limited" in the title was important, and that he would not have recommended that Defendant sign an unlimited guaranty. (Tr. vol. 2, at 96-97.)

31. The Amended Limited Guaranty states that Defendant guarantees the "New Collateral Replenishment Obligation" and the "New Indebtedness Payment Obligation," plus enforcement costs:

7

> Guaranty. Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Beneficiary, and its successors and assigns, as primary obligor and not merely as surety, the full and punctual payment and performance of each of the New Collateral Replenishment Obligation and the New Indebtedness Payment Obligation (collectively, the "Obligations"), plus all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder. . . .

(JX 17 at 2, ¶ 1.)

32.     The Amended Limited Guaranty defines the "New Collateral Replenishment Obligation" by reference to the Primary Obligors' obligations to pay $20 million in New Collateral under the terms and schedule stated in the Amended Agreement. (*Id.* at 1.)

33.     The Amended Limited Guaranty defines the "New Indebtedness Payment Obligation" as the Primary Obligors' obligation "to pay the unpaid balance of the Total Indebtedness . . . ." (*Id.* at 1-2.)

34.     Although the third recital to the Amended Limited Guaranty describes the Total Indebtedness as "including any new premiums becoming due during the term of the Amended Underlying Agreement," the Total Indebtedness was already defined in the Amended Agreement to be a static dollar amount. (*See id.* at 1; JX 18 at 5; Tr. vol. 2, at 123.) The Amended Limited Guaranty does not purport to redefine "Total Indebtedness." In fact, the first appearance of the term "Total Indebtedness" in the Amended Limited Guaranty is followed by a parenthetical that says, "as defined in the above-referenced [Amended Agreement]." (*See* JX 17 at 1.)

35.     The Amended Agreement does state that the "New Indebtedness" includes new premiums that are 60 or more days past due, but the language in the third recital to the Amended Limited Guaranty is not limited to new premiums that are 60 or more days past due. (*See* JX 17 at 1; JX 18 at 6-7, ¶ 3(c).) Given that the third recital to the Amended Limited Guaranty was not even a correct description of the New Indebtedness (let alone the Total Indebtedness), Mr. Ball did

not interpret it to redefine any of the defined terms in the Amended Agreement. (Tr. vol. 2, at 124-125.)[2]

36.     Further, to the extent the recitals to the Amended Limited Guaranty indicate that the obligation in paragraph 3(b)(i) of the Amended Agreement to pay $200,000 per month until the "Total Indebtedness" is paid in full applies to new premiums that become due during the term of the Amended Agreement, the recitals are in conflict with not only the Amended Agreement's definition of "Total Indebtedness" (*see* findings nos. 16-17, 34, *supra*; JX 18 at 5, ¶ 3), but also the construction given to the Amended Agreement by Lexon in its pre-lawsuit correspondence (*see* findings nos. 37-41, *infra*; JX 21; JX 22; JX 23; JX 24).

37.     In a February 25, 2019 email, sent just a few weeks after the date of the Amended Agreement, Lexon's then-Senior Vice President, Kieran Moran, sent a summary of the Amended Agreement to his fellow Lexon officers. (JX 21.)   In that summary, he explained the Primary Obligors' obligation to make monthly payments toward the "Total Indebtedness" with reference only to the defined amount of $3,538,400.75.  His summary makes no mention of new or renewal premiums being added to the "Total Indebtedness." (*See id.*; *see also* Tr. vol. 1, at 162-165.)

38.     In an October 29, 2019 email, Lexon's then-CEO Brian Beggs[3] stated that "Justice has met their installment obligations (with a little arm twisting) to pay down overdue past premiums," but that "[t]hey have not paid their renewal premiums for 2019 and are $2mm plus in the hole[.]"   (JX 22.)   When he said, "Justice has met their installment obligations," he was

---

[2] Mr. Ball was involved in reviewing and interpreting the documents at issue on behalf of the Primary Obligors and Defendant. Mr. Ball's boss, Jay Justice, generally took the lead negotiating the commercial terms with Lexon, but it was Mr. Ball who handled the review of and conversations regarding the documentary language. (Tr. vol. 2, at 84-85, 95-96, 142, 144-145, 163-164.)

[3] Mr. Beggs was the primary Lexon officer involved in negotiating the Amended Agreement. (Tr. vol. 1, at 100-101.)

9

referring to the obligation in paragraph 3(b)(i) of the Amended Agreement to pay $200,000 per month until the "Total Indebtedness" is paid in full. (Tr. vol. 1, at 167.) Thus, Mr. Beggs' email distinguished the obligation to pay installments toward the "Total Indebtedness" under paragraph 3(b)(i) of the Amended Agreement from the obligation to pay renewal premiums. (*See* JX 22; Tr. vol. 1, at 168-169.) This indicates that Lexon intended paragraph 3(b)(i) of the Amended Agreement to apply only to the specified overdue premium amount of $3,538,400.75, and that Lexon did not view the overdue 2019 renewal premiums as part of the "Total Indebtedness" payable under paragraph 3(b)(i).

39.     In another October 29, 2019 email, Lexon Senior Underwriter Jack Genet stated that "while Justice has made recent payments for collateral and past due premium as required under the 2/4/2019 Amendment agreement, I want to point out that they have not made any payments on new premiums." (JX 23; *see also* Tr. vol. 1, at 170.) This too indicates that Lexon viewed the obligation in the Amended Agreement to pay $200,000 per month until the "Total Indebtedness" is paid in full as applying only to the specified past-due amount of $3,538,400.75, and that Lexon did not view new premiums as part of the "Total Indebtedness" covered by paragraph 3(b) of the Amended Agreement.

40.     In a subsequent email in the same chain, Mr. Beggs stated that "the installment deal was for over 90 premiums and *completely separate from* their obligations to pay renewal premiums." (JX 23 (emphasis added).) By "installment deal," Mr. Beggs was referring to the obligation in paragraph 3(b)(i) of the Amended Agreement to make $200,000 payments toward the Total Indebtedness. (Tr. vol. 1, at 138-139, 170-171.) This too indicates that Lexon viewed the obligation to pay renewal premiums as separate and apart from the Amended Agreement and the obligation therein to pay $200,000 per month until the "Total Indebtedness" is paid in full.

10

41.     Perhaps most tellingly, in an October 31, 2019 email, Mr. Beggs stated as follows:

> *The installments were to catch up on late premiums from 2018.* I specifically stated in our May meetings that the installments were for overdue premiums and *we expected the 2019 renewal premiums to be paid, outside of the installments.* Otherwise, we will never catch up. Normal renewal payments are not "additional payments", we expect payment at renewal.

(JX 24, emphasis added.) The "installments" that Mr. Beggs was referring to in this email were the $200,000 monthly payments in paragraph 3(b)(i) of the Amended Agreement. (Tr. vol. 1, at 140, 171-173.) And the $3,538,400.75 "Total Indebtedness" figure in paragraph 3 of the Amended Agreement represents "late premiums from 2018." (*Id.* at 173.) The above-quoted email therefore plainly indicates that Lexon considered paragraph 3(b)(i)'s installment plan for the "Total Indebtedness" to apply only to the specified overdue premium amount of $3,538,400.75, and that Lexon *did not* view renewal premiums as becoming part of the "Total Indebtedness" that could be paid through paragraph 3(b)(i) of the Amended Agreement.

42.     The Amended Limited Guaranty, like the Original Limited Guaranty, placed a hard limit on Defendant's liability:

> Notwithstanding anything contained herein to the contrary, the obligations of Guarantor shall be limited to a total sum equal to (i) fifteen million U.S. dollars ($15,000,000.00) plus (ii) the amount of the Total Indebtedness specified in the Amended Underlying Agreement; (ii) provided that, in the event of any default by Collateral Obligor and/or Indebtedness Obligor with respect to the New Collateral Replenishment Obligation or the New Indebtedness Payment Obligation, including without limitation any failure to timely pay any payment due under either such Obligation, the obligations of Guarantor shall instead be limited to a total sum equal to (i) twenty million U.S. dollars ($20,000,000.00) plus (ii) the amount of the Total Indebtedness specified in the Amended Underlying Agreement.

