IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

LEXON INSURANCE COMPANY,

                    Plaintiff,

       -against-

JAMES C. JUSTICE II,

                  Defendant.

Civil Action No. 3:23-cv-00772

Judge Waverly D. Crenshaw, Jr.
Magistrate Judge Barbara D. Holmes

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF LEXON INSURANCE
COMPANY'S MOTION FOR ATTORNEYS' FEES AND OTHER EXPENSES**

      Pursuant to the personal guaranty dated as of March 26, 2018, as amended on February 4,

2019 (the "Guaranty"), the Court's December 3, 2024 Memorandum Opinion (ECF 68) and Order

(ECF 69), and the Court's August 22, 2025 Order (ECF 118), Plaintiff Lexon Insurance Company

("Lexon") submits this Memorandum of Law in Support of Lexon's Motion for Attorneys' Fees

And Other Expenses (the "Motion").[1]

## BACKGROUND

      On July 28, 2023, Lexon commenced this action against Defendant for breach of the

Guaranty, pursuant to which he personally guaranteed the payments of amounts owed to Lexon by

certain of his family-owned companies or their affiliates (the "Justice Companies") and another

affiliate, Beech Creek (collectively "Obligors") pursuant to an agreement dated March 26, 2018,

as amended on February 4, 2019 (the "Amended Agreement"). Lexon's prayer for relief was

---

[1] While Lexon submits this petition in accordance with the procedures set forth in Tennessee
Middle District Local Rule 54.01, Rule 54.01 does not substantively apply in this situation
because—as explained below—the Guaranty does not require Lexon to prevail in order to collect
the fees, costs, and expenses it now seeks. In any event, Lexon has prevailed on its claims. *See*
ECF 68, Memorandum Opinion of the Court granting Lexon's Motion for Summary Judgment.

straightforward: payment of the unpaid collateral and premium obligations guaranteed by the Defendant (Count I), plus all of its attorneys' fees, expenses, and costs incurred in enforcing the Guaranty (Counts II and III). Defendant pleaded one affirmative defense: that Lexon caused or contributed to its own damages by breaching its alleged agreement to use the collateral to reduce reclamation obligations. ECF 44 at 14.

The parties negotiated and agreed to an expeditious discovery schedule and, over the course of four months, conducted extensive fact discovery. During that phase, the parties collectively produced thousands of documents and took six depositions. *See* Declaration of Jason Halper (hereinafter, "Halper Decl.") ¶ 20. The parties also engaged in several meet and confers, through letters, phone calls, and one in-person meeting in Washington, D.C., to discuss the appropriate scope of discovery. *See id.* Also, at Defendant's request, Plaintiff agreed to reopen discovery following the fact discovery deadline to respond to new written document requests and to collect, analyze, and produce additional documents. *See id.* Three months after the close of discovery, Lexon moved for summary judgment on all three Counts set forth in the Complaint. *See id.*

On December 3, 2024, the Court granted Lexon's motion for summary judgment on all counts in the Complaint. ECF 68. The Court found Defendant liable on Count I for breach of the Guaranty and concluded that, at a minimum, Defendant must pay Lexon $14,250,000 in collateral and $3,538,400.75 in outstanding premiums that were due but unpaid as of February 4, 2019. The Court further found that Lexon is entitled to "additional [unpaid] premiums that became due during the Amended Agreement's term." *Id.* at 19.

The Court also found Defendant liable under Counts II and III. Accordingly, it held that Lexon is entitled to "all costs, expenses and fees (including the reasonable fees and expenses of [Lexon]'s counsel)" under Count II and that "Lexon has sustained Loss 'enforcing' the Guaranty

2

such that [Defendant] must indemnify Lexon for its Loss at a rate of 'six percent per annum from the date of its payment of each Loss'" pursuant to Count III. *Id.* at 20, 40; *see also* ECF 69. The Court also found that Lexon is entitled to pre- and post-judgment interest.

However, it reserved for trial two questions: (i) the period of time after February 4, 2019 during which additional premiums accrued pursuant to the Amended Agreement underlying the Guaranty; and (ii) the amount of such premiums. The parties substantially prepared for the jury trial originally scheduled for January 21, 2025 before agreeing to jointly ask the Court to proceed with a bench trial in August 2025 to avoid what Defendant represented was a conflict with his Senate schedule. The Court so ordered the parties' request, and a bench trial took place on August 20–21, 2025. The parties filed pre-trial briefs on July 28 and proposed findings of facts and conclusions of law on August 11. Four witnesses testified live at trial. Following trial, the parties submitted supplemental proposed findings of fact and conclusions of law.

Attorneys from Cadwalader, Wickersham & Taft LLP ("Cadwalader") represented Lexon from the commencement of the action through summary judgment. *See* Halper Decl. ¶ 6. After summary judgment was fully briefed and submitted in September 2024, certain attorneys left Cadwalader and joined Vinson & Elkins LLP ("V&E"), and Lexon changed counsel to V&E. *See id.* Lexon also engaged Nashville counsel Bass, Berry & Sims PLC ("Bass Berry"), which has represented Lexon since the filing of the Complaint. The attorneys from V&E and Cadwalader are located in New York, New York, and the attorneys from Bass Berry are located in Nashville, Tennessee.

