IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| LEXON INSURANCE COMPANY,<br><br>                       Plaintiff,<br><br>-against-<br><br>JAMES C. JUSTICE II,<br><br>                       Defendant. | Civil Action No. 3:23-cv-00772<br><br>Judge Waverly D. Crenshaw, Jr.<br><br>Magistrate Judge Barbara D. Holmes |

## **DECLARATION OF JASON HALPER**

I, Jason Halper, based upon my personal knowledge, investigation, and/or information provided to me, state under penalty of perjury as follows:

1.  I am a litigation partner at the law firm of Vinson & Elkins LLP ("V&E"), where I have practiced law since 2024. My business address is 1114 Avenue of the Americas, 32nd Floor, New York, New York 10036. I have been continuously engaged in the practice of law in the State of New York, and various other jurisdictions, for approximately 33 years.

2.  I am head of V&E's Complex Commercial Litigation Group in its New York office. In connection with this role, I have assessed and approved rates for attorneys in the litigation group for V&E's New York and other offices.

3.  Prior to practicing at V&E, I was a litigation partner at Cadwalader, Wickersham, & Taft LLP ("Cadwalader") for approximately 24 years. While at Cadwalader, between 2016 and 2024, I was the Co-Chair of the Global Litigation Group and Head of the Corporate & Financial Services Litigation Practice. I was also a member of Cadwalader's Management Committee (its most senior governing body) from 2021-2024 and Chair of the firm's Pro Bono Advisory

Committee from 2016-2024. In connection with certain of my roles at Cadwalader, I assessed, approved, and set rates for roughly 75 attorneys for approximately eight years.

4. In addition, I have received the following awards and recognition:

 a. Recognized by *Chambers USA* in Band 2, Securities Litigation, New York, 2010–present.

 b. *Legal 500 U.S.* in securities litigation defense, 2010–present.

 c. *Benchmark Litigation* "Litigation Star," identified as one of the preeminent litigation practitioners in the United States, 2010–present.

 d. *Crain's New York Business* list of 2025 Notable Litigators and Trial Attorneys, 2025.

 e. New York Super Lawyers list, *Super Lawyers* (Thomson Reuters), 2013–present.

 f. *Best Lawyers in America* (Commercial Litigation), 2014–present.

 g. *Lawdragon's* 500 Leading Global Litigators and 500 Leading Litigators in America, 2022–2025.

 h. *Martindale-Hubbell* ("AV Preeminent" Peer Review Rated).

 i. Fellow, American Bar Foundation.

 j. Advisory Board, Harvard Law School Program on Corporate Governance 2015–present.

 k. Adjunct Professor of Law, University of Pennsylvania Carey Law School 2015–present.

5. I am registered and in good standing to practice law in the State of New York. I have been lead attorney for Plaintiff Lexon Insurance Company ("Lexon") in the above-captioned case since the action was commenced against James C. Justice II ("Justice" or "Defendant"). At that time, I was practicing at Cadwalader. I have continued to represent Lexon in this action since joining V&E in September 2024 through the present. This Court granted my motion to appear *pro hac vice* in this action on August 7, 2023.

6. Attorneys from Cadwalader represented Lexon from commencement of the action through summary judgment. After summary judgment was fully briefed and submitted in September 2024, certain attorneys left Cadwalader and joined V&E, and Lexon changed representation to V&E.

7. In addition to the legal services I provided, legal services in this case were also provided to Lexon by other V&E (and, previously, Cadwalader) attorneys, paralegals, and support staff, including as listed in the tables in Paragraphs 16 and 17, *infra*. I and other members of the V&E team representing Lexon in this matter have extensive experience litigating in state and federal courts across the country. This experience has led to substantially favorable decisions in similar disputes in state and federal courts across the country.

8. V&E is an international law firm founded more than 100 years ago in 1917. Presently, it has offices in New York, Houston, Austin, Dallas, Denver, Dubai, Dublin, London, Los Angeles, Richmond, San Francisco, Tokyo, and Washington, D.C. V&E is regularly ranked as one of the nation's largest firms measured by gross revenue in the Am Law 100. In addition, V&E's Litigation & Regulatory Department is ranked in 67 Practice Categories by Chambers USA 2025, the Legal 500 recommends V&E as a leading law firm in 43 categories, and U.S. News-Best Lawyers ranks V&E as a national tier 1 law firm in 12 practice areas.

9. During this case, Bass, Berry, & Sims PLC ("Bass Berry") also worked with V&E—and, prior to that, Cadwalader—representing Lexon as Nashville counsel.

