**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| LEXON INSURANCE COMPANY,<br><br>                                   Plaintiff,<br><br>            -against-<br><br>JAMES C. JUSTICE II,<br><br>                             Defendant. | Civil Action No. 3:23-cv-0772<br><br>Chief Judge Waverly D. Crenshaw<br>Magistrate Judge Barbara D. Holmes |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S OBJECTIONS TO
PLAINTIFF LEXON INSURANCE COMPANY'S MOTION FOR ATTORNEYS' FEES
AND OTHER EXPENSES**

Pursuant to Local Rule 54.01(c), Defendant respectfully submits this memorandum of law in support of his objections to Lexon's Motion for Attorneys' Fees and Other Expenses. The controlling law is clear that any award of attorney fees and expenses must be reasonable and reflect the customary local rate. Lexon's motion, however, seeks over ███████ in attorney fees and expenses, including over 6,500 hours of attorney time at New York City rates enormously greater than those of even the largest litigation firm in Nashville. And Lexon compounds the impact of these outsize rates through overstaffing and overbilling, such as by having six attorneys and a paralegal attend the trial in this matter. For all the reasons that follow, any award of attorney fees and expenses to Lexon should be significantly less than the huge amount it seeks.

## BACKGROUND

In March 2018, certain companies affiliated with Defendant James C. Justice II ("Defendant") entered into an agreement providing that they would post $5 million in new collateral within six months and take certain steps to pay $3 million in past due premiums. (*See*

JX 3.)   On or about February 4, 2019, the parties executed an amendment (the "Amended Agreement") that increased the amount of new collateral to $20 million and set up a payment schedule that ended April 1, 2021. (JX 18 at 2.)   As to the premium indebtedness, the Amended Agreement added $2,513,400.75 in new debt to the $1,025,000 that remained as of the date of amendment, designated the resulting total of $3,538,400.75 as the "Total Indebtedness," and provided for installment payments.  (*Id.* at 5.)

Defendant executed an Amended and Restated Limited Commercial Guaranty (the "Limited Guaranty") contemporaneously with the Amended Agreement.  (*See* JX 17.)  Pertinent here, Section 1 of the Limited Guaranty provides for the recovery of attorney fees and litigation expenses:

> Guaranty. Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Beneficiary, and its successors and assigns, as primary obligor and not merely as surety, the full and punctual payment and performance of each of the New Collateral Replenishment Obligation and the New Indebtedness Payment Obligation (collectively, the "Obligations"), plus all costs, expenses and fees (***including the reasonable fees and expenses of Beneficiary's counsel***) in any way relating to the enforcement or protection of Beneficiary's rights hereunder.

(*Id.* at 2, ¶ 1, emphasis added.)  In addition, Section 2 of the Limited Guaranty broadly provides that the guarantor shall indemnify Lexon for any "Loss":

> Indemnification. The Guarantor shall, upon demand from the Beneficiary, promptly indemnify, exonerate, reimburse and hold the Beneficiary harmless from and against any and all liability, damage, cost and expense of whatsoever kind or nature (cumulatively, "Loss") and pay the Beneficiary for any Loss sustained or incurred (i) in connection with or arising out of any of the Beneficiary's obligations under the Amended Underlying Agreement or any GAI, (ii) by reason of the failure of the Guarantor to perform or comply with the covenant  and conditions of this Guaranty, and (iii) enforcing any of the covenants and conditions of this Agreement. An itemized statement of Loss by the Beneficiary, sworn to by an officer of the Beneficiary, shall be prima facie evidence of the fact and amount of the liability of the Guarantor to the Beneficiary. The Beneficiary shall be entitled to receive interest at the rate of six percent per annum from the date of its payment of each Loss.

(*Id.* at 3, ¶ 2.)

In July 2023, Lexon filed this lawsuit to enforce the Limited Guaranty. (*See* ECF 1.) Count I sought damages for breach of the Limited Guaranty, Count II sought attorney fees and litigation expenses, and Count III sought a declaratory judgment that Defendant must indemnify Lexon for any "Loss," as defined in the Limited Guaranty. (*See id.*, ¶¶ 78-101.) Defendant opposed Lexon's claims by arguing, among other things, that Lexon breached certain side letter agreements by refusing to release collateral to fund reclamation activities and otherwise undermined the primary obligors' ability to pay Lexon. (*See* ECF 61 at 1, 3-9, 13-18.)

On December 3, 2024, the Court issued a Memorandum Opinion (ECF 68) granting partial summary judgment to Lexon (the "Summary Judgment Opinion"). The Court found Defendant liable on Counts I–III and that Lexon is entitled to $14,250,000 in collateral, but the Court held that genuine issues of material fact remained as to the amount of "Total Indebtedness" owed. (*See* ECF 68, at 19-22, 40.) Without the benefit of briefing focused on this issue, the Court held that the "Total Indebtedness" includes the $3,538,400.75 specified in the Amended Agreement *plus* additional premiums that became due during the Amended Agreement's term. (*Id.* at 19, 20-21.) The Court then held that the "term" of the Amended Agreement was ambiguous and that there were genuine issues of material fact as to the "term," the amount of premium payments made, and, ultimately, the amount of premium owed to Lexon. (*Id.* at 19-22.)[1] The Court's Summary Judgment Opinion did not address damages under Counts II and III, which the Court had

---

[1] The Court did not, as Lexon asserts, hold that Defendant must pay Lexon a minimum of $3,538,400.75 in outstanding premiums. Rather, the Court held that there were genuine issues of material facts as to the premium payments previously made and the amount of Total Indebtedness owed. (*See* ECF 68 at 22.)

previously bifurcated and which the parties later agreed to determine through the post-trial process set forth in Local Rule 54.01. (*See id.* at 6-7, 14 (n.11), 40; *see also* ECF 87.)

At a status conference on June 23, 2025, the Court instructed the parties to submit pretrial briefs discussing (1) the areas where the parties agree and disagree; and (2) anything that a party believes the Court got wrong or missed in its damages-related rulings in the Summary Judgment Opinion. (June 23, 2025 Tr. at 4:8-20, 11:16-12:3.) The Court specifically stated that the parties could raise disagreements with the Court's analysis in their pretrial briefs and did not need to file motions to reconsider. (*Id.* at 12:1-3.)