(JX 17 at 4-5, ¶ 5(e).) The $20 million figure in paragraph 5(e)(i) corresponds to the collateral called for in the Amended Agreement, while paragraph 5(e)(ii) refers to the "amount" of Total Indebtedness "specified" in the Amended Agreement. (*See* Tr. vol. 1, at 52-53; Tr. vol. 2, at 127-

11

129.)  The only amount of Total Indebtedness specified in the Amended Agreement is $3,538,400.75. (*See* JX 18, at 5, ¶ 3; *see also* Tr. vol. 2, at 128-129.)

43.  Mr. Ball testified that he would never have recommended that Defendant sign the Amended Limited Guaranty if it did not limit his liability for premiums to the specified amount of $3,538,400.75. (Tr. vol. 2, at 129.)

44.  Like the Original Limited Guaranty, the Amended Limited Guaranty provides that it shall be governed by and construed under the laws of the State of West Virginia. (JX 17 at 6, ¶ 9.)

45.  On or about January 30, 2020, the Primary Obligors and Lexon executed a side letter agreement (the "January 2020 Side Letter Agreement") that, among other things, extended the Amended Agreement's payment schedule for the New Collateral.  (JX 31.)

46.  More specifically, the Amended Agreement set forth the following schedule: (i) if the full $20 million in New Collateral has not been paid by September 30, 2019, then the Primary Obligors pay $5 million (less payments previously made) on October 1, 2019; (ii) if the full $20 million has not been paid by March 31, 2020, then the Primary Obligors pay $10 million (less payments previously made) on April 1, 2020; (iii) if the full $20 million has not been paid by September 30, 2020, then the Primary Obligors pay $15 million (less payments previously made) on October 1, 2020; and (iv) if the full $20 million has not been paid by March 31, 2021, then the Primary Obligors pay $20 million (less payments previously made) on April 1, 2021. (JX 18 at 3-4, ¶ 2(d)(i)-(iv).)  The January 2020 Side Letter Agreement extended all the unexpired dates by six months.  (JX 31 at 2, ¶ 3; *see also* Tr. vol. 1, at 157-161.)

47.  Although the final payment date was stated as October 1, 2022 rather than October 1, 2021 in the January 2020 Side Letter Agreement, this was a mere typographical error; the parties

intended the final payment date to be October 1, 2021 (six months from the final payment date in the Amended Agreement). (Tr. vol. 1, at 158-161.)

48. Indeed, in an email dated January 31, 2020, Lexon's then-CEO stated—in reference to the January 30, 2020 Sider Letter Agreement's extension of the Amended Agreement's collateral payment schedule—that "we have agreed to push everything out six months[.]" (JX 33.)

49. On or about March 30, 2020, the parties entered into another side letter agreement (the "March 2020 Side Letter Agreement"). (JX 37.) The March 2020 Side Letter Agreement did not purport to further extend any of the deadlines extended by the January 2020 Side Letter Agreement. (*See id.*; *see also* Tr. vol. 1, at 161.)

50. Lexon drafted the Agreement, the Amended Agreement, the Amended Limited Guaranty, and both Side Letter Agreements. (JX 74, ¶ 20; *see also* JX 1, JX 19, JX 32, JX 36.)

51. In July 2023, Lexon filed this lawsuit to enforce the Amended Limited Guaranty. (*See generally* ECF 1.) Count I seeks damages for breach of the Amended Limited Guaranty, while Counts II and III seek enforcement costs (attorney fees and other litigation expenses). (*See id.*, ¶¶ 78-101.)

52. Defendant opposed Lexon's claims by arguing, among other things, that Lexon breached the Side Letter Agreements by refusing to release collateral to fund reclamation activities and otherwise undermined the Primary Obligors' ability to pay Lexon. (*See* ECF 61 at 1, 3-9, 13-18.)

53. On December 3, 2024, the Court issued a Memorandum Opinion (ECF 68) granting partial summary judgment to Lexon (the "Summary Judgment Opinion"). The Court found

13

Defendant liable on Counts I–III but determined that issues of material fact remained as to certain aspects of Lexon's damages under Count I. (*See* ECF 68, at 19-22, 40.)[4]

54.     Specifically, the Court held that Lexon is entitled to (1) $20 million in collateral, minus any collateral payments made by the Primary Obligors; plus (2) the "Total Indebtedness." (ECF 68, at 20-21.)  The Court found that there is no genuine issue of material fact as to the collateral balance owed ($14,250,000), but that there are genuine issues of fact as to the amount of "Total Indebtedness" owed. (*Id.* at 21.)

55.     The Court held—without the benefit of briefing focused on this issue—that the "Total Indebtedness" includes the $3,538,400.75 specified in the Amended Agreement *plus* additional premiums that became due during the Amended Agreement's term. (*Id.* at 19, 20-21.) The Court further held that the "term" of the Amended Agreement was ambiguous:

> While the parties do not address the issue directly, the "term" of the Amended Agreement (Doc. No. 55-4) is unclear. Nowhere in the Amended Agreement is the "term" defined, nor do the parties offer their own competing positions on their understandings of the Amended Agreement's length. The Guaranty does not provide clear insight to this question, either. (See Doc. No. 55-1). The Court can imagine various reasonable interpretations of the Amended Agreement's term length: until the New Collateral Replenishment Obligation and New Indebtedness Payment Obligation are paid off completely; until April 1, 2021, the latest date referenced in the Amended Agreement; or until Lexon declares the Obligors in default and demands payment from Governor Justice under the Guaranty. Considering there are many reasonable interpretations of the Amended Agreement's length, and the parties have provided no meaningful argument on this issue, the Court finds the term is sufficiently ambiguous as to warrant a jury's determination on its meaning at trial.

---

[4] The determination of Lexon's damages under Counts II and III had been bifurcated and therefore was not considered in the Summary Judgment Opinion.  The parties have since agreed to determine Lexon's damages under Counts II and III through the post-trial process set forth in Local Rule 54.01.  (*See* ECF 87.)

14

(*Id.* at 19-20, n.12; *see also id.* at 21-22 ("[T]he Court has already explained that the term of the Amended Agreement, which impacts the length of time in which additional premiums may accrue, is sufficiently ambiguous that it can only be resolved by the trier of fact.").

56.     The Court then held that there were genuine issues of material fact as to the "term" of the Amended Agreement, the amount of premium payments made to Lexon, and, ultimately, the amount of premium owed to Lexon.  (*Id.* at 22.)

57.     At a status conference on June 23, 2025, the Court instructed the parties to submit pretrial briefs by July 28, 2025, discussing (1) the areas where the parties agree and disagree; and (2) anything that a party believes the Court got wrong or missed in its damages-related rulings in the Summary Judgment Opinion.  (June 23, 2025 Tr. at 4:8-20, 11:16-12:3.)  The Court specifically stated that the parties could raise disagreements with the Court's analysis in their pretrial briefs and did not need to file motions to reconsider.  (*Id.* at 12:1-3.)

58.     On July 28, 2025, both parties filed pretrial briefs disagreeing in some respects with the Court's rulings in the Summary Judgment Opinion.  (*See* ECF 93; ECF 94.)

59.     Defendant's pretrial brief submitted that (1) the Amended Agreement defines "Total Indebtedness" as $3,538,400.75, not as the abstract sum of the "Remaining Indebtedness" and the "New Indebtedness"; and (2) even if the Amended Agreement did define "Total Indebtedness" as the abstract sum of the "Remaining Indebtedness" and the "New Indebtedness" instead of the specified amount of $3,538,400.75, the Amended Limited Guaranty caps Defendant's liability at the specified amount.  (ECF 93 at 4-6.)

60.     Lexon's pretrial brief submitted that, contrary to the Court's rulings, the term of the Amended Agreement is not ambiguous and is susceptible to only one reasonable interpretation. (ECF 94 at 8-14.)