On October 8, the parties filed their proposed findings of fact and conclusions of law. Pursuant to the Court's August 22 Order and Sections 1 and 2 of the Guaranty, Lexon now seeks its attorneys' fees in order to be made whole for its reasonable expenditures incurred in connection

with this litigation. It bears emphasizing that Lexon is not seeking its attorneys' fees as an *award*, nor is there any threat of Lexon securing a windfall. Lexon has, for several years (including before this action), pursued payment from Defendant and his companies and seeks only to be made whole for the reasonable expenses incurred and paid in enforcing its rights to payment throughout this litigation.

Indeed, the vast majority of the fees sought in this Motion could have been avoided if Defendant promptly complied with his obligations under the Guaranty. He did not. Instead, Defendant chose to force Lexon to prove its claims in this Court including through trial, as was Defendant's right. Defendant's exercise of this right and strategic decisions during this litigation came at a cost, *i.e.*, Lexon was required to incur significant additional fees as a result. Now that litigation has concluded in this matter, Defendant must bear that cost, as the Guaranty requires.

Lexon is entitled to reasonable attorneys' fees and expenses pursuant to the terms of the Guaranty. As set forth below, based on approximately 7,775.47 hours undertaken and billed by outside counsel and their professional support staff (and paid by Lexon) during the course of this litigation, Lexon seeks $███████ in attorneys' fees. In addition, Lexon seeks $258,933.36 in expenses and costs it incurred and paid in connection with this action.

## ARGUMENT

Under West Virginia law, courts will enforce a contract that "contains a clause allowing for recovery of attorney's fees." *Amaker v. Hammond's Mill Homeowners Ass'n, Inc.*, 2015 WL 6954981, at *9 (W. Va. Nov. 6, 2015). Here, the parties' contract—the Guaranty—contains two provisions addressing recovery of attorneys' fees: (i) Section 1 entitles Lexon to recover all costs, expenses, and fees related to the enforcement of the Guaranty, and (ii) Section 2 requires Defendant to indemnify Lexon for any and all "Loss," defined to include "any and all" costs and

4

expenses, incurred "by reason of the failure of [Defendant] to perform or comply with the covenants and conditions of this Guaranty" or Lexon's enforcement "of any of the covenants and conditions of [the Guaranty]." JX 17 §§ 1–2. The Court has already found that Lexon is entitled to reimbursement of its attorneys' fees and expenses incurred during this litigation under both provisions because all attorneys' fees and expenses incurred by Lexon during this action necessarily relate to its enforcement of the terms of the Guaranty. *See* Halper Decl. ¶ 34.

As set forth below, the Court should award Lexon $██████ in attorneys' fees and $258,933.36 in expenses, plus six percent interest on the total amount, under the Guaranty's indemnification provision. JX 17 § 2. Consistent with that provision, Lexon has submitted an itemized statement of its "Loss," which pursuant to Section 2 of the Guaranty is prima facie evidence of the amount due to Lexon under the parties' agreement. Given Lexon's entitlement to indemnification, the Court need not reach Lexon's alternative right to attorneys' fees under Section 1 of the Guaranty, as Lexon's rights under Section 2 are broader than those under Section 1, and the Court has already determined Lexon is entitled to both. Nonetheless, under Section 1 of the Guaranty, Lexon likewise is entitled to $██████ in attorneys' fees and $258,933.36 in expenses, plus seven percent interest on the total amount, because, among other factors explained below, Lexon's attorneys' expended a reasonable number of hours at reasonable rates during this litigation.

I.      **The Court Should Award Lexon The Attorneys' Fees Sought In The Motion.**

A.      **Lexon is entitled to attorneys' fees pursuant to the Guaranty's indemnification provision.**

In its summary judgment decision, the Court held that Lexon was entitled to indemnification pursuant to Section 2 of the Guaranty, which states:

Indemnification. [Justice II] shall, upon demand from [Lexon], promptly indemnify, exonerate, reimburse and hold [Lexon] harmless from and against any and all liability, damage, cost and expense of whatsoever kind or nature (cumulatively, "Loss") and pay [Lexon] for any Loss sustained or incurred (i) in connection with or arising out of any of [Lexon]'s obligations under the Amended Underlying Agreement or any GAI, (ii) by reason of the failure of the [Justice II] to perform or comply with the covenants and conditions of this Guaranty, and (iii) enforcing any of the covenants and conditions of this Agreement. An itemized statement of Loss by [Lexon], sworn to by an officer of [Lexon], shall be prima facie evidence of the fact and amount of the liability of the [Defendant] to [Lexon]. [Lexon] shall be entitled to receive interest at the rate of six percent per annum from the date of its payment of each Loss.

JX 17 § 2. The Court found "as a matter of law that [Defendant] has failed to perform or comply 'with the covenants and conditions of this Guaranty' and Lexon has sustained Loss 'enforcing' the Guaranty such that Governor Justice must indemnify Lexon for its Loss at a rate of 'six percent per annum from the date of its payment of each Loss.'" ECF 68 at 40. It, thus, ordered "[o]n Count III . . . that Governor Justice must indemnify and pay Lexon for all Loss incurred, as defined by the Guaranty, on account of his failure to comply with the Guaranty and Lexon's enforcement of the Guaranty. Such Loss will be calculated with an interest rate of six percent per annum from the date of Governor Justice's payment of each Loss." ECF 69.