10. Defendant also retained a non-local firm as primary counsel. Defendant retained Carey Douglas Kessler & Ruby PLLC, which is based in Charleston, West Virginia.

11. V&E and Cadwalader have billed Lexon a total of 7,196.67 hours as of September 30, 2025 in connection with this matter. Lexon seeks to recover a total of $ ▮▮▮▮▮▮▮▮ in

attorneys' fees paid to V&E for this legal work. A summary of the attorneys, paralegals or support staff who billed time on this matter and whose fees are the subject of Lexon's fee petition, and a description of the work completed, is attached as Exhibit 1.[1]

12.     The fees summarized in Exhibit 1 were reasonable and necessary to the prosecution of Lexon's claims, as described in Lexon's motion requesting attorneys' fees.  All of the entries listed in Exhibit 1 were billed to Lexon by V&E and Cadwalader. Fully redacted entries reflect time and thus billings associated with this matter but that Lexon is not seeking to recoup as part of this submission.

13.     The attorneys' fees that were actually incurred by Lexon in connection with this lawsuit are in excess of those being sought in Lexon's Motion for Attorneys' Fees.  That is the case for a number of reasons.

14.     First, Cadwalader and V&E provided Lexon with discounts on its rates, and Lexon is not seeking to recover attorneys' fees at an hourly rate higher than what it actually paid to V&E and Cadwalader.

15.     The total number of hours that were billed by V&E and Cadwalader timekeepers in this matter is 7,196.67. Cadwalader's rates were discounted by ██% for time billed from April 1, 2023 through February 29, 2024. Cadwalader's rates were discounted by ██% for time billed from March 1, 2024 through March 31, 2024. Cadwalader's rates were discounted by ██% for all time incurred after April 1, 2024. When the case transferred to V&E, V&E adopted and continued the ██% discount for all time incurred. During the pendency of this action, Lexon's total savings as a

---

[1] As explained below and in the Lexon's fee petition, Lexon is not seeking reimbursement for certain fees billed by attorneys and staff at V&E and Cadwalader.  In providing this summary, Lexon does not waive any attorney-client privilege or attorney work-product protection. Where appropriate, Lexon has redacted portions of the work description that would reveal privileged information.

result of these discounts amounted to approximately $1.3 million. Lexon has made timely payments for all invoices without objection throughout the course of the representation.

16. Second, Lexon is not seeking to recover fees incurred by paralegal and other support staff.[2] Nor is Lexon seeking to recover fees incurred by associates and partners who performed only a discrete project on the matter. While Lexon and I believe that this time was valuable and appropriate, we have made this decision in an attempt to streamline the submission and reduce potential disputes. Exhibit 1 (pp. 1–2) indicates in gray all timekeepers whose fees Lexon has voluntarily excluded from its request. The below table lists each Cadwalader timekeeper who billed time on this matter for which Lexon is seeking reimbursement, the job title of each timekeeper, and each timekeeper's as-billed hourly rates for this matter (rounded to the dollar): [3]

| Timekeeper | Effective Rate Apr 01, 2023 through Jun 30, 2023, after ■% discount | Effective Rate Jul 01, 2023 through Dec 31, 2023 after ■% discount | Effective Rate Jan 01, 2024 through Feb 29, 2024 after ■% discount | Effective Rate Mar 01, 2024 through Mar 31, 2024 after ■% discount | Effective Rate Apr 01, 2024 through Jun 30, 2024 after ■% discount | Effective Rate Jul 01, 2024 through Aug 31, 2024 after ■% discount | Total Hours |
|---|---|---|---|---|---|---|---|
| Jason Halper (Partner) | | | | | | | 540.17 |
| Sara Bussiere (Special Counsel) | | | | | | | 970 |
| Timbre Shriver (Assoc.) | | | | | | | 833.48 |
| Diane Lee (Assoc.) | | | | | | | 444.2 |

---

[2] Anthony Masington is the only paralegal whose fees are included in Lexon's request. Mr. Masington provided support to Lexon's trial team and assisted with Lexon's presentation to this Court at trial.
[3] "Associate" is abbreviated as "Assoc."; "Senior Associate" is abbreviated as "Sr. Assoc."; and "Paralegal" is abbreviated as "Para."

| Timekeeper | | | | | | | |
|---|---|---|---|---|---|---|---|
| Elizabeth Moore (Assoc.) | | | | | | | 874.31 |
| Jack Delano (Assoc.) | | | | | | | 120.36 |
| Rachel Skene (Assoc.) | | | | | | | 69.08 |
| Omar Khoury (Assoc.) | | | | | | | 50.54 |