On July 28, 2025, both parties filed pretrial briefs disagreeing in some respects with the Court's rulings in the Summary Judgment Opinion. (*See* ECF 93; ECF 94.) Defendant's pretrial brief submitted that (1) the Amended Agreement defines "Total Indebtedness" as $3,538,400.75, not as the abstract sum of the "Remaining Indebtedness" and the "New Indebtedness"; and (2) even if the Amended Agreement did define "Total Indebtedness" as an abstract sum instead of the specified amount of $3,538,400.75, the Limited Guaranty caps Defendant's liability at the specified amount. (ECF 93 at 4-6.) Lexon's pretrial brief submitted that, contrary to the Court's rulings, the term of the Amended Agreement is not ambiguous. (ECF 94 at 8-14.)

On August 20 and 21, 2025, the Court held a bench trial at which the Court heard evidence on, among other issues, the meaning of "Total Indebtedness" and the cap on Defendant's liability. (*See e.g.*, Aug. 20, 2025 Tr. at 152-53, 200-201; Aug. 21, 2025 Tr. at 90-105, 128-129.) After the trial, the Court entered an Order (ECF 118) directing the parties to file proposed findings of facts and conclusions of law within 30 days from receipt of the trial transcript and directing Lexon to move for attorney fees within 35 days from receipt of the trial transcript. On October 14, 2025, Lexon filed a motion seeking over ███████ (plus interest) in attorney fees and expenses

4

charged by three firms: Bass Berry & Sims PLC ("Bass Berry"), which is Lexon's Nashville-based local counsel; the New York City office of Cadwalader, Wickersham & Taft LLP ("Cadwalader"); and the New York City office of Vinson & Elkins LLP ("V&E"), which replaced Cadwalader as Lexon's primary counsel after certain attorneys departed Cadwalader for V&E.  (*See* ECF 132 at 3, 22.)

## ARGUMENT

Lexon seeks to recover attorney fees and expenses based on contractual language in the Limited Guaranty.  *See* ECF 127 at 4.  The Limited Guaranty contains a West Virginia choice of law provision, and Lexon has acknowledged that West Virginia law governs the Limited Guaranty.  *See* JX 17 at 6, ¶ 9; ECF 53 at 8, n.12; *see also Hometown Folks, LLC v. S & B Wilson, Inc.*, 643 F.3d 520, 533 (6th Cir. 2011) ("In diversity cases, attorneys' fees are governed by state law.").  Thus, West Virginia law controls Lexon's claim for attorney fees and expenses.  And as demonstrated below, West Virginia law does not allow Lexon to recover the enormous amount of attorney fees and expenses that it seeks.

**I.** **Section 1 of the Limited Guaranty, not Section 2, governs Lexon's recovery of attorney fees and expenses.**

It is well-settled in West Virginia and elsewhere that when two provisions of a contract are potentially applicable, and one provision specifically addresses the matter at hand while the other is more general, a court should apply the more specific provision over the general provision.  *See Hoops v. United Bank*, No. CV 3:22-0072, 2022 WL 17097006, at *7, n.8 (S.D.W. Va. Nov. 21, 2022); *U. S. for Use of Westinghouse Elec. Corp. v. Marietta Mfg. Co.*, 339 F. Supp. 18, 27 (S.D.W. Va. 1972); *Levine v. Emps. Ins. Co. of Wausau*, 887 F.3d 623, 630 (4th Cir. 2018); *U. S. v. Yooho Weon*, 722 F.3d 583, 590 (4th Cir. 2013).  Here, Section 1 of the Limited Guaranty specifically

addresses the guarantor's liability for "reasonable fees and expenses of Beneficiary's counsel." *See* JX 17 at 2, ¶ 1. Section 2 of the Limited Guaranty, on the other hand, provides that the guarantor shall indemnify the beneficiary from any "Loss," which is broadly defined as "any and all liability, damage, cost and expense of whatsoever kind or nature." *See id.* at 3, ¶ 2. Unlike Section 1, Section 2 does not specifically mention the fees and expenses of Lexon's counsel. Because Section 1 of the Limited Guaranty specifically addresses Lexon's recovery of attorney fees and litigation expenses, Section 1—rather than the more general Section 2—governs Lexon's motion for attorney fees and expenses.

It is also well-settled that "specific words or clauses of an agreement are not to be treated as meaningless, or to be discarded, if any reasonable meaning can be given them consistent with the whole contract." Syl. Pt. 1, *Wood v. Sterling Drilling & Prod. Co.*, 422 S.E.2d 509 (W.Va. 1992); *see also New v. Metro. Life Ins. Co.,* No. CV 1:24-00212, 2025 WL 2263007, at *5 (S.D.W. Va. Aug. 7, 2025) (recognizing the "established principle" that courts should not interpret contracts in a manner that would render provisions superfluous). Here, to hold that Lexon can recover its attorney fees and litigation expenses under Section 2 of the Limited Guaranty would render Section 1 meaningless and superfluous. The language providing for recovery of "reasonable fees and expenses of Beneficiary's counsel" in Section 1 would serve no purpose if Lexon could recover its attorney fees and expenses under the broad rubric of "Loss" in Section 2. By contrast, holding that Section 1 governs Lexon's recovery of attorney fees and litigation expenses does not render Section 2 superfluous, as the latter could still apply to other types of "Loss."

In addition, under West Virginia law, any ambiguity or uncertainty in a contract must be resolved against the drafter. *See CONSOL Energy, Inc. v. Hummel*, 792 S.E.2d 613, 620-21 (W. Va. 2016); *Jochum v. Waste Mgmt. of W. Va., Inc.*, 680 S.E.2d 59, 64 (W. Va. 2009). Here, Lexon

6

has stipulated that it drafted the Limited Guaranty. (JX 74 (ECF 103), ¶¶ 10, 20.) Thus, any uncertainty as to whether Section 1 or Section 2 governs Lexon's recovery attorney fees and litigation expenses must be resolved against Lexon.[2] For all these reasons, any award of attorney fees and litigation expenses to Lexon should be made under Section 1 of the Limited Guaranty rather than Section 2.