15

## II.    CONCLUSIONS OF LAW

**A.    The meaning of "Total Indebtedness" in the Amended Agreement**

**1.    The plain language of the Amended Agreement defines "Total Indebtedness" as a specific, static amount: $3,538,400.75.**

Although the Court initially held otherwise in its Summary Judgment Opinion, the Court now concludes, after consideration of the parties' subsequent briefing and the evidence at trial, that the Amended Agreement defines the term "Total Indebtedness" as the fixed dollar amount of $3,538,400.75.  The Court begins with paragraph 3 of the Amended Agreement, which defines "Total Indebtedness" as follows:

> The Parties Agree the Remaining Indebtedness is equal to One Million Twenty-Five Thousand U.S. dollars ($1,025,000.00). The Parties also agree that in addition to the Remaining Indebtedness, additional premium of $2,513,400.75 is now due and owing (the "New Indebtedness"). The Remaining Indebtedness together with the New Indebtedness is equal to ***$3,538,400.75 (the "Total Indebtedness")***.

(JX 18 at 5, ¶ 3, emphasis added.)  As Mr. Ball testified, placing the capitalized term "Total Indebtedness" in parentheses immediately after the number "$3,538,400.75" indicates that the definition of "Total Indebtedness" is $3,538,400.75. (Tr. vol. 2, at 90, 98-99.)

True, paragraph 3(c) of the Amended Agreement later states that the "New Indebtedness" shall be increased by new premiums that become due during the term of the Amended Agreement. (JX 18 at 6-7, ¶ 3(c).)  But there is no language in paragraph 3(c) or anywhere else in the Amended Agreement that says the "Total Indebtedness" ever changes.  If Lexon intended the "Total Indebtedness" to increase, then it could have written that the "Total Indebtedness" increases instead of writing only that the "New Indebtedness" increases.  (*See* Tr. vol. 2, at 108-109; JX 18 at 6-7, ¶ 3(c).)

16

Nor does the modification of the definition of "New Indebtedness" mean that the definition of "Total Indebtedness" also changes. Critically, the Amended Agreement does not define "Total Indebtedness" as the abstract sum of the "Remaining Indebtedness" and the "New Indebtedness," whatever those amounts may be. Rather, the plain language of paragraph 3 defines "Total Indebtedness" as a specific dollar amount: $3,538,400.75. (JX 18 at 5, ¶ 3; *see also* Tr. Vol. 2, at 90, 92-93, 98-99, 102.) If Lexon intended the "Total Indebtedness" to be the abstract total of the Remaining Indebtedness and the New Indebtedness, the latter of which may increase, then it could have said that in the Amended Agreement instead of listing a specific number and writing "Total Indebtedness" after it in parentheses. (*See* Tr. vol. 2, at 105.)

### 2. The preamble to the Amended Limited Guaranty does not change the Court's conclusion that the Total Indebtedness is a static amount.

To the extent that the third "WHEREAS" clause in the preamble to the Amended Limited Guaranty indicates that the "Total Indebtedness" includes new premiums becoming due during the term of the Amended Agreement (JX 17 at 1), that is at best an inconsistency that conflicts with the actual definition of "Total Indebtedness" in the Amended Agreement. And under West Virginia law, any ambiguity or uncertainty in a contract should be resolved against the drafter. *See CONSOL Energy, Inc. v. Hummel*, 792 S.E.2d 613, 620-21 (W. Va. 2016); *Jochum v. Waste Mgmt. of W. Va., Inc.*, 680 S.E.2d 59, 64 (W. Va. 2009). Here, Lexon has stipulated that it drafted the Amended Agreement and the Amended Limited Guaranty. (JX 74 (ECF 103), ¶¶ 10, 20.)

Lexon has argued that this canon does not apply to a contract that was negotiated between sophisticated parties. But Lexon has not cited—and the Court has not found—any West Virginia case adopting this exception. In fact, the court in one of the cases that Lexon cited in its pretrial Proposed Findings of Fact and Conclusions of Law (ECF 102) held that an arbitrator properly

invoked the principle that ambiguities in a contract should be strictly construed against the drafter despite evidence that the other party's counsel reviewed the contract and made redlined suggestions about one of its provisions. *See Elkland Holdings LLC v. Eagle Mining LLC*, No. 2:14-CV-15043, 2015 WL 13037115, at \*15 & n.15 (S.D.W. Va. July 29, 2015). Similarly, in *Jochum*, the drafter of the contract argued that the other parties "engaged in the negotiation of the terms of the Agreement and entered into it voluntarily, knowingly, and intelligently," yet the court still went on to invoke the rule that "[u]ncertainties in an intricate and involved contract should be resolved against the party who prepared it." 680 S.E.2d at 64.

Moreover, "where the meaning [of a writing] is uncertain and ambiguous, parol evidence is admissible to show the situation of the parties, the surrounding circumstances when the writing was made, and the practical construction given to the contract by the parties themselves either contemporaneously or subsequently[.]" *Miller v. WesBanco Bank, Inc.*, 859 S.E.2d 306, 328 (W. Va. 2021). As discussed below, the pre-litigation construction given to the Amended Agreement by Lexon weighs against holding that the "Total Indebtedness" includes new or renewal premiums that became due after the date of the Amended Agreement.

### 3. Extrinsic evidence indicates that the parties intended "Total Indebtedness" to mean the static amount of $3,538,400.75.

Lexon's own pre-litigation correspondence indicates that Lexon understood and intended the paragraph 3(b)(i) of the Amended Agreement—wherein the Primary Obligors agreed to pay $200,000 per month until the "Total Indebtedness" is paid in full—to apply only to the specified amount of $3,538,400.75. Less than a month after the Amended Agreement was executed, Lexon's Senior Vice President, Kieran Moran, sent an "update" to other Lexon officers summarizing the Amended Agreement. (JX 21.) In that summary, Mr. Moran explained that the

18

Primary Obligors agreed to pay $200,000 per month until the "Total Indebtedness" of $3,538,400.75 is paid in full. Mr. Moran's summary says nothing about new or renewal premiums that become overdue during the term of the Amended Agreement being added to the "Total Indebtedness." (*See id.*) If Lexon intended renewal premiums to become part of the Total Indebtedness once they become 60 days overdue, then surely Mr. Moran would have included this critical detail in his summary of the Amended Agreement.

Further, in a series of emails, Lexon made clear that it *did not* intend the "Total Indebtedness"—as used in paragraph 3(b)(i)—to include premiums becoming due after the date of the Amended Agreement:

- In an October 29, 2019 email, Mr. Beggs stated that "Justice *has met their installment obligations* (with a little arm twisting) to pay down overdue past premiums," but that "*[t]hey have not paid their renewal premiums for 2019* and are $2mm plus in the hole[.]" (JX 22, emphasis added.)

- In another October 29, 2019 email, Lexon Senior Underwriter Jack Genet stated that "while Justice *has made recent payments* for collateral and past due premium *as required under the 2/4/2019 Amendment agreement*, I want to point out that *they have not made any payments on new premiums*." (JX 23, emphasis added.)

- Later in the same email chain, Mr. Beggs stated that "*the installment deal was* for over 90 premiums and *completely separate from their obligations to pay renewal premiums*." (*Id.*, emphasis added)

- In an October 31, 2019 email, Beggs stated as follows: "*The installments were to catch up on late premiums from 2018*. I specifically stated in our May meetings that the installments were for overdue premiums and *we expected the 2019 renewal premiums to be paid, outside of the installments*. Otherwise, we will never catch up. *Normal renewal payments are not "additional payments"*, we expect payment *at renewal*." (JX 24, emphasis added.)

Lexon's repeated recognition that the Primary Obligors made the installment payments toward the "Total Indebtedness" as required by paragraph 3(b)(i) of the Amended Agreement *but*

19

*had not made* payments for "new premiums" or "renewal premiums" demonstrates that Lexon did not intend new or renewal premiums to become part of the "Total Indebtedness" payable through paragraph 3(b) of the Amended Agreement.