To establish the "Loss" Lexon incurred, Lexon must submit a sworn "itemized statement of Loss," which, under the indemnification provision, "shall be prima facie evidence of the fact and amount of the liability of [Defendant] to [Lexon]." JX 17 § 2. The "Loss" covered by the indemnification provision is broad in scope in that it includes any and all "expense of whatsoever kind or nature" incurred (i) by reason of Defendant's failure "to perform or comply with the covenants and conditions of this Guaranty" and/or (ii) "enforcing any of the covenants and

conditions of this Agreement."[2] *Id.* Lexon has attached hereto as **Appendix A** an itemized statement of Loss and sworn affidavit detailing the attorney fees and costs it incurred in connection with Defendant's failure to comply with the terms of the Guaranty and Lexon's enforcement of the Guaranty in this action. *See VRF Eye Specialty Grp., PLC v. Yoser*, 765 F. Supp. 2d 1023, 1033 (W.D. Tenn. 2011) ("Attorney fees and costs are recoverable under an express indemnity contract if the language of the agreement is broad enough to cover such expenditures.") (quoting *Power & Telephone Supply Co., Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 933 (6th Cir. 2006)). The Court therefore should order that Lexon is entitled to indemnification in the full amount sought in Appendix A.[3]

This result is consistent with the general policy purpose of indemnity provisions and the Guaranty's purpose of preventing loss to Lexon. *See Indemnification*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("indemnification" is the "action of compensating for loss or damage sustained," which in turn serves to make a party "whole"); *Pike Creek Chiropractic Ctr., P.A. v. Robinson*, 637 A.2d 418, 423 (Del. 1994); ECF 119, Sentman 27:3–18 (explaining that unlike a typical insurance company that does not "seek indemnification or reimbursement for what they pay,"

---

[2] The Court found that attorneys' fees were incurred in connection with or by reason of the failure of Justice to perform under the terms of the Guaranty. *See* ECF 68 at 39–40 ("Lexon is entitled to compensation for its Loss relating to Governor Justice's failure to abide by the Guaranty, or Lexon's enforcement of the Guaranty, at a rate of six percent interest per year.").

[3] In light of Lexon's prima facie showing of Loss, Defendant bears the burden to prove that Lexon's attorneys' fees are not reasonable. *See Fallon Elec. Co., Inc. v. Cincinnati Ins. Co.*, 121 F.3d 125, 128 (3d Cir. 1997) (holding that "prima facie" provision shifts burden of proof to indemnitors to prove costs are unreasonable) (citing *Buckeye Union Ins. Co. v. Boggs*, 109 F.R.D. 420, 423–24 (S.D.W. Va. 1986) (finding prima facie provision in indemnity agreement enforceable)). Defendant cannot make such a showing; as Lexon demonstrates, *infra* Section I.B, its fees are reasonable.

surety companies do not assume losses, meaning that "if there's any loss, the surety seeks recovery or reimbursement for all losses as a result of the principal's failure to perform").

Now that the parties have submitted all issues to the Court. *See, e.g.,* ECF 121; ECF 125 (amending ECF 122). Lexon requests the payment of $ ███████ in attorneys' fees and expenses incurred in enforcing the Guaranty, which will place Lexon near—but not completely in[4]—the position it would have been had Defendant performed his obligations under the Guaranty. Also, as the Court already concluded in awarding Lexon summary judgment, Section 2 of the Guaranty entitles Lexon "to receive interest at the rate of six percent per annum from the date of its payment of each Loss." ECF 68 at 39–40. Thus, Lexon further requests $ ███████ in pre-judgment interest on the attorneys' fees it incurred, for a total amount of $ ███████, as calculated below.

### B. In the alternative, Lexon is entitled to recover its attorneys' fees pursuant to the Guaranty's enforcement provision.

In the alternative, Lexon seeks to recover under Section 1 of the Guaranty the attorneys' fees it incurred and paid to its outside counsel to prosecute its claims and collect under the Guaranty. In awarding summary judgment, the Court found that Section 1 of the Guaranty entitles Lexon to payment of its reasonable attorneys' fees, costs, and expenses incurred during this litigation. That provision provides:

> [Justice II] hereby absolutely, unconditionally and irrevocably guarantees to [Lexon] . . . the full and punctual payment and performance of each of [Justice obligations under the Guaranty] . . . plus all costs, expenses and fees (including the reasonable fees and expenses of [Lexon]'s counsel) in any way relating to the enforcement or protection of [Lexon]'s rights hereunder.

---

[4] As explained herein, even if the Court awards Lexon the full relief sought in the motion, Lexon will not be made whole, as Lexon is not seeking reimbursement for certain fees and expenses that it incurred in connection with this action.

JX 17 § 1.

Courts maintain "great discretion" in determining the reasonableness of attorneys' fees and expenses awarded pursuant to a contractual right. *In re Tara Retail Grp.*, LLC, 636 B.R. 439, 449 (Bankr. N.D.W. Va. 2021). In assessing a contractual right to "reasonable" attorneys' fees, courts consider the amount of time spent and rates charged for that time. *Id.* In addition, courts are often guided by Rule 1.5 of the Model Rules of Professional Conduct, as well as other guidance developed in statutory or other fee-shifting contexts. *See, e.g., id.*; *Aetna Cas. & Sur. Co. v. Pitrolo*, 342 S.E.2d 156, 161–62 (W. Va. 1986) (outlining factors "relevant to the calculation of reasonable attorney's fee awards"); *Reasonable Attorney's Fee*, BLACK'S LAW DICTIONARY (12th ed. 2024) (citing MODEL RULES OF PRO. CONDUCT r. 1.5 (A.B.A. 2005)) (explaining that the fairness of attorney compensation may be based on "several factors").