17. The below table lists each V&E timekeeper who billed time on this matter for which Lexon is seeking reimbursement, the current job title of each timekeeper (or the last job title if the timekeeper no longer is employed at V&E), and each timekeeper's as-billed hourly rates for this matter (rounded to the dollar):

| Timekeeper | Effective Rate Oct 23, 2024 through Dec 30, 2024 after ▇% discount | Effective Rate Jan 01, 2025 through Sept 30, 2025 after ▇% discount | Total Hours |
|---|---|---|---|
| Jason Halper (Partner) | | | 387.5 |
| Sara Brauerman (Partner) | | | 295.75 |
| Timbre Shriver (Sr. Assoc.) | | | 945 |
| Tiffany Monroy (Assoc.) | | | 463.5 |
| Emma Shuck (Assoc.) | | | 178 |
| Robert Gilbertson (Assoc.) | | | 109.75 |
| Hendy Posner (Assoc.) | | | 90 |

| Anthony Masington (Para.) | ███████████ | 154.75 |

18. I believe that the number of hours billed and the hourly rates of the various timekeepers are reasonable. In reaching this conclusion, I have considered the factors set forth in West Virginia Rule of Professional Conduct 1.5(a), including the following:

    a. the time and labor required, the novelty and difficulty of the questions involved, and skill requisite to perform the legal service properly;

    b. the fee customarily charged in the locality for similar legal services;

    c. the amount involved and the results obtained;

    d. the time limitations imposed by the client or by the circumstances;

    e. the nature and length of the professional relationship with the client;

    f. the experience, reputation, and ability of the lawyer or lawyers performing the services; and

    g. whether the fee is fixed or contingent.

19. The rates charged for this matter by V&E and Cadwalader are reasonable for complex commercial litigation matters in the New York legal market and elsewhere when as here New York counsel litigates outside New York for a client, particularly in light of the significant amount at stake, the high profile nature of the Defendant, the expert counsel provided, and the industry's recognition for exceptional work. For V&E and Cadwalader, Lexon was charged those firms' standard hourly rates in effect at the time, but, in my experience, the █% discount provided for the majority of the duration of the case exceeds the firms' standard discounts, if any, of approximately █%. My understanding is that these rates also are similar to or, in some cases, less than rates charged by other top AmLaw firms.

20. The number of hours worked by the V&E and Cadwalader teams also is reasonable, especially considering the hard-fought nature of the litigation. Among other litigation tasks, V&E's timekeepers in this matter investigated and mastered a complex factual background, including learning key aspects of two industries (surety and coal mining) subject to extensive regulatory requirements; drafted and filed the complaint; opposed Defendant's Motion to Dismiss Count III; analyzed and understood the storied history of Lexon's relationship with the Justice Companies, Lexon's accounting records, and certain state regulatory matters related to the Justice Companies; served and responded to 40 discovery requests; conducted extensive written discovery and document production; reviewed and analyzed tens of thousands of pages of documents; took and defended six depositions; drafted and filed a motion, ancillary papers, and reply in support of a successful summary judgment motion; engaged in multiple court-ordered mediations, one of which was in-person in Nashville, Tennessee; appeared for multiple court conferences; substantially prepared for a jury trial before the trial date was continued at the Defendant's request from January to August 2025 and Defendant withdrew his jury demand; drafted pretrial briefing and proposed findings of fact and conclusions of law; prepared the pretrial order, including designating exhibits from among the over 5,000 documents produced in the case; prepared for and conducted a trial with live witnesses; and drafted post-trial proposed findings of fact and conclusions of law. During fact discovery, the parties also engaged in several meet and confers, through letters, phone calls, and one in-person meeting in Washington, D.C., to discuss the appropriate scope of discovery. Also, at Defendant's request, Plaintiff agreed to reopen discovery following the fact discovery deadline to respond to new written document requests and to collect, analyze, and produce additional documents. Three months after the close of discovery, Lexon moved for summary judgment on all three counts set forth in the Complaint.

21. During the discovery phase of this case, Cadwalader's associate counsel reviewed approximately 37,951 separate documents as part of its document collection and review. Cadwalader engaged a third-party legal services provider, TransPerfect Legal Solutions ("TransPerfect"), to manage its electronic document database containing tens of thousands of documents. The use of a third-party discovery vendor is common practice in the industry in order to ensure the appropriate preservation of electronic discovery, and to facilitate an efficient review of Lexon's files.