## II. Regardless of which section of the Limited Guaranty applies, Lexon can only recover *reasonable* attorney fees and expenses.

Section 1 of the Limited Guaranty provides for the recovery of the "reasonable" fees and expenses of Lexon's counsel. Even if Section 2 (which does not specifically mention attorney fees or attorney expenses) could be read to also encompasses attorney fees and expenses, the Limited Guaranty must be read as a whole and the specific use of the word "reasonable" in Section 1 as a qualifier cannot be discarded. *See* Syl. Pt. 1, *Wood*, 422 S.E.2d 509. To hold that Lexon can choose to recover *unreasonable* attorney fees and expenses under Section 2 instead of settling for "reasonable" attorney fees and expenses under Section 1 would be patently absurd and would render Section 1's provision for "reasonable" attorney fees and expenses utterly superfluous. *See Dunbar Fraternal Ord. of Police, Lodge No. 119 v. City of Dunbar*, 624 S.E.2d 586, 591 (W. Va. 2005) (recognizing that a contract should not be interpreted in a manner that creates an absurd

---

[2] Lexon has previously argued that this canon does not apply to a contract that was negotiated between sophisticated parties. *See* ECF 102 at 12, n.5. But Lexon has not cited any West Virginia case adopting this exception. On the contrary, the court in one of the cases that Lexon cited held that an arbitrator properly invoked the principle that ambiguities in a contract should be strictly construed against the drafter despite evidence that the other party's counsel reviewed the contract and made redlined suggestions about one of its provisions. *See Elkland Holdings LLC v. Eagle Mining LLC*, No. 2:14-CV-15043, 2015 WL 13037115, at *15 & n.15 (S.D.W. Va. July 29, 2015). Similarly, in *Jochum*, the drafter of the contract argued that the other parties "engaged in the negotiation of the terms of the Agreement and entered into it voluntarily, knowingly, and intelligently," yet the court still went on to invoke the rule that "[u]ncertainties in an intricate and involved contract should be resolved against the party who prepared it." 680 S.E.2d at 64.

7

result); *New*, 2025 WL 2263007 at *5 (applying "the established principle of contract interpretation that 'courts do not interpret contracts in a manner that would render provisions superfluous or as having no effect.'").

And even if the Limited Guaranty did not use the word "reasonable" at all, the attorney fees and expenses sought thereunder would still have to be reasonable. West Virginia law implies a duty of good faith and fair dealing in every contract, and "good faith" includes reasonableness. *See Miller v. WesBanco Bank, Inc.*, 859 S.E.2d 306, 329-330 (W. Va. 2021).[3] Moreover, reasonableness has long been the cornerstone of attorney fee award determinations under West Virginia law. In 1986, the Supreme Court of Appeals of West Virginia ("SCAWV") announced a multi-factor test to ensure that attorney fee awards are reasonable:

> Where attorney's fees are sought against a third party, the test of what should be considered a reasonable fee is determined not solely by the fee arrangement between the attorney and his client. The reasonableness of attorney's fees is generally based on broader factors such as: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Syl. Pt. 4, *Aetna Cas. & Sur. Co. v. Pitrolo*, 342 S.E.2d 156 (W. Va. 1986).

Since then, West Virginia courts have applied the *Pitrolo* factors to ensure reasonableness in every fee-shifting context. *See e.g., Auto Club Prop. Cas. Ins. Co. v. Moser*, 874 S.E.2d 295, 307 (W. Va. 2022) (fee-shifting doctrine applicable against insurers); *W. Va. Dep't of*

---

[3] Notably, a Tennessee court has specifically held—in a case involving Lexon—that the word "reasonable" must be read into an indemnity agreement covering attorney fees. *Lexon Ins. Co. v. Windhaven Shores, Inc.*, 601 S.W.3d 332, 342 (Tenn. Ct. App. 2019). This is consistent with West Virginia law.

8

*Transportation, Div. of Highways v. Newton*, , 797 S.E.2d 592, 603 (W. Va. 2017) (statutory fee-shifting and "bad faith" doctrine); *Mimi's Inc. v. BAI Riverwalk, L.P.*, No. 18-0775, 2020 WL 1487804, at *3, *8, n.9 (W. Va. Mar. 23, 2020) (contractual fee-shifting provision). These factors determine the reasonableness of both the time expended and the rate charged by a party's counsel. *See* Syl. Pt. 3, *Bishop Coal Co. v. Salyers*, 380 S.E.2d 238 (W. Va. 1989). While the SCAWV has held that courts need not make detailed findings on every factor, some of which may be irrelevant in a given situation (*see Newton*, 707 S.E.2d at 604), the SCAWV has never held in any fee-shifting context that a court can forgo the *Pitrolo* reasonableness factors altogether. Thus, the law is clear that Lexon can only recover *reasonable* attorney fees, which are to be determined through the *Pitrolo* factors.[4]

## III. The amount of attorney fees that Lexon seeks is unreasonable, excessive, unwarranted, and unjust.

### A. Lexon can only recover attorney fees at the local market rate for Nashville.

The *Pitrolo* test asks not whether hourly rates and aggregate fees are "customary" for the attorney seeking fees; rather, it asks whether the rate and aggregate fees are customary for similar legal services in the locality where the action was filed. *See Thomas v. Houck*, 2016 WL 6780095, at *7, n.13 (W. Va. Nov. 16, 2016); *Hollen v. Hathaway Elec., Inc.*, 584 S.E.2d 523, 529 (W. Va. 2003). Indeed, the SCAWV has repeatedly recognized that "a losing defendant cannot be saddled

---

[4] Ordinarily, the party seeking attorney fees bears the burden of proving reasonableness. *See Westfield Ins. Co. v. Sistersville Tank Works, Inc.*, No. 5:18-CV-100, 2024 WL 4800591, at *7 (N.D.W. Va. May 16, 2024); *Nesmith v. Hospice Compassus*, No. 3:17-CV-1371, 2019 WL 1053646, at *5 (M.D. Tenn. Feb. 14, 2019). Lexon argues in a footnote that certain language in Section 2 of the Limited Guaranty shifts the burden to Defendant to prove that Lexon's attorney fees are not reasonable. As demonstrated above, however, Section 1 of the Amended Guaranty, rather than Section 2, governs Lexon's motion for attorney fees. And regardless of which party bears the burden of proof, the attorney fees that Lexon seeks are manifestly unreasonable. *See* Section III, *infra*.