The same is true of Mr. Beggs' express statements that (a) "the installment deal" was "completely separate" from the Primary Obligors' obligations to pay renewal premiums; (b) "[t]he installments were to catch up on late premiums from 2018;" and (c) Lexon expected 2019 renewal premiums to be paid "outside of the installments." (JX 23; JX 24.) Indeed, Mr. Beggs testified that the "installments" he was referring to were the $200,000 payments in paragraph 3(b)(i) of the Amended Agreement, that the $3,538,400.75 "Total Indebtedness" figure in the Amended Agreement represents "late premiums from 2018," and that the Primary Obligors already had a separate obligation to pay new or renewal premiums. (Tr. vol. 1, at 138-139, 170-173.) Thus, in his October 2019 emails, Mr. Beggs was clearly telling the Primary Obligors (through broker Clint Diers) that (a) the $200,000 installments paid toward the "Total Indebtedness" under paragraph 3(b)(i) of the Amended Agreement were a mechanism to pay only the $3,538,400.75 that was overdue as of the date of the Amended Agreement; and (b) the installments under paragraph 3(b)(i) *were not* a mechanism for paying renewal premiums accruing after the date of the Amended Agreement.

Although Mr. Beggs testified at trial that renewal premiums become payable as "Total Indebtedness" under the Amended Agreement once they become 60 days overdue (Tr. vol. 1, at 141), that is not what he told Mr. Diers in his October 2019 emails. If renewal premiums become part of the "Total Indebtedness" once they become 60 days overdue, then, under the plain language of the Amended Agreement, the Primary Obligors could pay those renewal premiums via the $200,000 monthly installments under paragraph 3(b)(i) of the Amended Agreement. (*See* JX 18,

at 5, ¶3(b)(i).)  Yet, Mr. Beggs told Mr. Diers that the Primary Obligors *could not* pay the renewal premiums via those installments, that the obligation to pay renewal premiums was "completely separate" from the Amended Agreement's installments, and that renewal premiums must be paid in full at the time of renewal.  (JX 22; JX 23; JX 24.)

Plainly, Lexon intended the term "Total Indebtedness," as used in the Amended Agreement's requirement to pay $200,000 per month until the "Total Indebtedness" is paid in full, to mean only the specified amount of $3,538,400.75 that was due as of the date of the Amended Agreement, and intended for new or renewal premiums to be paid independently of the Amended Agreement.  (JX 24.)  Lexon cannot now claim that renewal premiums accruing during the term of the Amended Agreement became part of the "Total Indebtedness" after repeatedly insisting that the Primary Obligors must pay those renewal premiums outside of the installment payments for the "Total Indebtedness."

In addition, the Court is not convinced that the Primary Obligors have ever treated or acknowledged the "Total Indebtedness" as a variable number.  Although Lexon cross-examined Mr. Ball with certain answers that he gave at his deposition, those answers can be read to acknowledge simply that premiums continued to accrue over time. (*See* Tr. vol. 2, at 152-153, 156-157.)  The same is true of Mr. Ball's statements in JX 67, the Primary Obligors' response to Lexon's July 2023 Notice of Default. (*Id.* at 154-157.)  Mr. Ball never specifically acknowledged at his deposition or in JX 67 that the defined term "Total Indebtedness" is a growing number. There is a difference between (a) premiums continuing to accrue, which Lexon admits occurs independently of the Amended Agreement (*see* Tr. vol. 1, at 67, 83, 102-103, 177-178, 180); and (b) those accruing premiums being added to the defined term "Total Indebtedness" under the Amended Agreement.  Mr. Ball explained this distinction at trial and testified that, when he gave

his deposition and sent JX 67, he was merely acknowledging that premiums to continue to accrue, not that ongoing premiums were added to the "Total Indebtedness." (Tr. vol. 2, at 153, 156-157). The Court finds Mr. Ball's testimony to be credible.[5]

Lexon has also pointed to a January 30, 2019 email (JX 13) as evidence that the parties intended new premiums to become "Total Indebtedness," but the Court finds this email less than convincing. Although this email states that the Primary Obligors "agree to pay $200,000 per month for premium payments, until such time as the equipment is liquidated and/or all premiums are current," the email pre-dates the drafting of the actual language of the Amended Agreement and does not even use the term "Total Indebtedness." (*See* JX 13.) The phrase "until all premiums are current" in the email could have simply been a reference to catching up the then-past-due balance. Or it could have been a reference to what would eventually become paragraph 3(d) of the Amended Agreement, which provides a mechanism for eliminating accumulated "New Indebtedness" after the "Total Indebtedness" is paid in full. (*See* JX 18 at 7, ¶ 3(d); Tr. vol. 2, at 99-101, 109-110, 116-120.) Or the terms of parties' conceptual agreement could have been refined

---

[5] To the extent Lexon relies on Defendant's Response to Plaintiff's Statement of Undisputed Material Facts (ECF 58), the Court is unpersuaded for similar reasons. Paragraph 9 of Lexon's Statement says that "[t[he Amended Agreement further provides that 'additional amounts for premium may become due during the term of this Agreement' and that the *amount of premiums constituting* Total Indebtedness 'shall be increased in like amount,'" citing ¶ 3(c) of the Amended Agreement. (*See* ECF 58, ¶ 9 (emphasis added).) It is true that the "Total Indebtedness" is made up of premiums, and that premiums continued to accrue. Paragraph 9 of Lexon's Statement does not specifically allege that the Amended Agreement says that the defined term "Total Indebtedness" increases. Nor could it, because ¶ 3(c) of the Amended Agreement manifestly does not say that the "Total Indebtedness" increases; it says only that the "New Indebtedness" increases. (*See* JX 18 at 6-7, ¶ 3(c).) Thus, if Lexon intended ¶ 9 of its Statement to assert, as a matter of fact, that the Amended Agreement says that the "Total Indebtedness" increases, then ¶ 9 is plainly incorrect regardless of whether Defendant disputed it. Moreover, Defendant's Response to Plaintiff's Statement of Undisputed Material Facts was not offered into evidence at trial and is not evidence of the Primary Obligors' intent.

22

in the drafting process.  For all these reasons, this email is far from conclusive on the parties' intended meaning of the term "Total Indebtedness." [6]

Lexon has also cited the same email as evidence that it was the Primary Obligors who proposed the timeline under which ongoing premiums would convert to "New Indebtedness."  The Primary Obligors do propose in this email that "60 days will be deemed current on premium payments," but this proposal is made in response to Lexon's proposal that "Gov. Justice's personal indemnity is increased to $15MM now with an immediate step-up . . . in the event any collateral payment or premium payment is not paid on time." (*See* JX 13.) Thus, the Primary Obligors were not proposing the timeline for additional premiums to become "New Indebtedness"; they were proposing that a missed premium payment would not trigger the step-up in the amount of Defendant's guaranty until the premium is 60 days past due.  And regardless, even if the Primary Obligors did propose the timeline for additional premiums becoming "New Indebtedness," that would not mandate the conclusion that the "New Indebtedness" increases the "Total Indebtedness." Again, the Amended Agreement defines the "Total Indebtedness" as a fixed number.  And while the Amended Agreement later provides that the "New Indebtedness" is capable of increasing, it never states that the "Total Indebtedness" is also capable of increasing.

The Court concludes that the weight of the evidence indicates that the parties to the Amended Agreement defined and intended the "Total Indebtedness" to mean the static amount of $3,538,400.75.  To the extent the evidence on this point is in conflict, any doubt must be resolved against Lexon as the drafter of the Amended Agreement.  *See Lee v. Lee*, 721 S.E.2d 53, 57-58 (W. Va. 2011) ("[A]mbiguous terms should be construed in such a manner as to effectuate the

[6] Notably, although Lexon discussed this email (which also appears in JX 15) in its pretrial submissions, Lexon did not elicit any testimony about JX 13 or JX 15 at trial.

intention of the parties, but where the evidence pertaining to the parties' intent conflicts, the ambiguous terms should be construed against the party who drafted the document.").