To that end, Lexon seeks to recover a total of $ ██████ in attorneys' fees. *See* Halper Decl., Ex. 1; Phillips Decl., Ex. 1.[5] Lexon has attached hereto as **<u>Appendix B –E</u>** the Declarations of Jason Halper, Bob Boston, W. Brantley Phillips, Jr., and L. Webb Campbell II, respectively, and all supporting documentation and Exhibits cited therein, including the invoices reflecting all time billed to Lexon by Cadwalader, V&E, and Bass Berry.[6] For the reasons set forth below, the Court should find that the attorney's fees Lexon seeks in the Motion are reasonable.

        i.    <u>Lexon's Attorneys Fees are Reasonable Because Their Attorneys Expended a Reasonable Number of Hours at Reasonable Rates</u>

---

[5] In providing this summary, Lexon does not waive any attorney-client privilege or attorney work-product protection.

[6] These invoices are redacted to omit information protected by the attorney-client privilege or work product privilege, as well as to indicate time for which Lexon is not seeking reimbursement.

First, as set forth in this Motion and supported in detail by these accompanying Declarations, the hours expended and rates charged by Lexon's attorneys in this matter were reasonable. *See, e.g.,* Halper Decl. ¶ 12; Boston Decl. ¶ 5; Phillips Decl. ¶ 12; Campbell Decl. ¶ 9. With respect to the hours expended, this litigation required counsel for Lexon to, among other things, draft and file the Complaint in this action; oppose Justice's Motion to Dismiss Count III; analyze and understand significant aspects of the surety and coal mining industries, the storied history of Lexon's relationship with the Justice Companies, Lexon's accounting records, and certain state regulatory matters related to the Justice Companies; review approximately 35,000 documents for potential production; prepare for and conduct six depositions; serve and respond to document and interrogatory requests; resolve disputes related to Defendant's responses to Lexon's discovery requests; respond to Defendant's discovery requests served after the deadline for completion of discovery; analyze and respond to Defendant's production of hundreds of documents after the deadline for completion of discovery; respond to Defendant's disclosure three weeks after the close of discovery of two individuals who purportedly had information related to an unpled defense; address Defendant's failure to disclose an email account associated with the Justice Companies, requiring additional discovery efforts; travel for discovery-related matters, including to The Greenbrier Resort in White Sulphur Springs, West Virginia for Defendant's deposition (at his insistence) and to Washington D.C. for an in-person meet and confer as required by this Court's rules; attend multiple case management conferences; engage in multiple court-ordered mediations, one of which was in-person in Nashville, Tennessee; file a memorandum in support of bifurcation of the amount of Lexon's claims for costs, expenses, and fees; draft a motion for summary judgment and compile corresponding supporting exhibits; substantially prepare for a jury trial before it was continued to accommodate Defendant's Senate schedule and converted into

a bench trial; prepare for and appear at multiple pre-trial hearings; draft pre-trial briefing and the contents of the pre-trial order, including reviewing the approximately 5,000 documents produced in discovery for purposes of creating Lexon's exhibit list; oppose Defendant's motion, filed approximately 36 hours before commencement of trial in August, to yet again continue the trial; prepare for and participate in a bench trial; draft pre- and post-trial proposed findings of fact and conclusions of law; and file this submission. During the representation, Lexon's counsel incurred travel-related expense charges, many of which Lexon has voluntarily omitted from its fee request in a good faith effort to focus on obtaining the fees for time billed by Lexon's attorneys. *See* Halper Decl. ¶ 31; *see also* Halper Decl., Ex. 2.

The hourly rates charged for this matter are also reasonable. *See* Halper Decl. ¶ 19; *see also* Boston Decl. ¶ 5. A "reasonable hourly rate" is generally one "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984). The reasonable hourly rate is typically equal to the prevailing market rate—or the "customary fee"—in the relevant jurisdiction. *Hollen v. Hathaway Elec., Inc.*, 584 S.E.2d 523, 529 (W. Va. 2003). The rates charged by Bass Berry were reasonable for Nashville, and the rates charged by Cadwalader and V&E were reasonable for national firms representing clients in litigation in the Middle District of Tennessee. *See* Campbell Decl. ¶¶ 7–9*;* Boston Decl. ¶¶ 5–10).

With respect to Cadwalader and V&E specifically, courts may apply out-of-town counsel's market rate if the complexity of the case or specialized nature of the litigation warrants such application, as is the case here. *See Smith v. Serv. Master Corp.*, 592 F. App'x 363, 369 (6th Cir. 2014) (acknowledging that "[d]istrict courts are free to look to a national market, an area of specialization market or any other market they believe appropriate to fairly compensate particular

attorneys in individual cases"); *see also Sigley v. Kuhn*, 205 F.3d 1341 (6th Cir. 2000). In analyzing whether to apply out-of-town counsel's market rate, the "court must determine: '(1) whether hiring the out-of-town specialist was reasonable in the first instance; and (2) whether the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation.'" *The Ne. Ohio Coal. For the Homeless v. Husted*, 831 F.3d 686, 716 (6th Cir. 2016) (quoting *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995)).