22. Much of the primary case responsibility for this matter was assigned to associate attorneys, paralegals, and support staff who billed at a substantially lower rate than partners who might otherwise have taken on that responsibility. For example, practically all document review and production and the initial drafting of legal briefing was performed by associates. Additionally, the work that V&E's and Cadwalader's paralegals, practice support group, and related support staff performed was necessary for the litigation of this dispute and performed more efficiently and at lower rates by those timekeepers than if V&E's attorneys had performed that necessary work. None of the fees associated with the work performed by non-attorney support staff is being sought in this petition by Lexon, other than Anthony Masington's trial services and trial preparation assistance.

23. Defendant's approach to litigating this case also resulted in increased fees. While we recognize that a party is free to litigate as it deems strategically beneficial within the bounds of the applicable rules, and that this litigation was hard fought, certain choices by the Defendant here led to litigation costs. A most recent example involved Defendant's motion to continue the trial, filed the evening of August 18 when trial was scheduled to begin 36 hours later on August 20. (ECF 112–115.) That required a team of Lexon's lawyers to devote hours to investigating, drafting

9
Case 3:23-cv-00772    Document 127-2    Filed 10/14/25    Page 9 of 14 PageID #: 2871

and filing an opposition submission on a very short timetable (six hours). Defendant also requested that we move the trial date from January to August 2025 due to the Defendant's Senate schedule at a point when Lexon's efforts to prepare for what was then slated to be a jury trial (due to Defendant's jury demand) were well under way. (ECF 115 at 1–2.)

24. Additional examples can be found from the discovery process. During discovery, the parties addressed numerous discovery disputes with related letter exchanges. Among others, Lexon sought to address Defendant's deficient responses to Lexon's discovery requests as well as the expansive document and interrogatory requests served by Defendant. For example, Defendant pursued discovery on an agreement between Lexon and a state regulator that was not relevant to any claims or pled defenses and had not even been entered into yet; pursued discovery after the deadline for completion of discovery; produced hundreds of documents over two weeks after the discovery cutoff in support of an affirmative defense that had not been pled; and disclosed for the first time three weeks after the discovery cutoff two individuals who purportedly had information related to the same unpled defense. Defendant also unilaterally informed Lexon that he or his representatives could not attend scheduled depositions on extremely short notice and twice requested to delay trial. Counsel also became aware as part of these discovery disputes that Justice had failed to disclose the existence of an email account associated with the Justice Companies, requiring additional discovery efforts. These events forced counsel for Lexon to spend a significant number of hours on discovery-related side tasks that would not have otherwise occurred. These increased hours necessarily resulted in increased fees.

25. Counsel for Lexon also devoted significant time to effect service on Defendant, who initially did not agree to accept service and, by virtue of his position at the time as Governor of West Virginia, was not readily susceptible to service by typical means. On August 2, 2023,

Lexon met with James ("Jay") Justice III and Stephen Ball, representatives of the Justice Companies. Steven Ruby also attended this meeting, and Jay Justice represented that Mr. Ruby would represent Defendant. Jay Justice further represented that Mr. Ruby was authorized to accept service on Defendant's behalf. On August 3, I emailed Mr. Ball, Jay Justice, and Mr. Ruby to request confirmation that Mr. Ruby was authorized to accept service. At that time, Lexon offered to provide a waiver of process under Federal Rule of Civil Procedure 4, but did not attach the form. I did not receive a response. On August 4, the summons signed by the court clerk, and the complaint with exhibits, and other e-filed documents were sent via certified mail, return receipt requested to Defendant at 208 Dwyer Lane, Lewisburg, WV 24901, as provided for in the underlying guaranty agreement. On August 8, the return receipt was signed by Defendant's wife, Cathy Justice. On August 9, proof of service was filed. On August 16, Lexon and counsel at Cadwalader attempted to effect personal service on Defendant via his agents. On August 18, in order to exhaust all personal service options, Lexon attempted service at three other potential locations. On August 29, Mr. Ruby emailed me and claimed that service was not valid, but offered to waive service pursuant to Federal Rule of Civil Procedure 4(d). On August 30, Mr. Ruby sent me a signed waiver of service form. Because of Defendant's refusal to accept or waive service for nearly a full month, counsel at Cadwalader were forced to spend significant resources and hours undertaking multiple attempts at service.