9

with attorneys' fees that are unreasonably large simply because the plaintiff chooses a lawyer from New York City or another urban area where overhead costs and prevailing hourly rates make the lawyer's customary and usual charges far above what equally competent [local] lawyers would charge." *Hollen*, 584 S.E.2d at 529 (*citing Bishop Coal Co. v. Salyers*, 380 S.E.2d 238, 249 (W. Va. 1989)); *see also Fairmont Tool, Inc. v. Davis*, 868 S.E.2d 737, 753 (W. Va. 2021). Rates that are "enormously greater than the 'local rate' w[ill] not stand[.]" *Hollen*, 584 S.E.2d at 529.

While the SCAWV has recognized that lawyers commonly travel from the more populous cities *within West Virginia* to represent clients in smaller counties (*Hollen*, 584 S.E.2d at 529), Lexon did not file this case in rural Tennessee and then seek counsel from a nearby city. Rather, Lexon filed this case in Nashville, the largest city in Tennessee. Thus, Lexon can only recover attorney fees at the customary rates charged in and around Nashville.

### B. Courts have recently recognized that the local market rate in Nashville is far lower than the rates sought by Lexon.

Just last year, this Court held that rates of $450 per hour for partners and $375 per hour for associates fell within the market rate in this district. *See Moore v. Mount Zion Baptist Church*, No. 3:22-CV-00965, 2024 WL 4133030, at *5 (M.D. Tenn. Sept. 10, 2024). The Court cited several recent local decisions awarding rates ranging from $450 to $550 per hour for partners and $300 to $375 per hour for associates. *See id.* Although *Moore* involved alleged violations of the Family and Medical Leave Act, the Fair Labor Standards Act, and the Equal Pay Act of 1963 as opposed to alleged breaches of contract, there is no plausible reason why attorneys litigating breach of contract claims deserve rates substantially higher than attorneys litigating federal statutory claims.

In 2023, in a case involving both federal statutory claims and a breach of contract claim, the Court found a rate of $500 per hour to be appropriate for a partner with "impressive

professional credentials attained over more than thirty years of practice," and found a rate of $300 per hour to be appropriate for an associate and "special attorney" with approximately 11 years of experience. *See Southall v. USF Holland, Inc.*, No. 3:19-CV-01033, 2023 WL 2668497, at *5-*6 (M.D. Tenn. Mar. 28, 2023). The Court cited several recent local decisions awarding rates ranging from $395 to $600 per hour for partner-level attorneys and $250 to $400 for less experienced attorneys. *See id.* The Court declined to award the requested rates of $615 per hour for the partner and $325 per hour for the associate and "special attorney," finding these rates to be too high despite the "extraordinary nature of the effort required to litigate this particular case." *See id.*

By contrast, Lexon seeks to recover attorney fees at rates ranging from ███ to ███ for partners and from ███ to ███ per hour for associates. To elaborate, Lexon seeks the following hourly rates for its Nashville-based counsel, Bass Berry:

- for work in 2023, ███ for partner Brantley Phillips, ███ for associate Garrah Carter-Mason, and ███ for paralegal Laura Bilbrey;

- for work in 2024, ███ for Mr. Phillips, ███ for Ms. Carter-Mason, and ███ for Ms. Bilbrey;

- for work in 2025, ███ for Mr. Phillips, ███ for Ms. Carter-Mason, and ███ for Ms. Bilbrey.

*See* Declaration of W. Brantley Phillips, Jr., ECF 132-6, ¶ 8. These rates dwarf the Nashville market rate determined in the cases discussed above.

In an attempt to support Bass Berry's rates, Lexon has produced a declaration by a partner at the Nashville law firm of Sherrard Roe Voight & Harbison, PLC ("SRVH") averring that (1) SRVH routinely charges ███ to ███ for partners and ███ to ███ for associates; and (2) both SRVH's and Bass Berry's rates are comparable to those of other commercial litigation attorneys in the Nashville legal market. *See* Declaration of L. Webb Campbell, ECF 132-7, ¶¶ 1, 5-6, 9.

11

Notably, however, SRVH was one of the law firms whose rates this Court discussed last year in *Moore*. *See Moore*, 2024 WL 4133030, at *1. And in *Moore*, this Court determined that the appropriate market rate for SRHV member Chris Sabis[5] was only $450 per hour and that the recoverable rate for SRHV's associates was only $250 per hour. *See id.* at *2, *5. Further, Lexon has not cited a single case where rates comparable to those it seeks for work done by Bass Berry were awarded in this district. *See Evans v. Caregivers, Inc.*, No. 3:17-CV-402, 2018 WL 1899360, at *3 (M.D. Tenn. Apr. 20, 2018) (reducing requested rates after observing that the requesting parties "have cited no cases in this district where awards comparable to the amounts requested by them individually have been awarded in this district.")

As high as Bass Berry's rates are, the rates Lexon is claiming for the New York attorneys at Cadwalader and V&E are even higher. For those firms, Lexon seeks the following hourly rates:

- for work in 2023, ▮▮▮ for partner Jason Halper, ▮▮▮ for special counsel Sara Brauerman, and ▮▮ to ▮▮ for associates;

- for work in 2024, ▮▮ to ▮▮ for Mr. Halper, ▮▮ to ▮▮ for Ms. Brauerman (who became a partner in late 2024), and ▮▮ to ▮▮ for associates;

- for work in 2025, ▮▮ for Mr. Halper, ▮▮ for Ms. Brauerman, and ▮▮ to ▮▮ for associates.