### 4. Defining the "Total Indebtedness" as a static number is consistent with the remainder of the Amended Agreement.

The Court's conclusion that the "Total Indebtedness" is a static number does not render paragraph 3(c) of the Amended Agreement meaningless or conflict with other provisions in the Amended Agreement. Rather, each subsection in paragraph 3 serves a distinct purpose that is in harmony with the other subsections. Paragraph 3(b) sets forth the payment terms for the static "Total Indebtedness." (JX 18 at ¶ 3(b).) Paragraph 3(c) serves to "recognize" that additional premiums continue to independently accrue during the term of the Amended Agreement and that the Primary Obligors are ultimately responsible for those premiums as "New Indebtedness." (*Id.* at ¶ 3(c).) And paragraph 3(d)—which states that when the Total Indebtedness is paid in full, the Primary Obligors must pay "any additional premium due" or $200,000 per month, "whichever is greater"—provides the payment terms for the "New Indebtedness." (*Id.* at ¶ 3(d).) In other words, once the "Total Indebtedness" is paid in full through paragraph 3(b), any premiums that have become 60 or more days past due since the date of the Amended Agreement and constitute "New Indebtedness" under paragraph 3(c) must be paid in accordance with paragraph 3(d). (*See* Tr. vol. 2, at 99-101, 109-110, 116-119.)

Nor does the Court's conclusion result in double-counting under paragraphs 3(c) and 3(d) of the Amended Agreement. If new premiums that are 60 or more days past due became part of the "Total Indebtedness" under paragraph 3(c), then they would be paid through paragraph 3(b) and could not also be paid through paragraph 3(d). But if, as the Court has held, the "Total Indebtedness" is only the static amount of $3,538,400.75 that was overdue as of the date of the

24

Amended Agreement, and subsequently accruing premiums never become part of the Total Indebtedness, then the subsequently accruing premiums are never paid through paragraph 3(b) and there is no double-counting. Paragraph 3(d) is the only provision in the Amended Agreement that addresses payment of premiums that become 60 or more days past due during the term of the Amended Agreement. (*See* Tr. vol. 2, at 113-120.)

### 5. Lexon's interpretation of the "Total Indebtedness" is inconsistent with other provisions in the Amended Agreement and with the extrinsic evidence.

Lexon's contention that the "Total Indebtedness" is a variable number that includes ongoing renewal premiums as they become 60 days past due is inconsistent with paragraph 3(d) of the Amended Agreement. Paragraph 3(d) provides payment terms that spring into effect "[a]t such time as the Total Indebtedness is paid in full[.]" If the "Total Indebtedness" *includes* all of the additional premiums that become part of the "New Indebtedness" under paragraph 3(c), then were would be nothing left to pay "[a]t such time as the Total Indebtedness is paid in full," and paragraph 3(d) would serve no purpose. (*See* Tr. vol. 2, at 111-112.)

Although one Lexon witness testified that paragraph 3(d) was "kind of a catchall" to capture premiums that were not yet 60 days past due (Tr. vol. 1, at 61-62), this "catchall" would be entirely unnecessary because those premiums would already be collectable independently of the Amended Agreement (*id*. at 66-67, 83-84). Further, the same witness testified that the Amended Agreement would terminate immediately upon the payment of the New Collateral if no premiums were 60 or more days in arrears at that moment, indicating that Lexon did not, in fact, intend any part of the Amended Agreement to cover premiums that were fewer than 60 days past due. (*See id.* at 66, 83.)

Perhaps recognizing this inconsistency, Lexon proffered testimony that paragraph 3(d) can be viewed as bridging the gap if the Primary Obligors paid the "Total Indebtedness" in full but not the New Collateral. (*Id.* at 63-64.) But paragraph 3(d) does not say that the payments set forth therein terminate when the New Collateral is paid in full or even mention the Primary Obligors' collateral obligations. (*See* JX 18 at 7, ¶ 3(d).) Further, if the Court were to adopt Lexon's view that (a) the "Total Indebtedness" is a variable number capable of increasing during the term of the Amended Agreement, and (b) the term of the Amended Agreement lasts until all obligations therein are satisfied, then the Primary Obligors could never definitively pay the "Total Indebtedness" in full until they also paid the New Collateral in full. According to Lexon, as long as the Amended Agreement's collateral obligations remained unsatisfied, the term of the Amended Agreement would persist, and the "Total Indebtedness" would be capable of increasing at the moment that any renewal premiums fall 60 days in arrears.

Moreover, if the Total Indebtedness were a variable number that increases by the amount of ongoing renewal premiums as they become overdue, then it would make no sense for Lexon to agree to the $200,000 payments in paragraph 3(b)(i) of the Amended Agreement. Lexon has acknowledged that $200,000 per month is insufficient to eliminate the Total Indebtedness if ongoing renewal premiums are added to it as they become overdue. (*See* JX 24 (stating that Lexon expected "[n]ormal renewal premiums" to be paid "outside of the installments" because "[o]therwise, we will never catch up"); JX 26 (stating that "premium installments at $200,000 isn't closing the gap"); *see also* Tr. vol. 1, at 191-192, 194-197.) Thus, giving "Total Indebtedness" the variable meaning that Lexon suggests would require this Court believe that Lexon knowingly agreed to payment terms for the "Total Indebtedness" that were potentially insufficient to eliminate the "Total Indebtedness."

The Court finds this unlikely. Why would Lexon agree to paragraph 3(b)(i) as a means to pay the "Total Indebtedness" if additional premiums may become part of the "Total Indebtedness" under paragraph 3(c), and the $200,000 installments called for in paragraph 3(b)(i) are insufficient to pay the "Total Indebtedness" once those additional premiums are added? By contrast, the $200,000 installments under paragraph 3(b)(i) *would* eliminate the static amount of $3,538,400.75. And once that static, defined "Total Indebtedness" was eliminated, then paragraph 3(d) of the Amended Agreement provides terms for the payment of the additional premiums amounts discussed in paragraph 3(c).

This is not only how Mr. Ball explained his understanding of the Amended Agreement at trial (*see* Tr. vol. 2, at 99-101, 109-110, 116-120), but also how the Primary Obligors' broker, Clint Diers, expressed their understanding of the Amended Agreement in pre-litigation email correspondence. In response to Lexon's statement in an October 2019 email that the Primary Obligors had made the payments required by the Amended Agreement but had not made any payments for renewal premiums, Mr. Diers said, "[t]hey are following the deal that was agreed to." (*See* JX 23.) And while Lexon's response to Mr. Diers disputed that the Primary Obligors had followed the deal, Lexon did not tell Mr. Diers that the renewal premiums became part of the "Total Indebtedness" under the Amended Agreement. Instead, Lexon insisted that the obligation to pay renewal premiums was "completely separate" from "the installment deal" and that renewal premiums were to be paid "outside of the installments." (*See* JX 23; JX 24.)

Ultimately, Mr. Ball's view that the "Total Indebtedness" is a fixed dollar amount and that paragraph 3(d) of the Amended Agreement provides payment terms for additional "New Indebtedness" that arises during the pendency of the Amended Agreement is, at the very least, a reasonable interpretation of the Amended Agreement. Lexon's view is more problematic, but to

27

the extent it is also reasonable, that just underscores the ambiguity of the Amended Agreement. *See Jochum*, 680 S.E.2d at 64 (explaining that contract language is ambiguous where it is "reasonably susceptible of two different meanings" or "of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning"). And as explained, the Court must resolve that ambiguity against Lexon, the party who drafted the document. *See CONSOL*, 792 S.E.2d at 620-21 (W. Va. 2016); *Lee*, 721 S.E.2d at 57; *Jochum*, 680 S.E.2d at 64.

In summary, based on the language of the Amended Agreement and the extrinsic evidence discussed above, the Court concludes that the term "Total Indebtedness," as used in the Amended Agreement, means the static amount of $3,538,400.75.

**B.      The amount of "Total Indebtedness" damages Lexon is entitled to recover from Defendant under the Amended Limited Guaranty**

**1.   The Amended Limited Guaranty limits Defendant's liability to the specified amount of Total Indebtedness.**

Even if the Amended Agreement did define "Total Indebtedness" as the abstract sum of the "Remaining Indebtedness" and the "New Indebtedness" instead of the specified amount of $3,538,400.75, the Amended Limited Guaranty caps Defendant's liability at the specified amount:

> *Notwithstanding anything contained herein to the contrary*, the obligations of Guarantor *shall be limited to* a total sum equal to (i) fifteen million U.S. dollars ($15,000,000.00) plus (ii) the *amount* of the Total Indebtedness *specified* in the Amended Underlying Agreement; (ii) provided that, in the event of any default by Collateral Obligor and/or Indebtedness Obligor with respect to the New Collateral Replenishment Obligation or the New Indebtedness Payment Obligation, including without limitation any failure to timely pay any payment due under either such Obligation, the obligations of Guarantor *shall* instead *be limited to* a total sum equal to (i) twenty million U.S. dollars ($20,000,000.00) plus (ii) the *amount* of the Total Indebtedness *specified* in the Amended Underlying Agreement.