Lexon's hiring out-of-town counsel was reasonable. Both parties retained as their primary counsel non-local firms with which they have longstanding working relationships. Defendant retained Carey Douglas Kessler & Ruby PLLC based in Charleston, West Virginia, and Lexon retained Cadwalader and then V&E in New York, New York. *See* Halper Decl. ¶¶ 5–6. The fact that both parties selected familiar, out-of-state firms reflects that this was a national matter of importance to the parties, with significant recoveries and contractual rights at issue.

Cadwalader and V&E were retained because of, among other things, the longstanding relationship between Lexon and lead counsel for this matter. As described more fully in Mr. Halper's Declaration, the relationship between Lexon and the lead counsel it hired for this litigation predates Lexon's dispute with Defendant. *See id.* ¶ 30. Indeed, Lexon has engaged lead counsel in at least five other matters, at least one of which required counsel to become familiar with the Justice Companies' account. This familiarity with Lexon's surety business and its relationship with the Justice Companies injected additional efficiencies and strategic benefits into the handling of the matter. Lexon has been satisfied with the performance and rates throughout the relationship. *See id.*

Moreover, as explained in Mr. Halper's Declaration, hiring Cadwalader and V&E as out-of-town specialists was also appropriate given the complexity of the parties' relationship, the

importance of the dispute to Lexon for purposes of its ongoing business operations and contractual relationships, and the high-profile nature of the Defendant. *See id.* ¶¶ 28–29. Cadwalader and V&E are both large law firms with significant experience litigating complex, sensitive, and high-profile matters. *See id.* ¶¶ 3, 7–8. This expertise was important in, among other things, managing the unique relationship between Lexon, Defendant, and Defendant's companies: Lexon and Defendant and his companies still have an ongoing contractual relationship, and hiring Cadwalader and V&E helped balance the needs to litigate zealously while also maintaining the parties' working relationship outside the litigation. This was particularly important in light of the fact that the Justice Companies' account is one of Lexon's largest legacy accounts, dating back over 15 years. Additionally, pursuing this litigation was important to Lexon given the tens of millions of dollars at issue and to vindicate important contractual rights, *i.e.*, enforcement of a guaranty of underlying collateral and premium obligations. Such rights are vital to Lexon's overall business, as Lexon often secures guarantees from owners of the primary obligor. *See id.* ¶ 29. Therefore, the outcome of this litigation has significant precedential value to Lexon. Also, Defendant's status as a public official heightened these considerations. *See id.* ¶ 28.

The rates charged by Lexon's counsel were also reasonable in light of the degree of skill, experience, and reputation of their attorneys. The hourly rates charged by Cadwalader and V&E are consistent with the prevailing market rates for large law firm attorneys in New York, New York, regardless of whether the particular litigation is pending in New York or elsewhere in the country. *See id.* ¶ 19; *see also* Boston Decl. ¶ 5. And, the hourly rates charged by Bass Berry are consistent with the prevailing market rates in Nashville, Tennessee. *See* Campbell Decl. ¶¶ 7–9; *see also* Phillips Decl. ¶ 12. The rates charged are based on these firms' expertise and years of experience handling complex commercial litigation across the nation. *See* Halper Decl. ¶ 19;

Boston Decl. ¶ 5; *see also* Campbell Decl. ¶¶ 7–9; Phillips Decl. ¶ 12. This experience has led to substantially favorable decisions in similar disputes in federal and state courts across the country. *See* Halper Decl. ¶ 7.

The rates charged by partners during the course of this litigation also reflect expertise and industry recognition of excellence. (*See* Halper Decl. ¶¶ 2–3; Phillips Decl. ¶¶ 9–11; Boston Decl. ¶¶ 7–8. For example, Mr. Halper is head of V&E's Complex Commercial Litigation Group in its New York office and was co-chair of the Global Litigation Group and head of the Corporate & Financial Services Litigation Practice at Cadwalader. *See* Halper Decl. ¶¶ 2–3. Mr. Halper's hourly rate reflects his track record of successful advocacy and expertise in complex litigation matters. These rates are standard for international law firms, even for work charged outside the practitioners' normal jurisdiction. *See Hollen*, 584 S.E. at 529.

Because Lexon has been a long-time client of Mr. Halper's, Cadwalader's and V&E's rates were significantly discounted in several ways. First, Cadwalader's rates were discounted by ■% for time billed from April 1, 2023 through February 29, 2024. *See* Halper Decl. ¶ 15. Second, Cadwalader's rates were discounted by ■% for time billed from March 1, 2024 through March 31, 2024. *See id.* Third, Cadwalader's and, subsequently, V&E's rates were discounted by ■% for all time incurred after April 1, 2024. *See id.* These discounts amounted to a cost savings of approximately $1.3 million. *See id.* Lexon has made timely payments for all invoices without objection throughout the course of the representation. *See id.*

Moreover, much of the work performed on this matter was appropriately delegated to relatively more junior attorneys who bill at lower rates. For example, junior attorneys conducted nearly all research and reviewed several thousand documents as part of document collection and review efforts during the discovery phase of this case. *See id.* ¶ 16. Throughout the litigation,

practically all of the document review and legal research was performed by Cadwalader's and V&E's associates.