26. Associates at Cadwalader and V&E also incurred costs for use of Westlaw and PACER during this litigation. These platforms are widely used in the industry and the costs incurred from these services are standard in the industry. The costs incurred for use of these services were all reasonably related to the issues raised in this case, are standard in the industry in New York and Tennessee, and were vital to the prosecution of Lexon's case. In addition, during

the representation, Cadwalader and V&E incurred standard travel expense charges, many of which we have voluntarily omitted from our fee request in a good faith effort to focus on obtaining the fees for time billed by Lexon's core team of attorneys. Attached as Exhibit 2 is Lexon's expense documentation. Lexon is not seeking to recover these expenses despite the terms of the Guaranty and this Court's order on summary judgment making it clear that Lexon is entitled to *all* costs, expenses, and fees related to this action. These omitted costs and expenses include certain charges for litigation support; certain local travel expenses, such as car services; and all meal expenses incurred by counsel while working on this matter before trial, including meals provided to all parties (including Defendant's counsel) during depositions.

27. As stated in Paragraph 16, Lexon also omitted from this request fees billed by all non-lawyer staff (other than Mr. Masington), as well as partners and associates at Cadwalader and V&E who worked only on discrete tasks. These omissions result in an effective blended hourly rate of $█████ for Cadwalader's and V&E's attorneys, and results in an additional $498,128.53 paid by Lexon but not being sought in this fee petition. Though Lexon has chosen not to seek herein the fees associated with these hours, Lexon and I believe that every hour spent on this case contributed to Lexon's successful outcome. Accordingly, it calculated this blended rate by dividing the total discounted fee by the total hours billed to the matter: $█████████ / 7,196.67 = $█████/hr.

28. When this action was filed, Defendant was the sitting Governor of West Virginia, and he is now the junior United States Senator from West Virginia. Defendant's notoriety and influence in West Virginia and elsewhere had a material impact on Lexon's approach to the case, particularly as it approached what was then scheduled to be a jury trial. We were retained in part because of our experience in sensitive and high profile matters, and our ability to face a wealthy,

high-profile political figure in adversarial proceedings. Given the complexity of the underlying issues, the amount involved, and the high-profile nature of the action, I understand that retaining trusted counsel was important to Lexon.

29. Additionally, pursuing this litigation was important to Lexon given the tens of millions of dollars at issue and to vindicate important contractual rights, *i.e.*, enforcement of a guaranty of underlying collateral and premium obligations. Such rights are vital to Lexon's business, as Lexon often secures guarantees from owners of a primary obligor. Also, Defendant's status as a public official heightened these considerations. Our expertise also was important in attempting to manage the unique relationship between and among Lexon, Defendant, and Defendant's companies, given that, notwithstanding the litigation, Lexon and Defendant and his companies still have an ongoing contractual relationship.

30. I have represented Lexon on various matters since approximately 2020. In recognition of this long-standing, successful relationship, Cadwalader offered Lexon a ▮% bottom line discount applicable to all fees. As discussed previously in Paragraph 15, this discount increased to ▮% and ultimately to a ▮% discount for all time incurred after April 1, 2024 to September 2024, when I moved to V&E. V&E continued to honor the ▮% discount for this matter. These discounts amounted to a cost savings to Lexon of approximately $1.4 million. I believe that I have always maintained a positive relationship with Lexon, representatives of Lexon have expressed to me their appreciation for the results obtained in this matter, and I have had the privilege to represent Lexon in 5 matters that have arisen since this case commenced.

31. The travel-related fees and expenses incurred by counsel at Cadwalader, V&E, and Bass Berry were also reasonable. Because the forum for this action is Nashville, Tennessee, counsel has been required to travel to Nashville multiple times throughout this litigation, including

for a settlement meeting, hearings, mediation, and trial. In addition to travel to Nashville, counsel also traveled at Defendant's insistence to White Sulphur Springs, West Virginia to take the Defendant's deposition at The Greenbrier Resort, which he and his family own. Counsel also traveled to Washington, D.C. for an in-person meet and confer. Both of these trips required travel expenditures.

32. Though I maintain that all travel-related expenses were reasonable, we have voluntarily omitted some of these expenses from our fee request in a good faith effort to focus attention to the fees charged to Lexon for our billable work. *See supra* ¶ 26.

33. Lexon also incurred charges for deposition transcripts and deposition equipment, which is standard industry practice.

34. All attorneys' fees and expenses incurred by Lexon during this action necessarily relate to its enforcement of the terms of the Guaranty.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 14th day of October, 2025.

*/s/ Jason Halper*
Jason Halper