*See* Declaration of Jason Halper, ECF 132-2, ¶¶ 16-17. Not only are these rates enormously greater than the local rates determined in *Moore*, *Southall*, and the cases cited therein, but they are also enormously greater than the above-market rates charged by Bass Berry. In fact, Mr. Halper's hourly rate is more than twice that of Mr. Phillips, a partner at Bass Berry with nearly 30 years of experience and who has litigated cases before the United States Supreme Court. *See* Declaration

---

[5] According to his firm bio, Mr. Sabis is a well-credentialed and highly experienced litigator whose practice includes commercial litigation. *See* https://srvhlaw.com/attorneys/chris-sabis/.

of W. Brantley Phillips, Jr., ECF 132-6, ¶ 10. Thus, there is no question that the rates Lexon seeks exceed the local market rate.

### C. Even if this Court determines that Bass Berry's rates are reasonable, Lexon still cannot recover attorney fees at New York City rates.

According to Lexon's own evidence, Bass Berry is one Tennessee's leading law firms and can be expected to charge rates at or above the highest ranges in Nashville. *See* ECF 132-7, Declaration of L. Webb Campbell, ¶ 7. To be clear, Defendant maintains that the rates Lexon claims for Bass Berry exceed the customary local rate. But to the extent Bass Berry's rates are recoverable, they represent the absolute ceiling for rates in this case. Although Lexon cites Sixth Circuit law for the notion that courts may apply the rates of an "out-of-town specialist" under certain circumstances, Lexon's reliance on this precedent is misplaced for several reasons.

First, West Virginia law, rather than federal law, governs Lexon's contractual claim for attorney fees. And as discussed, the SCAWV has plainly stated that a losing defendant "cannot be saddled with" attorney fees that are "far above what equally competent [local] lawyers would charge" simply because the plaintiff "chooses a lawyer from New York City," and that rates that are "enormously greater than the 'local rate' w[ill] not stand[.]" *Hollen*, 584 S.E.2d at 529.

Second, even if Sixth Circuit precedent regarding "out-of-town specialists" did control, the Cadwalader and V&E attorneys at issue are not "out-of-town specialists." This is a breach of contract case, not a case about patent law or some other esoteric legal framework. The attorneys from Cadwalader and V&E are no more "specialists" in contract law than the attorneys at Bass Berry.

Third, and relatedly, there no reason why Lexon needed to hire Cadwalader and V&E in this case. The Sixth Circuit precedent that Lexon relies upon recognizes that out-of-town rates

13

should not be awarded where competent counsel capable of handling complex litigation are available locally at a significantly lower rate. *See The Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 716, 719, (6th Cir. 2016); *Hadix v. Johnson*, 65 F.3d 532, 535, 536 (6th Cir. 1995). Here, Lexon's local counsel, Bass Berry, promotes itself as the largest litigation firm in Nashville and as "a national law firm with more than 350 attorneys dedicated to delivering exceptional service to numerous publicly traded companies and Fortune 500 businesses in significant litigation and investigations, complex business transactions, and international regulatory matters." *See* https://www.bassberry.com/news/bass-berry-sims-ranked-largest-healthcare-and-litigation-firm-in-nashville/. The materials Lexon submitted in support of its fee motion not only confirm Bass Berry's status as a leading law firm but also highlight the impressive credentials of Mr. Phillips in particular. *See* Declaration of W. Brantley Phillips, Jr., ECF 132-6, ¶ 10; Declaration of L. Webb Campbell, ECF 132-7, ¶¶ 7-8. Plainly, Mr. Phillips and the army of lawyers at Bass Berry were capable of handling this case. As such, there is no justification for hiring New York lawyers at rates significantly higher than those charged by Bass Berry.[6]

Although Lexon attempts to offer several purported justifications, none of them have merit. Lexon first argues that hiring out-of-town counsel was reasonable because Defendant also hired a familiar, out-of-state firm. But this ignores the fact that Defendant's chosen counsel is a small firm from his native West Virginia, as opposed to a large firm in New York City. Lexon, which

---

[6] For this reason, Lexon's Declaration of Robert E. Boston is irrelevant. Even if, as Lexon claims, this declaration shows that Cadwalader and V&E's rates are "consistent with the prevailing market rates for large law firm attorneys in New York, New York, regardless of whether the particular litigation is pending in New York or elsewhere" (*see* ECF 132 at 13), West Virginia law prohibits Lexon from saddling Defendant with such rates, and Sixth Circuit law recognizes that a party cannot recover such rates where, as here, competent counsel are available locally at a significantly lower rate. It is also notable that Mr. Boston, a partner with over 44 years of experience, charges significantly less than the rates Lexon requests for Mr. Halper. *See* ECF 132-5, ¶¶ 1, 4.

14

is based in Mt. Juliet, Tennessee (*see* ECF 1, ¶ 26), was free to hire attorneys with whom it is familiar, but that familiarity cannot justify saddling Defendant with attorney fees at New York City rates that grossly exceed the customary local rate in Nashville.

Relatedly, Lexon argues that its longstanding relationship with its New York City attorneys "injected additional efficiencies and strategic benefits into the handling of this matter." But any such "efficiencies and strategic benefits" are more than cancelled out by the fact that these New York City attorneys' rates are more than double those of the largest litigation firm in Nashville. Surely it would have been more cost efficient for Lexon to familiarize Bass Berry with its surety business and history with the Justice Companies than to hire vastly more expensive New York City attorneys to litigate this case from start to finish.

Lexon also maintains that hiring its New York City attorneys was appropriate due to the "complexity of the parties' relationship," the importance of the dispute to Lexon, and the "high-profile nature of the Defendant." But given Bass Berry's and Mr. Phillips' credentials and experience with complex commercial litigation, there is no reason why Bass Berry (or an equally prestigious Nashville firm) could not have handled this matter.