28

(JX 17 at 4-5, ¶ 5(e), emphasis added.)  The plain language of paragraph 5(e)(i) limits Defendant's exposure for the collateral portion of the Amended Agreement to $20,000,000,[7] while the plain language of paragraph 5(e)(ii) limits Defendant's exposure for premium to the "amount" of Total Indebtedness "specified" in the Amended Agreement.  There is only one "amount" of the Total Indebtedness "specified" in the Amended Agreement: $3,538,400.75.  (*See* JX 18 at 5, ¶ 3; *see also* Tr. vol. 1, at 200-201; Tr. vol. 2, at 128-129.)

If Lexon thought the "Total Indebtedness" was  a variable amount and wanted Defendant to be on the hook for more than the $3,538,400.75 "amount" that is "specified" in the underlying Amended Agreement, then Lexon could have simply written "plus the Total Indebtedness" in paragraph 5(e)(ii) of the Amended Limited Guaranty instead of writing "plus the *amount* of the Total Indebtedness *specified* in the Amended Underlying Agreement." The Court cannot treat the words "amount" and "specified" as meaningless and superfluous. *See* Syl. Pt. 1, *Wood v. Sterling Drilling & Prod. Co.*, 422 S.E.2d 509 (W.Va. 1992) ("[S]pecific words or clauses of an agreement are not to be treated as meaningless, or to be discarded, if any reasonable meaning can be given them consistent with the whole contract.") Thus, the Amended Limited Guaranty limits the "Total Indebtedness" damages for which Defendant is responsible to the specified amount of $3,538,400.75.

This is consistent with the manifest purpose of paragraph 5(e) of the Amended Limited Guaranty, which is to put a hard limit on Defendant's responsibility as guarantor.  It would make no sense to "limit" Defendant's exposure to a nebulous, uncertain amount—*e.g.*, the amount of

---

[7] Lexon's Executive Vice President and Head of Surety, Jeremy Sentman, testified that [w]henever the figure $20 million appears" in the Amended Agreement or the Amended Limited Guaranty, it is "always" a reference to collateral and never a reference to premium. (*See* Tr. vol. 1, at 52-53.)

additional premiums that continue to become due independently of the Amended Agreement until the Primary Obligors have paid off all sums owed to Lexon, which may never happen. And the language in paragraph 5(e) purporting to "limit" Defendant's exposure as guarantor would be meaningless and superfluous if it imposed no discernable limit short of the maximum, unspecified amount that the Primary Obligors could potentially owe. *See* Syl. Pt. 1, *Wood*, 422 S.E.2d 509 (holding that courts must give effect, if possible, to all parts of a contract); *see also New v. Metro. Life Ins. Co.,* No. CV 1:24-00212, 2025 WL 2263007, at *5 (S.D.W. Va. Aug. 7, 2025) (recognizing the "established principle" that courts should not interpret contracts in a manner that would render provisions superfluous).

The Court has already concluded that the "Total Indebtedness" is the static amount of $3,538,400.75. But even if the Court had concluded otherwise, paragraph 5(e) of the Amended Limited Guaranty limits Lexon's premium recovery *from Defendant* to $3,538,400.75, which is "the *amount* of the Total Indebtedness *specified* in the Amended Underlying Agreement." Paragraph 5(e) of the Amended Limited Guaranty does not permit Lexon to recover over $10 million in premiums from Defendant, as Lexon is attempting to do in this case.

### 2. Defendant owes no money to Lexon because the Primary Obligors have made premium payments in excess of the specified amount of Total Indebtedness.

With respect to premiums, the Amended Limited Guaranty guarantees payment of the "New Indebtedness Payment Obligation," which the Amended Limited Guaranty defines as the Primary Obligors' obligation "to pay the unpaid balance of the Total Indebtedness . . . ." (JX 17 at 1-2.) Because the Court has concluded that the "Total Indebtedness" is the specified amount of $3,538,400.75, the "New Indebtedness Payment Obligation" is the Primary Obligors' obligation to pay $3,538,400.75, to the extent that it remains unpaid. To the extent Lexon argues that the

30

Amended Limited Guaranty also guarantees amounts due under any GAI within 10 business days of demand therefore (JX 17, at 3, ¶ 1(c)), its argument must fail. Lexon's demand letter (JX66) made no reference to any GAI. And more importantly, as discussed above, the Amended Limited Guaranty limits Defendant's responsibility for premiums to "the amount of the Total Indebtedness specified in the Amended Underlying Agreement." (JX 17 at 4-5, ¶ 5(e).) Thus, with respect to premiums, Defendant guaranteed only that the Primary Obligors would pay the specified amount of $3,538,400.75.

As Defendant demonstrated at trial, the Primary Obligors made premium payments totaling more than $3,538,400.75 by October 6, 2020. (*See* Tr. vol. 2, at 91-92, 129-130; JX 73.) Because the Primary Obligors have paid "the amount of the Total Indebtedness specified in the Amended Underlying Agreement" in full, Defendant owes no money to Lexon for premiums under the Amended Limited Guaranty.

## C. The term of the Amended Agreement

Although it is no longer necessary to determine the term of the Amended Agreement in light of the Court's holdings above, the Court believes that doing so in the wake of the recent bench trial promotes efficiency and will guide the parties in their post-judgment decision-making.

The Court has already determined that the term of the Amended Agreement is ambiguous. (ECF 68 at 19-22.) As the United States Supreme Court has observed, courts should not construe ambiguous writings to create lifetime promises, and contracts of unspecified duration should ordinarily be treated not as "operative in perpetuity" but as "operative for a reasonable time." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441 (2015). Similarly, West Virginia's Supreme Court of Appeals has observed that "[w]here a contract provides no definite time for performance, the law implies a reasonable time," and that "[w]hat is a reasonable time is to be

31

determined in the light of all the circumstances attending the transaction." Syl. Pt. 1, *Huminsky v. Gary Nat. Bank*, 150 S.E. 9 (W. Va. 1929). Thus, the Court will determine a reasonable term in light of the circumstances surrounding the Amended Agreement.

### 1. The circumstances surrounding the Amended Agreement support holding that its term lasted no longer than October 1, 2021.

The original March 26, 2018 Agreement had three main components: (1) Lexon would release approximately $4.4 million in collateral; (2) the Primary Obligors would post "New Collateral" with a value of $5 million; and (3) the Primary Obligors would, through the sale of certain equipment or otherwise, pay the then-outstanding premium balance (or "Indebtedness") of $3 million.[8] (JX 3.) The first component was to be performed "immediately upon execution" of the Agreement. (*Id.*, ¶ 1.) The second component was to be performed by the six-month anniversary of the Agreement. (*Id.*, ¶ 2.) And the third component was to be performed within five business days after the two-month anniversary of the Agreement. (*Id.*, ¶ 3(d).) Thus, the plain language of the original Agreement shows that the parties intended it to be fully performed within six months. The trial testimony confirms this intent. (*See* Tr. vo1. 1, at 149-150; Tr. vol. 2, at 83-84.)

The Primary Obligors were unable to post the New Collateral or pay the Indebtedness by the deadlines in the Agreement. (Tr. vol. 2, at 87-88.) As of February 4, 2019, however, they had reduced the "Indebtedness" to $1,025,000. (JX 18; Tr. vol. 1, at 47-48, 54-55, 57-58; Tr. vol. 2, at

---

[8] Notably, Lexon wants this Court to believe that it would never have signed an agreement that covered the payment of a finite amount of old premium without also addressing ongoing renewal premiums, yet that is exactly what Lexon did in the original Agreement. Lexon has never disputed that the "Indebtedness" in the original Agreement is a static amount.