In a good faith effort to focus on obtaining the fees for this time billed by Lexon's core team of attorneys, Lexon has voluntarily omitted certain fees and expenses from its fee request. Lexon did so despite the terms of the Guaranty and this Court's order on summary judgment making it clear that Lexon is entitled to *all* reasonable costs, expenses, and fees related to this action, and Lexon maintains the reasonableness of these amounts. Nonetheless, Lexon voluntarily omits from this petition fees billed by all staff (other than trial staff), as well as partners and associates at Cadwalader and V&E who worked only on discrete tasks within the case. As a result of not seeking these amounts, which total $███████, Cadwalader's and V&E's attorneys billed at an effective blended hourly rate of $████.

Accordingly, pursuant to Section 1, Lexon requests the payment of $█████████ in attorneys' fees and $208,691.96 in non-taxable costs and expenses incurred in enforcing the Guaranty.[7] Lexon also seeks pre-judgment interest on its attorneys' fees, and taxable and non-taxable costs and expenses, at the rate of 7% per annum. As calculated below, this amounts to $████████ in pre-judgment interest, for a total amount of $█████████.

_____

[7] As discussed below, *infra* n.13, Lexon has separately filed a Bill of Costs to recover its taxable costs and expenses.

ii.  Other Factors Lend Further to Awarding Lexon the Attorneys' Fees It Is
Seeking to Recover.

As noted, West Virginia courts may consider other factors "relevant to the calculation of reasonable attorney's fees." *Pitrolo.* 342 S.E.2d at 162.[8] These factors further support awarding Lexon the amount of fees set forth in this Motion.

For example, the amount involved and the results obtained (which are among the "most critical" considerations) favor the award Lexon seeks. *See Heldreth v. Rahimian*, 637 S.E.2d 359, 370 (W. Va. 2006); *Beattie v. CMH Homes, Inc.*, 2015 WL 4163337, at *2 (S.D.W. Va. July 9, 2015); *see also Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). The amount in controversy in this action is high, as the Court has already recognized by awarding Lexon damages at summary judgment in the amount of $14,250,000 in collateral and $3,538,400.75 in outstanding premiums that were due but unpaid as of February 4, 2019, "plus additional [unpaid] premiums that became due during the Amended Agreement's term." ECF 68 at 19.

Also, on December 3, 2024, this Court granted Lexon summary judgment as to Defendant's liability on all counts in the Complaint. *Id.* That ruling further tips the scales in favor of an award of the fees Lexon seeks to recover. As stated earlier, in granting summary judgment, this Court found Defendant liable on Count I for breaching his contractual commitments by failing to pay amounts due under the Guaranty and held that Defendant was required to pay Lexon $14,250,000 in collateral and $3,538,400.75 in outstanding premiums that were due but unpaid as of February 4, 2019 plus "additional [unpaid] premiums that became due during the Amended Agreement's term" and pre- and post-judgment interest on those amounts. *Id.* It also concluded that Lexon is

---

[8] The nonexclusive list of factors identified in *Pitrolo* mirror both the West Virginia Rules of Professional Conduct and the American Bar Association's Model Rules of Professional Conduct. *See* W. Va. RPC 1.5(a)(1)-(8); *see also* MODEL RULES OF PRO. CONDUCT r. 1.5 (A.B.A. 2009).

entitled to "all costs, expenses and fees (including the reasonable fees and expenses of [Lexon]'s counsel)" and that "Lexon has sustained Loss 'enforcing' the Guaranty such that [Defendant] must indemnify Lexon for its Loss at a rate of 'six percent per annum from the date of its payment of each Loss.'" *Id.* at 19–21, 40. This decision marked a significant victory for Lexon. Though Lexon's entitlement to its fees, costs, and expenses does not hinge on whether or not it prevails, its success further supports a finding that Lexon is entitled to the fees, costs, and expenses it incurred in enforcing its rights under the Guaranty and which are sought herein.

In addition, the time, labor, and skill required of Lexon's attorneys to successfully prosecute its underlying claim in the face of a complicated set of facts similarly favor Lexon's claims for reasonable attorneys' fees.[9] Also, as discussed above, a significant portion of Lexon's attorneys' fees were incurred in responding to strategic decisions made by Defendant,[10] such as rescheduling depositions, serving discovery after the deadline for completion of discovery, and

---

[9] During the discovery phase, Lexon served and responded to 40 discovery requests, reviewed and analyzed tens of thousands of pages of documents, produced thousands of documents, took and defended six depositions, and engaged in multiple meet and confers—one of which occurred in Washington D.C. *See* Halper Decl. ¶ 20. The parties also engaged in extensive letter exchanges to address Defendant's responses to Lexon's discovery requests as well as the numerous document and interrogatory requests served by Defendant. *Id.*

[10] For example, Defendant pursued discovery on a reclamation agreement between Lexon and a regulator that was not relevant to any claims or pled defenses and had not yet been entered into; sought additional discovery after the close of discovery; produced hundreds of documents over two weeks after the discovery cutoff; disclosed after the discovery cutoff two individuals who purportedly had information related to an unpled defense; and failed to disclose the existence of an email account associated with the Justice Companies. *See* Halper Decl. ¶¶ 23–24. Defendant's strategic decisions related to discovery resulted in a significant number of hours spent on discovery-related tasks—including, but not limited to, analysis of certain regulatory matters to address the above-mentioned discovery requests by Defendant—that were necessary to Lexon's good faith efforts to respond to Defendant.

taking this matter to trial after this Court's ruling on summary judgment.[11] *See* Halper Decl. ¶¶ 20, 23–24.