Lexon also points to the discounts that its New York City attorneys have applied to their rates and asserts that much of the work was delegated to "junior attorneys" who bill at lower rates. But even after discounts, Lexon's New York City counsel still charged upwards of ▮▮▮▮ per hour for partners and upwards of ▮▮▮▮ per hour for certain associates. *See* Declaration of Jason Halper, ECF 132-2, ¶¶ 16-17. And despite Lexon's assertion that it delegated much of the work to "junior attorneys," Lexon is claiming more than 927 hours for Mr. Halper (a partner) and more than 1,265

15

hours for Ms. Brauerman (special counsel and later a partner). *See id.*[7] Further, the two associates who did the most work on the case—Timbre Shriver and Elizabeth Moore—charged over ███ per hour for much of this litigation. *See id.* For all the foregoing reasons, the New York City rates that Lexon seeks are unreasonable and unjustified under both controlling West Virginia law and under Sixth Circuit law.

### D. Lexon seeks to recover attorney fees for excessive, redundant, or otherwise unnecessary attorney time.

When reviewing a fee petition, a court should exclude hours that are excessive, redundant, or otherwise unnecessary. *See Allen v. Monsanto Co.*, No. CIV A 205-0578, 2007 WL 1859046, at *2 (S.D.W. Va. June 26, 2007); *see also* Syl. Pt. 3, *Bishop Coal*, 380 S.E.2d 238 (recognizing that both time expended and hourly rate must be reasonable); *Moore*, 2024 WL 4133030, at *6 (applying a 50% across-the-board reduction of hours to account for redundant and excessive billing). Excessive, redundant, and unnecessary billing occurs not only when attorneys spend an inordinate amount of time on a task, but also where more attorneys than necessary attend a proceeding or work on a task. *See Monsanto,* 2007 WL 1859046 at *3; *Schlosser v. VRHabilis, LLC*, No. 3:20-CV-190-TRM-JEM, 2024 WL 1600671, at *3-*4 (E.D. Tenn. Feb. 1, 2024). Here, Lexon's counsel's billing records reveal significant overstaffing and excessive attorney time. While it would be impossible to exhaustively catalog every instance of overstaffing or excessive billing in the hundreds of pages of billing records Lexon has produced (especially given the many redactions therein), several illustrative examples are identified below.

---

[7] Lexon's assertion that its New York attorneys billed at a "an effective blended rate" of ███ (ECF 132 at 15) is a red herring, as this "blended rate" is obviously inflated by the many hundreds of hours billed at rates far greater than the "blended rate," and even the "blended rate" is wildly out of step with the customary local rate in Nashville.

Between October 30 and November 7, 2023, four Cadwalader attorneys (J. Halper, S. Bussiere, T. Shriver, and D. Lee) spent a combined total of over 100 hours working on Lexon's response to Defendant's 7-page partial motion to dismiss.  *See* ECF 132-3 at LIC-00000132-138.

On November 16, 2023, Lexon had five attorneys (three from Cadwalader and two from Bass Berry) attend the initial case management conference.  *See* ECF 132-3 at LIC-00000142; ECF 133 at LIC-00000016.

On February 21, 2024, Lexon had four attorneys (three from Cadwalader and one from Bass Berry) attend a meet and confer regarding discovery issues.  *See* 132-3 at LIC-00000181; ECF 133 at LIC-00000025.

On April 10, 2024, two Cadwalader attorneys spent approximately 12 hours each preparing for and attending the deposition of Steve Ball.  *See* ECF 132-3 at LIC-00000297.  Further, at least two Cadwalader attorneys attended every deposition in this case.  *See id.*, LIC-00000302, 303, 311, 312, 313, 315.  With the exception of the deposition of Defendant, only one attorney for Defendant attended each deposition. *See* Declaration of D. Pogue.

Between May 1 and August 2, 2024, four Cadwalader attorneys (J. Halper, S. Bussiere, T. Shriver, and E. Moore) spent a combined total of more than 400 hours working on Lexon's motion for summary judgment and supporting materials (affidavits, Rule 56.1 statement, etc.).  *See* ECF 132-3 at LIC-00000208-210; ECF 132-4 at LIC00000214-249.

On May 7, 2024, two Cadwalader attorneys (S. Bussiere and E. Moore) traveled from New York City to Washington D.C. to attend an in-person meet and confer.  *See* ECF 132-3, at LIC-00000211-212.  Only one attorney attended this meet and confer on behalf of Defendant.  *See* Declaration of D. Pogue.

17

On June 6, 2024, Lexon had four attorneys attend mediation. *See* ECF 132-4 at LIC00000230; ECF 133 at LIC00001065. On December 13, 2024, Lexon had five attorneys attend mediation. *See* ECF 132-4 at LIC-00000274; ECF 133 at LIC00000063. On May 12, 2025, Lexon had four attorneys attend mediation. *See* ECF 132-4 at LIC-00000741; ECF 133 at LIC00001076.

On August 20 and 21, 2025, Lexon had six attorneys (four from V&E and two from Bass Berry) and a paralegal attend the bench trial of this matter. *See* ECF 132-4 at LIC-00000786; ECF 133 at LIC-00001092-1093.

Due to the pervasive overstaffing and overbilling by Lexon's attorneys, Defendant respectfully submits that the Court should apply a significant reduction to the number of hours requested in Lexon's fee motion. *See e.g.*, *Monsanto*, 2007 WL 1859046 at *3; *Moore*, 2024 WL 4133030 at *6.[8] Defendant recognizes that Lexon has attempted to blame the extreme amount of time its attorneys have billed in this case on Defendant's requests to continue trial, various alleged "strategic decisions by Defendant" relating to discovery, and issues relating to the initial service of process. To be clear, Defendant disagrees with Lexon's characterizations of these alleged events and denies any implications of wrongdoing.[9] But is unnecessary to delve into these issues because

---

[8] Defendant acknowledges that Lexon has omitted certain timekeepers from its fee request. However, the total charges for the omitted timekeepers add up to approximately ███████, which, while not an insubstantial amount of money in the abstract, is only about 7% of the ████████ in attorney fees that Lexon is claiming. *See* ECF 132-2, ¶ 16; ECF 132-3, pp.1-2.