89.)  They also sought new bonds from Lexon.  (*See* JX 18 at 2.)  These circumstances led to the execution of the Amended Agreement.  (Tr. vol. 2, at 87-88.)

Under the Amended Agreement, the Primary Obligors agreed to deliver $20 million in "New Collateral" to Lexon on a schedule that ended in April 2021.  (JX 18 at 2-5, ¶ 2.)  They also agreed to pay $3,538,400.75 in "Total Indebtedness"—representing the remaining $1,025,000 of the "Indebtedness" from the original Agreement plus $2,514,400.75 of additional premium that was due and owing as of the date of the Amended Agreement—on a schedule that would last approximately 18 months at most.  (*Id.* at 5-6, ¶ 3.)  More specifically, they agreed to pay $200,000 per month ($3,538,400.75 divided by $200,000 is approximately 18) *and* to sell certain equipment with the proceeds to be used to reduce the Total Indebtedness, which would decrease the number of monthly $200,000 payments needed to eliminate the Total Indebtedness.  (*Id.*)

This language indicates that the parties intended the Total Indebtedness to be paid by August 2020 (18 months from February 2019).  That this payoff did not happen as contemplated does not change the intended term of the payments toward the Total Indebtedness.  Because the Primary Obligors agreed to pay $20 million in collateral on a schedule that ended April 1, 2021, and to pay the Total Indebtedness on a schedule that would end by August 2020, the Court concludes that the original "term" of the Amended Agreement should be defined as ending on April 1, 2021—the latest date referenced and contemplated in the Amended Agreement.  The Court recognizes, however, that the January 2020 Side Letter Agreement extended the collateral payment schedule by six months.  Thus, the Court concludes that term of the Amended Agreement should be defined as ending October 1, 2021, at the latest.

Lexon points to its July 24, 2023 Notice of Default (JX 66) and the Primary Obligors' response thereto (JX 67) as evidence that the Primary Obligors considered the Amended

33

Agreement to be in effect long after October 1, 2021, but the Primary Obligors make no such acknowledgement in their response to the Notice. True, the Primary Obligors' response says, "we understand there are premiums continuing to accrue on the bonds." (JX 67). But, again, there is a difference between (a) premiums continuing to accrue, which happens independently of the Amended Agreement; and (b) those accruing premiums being added to the defined term "Total Indebtedness" under the Amended Agreement. (*See* Tr. vol. 2, 156-157.) The Primary Obligors' response to Lexon's Notice of Default never acknowledges the latter nor otherwise acknowledges that the Amended Agreement is still in effect. (*See* JX 67.) Further, when viewed as a whole, the Primary Obligors' response reads as an effort to address the broader relationship between the Primary Obligors and Lexon. The Court is not convinced that the Primary Obligors' response (JX 67) is inconsistent with the Court's conclusion that term of the Amended Agreement lasted no longer than October 1, 2021.

### 2. Defining the term to have ended by October 1, 2021, is more reasonable and consistent with the evidence than Lexon's position on the term.

The Court declines to hold, as Lexon urges, that the term of the Amended Agreement extends until all collateral and premiums obligations have been paid in full.

First, if completion of performance always governed the term of a contract, then every contract that is breached through nonperformance would have an infinite term. Lexon's argument that it would be commercially unreasonable to determine the term of the Amended Agreement based on a date when the Primary Obligors were supposed to, but did not, satisfy their obligations conflates the Primary Obligors' *liability for the debt created by* the Amended Agreement with *the term of* the Amended Agreement. To illustrate, suppose the original Agreement were never amended. The Agreement called for payment of $3 million in premium "Indebtedness" within

two months and $5 million in "New Collateral" within six months. The failure to pay those obligations in full by the contractual deadlines may mean that the Primary Obligors breached the Agreement and were liable to Lexon for the unpaid balance, and the Primary Obligors' *liability* may continue after the six-month deadline, but that does not mean that the *term* of the Agreement has been extended. Performance was due within six months. It would defy logic to hold that a contract requiring performance within six months has an infinite and ongoing term.

Second, if the Court were to hold, as Lexon urges, that the "Total Indebtedness" is increased by additional premiums that become due during the term of the Amended Agreement, then defining the term of the Amended Agreement by the obligation to pay the "Total Indebtedness" would be circular. The *term of the Amended Agreement* would depend on the payment in full of all premiums that become due during the *term of the Amended Agreement*. The term to be defined cannot be part of the definition.

Third, Lexon's contention that the term of the Amended Agreement lasts until the Primary Obligors both pay the New Collateral in full and pay their 60-days-or-more-past-due premium balance down to zero is contrary to the language of the Amended Agreement. Nowhere does the Amended Agreement say that it terminates when the 60-days-or-more-past-due premium balance (which is how Lexon would have this Court define the "Total Indebtedness") is paid down to zero. On the contrary, paragraph 3(d) of the Amended Agreement says that the Primary Obligors must pay a minimum of $200,000 per month even *after* the Total Indebtedness is paid in full. (JX 18 at 7, ¶ 3(d); *see also* Tr. vol. 1, at 182.) Although Lexon posits that paragraph 3(d) can be viewed as "bridging the gap" in the event that the Primary Obligors brought their premium obligations current but did not pay the full amount of the New Collateral (Tr. vol. 1, at 64), paragraph 3(d) does not say anything about the status of the collateral obligations. It simply says that when the

35

Total Indebtedness is paid in full, the Primary Obligors must pay *the greater of* "any additional premium due" or $200,000 per month, with no end date. (*See* JX 18 at 7, ¶ 3(d).)

Fourth, Lexon's contention that the term of the Amended Agreement lasts until the Primary Obligors both pay the New Collateral in full and pay their 60-days-or-more-past-due premium balance down to zero would result in an infinite term. Mr. Ball testified at trial that the Primary Obligors have no ability to make premium payments to Lexon or to pay the $14,250,000 balance of the New Collateral. (Tr. vol. 2, at 78, 131-132.) Likewise, Lexon recognized in multiple emails that paying $200,000 per month under the Amended Agreement would never eliminate the Primary Obligors' premium balance. (JX 24, JX 26, JX 29; *see also* Tr. vol. 1, at 191, 194-197.) Thus, Lexon's proposed interpretation would result in a potentially never-ending obligation to pay $200,000 per month and a perpetual term. *See M & G Polymers*, 574 U.S. at 441 (recognizing "the traditional principle that courts should not construe ambiguous writings to create lifetime promises").[9]

Fifth, Lexon's view of the term of the Amended Agreement would countenance arbitrary and illogical results. Under Lexon's view, if the Primary Obligors were to bring their premium balance to zero *after* paying the New Collateral in full, then the Primary Obligors would have satisfied their premium obligations under the Amended Agreement and the Amended Agreement would terminate at that very moment. (Tr. vol. 1, at 62, 65-66, 69-70, 83.) They might never pay another cent toward premium after that moment, but because they brought the balance to zero for

---

[9] To the extent Lexon relies on language in the Amended Limited Guaranty (JX 17) indicating that the guaranty continues until the complete satisfaction of all the obligations defined therein, the Court notes that the duration of the Amended Limited Guaranty does not inform the term of the underlying Amended Agreement. Even if the Amended Agreement had a specified term of six months, the guaranty could still continue beyond the underlying agreement's term and remain in force until the subject obligations are satisfied.

36

a fleeting moment at the right point in time, the Primary Obligors would be deemed to have satisfied their premium obligations under the Amended Agreement. On the other hand, if the Primary Obligors were to bring the premium balance to zero *without* paying the New Collateral in full, then the Primary Obligors' premium obligations under the Amended Agreement would continue indefinitely. They could pay tens of millions of dollars in premium over a span of decades and never fall behind again, but they would not be deemed to have satisfied their premium obligations under the Amended Agreement.