Further, considering Defendant's claims of financial strain, Lexon sought to promptly and efficiently pursue its claims to ensure timely payment of judgment. Tellingly, when asked by the Court during trial whether "any of the companies plan on making payment of the premiums," Stephen Ball, general counsel to the Justice Companies, testified that "there's no ability to currently do that." ECF 120, Ball 161:17–23. When pressed further about the timeline for payment, Mr. Ball explained: "Typically those conversations resolve around needing to sell some asset, which most of them are currently lined up with a senior lender. But that's . . . the pathway to pay the premiums." *Id.* at 161:24–162:5. This factual backdrop required counsel for Lexon to attempt to operate under truncated timelines to promptly resolve this matter in Lexon's favor.

Finally, the challenge of pursuing an action against a public official also weighs in favor of a finding that Lexon's attorneys' fees are reasonable. *See, e.g., King v. McMillan*, 2008 WL 11389560, at *3 (W.D. Va. Aug. 8, 2008) (fact that Title VII action "proceeded against the Sheriff of Roanoke, and was therefore high profile, may have made it somewhat undesirable to some attorneys, but more desirable to others"); *Pucci v. Somers*, 834 F. Supp. 2d 690, 704 (E.D. Mich. 2011) (undesirability of the case weighed in favor of an upward adjustment to the lodestar where plaintiff was suing a sitting chief judge in a local district court).[12] When Lexon filed this action,

---

[11] While Lexon acknowledges that Defendant was within his rights to force Lexon to prove its claims in court, that decision—and others—required Lexon to incur significant fees and expenses that otherwise would not have been incurred.

[12] *See also* David Thomas and Mike Scarcella, *Some law firms that cut deals with Trump take cases opposing his administration*, REUTERS (Sept. 16, 2025), https://www.reuters.com/legal/government/some-law-firms-that-cut-deals-with-trump-take-cases-opposing-his-administration-2025-09-16/#:~:text=A%20Reuters%20investigation%20in%20July%20found%20that%20dozens%20of%20major%20law%20firms%2C%20wary%20of%20retaliation%2C%20have%20broadly%20s

Defendant served as the sitting Governor of West Virginia. He now serves as the junior United States Senator from West Virginia. *See* Halper Decl. ¶ 28. Defendant's high-profile status complicated certain aspects of the conduct of this litigation. *See id.*

## II. The Court Should Award Lexon its Costs and Expenses Identified in the Motion.

In addition to reasonable attorneys' fees, Lexon is also entitled to collect the costs and expenses it incurred in this litigation, to the extent sought herein. Under West Virginia law, parties are permitted to contract around the general rule that each party bears its own litigation costs. *Martinka Coal Co. v. W. Virginia Div. of Env't Prot.*, 59 S.E. 660, 662 (W. Va. 2003). Under the language of the Guaranty, Lexon is entitled to costs under *either* the Guaranty's indemnification provision or its enforcement provision. *See* JX 17 § 1 (entitling Lexon to reasonable fees and expenses of counsel), § 2 (entitling Lexon to indemnification for "any and all" "damage, cost, and expense").

Throughout the course of the litigation, Lexon incurred expenses falling into seven distinct categories. As described in Mr. Halper's Declaration, all of these expenses were reasonably incurred in the normal course of litigation. *See* Halper Decl. ¶¶ 26, 31–33. These expenses are set forth in Appendix A, Ex. 2, and receipts or other support for these expenses were timely produced to Defendant. For example, associate counsel for Lexon incurred costs related to legal research (such as Westlaw and PACER). *See id.* ¶ 26. The costs incurred for these services were all reasonably related to the issues in this case, are standard in the industry in New York and Tennessee, and were vital to the prosecution of Lexon's case. *See id.* Similarly, counsel for Lexon incurred routine costs for travel. *See id.* ¶¶ 31–32. Lexon also incurred charges for deposition

---

caled%20back%20pro%20bono%20work%2C%20workplace%20diversity%20initiatives%20and%20litigation%20that%20could%20place%20them%20in%20conflict%20with%20Trump (reporting that law firms are hesitant to take on litigation that could place them in conflict with the current administration).

transcripts and recordings, which is standard industry practice. *See id.* ¶ 33. In addition, Lexon engaged a third-party e-discovery services provider, TransPerfect Legal Solutions ("TransPerfect"), to manage its electronic document database containing tens of thousands of documents reviewed in the course of discovery. *See id.* ¶ 21. The use of a third-party discovery vendor is common practice in the industry in order to ensure the appropriate preservation of electronic discovery, particularly given the size of the database. *See id.* In total, Lexon requests an award of $258,933.36 for costs and expenses incurred in enforcing its rights under the Guaranty.[13]

As with attorneys' fees, Lexon has also voluntarily omitted costs and expenses relating to certain charges for litigation support; certain local travel expenses, such as car services; all meal expenses incurred by counsel while working on this matter (other than for trial), including meals provided to all parties (including counsel for Defendant) during depositions; and certain costs related to service of process. Thus, omitting these fees and expenses further underscores the reasonableness of Lexon's request.