[9] For example, Defendant denies that he pursued a reclamation agreement that was "not relevant," as Defendant had a good faith belief that that Lexon's reclamation agreement may have undermined the primary obligors' ability to perform under the Agreement. As another example, Defendant denies the characterization that he sought discovery after the deadline: his third and final set of discovery requests was served before the discovery cutoff, there were only two requests therein, and those requests were more targeted requests for documents and information responsive to broader, previously served requests. While Defendant doubts that the Court wishes to hear argument on the merits of multiple discovery disputes (none of which progressed to the point of a discovery motion) in deciding the pending fee petition, Defendant provides these examples to demonstrate that there are areas of legitimate disagreement.

Defendant is not asking the Court to cut the hours spent responding to his requests to continue, effecting service, or dealing with his alleged "strategic decisions" in discovery (except to the extent Lexon's counsel overstaffed a given task, such as by sending two New York attorneys to the in-person meet and confer in Washington, D.C.).

E.    None of the other *Pitrolo* factors justify the gigantic award that Lexon seeks.

Defendant has already demonstrated that three of the *Pitrolo* factors—the customary local fees, awards in other cases in this region, and the time and labor required—weigh against the amount of attorney fees that Lexon seeks. Further, Defendant has explained that neither Lexon's relationship with its New York City attorneys nor the experience or abilities of those attorneys justify saddling him with New York City rates, especially where, as here, competent counsel were available locally at a significantly lower rate. Relatedly, Defendant has explained that this breach of contract action was not so novel or difficult that Bass Berry (or some other Nashville firm) could not have properly handled it. This covers the first, second, third, fifth, ninth, eleventh, and twelfth *Pitrolo* factors. The remaining factors do not change the calculus.

The fourth *Pitrolo* factor (preclusion of other employment by the attorney) does not justify New York City rates since Lexon's local counsel was amply capable of handling this case. And there is no basis for a contingency fee enhancement under the sixth *Pitrolo* factor since Lexon's attorneys charged fixed rates.

Although Lexon implies that there were special time limitations (the seventh *Pitrolo* factor) because Defendant and the primary obligors lack the ability to pay (ECF 132 at 18), Lexon has not offered any basis to conclude that its prospects for collection were any better at the outset of this case. Further, Lexon cannot credibly claim that it was operating under "truncated timelines" given that it jointly moved to continue the case. *See* ECF 72.

19

Lexon also asserts that the eighth *Pitrolo* factor (the amount involved and the results obtained) favors the award it seeks, but "the results obtained" cannot be evaluated until the Court enters its rulings on the issues presented at trial. And given Bass Berry's size, credentials, and experience, there is no basis to conclude that Lexon could not have trusted Bass Berry to handle a case of this magnitude or could not have achieved the same results (whatever the eventual results may be) without hiring New York City lawyers.

Finally, while Lexon argues that this case *could be* considered undesirable (the tenth *Pitrolo* factor) due to Defendant's status as a public official, Lexon acknowledges that a defendant's high-profile status can make a case *more desirable*.

## IV. The costs and expenses Lexon seeks are also excessive.

Lexon asks this Court to award it a total of $258,933.36 in costs, made up of $50,241.40 in taxable costs (which Lexon also seeks through a separately filed Bill of Costs) and $208,691.96 in non-taxable costs. Many of these costs are excessive due to a combination of Lexon's counsel's overstaffing and Lexon's counsel's preference for luxury accommodations. To illustrate:

- Lexon seeks over $3,100 for lodging for two Cadwalader attorneys at an Omni hotel for the April 16, 2024 deposition of Defendant, plus $1,282.02 in airfare and $340.25 for car service for those two attorneys. *See* ECF 127-5 at 4.

- Lexon seeks $1,546 for rail travel for two Cadwalader attorneys to attend the May 7, 2024 meet and confer in Washington, D.C. *See id.*

- Lexon seeks $14,373.46 for lodging at the Four Seasons for four V&E attorneys and a paralegal during trial; $3,196 for airfare for these individuals to attend the trial; $674 in flight change fees for these individuals due to the trial ending earlier than anticipated; and $1,653 for meals for these individuals during trial. *See* ECF 127-5 at 8, 10-12.

- Lexon also seeks $4,013 for lodging at the Four Seasons for its corporate representative, Jeremy Sentman, and one of its witnesses, Brian Beggs. *See*

ECF 127-5 at 16. This includes four nights at the Four Seasons for Mr. Beggs, even though he only testified on one day. *See* ECF 128-2 at 22-23. [10]

In addition, it appears that the legal research charges that Lexon seeks to recover may not reflect actual costs. Cadwalader and V&E presumably have Westlaw plans with standard monthly rates. Lexon does not explain how Cadwalader and V&E apportioned those monthly costs among its clients such that, for example, Lexon owed $9,222.10 for Westlaw research in November 2024 and $21,365.79 for Westlaw research in December 2024. *See* ECF 127-5 at 5. To the extent Cadwalader and V&E were billing Lexon on a per search or per document basis, Lexon cannot recover for charges that exceed Cadwalader and V&E's actual costs attributable to this case.

## V. Lexon cannot recover attorney fees and expenses that would exceed the contractual limit on Defendant's exposure under the Limited Guaranty.

Paragraph 5(e) of the Limited Guaranty provides that "*[n]otwithstanding anything contained herein to the contrary*, the obligations of Guarantor *shall be limited to* a total sum equal to . . . (i) twenty million U.S. dollars ($20,000,000.00) plus (ii) the amount of the Total Indebtedness specified in the Amended Underlying Agreement." JX 17 at ¶5(e) (emphasis added). Thus, under the plain language of the Limited Guaranty, the maximum amount that Defendant can be required to pay is $20 million plus the contractually specified amount of Total Indebtedness.