Sixth, while the obligation to deliver $20 million in New Collateral was created by the Amended Agreement (Tr. vo1. 1, at 177), the Primary Obligors would have the obligation to pay premiums for their surety bonds even if the Amended Agreement never existed. Lexon acknowledges that premiums accrued before the original Agreement was ever executed and that renewal premiums continue to accrue independently of the Amended Agreement. (Tr. vol. 1, at 67, 83, 102-103, 177-178, 180; Tr. vol. 2, at 68-69.) Moreover, Mr. Beggs' emails indicate that the $200,000 installments called for in the Amended Agreement are insufficient to eliminate the independently accruing premium balance. (*See* JX 24; JX 26.) The Court concludes that it is more reasonable to define the term of the Amended Agreement based on the collateral payment schedule created therein—and the latest date referenced in the entire Amended Agreement—than to define it based on payments toward premium obligations that accrue independently of the Amended Agreement.

Ultimately, it is clear to the Court that nobody intended the Amended Agreement to last over six years and counting, or to obligate Defendant to cover the Primary Obligors' ongoing premium payments in perpetuity. Indeed, the Amended Agreement provides that "[t]he Parties agree time is expressly made of the essence with respect to each and every provision of this

37

Amendment and the documents and instruments entered into in connection herewith." (JX 18 at 8, ¶ 7.) For all of the foregoing reasons, the Court finds it most reasonable to define the term of the Amended Agreement by the parties' intended deadline for payment of the New Collateral, which, as explained, was the latest date referenced and contemplated in the Amended Agreement and a date by which the parties intended for both the New Collateral and the Total Indebtedness to have been paid in full. That date, as amended, was October 1, 2021.[10]

### D.     The amount of pre- and post-judgment interest

West Virginia Code § 56-6-27 governs prejudgment interest in contract cases. *See* Syl. Pt. 1, *Miller v. WesBanco Bank, Inc.*, 859 S.E.2d 306 (W. Va. 2021) ("West Virginia Code section 56-6-27 (eff. 1923) provides the exclusive means by which to obtain prejudgment interest in any action founded on contract."). Under § 56-6-27, prejudgment interest is not mandatory but a matter of discretion. *See Velasquez v. Roohollahi*, No. 13-1245, 2014 WL 5546140, at *3-4 (W. Va. Nov. 3, 2014); *Leyzorek v. Pocahontas Cnty. Solid Waste Auth.*, No. 13-1160, 2014 WL 2922803, at *4 (W. Va. June 27, 2014).

---

[10] It follows that even if the Court had found that Lexon were entitled to recover premiums that accrued during the term of the Agreement, Lexon's recovery would not have exceeded $3.2 million. To elaborate, The testimony of Lexon's Vice President of North American Controls, William Muller, indicates that the net premium balance that was 60 or more days past due as of the end of August 2021 was approximately $2,135,000. (Tr. vol. 2, at 70-73.) Mr. Muller further testified that by October 2021, the most that could have been added would be the numbers in row 4 of columns C and D of the "Agency Summary" tab of the spreadsheet in JX 50, which total $295,686.33. (*Id.* at 73-74; *see also* JX 50.) And he testified that adding 30% to the net premium provides a rough estimate of gross premium. (Tr. vol. 2, at 73.) Thus, to estimate the amount of gross premium that was 60 or more days past due as of October 1, 2021, the Court would add $295,686.33 to $2,135,000 and then add 30% of that total. Using this formula, the maximum about of gross premium that could have been 60 or more days past due as of October 1, 2021 is approximately $3,159,894. To the extent Lexon takes issue with this estimate, the Court notes that it is Lexon's burden to prove its damages and that Lexon failed to provide direct evidence of the amount of premium that was 60 or more days past due as of October 1, 2021.

Because W. Va. Code § 56-6-27 does not prescribe how to decide whether to award prejudgment interest or how to calculate it, federal courts have logically focused on the loss of use of the money owed and the injured party's borrowing costs. *See Com. Builders, Inc. v. McKinney Romeo Props., LLC*, No. 1:20CV62, 2022 WL 16706973, at \*14 (N.D.W. Va. May 18, 2022). Here, the Court concludes that no prejudgment interest should be awarded on the collateral portion of the judgment because collateral exists for security, not for the holder's use.[11]

Turning to post-judgment interest, even in contract cases where *prejudgment* interest is governed by W. Va. Code § 56-6-27, *post-judgment* interest is governed by federal law in accordance with 28 U.S.C. § 1961. *See Ferguson Enters., LLC v. Wolfe Constr. Co., Inc.*, No. 2:20-CV-00439, 2021 WL 2877604, at \*3 (S.D.W. Va. July 8, 2021). Under § 1961, post-judgment interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding [ ] the date of the judgment." 28 U.S.C. § 1961(a). Here, the applicable rate is _____.[12]

---

[11] Even if the Court were to award pre-judgment interest, the Court would not calculate that interest at 7% (the rate Lexon claimed was appropriate in its pretrial brief). That would be the applicable statutory rate if this case were governed by W. Va. Code § 56-6-31. *See* W. Va. Code § 56-6-31; *see also* https://www.courtswv.gov/sites/default/pubfilesmnt/2023-06/interest2023_0.pdf. But § 56-6-31 does not apply in cases founded on contract; rather, W.Va. Code § 56-6-27 provides the exclusive means to obtain prejudgment interest in contract cases. *See Miller*, 859 S.E.2d at 319-22. In cases governed by § 56-6-27, federal courts have looked to treasury yields as an indicator of borrowing costs. *See Com. Builders*, 2022 WL 16706973 at \*14 (using the one-year constant maturity Treasury yield, averaged on a weekly basis, as the rate of prejudgment interest); *see also Richards v. EQT Prod. Co.*, No. 1:17CV50, 2019 WL 4120819, at \*7 (N.D.W. Va. Aug. 29, 2019).

[12] *See* https://www.federalreserve.gov/releases/h15/. (Defendant cannot predict what the weekly average 1-year constant maturity Treasury yield will be for the week preceding the eventual judgment in this case.)

## III. RULING

For the foregoing reasons, the Court hereby ORDERS as follows:

1) Lexon is not entitled to recover any amount of premiums or "Total Indebtedness" from Defendant;

2) Lexon is not entitled to prejudgment interest on the $14,250,000 in outstanding New Collateral that the Court determined in its Summary Judgment Opinion;

3) Lexon is entitled to post-judgment interest at the rate of _____.

An appropriate final judgment order will be entered after Lexon's damages under Counts II and III are determined through the post-trial procedure set forth in Local Rule 54.01.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE

Respectfully submitted,

JAMES C. JUSTICE II,

By Counsel:

*/s/ Peter C. Robison*
Peter C. Robison (No. 27498)
LEWIS THOMASON, P.C.
427 Church Street, Suite 2500
Nashville, TN 37219
(615) 259-1366
probison@lewisthomason.com

*/s/ David R. Pogue*
David R. Pogue (admitted *pro hac vice*)
Raymond S. Franks II (admitted *pro hac vice*)
CAREY DOUGLAS KESSLER & RUBY PLLC
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone:     (304) 345-1234
Facsimile:     (304) 342-1105
drpogue@cdkrlaw.com
rfranks@cdkrlaw.com

41

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that on October 10, 2025, the foregoing document was filed via the Court's ECF system, which will send a notice of electronic filing to all ECF-registered counsel of record listed below:

| | |
|---|---|
| Jason M. Halper (*admitted pro hac vice*) | W. Brantley Phillips, Jr. (BPR# 018844) |
| Sara E. Brauerman (*admitted pro hac vice*) | Garrah Carter-Mason (BPR# 037518) |
| Timbre Shriver (*admitted pro hac vice*) | BASS, BERRY & SIMS PLC |
| VINSON & ELKINS LLP | 150 Third Avenue South, Suite 2800 |
| The Grace Building | Nashville, TN 37201 |
| 1114 Avenue of the Americas | Tel: (615) 742-6200 |
| 32nd Floor | Fax: (615) 742-6293 |
| New York, NY 10036 | bphillips@bassberry.com |
| Phone: 212-237-0000 | garrah.cartermason@bassberry.com |
| Email: jhalper@velaw.com | |
|     sbrauerman@velaw.com | |
|     tshriver@velaw.com | |

*/s/ Peter C. Robison*
Peter C. Robison

42