## III.    The Court Should Award Lexon Interest on All Fees, Costs, and Expenses Identified in the Motion.

Finally, Lexon is entitled to pre- and post-judgment interest on its fees, costs, and expenses incurred in this litigation. The interest rate to be applied varies depending on which provision of the Guaranty—Section 1 or Section 2—the Court chooses to base Lexon's award.

---

[13] In requesting these expenses, Lexon recognizes the difference between taxable costs—which are presumptively awarded to a prevailing party and set forth in 28 U.S.C. § 1920 and amount to $50,241.40 in this case—and nontaxable costs, which amount to $208,691.96. *See Bridgeport Music, Inc. v. Justin Combs Publ'g, Inc.*, No. 3:05-0155, 2009 WL 10729031, at *3 (M.D. Tenn. July 1, 2009); *Freeman v. Blue Ridge Paper Prods., Inc.*, 624 F. App'x 934, 938 (6th Cir. 2015). Because Lexon is entitled to all of its costs incurred in enforcing the Guaranty, regardless of whether or not it prevailed, Lexon is entitled to both taxable and non-taxable costs. *See* JX 17 §§1–2. However, to comply with the procedure set forth in Local Rule 54.01 and Fed. R. Civ. P. 54(d), Lexon has separately filed its Bill of Costs for taxable costs pursuant to 28 U.S.C. §1920, requesting $50,241.40.

For both Counts II and III, Lexon has calculated pre-judgment interest only on these amounts by aggregating the fees, costs, and expenses billed for 2023 and calculating simple interest on that amount from December 31, 2023 to the present. Lexon performed the same calculation for attorneys' fees, costs, and expenses incurred in calendar year 2024, calculating simple interest on that amount from December 31, 2024 to the present. Lexon is not seeking prejudgment interest on fees incurred in calendar year 2025. The calculation is the same for Section 1 and 2, the only difference being the interest rate applied.

In particular, if Lexon is awarded its fees, costs, and expenses under Section 2 of the Guaranty, *supra* I.A., Lexon is entitled to interest of 6% from the date of each "Loss." JX 17 § 2. When calculated as described above, this amounts to $███████ in pre-judgment interest. Lexon is also entitled to post-judgment interest on these amounts at a rate of 6% and post-judgment interest will begin to accrue once the judgment is entered.

If Lexon is awarded its fees, costs, and expenses under Section 1 of the Guaranty, *supra* I.B., Lexon is entitled to pre- and post-judgment interest in the following percentages and amounts. *See Harsco Corp. v. CSX Transportation, Inc.*, 2017 WL 3821878, at *5 (W. Va. Sept. 1, 2017) (affirming award of pre-judgment interest on attorneys' fees and costs because it "serves to fully compensate the injured party for the loss of the use of funds") (citation omitted); *Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 590 (6th Cir. 2002) ("We have previously held that the post-judgment interest statute requires payment of post-judgment interest on an award of legal expenses, just as with any other award of damages.").

- Pre-judgment Interest: 7%; $█████████

- Post-judgment Interest: 5%[14]; amount to be determined

## CONCLUSION

For the foregoing reasons, Lexon respectfully requests that, under Section 2 of the Guaranty, the Court award Lexon attorneys' fees in the amount of $███████; and taxable and non-taxable costs and expenses in the amount of $258,933.36; pre-judgment interest on these amounts at a rate of 6% in the amount of $██████; for a total amount of $████████; plus post-judgment interest on the principal amount at a rate of 6%.

In the alternative, Lexon respectfully requests that, under Section 1 of the Guaranty, the Court award Lexon attorneys' fees, in the amount of $████████ and non-taxable costs and expenses, in the amount of $208,691.96. To the extent the Court relies on Section 1 of the Guaranty, Lexon does not seek to recover its taxable costs and expenses and has instead filed a Bill of Costs to recover those taxable amounts. In addition, Lexon respectfully requests that the Court award Lexon pre-judgment interest on all fees and expenses, including taxable expenses, at a rate of 7% in the amount of $███████; for a total amount of $███████; plus post-judgment interest on the principal amount at a rate of 5%.

---

[14] *See* 28 U.S.C. § 1961; *see also Jack Henry & Assocs., Inc. v. BSC, Inc.*, 487 F. App'x 246, 260 (6th Cir. 2012) (recognizing the default rule that, "federal law [*i.e.*, § 1961] controls post-judgment interest even while state law governs awards of prejudgment interest")

Date: October 14, 2025

*/s/ W. Brantley Phillips, Jr.*
W. Brantley Phillips, Jr.
Garrah Carter-Mason
**BASS, BERRY & SIMS PLC**
150 Third Avenue South
Suite 2800
Nashville, TN 37201
(615) 742-6200
bphillips@bassberry.com
garrah.cartermason@bassberry.com

Jason M. Halper
Sara E. Brauerman
Timbre Shriver
**VINSON & ELKINS LLP**
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
(212) 237-0000
jhalper@velaw.com
sbrauerman@velaw.com
tshriver@velaw.com

*Attorneys for Plaintiff*

23

**<u>CERTIFICATE OF SERVICE</u>**

   The undersigned hereby certifies that, on October 14, 2025, the foregoing document was filed via the Court's ECF system, which will send a notice of electronic filing to all ECF-registered counsel of record.


            */s/ W. Brantley Phillips, Jr.*