---

[10] Even if it were reasonable to saddle Defendant with the expense of paying for Lexon's attorneys and corporate representative to stay at a luxury hotel like the Four Seasons, Defendant should not have to pay for Mr. Beggs' accommodations under the Limited Guaranty. The Limited Guaranty guarantees payment of *Lexon's* reasonable expenses, not the expenses of third-party witnesses. Although a third-party witness's expenses can be taxable as costs under Rule 54(d) and 28 U.S.C.A. § 1920, the taxable subsistence allowance cannot exceed "the maximum per diem allowance prescribed by the Administrator of General Services . . . for official travel in the area of attendance by employees of the Federal Government." *See* 28 U.S.C. § 1821(d)(2); *U.S. ex rel. Davis v. U.S. Training Ctr., Inc.*, 829 F. Supp. 2d 329, 334 (E.D. Va. 2011). That allowance, in August 2025, was $217 per day. *See* https://www.gsa.gov/travel/plan-book/per-diem-rates/per-diem-rates-results?action=perdiems_report&fiscal_year=2025&state=TN&city=Nashville&zip=.

Courts have held that when a guaranty places a limit on the guarantor's liability, that limit includes any liability for attorney fees and costs, and a plaintiff cannot recover attorney fees that would increase the guarantor's exposure beyond the limit. *See Cont'l Indus. Cap., LLC v. Lightwave Enters., Inc.*, 85 A.D.3d 1639, 1640, 925 N.Y.S.2d 301 (2011); *First-Citizens Bank & Tr. Co. v. 4325 Park Rd. Assocs., Ltd.*, 515 S.E.2d 51, 55 (N.C. App. 1999).

Defendant maintains that he owes no money for the Total Indebtedness under the Limited Guaranty (*see* ECF 125 at 30-31), but if the Court disagrees and orders Defendant to pay the Total Indebtedness, then the maximum amount left for attorney fees and litigation expenses under the limit in paragraph 5(e) of the Limited Guaranty will be $5.75 million (the delta between the $20 million dollar cap in paragraph 5(e)(i) and the $14.25 million that the Court found Defendant liable for in its Summary Judgment Opinion). To be clear, Defendant submits that Lexon should be awarded far less than $5.75 million once an appropriate local rate is applied and the claimed hours are reduced to account for overstaffing and overbilling. But the absolute most that Lexon could recover under the cap in the Limited Guaranty is $5.75 million.

## VI. Lexon is not entitled to 7% prejudgment interest, and the determination of the post-judgment interest rate is premature.

West Virginia Code § 56-6-27 exclusively governs prejudgment interest in contract cases. *See* Syl. Pt. 1, *Miller v. WesBanco Bank, Inc.*, 859 S.E.2d 306 (W. Va. 2021). Under § 56-6-27, prejudgment interest is not mandatory but a matter of discretion. *See Velasquez v. Roohollahi*, 2014 WL 5546140, at *3-4 (W. Va. Nov. 3, 2014). Further, although § 56-6-27 does not prescribe how to calculate prejudgment interest, federal courts have held that it should reflect the injured party's borrowing costs and have looked to Treasury yields as an indicator of those costs. *See Com. Builders, Inc. v. McKinney Romeo Props., LLC*, 2022 WL 16706973, at *14 (N.D.W. Va.

May 18, 2022); *Richards v. EQT Prod. Co.*, 2019 WL 4120819, at *7 (N.D.W. Va. Aug. 29, 2019). Given that the one-year constant maturity Treasury yield has never exceeded 5.5% since this lawsuit was filed and currently sits around 3.55%,[11] Lexon's is not entitled to prejudgment interest at 7%.

Similarly, post-judgment interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding [ ] the date of the judgment." 28 U.S.C. § 1961(a). Defendant cannot predict what the weekly average 1-year constant maturity Treasury yield will be for the week preceding the eventual judgment in this case, but based on the most recent available data, it will likely be lower than the 5% claimed by Lexon.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court deny Lexon's motion as written, and reduce Lexon's counsel's hourly rates to rates consistent with this Court's observations of the customary local rate in *Moore*, *Southall*, and the cases cited therein. Alternatively, if the Court determines that Bass Berry's rates reflect the customary local rate, then Defendant respectfully requests that the Court reduce Lexon's New York counsel's rates to those charged by Bass Berry. Further, Defendant respectfully requests that the Court reduce the number of attorney hours claimed by Lexon to account for excessive, redundant, or otherwise unnecessary attorney time, and reduce the costs and expenses that Lexon seeks to recover to account for excessive amounts. Finally, Defendant respectfully requests that any interest be appropriately calculated as set forth above.

---

[11] *See* https://fred.stlouisfed.org/series/DGS1.

Respectfully submitted,

JAMES C. JUSTICE II,

By Counsel:

*/s/ Peter C. Robison*
Peter C. Robison (No. 27498)
LEWIS THOMASON, P.C.
427 Church Street, Suite 2500
Nashville, TN 37219
(615) 259-1366
probison@lewisthomason.com

*/s/ David R. Pogue*
David R. Pogue (admitted *pro hac vice*)
Raymond S. Franks II (admitted *pro hac vice*)
CAREY DOUGLAS KESSLER & RUBY PLLC
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone:    (304) 345-1234
Facsimile:    (304) 342-1105
drpogue@cdkrlaw.com
rfranks@cdkrlaw.com

24

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 28, 2025, the foregoing document was filed via the Court's ECF system, which will send a notice of electronic filing to all ECF-registered counsel of record listed below:

| | |
|---|---|
| Jason M. Halper (*admitted pro hac vice*) | W. Brantley Phillips, Jr. (BPR# 018844) |
| Sara E. Brauerman (*admitted pro hac vice*) | Garrah Carter-Mason (BPR# 037518) |
| Timbre Shriver (*admitted pro hac vice*) | BASS, BERRY & SIMS PLC |
| VINSON & ELKINS LLP | 150 Third Avenue South, Suite 2800 |
| The Grace Building | Nashville, TN 37201 |
| 1114 Avenue of the Americas | Tel: (615) 742-6200 |
| 32nd Floor | Fax: (615) 742-6293 |
| New York, NY 10036 | bphillips@bassberry.com |
| Phone: 212-237-0000 | garrah.cartermason@bassberry.com |
| Email: jhalper@velaw.com | |
| sbrauerman@velaw.com | |
| tshriver@velaw.com | |

*/s/ Peter C. Robison*
Peter C. Robison