# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **LEXON INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:23-cv-00772** |
| | ) | |
| **JAMES C. JUSTICE, II,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Lexon Insurance Company ("Lexon") brought this breach of contract and declaratory judgment action against Defendant James C. Justice, II ("Senator Justice"). At summary judgment, the Court concluded that Lexon was entitled to judgment on its breach of contract and declaratory judgment claims, but reserved the issue of damages under Count I for trial.[1] (See Doc. No. 68).

On August 20 and 21, 2025, the Court conducted a bench trial on Lexon's damages under Count I, during which it heard live testimony from Lexon's Senior Vice President and Head of Surety Claims, Jerry Sentman ("Sentman"), Lexon's former Chief Executive Officer, Brian Beggs ("Beggs"), Lexon's Vice President of North American Controls and previous Vice President of Surety Operations, William Muller ("Muller"), and Executive Vice President and in-house counsel

---

[1] The Court reserved the issue of damages Lexon is entitled to under Counts II and III for future proceedings, pursuant to Lexon's bifurcation order. (Doc. No. 50; see Doc. No. 68 at 40; Doc. No. 107 at 4). To the extent they seek to dispute post-judgment interest or other matters related to those Counts, the Court will address those arguments pursuant to procedures set forth in Local. Rule 54.01.

for the Justice Companies, Steven Ball ("Ball").[2]  Based on the record before the Court and the parties' arguments, and having weighed the credible evidence, the Court finds by a preponderance of the evidence that Senator Justice breached the contracts between the parties, entitling Lexon to $25,179,709.24 in damages, plus pre- and post-judgment interest, under Count I.  In support of this ruling, the Court enters the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a).

I.    **FINDINGS OF FACT**[3]

     A.    **The Parties' Business Relationship**

    1.    This case involves coal industry surety bonds.  As a condition precedent to issuing a mining permit, regulators require coal mining companies to obtain bonds from a third-party surety to secure their performance on reclamation activities (*i.e.*, activities restoring the mined ground to preexisting or otherwise agreed upon conditions).  Tr. Vol. 1 at 25:14–25.

    2.    Unlike typical contracts, there are three parties to surety bond contracts.  Id. at 24:5.  These parties include: (1) the principal (*i.e.*, the insured), who has the primary obligation to (2) an obligee, who is typically a municipal, governmental, or regulatory body that requires permits for

---

[2] The "Justice Companies" are defined collectively as James C. Justice Companies, Inc., Southern Coal Corporation, Kentucky Fuel Corporation, Justice Family Group, LLC, and Mechel Bluestone, Inc.  (See Doc. No. 68 at 2).

[3] The Court's Findings of Fact do not encompass a complete recitation of the record.  The omission of any particular detail in this section should not be construed as the Court's failure to consider that detail or the inferences it would support.  That some details were omitted in the interest of conveying a concise presentation of the relevant, credible evidence and details that the Court considered ultimately dispositive.  Except where the Court discusses differing testimony on a specific issue, the Court has considered and rejected any contrary testimony regarding that matter in favor of the specific fact found.  Last, for ease of reference, the Court will cite to:  (i) the August 20, 2025 trial transcript (Doc. No. 119) as "Tr. Vol. 1," and the August 21, 2025 trial transcript (Doc. No. 120) as "Tr. Vol. 2"; (ii) the exhibits admitted at trial as joint exhibits as "JX", Lexon's exhibits as "P. Ex.", and Senator Justice's exhibits as "D. Ex."; and (iii) the parties' Proposed Joint Stipulated Facts (Doc. No. 103) as "Joint Stip."

2

the principal to operate, and (3) the surety bond company, which serves as the secondary guarantor of the principal.  Id. at 24:21–25:13.

3.      Here, in the context of coal mining operations, the principals are various entities, including Senator Justice's family-owned companies and their affiliates ("Justice Companies") and another affiliate, Beech Creek Coal Corp. ("Beech Creek") (collectively with "Justice Companies," "Obligors").  Id. at 24:20–25:25.  The obligee is a government regulator granting operation permits to the obligee, and the surety bond—here, executed by Lexon—guarantees the performance between the two.  Id.

4.      Under this tripartite structure, if the Obligors did not perform the obligations subject to the bond, Lexon, as the surety, is required to ensure performance of those obligations.  Id. at 25:14–26:15, 26:16–27:2.  As of the date of trial, Lexon's exposure on the Obligors' bonds totaled approximately $112 million.  Id. at 40:23–41:1, 116:20–23.

5.      To ensure the Obligors performed under the tripartite surety bond contracts, each of the Obligors executed a General Agreement of Indemnity ("GAI") with Lexon.  See JX 4 (attaching multiple GAIs executed by certain of the Justice Companies).[4]  GAIs specify the relationship between the Obligor and Lexon.  Tr. Vol. 1 at 32:23–25.

6.      Each GAI applies to all bonds issued on behalf of each Obligor.  See id.  Pursuant to the GAIs, each Obligor agreed to (1) pay recurring annual premiums; and (2) at Lexon's request, deposit collateral to protect Lexon against loss if Lexon incurred costs to perform the Obligors'

---

[4] Sompo International, a global insurance company, is a sister company to Lexon that acquired it in a transaction that closed on June 1, 2018.  See Tr. Vol. 1 at 35:3–6.  After this transaction, Sompo entered into the GAIs, the Agreement, and the Original Guaranty with the Obligors and Senator Justice.  See infra.  Given that Lexon entered into these contracts if not in name, but in structure, the Court will refer to Lexon, rather than Sompo, as the party to these agreements herein.

obligations under the bonds.  See e.g., id. at 28:17–30:14.  With this structure, Lexon, as the surety, "assumes no loss."  Id. at 27:13; see id. at 27:13–18.

7.  Surety bond contracts exist until all of the underlying obligations thereunder are performed.  Id. at 33:5–21 (Sentman testifying that surety obligations remain even if the obligee is not being paid by the insured).

8.  Consistent with this structure, neither the surety bonds issued by Lexon, nor the GAIs, have a termination date.  See, e.g., JX 4.

9.  Instead, the parties' obligations under the bonds remain ongoing until the Obligors perform their obligations, or until Lexon's bond is replaced by another surety's bond.  Tr. Vol. 1 at 27:24–28:2 (Sentman testifying that "[o]nce a surety bond is issued, it cannot be cancelled.  It remains in full force and effect until it is either released by the obligee or the principal has basically discharged its duties under the contract.")).

10.  Given this, Lexon's obligation to the Obligors under the surety bonds "exists until the underlying obligations of the principal have been satisfied."  Id. at 33:5–9.

11.  During the course of the surety bonds, Lexon's only compensation for its long-term exposure is the premium payments described under the GAIs.  Id. at 28:22–29:5 (Sentman testifying that premiums are "the only way that [surety companies] realize any revenue").  Collateral payments serve merely as an additional protection to Lexon, given the risk it incurs with this arrangement.  Id. at 29:12–17.

12.  Accordingly, the Obligors owe premium payments and collateral obligations to Lexon until the surety bond is either satisfied or replaced.  See JX 4 ¶ 1 at 2; see also Tr. Vol. 1 at 37:14–38:6 (Sentman explaining language in a GAI that the Obligor would "continue to pay

[premiums and charges] [] annual[ly] until [Lexon] shall be discharged and released from any and all liability and responsibility upon and from each such bond or the matters arising therefrom").

B.     **The Agreement and Original Guaranty**

13.     In early 2018, the Obligors requested that Lexon release to them $5,000,000 of collateral it was holding in connection with certain surety bonds. Tr. Vol. 1 at 43:11–17. At the time the Obligors made this request to Lexon, they were in default on their premium obligations. Id. at 43:18–22.

14.     In response to the Obligors' request for the release of the $5,000,000 in collateral and the outstanding premium balance the Obligors owed to Lexon, the Obligors, Lexon, and Senator Justice executed an agreement dated March 26, 2018 ("Agreement"). Joint Stip. ¶ 1; see also JX 3.

15.     Per the Agreement, Lexon agreed to "diligently pursue the liquidation/release of [the $5,000,000 in] Collateral and deliver the [$5,000,000 in] Collateral to the respective" Obligors. JX 3 ¶ 1.

16.     In exchange, the Obligors agreed to: (1) "post new collateral with value of $5,000,000.00" by "no later than the six-month anniversary of the Effective Date of this Agreement[,]" September 26, 2018; and (2) pay the Indebtedness of the Obligors, defined as $3,000,000, within two months of the Effective Date of the Agreement, May 26, 2018. Id. ¶¶ 2–3; see id. at Recitals ¶¶ 1–3.

17.     As a condition precedent to any and all obligations under the Agreement, Senator Justice agreed to execute a personal guaranty on behalf of the Obligors. JX 2; see also JX 3 ¶ 4.

18. On the same day the Obligors, Senator Justice, and Lexon executed the Agreement, Senator Justice executed a Limited Commercial Guaranty ("Original Guaranty") "in favor and for the benefit of Lexon[.]" Joint Stip. ¶ 2; see also JX 2.

19. Under the Original Guaranty, Senator Justice agreed to:

[A]bsolutely, unconditionally and irrevocably guarantee[] to [Lexon], and its successors and assigns, as primary obligor and not merely as surety, the full and punctual payment and performance of each of the Collateral Replenishment Obligation, the Collateral Shortfall Payment Obligation and the Indebtedness Payment Obligation (collectively, the "Obligations"), plus all costs, expenses and fees (including the reasonable fees and expenses of [Lexon's] counsel) in any way relating to the enforcement or protection of [Lexon's] rights hereunder.

JX 2 ¶ 1.

20. The Original Guaranty defines the Collateral Replenishment Obligation as the new collateral of $5,000,000 that the Obligors agreed to provide Lexon within six months of the execution of the Agreement. Id. at Recitals ¶ 1(i); see JX 3 ¶ 2.

21. It further defines the Collateral Shortfall Payment Obligation as the amount of the Collateral Replenishment Obligation "less the value, as agreed by Lexon, of any New Collateral provided prior to such deadline that is acceptable to Lexon," JX 2 at Recitals ¶ 1(i), and the Indebtedness Payment Obligation as "the unpaid balance of the Indebtedness," defined in the Agreement as the $3,000,000 owed to Lexon by the Obligors. Id. at Recitals ¶ 1(ii); see JX 3 ¶ 3.

22. The Original Guaranty further provides that "the obligations of [Senator Justice]" shall be limited to a total sum equal to (i) five million U.S. dollars ($5,000.000) plus (ii) the amount of the Indebtedness specified in the Underlying Agreement." JX 2 ¶ 4(e).

C. **The Amended Agreement and Guaranty**

23. The Obligors were unable to provide the $5,000,000 in New Collateral, and only paid $1,025,000.000 of the total $3,000,000 in Indebtedness, by the deadlines specified in the Agreement. JX 18 at Recitals ¶¶ 1–3.

6

24.     To address Obligors' outstanding obligations, Lexon agreed to negotiate an amendment to the Agreement rather than taking legal action against the Obligors under the GAIs. JX 6 at 2; Tr. Vol. 1 at 123:19–22, 126:20–127:2.

25.     In executing this new agreement, Beggs, Sentman, and other Lexon representatives informed the Obligors and Senator Justice that any new agreement would require the Obligors to: (1) replenish Lexon's collateral account to $20,000,000.00; (2) pay outstanding premiums due at the time of amendment; and (3) remain current on premiums continuing to accrue under the GAIs. Tr. Vol. 1 at 60:17–61:2, 120:11–21.

26.     In line with those discussions, and the Obligor's outstanding obligations under the Agreement, Lexon, the Obligors, and Senator Justice entered into an amendment to the Agreement, dated February 4, 2019 ("Amended Agreement").  Joint Stip. ¶ 3; see JX 18.

27.     The Amended Agreement specifically explains this history between the parties in its recitals, stating:

> **WHEREAS**, reference is made to that certain Agreement dated March 26, 2018 by and among the Parties (the "Agreement") which, as modified herein, is incorporated herein by reference as if set forth in full;
>
> **WHEREAS**, more than One Million Twenty-Five Thousand U.S. dollars ($1,025,000.00) of the Indebtedness remains unpaid (the "Remaining Indebtedness");
>
> **WHEREAS**, the Collateral Justice Companies failed to provide New Collateral to Lexon under the terms of the Agreement;
>
> **WHEREAS**, Justice II entered into a Limited Commercial Guaranty dated March 26, 2018 for the benefit of Lexon (the "Guaranty") pursuant to which Justice II guaranteed payment of the Indebtedness and the New Collateral;
>
> **WHEREAS**, as of February 4, 2019, the Remaining Indebtedness and New Collateral remained unpaid in breach of the Agreement;
>
> **WHEREAS**, Lexon issued a written demand to Justice II on January 14, 2019 demanding payment of the remaining Indebtedness and the New Collateral;

**WHEREAS**, Justice II has breached the terms of the Guaranty;

**WHEREAS**, the Collateral Justice Companies, Beech Creek and Justice II have asked Lexon to execute new bonds having a total penal sum of approximately Three Million Five Hundred Thousand U.S. dollars $3,500,000.00;

**WHEREAS**, Lexon has agreed to consider the issuance of such bonds if the Collateral Justice Companies, Beech Creek and Justice II agree to certain amendments to the terms and conditions of the Agreement; and

**WHEREAS**, in connection with the foregoing, the Parties hereto desire to amend the Agreement.

JX 18 at Recitals ¶¶ 1–10.

28.     Under the Amended Agreement, the parties increased the New Collateral that the Obligors were required to deliver to Lexon from $5,000,000, as described the Agreement, to $20,000,000.00 in the Amended Agreement ("New Collateral"). Id. ¶¶ 1–2.

29.     The Amended Agreement provides three ways for Obligors to satisfy their New Collateral obligation: (1) monthly $250,000 payments ("Collateral Payments"); (2) proceeds from the upcoming sale of some of the Obligors' entities (the "Liquidity Event"), and (3) additional payments every six months in the amounts specified ("Additional Collateral Payments"). See id. ¶¶ 2(a)–(d).

30.     The Amended Agreement also addresses the Obligors' outstanding premium payments, i.e., the Indebtedness specified in the Agreement. See id. ¶¶ 2–3.

31.     Specifically, the Amended Agreement states that "[t]he [p]arties [a]gree the Remaining Indebtedness is equal to One Million Twenty-Five Thousand U.S. dollars ($1,025,000.00)." Id. ¶ 3.

32.     The Amended Agreement continues: "[t]he [p]arties also agree that in addition to the Remaining Indebtedness, additional premium of $2,513,400.75 is now due and owing (the

"New Indebtedness"). The Remaining Indebtedness together with the New Indebtedness is equal to $3,538,400.75 (the "Total Indebtedness")." Id.; Joint Stip. ¶ 5.

33.     The Amended Agreement further provides that the Obligors recognize:

[T]hat additional amounts for premium may become due during the term of this Agreement and they hereby agree that the New Indebtedness shall be increased in like amount (e.g., if new premium is due on March 2, 2019 in the amount of $10,000.00, the New Indebtedness is increased by $10,000.00). Additional amounts for premiums under this sub-paragraph are those premiums that are sixty (60) days or more past due.

JX 18 ¶ 3(c); see Joint Stip. ¶ 6.

34.     In sum, Total Indebtedness is defined as the total of: (i) the outstanding premiums due to Lexon as of March 26, 2018 (the "Remaining Indebtedness") plus (ii) premiums that accrued between March 26, 2018 (date of the original Agreement) and February 4, 2019 (date of the Amended Agreement) plus (iii) premiums that continue to accrue after February 4, 2019 and remain unpaid for 60 days or more (with premiums described in (ii), "New Indebtedness"). Id. 18 ¶ 3.

35.     To resolve the Total Indebtedness, the Obligors agreed to pay Lexon "the sum of Two Hundred Thousand U.S. dollars ($200,000) per month until the Total Indebtedness is paid in full (the "Premium Payments")." Id. ¶ 3(b)(i). In the alternative, the parties agreed that proceeds from the upcoming sale of certain Beech Creek equipment would be used to reduce the Total Indebtedness. Id. ¶ 3(b)(ii).

36.     Under the terms of the Amended Agreement, the Obligors were scheduled to pay off the Total Indebtedness in full by August 2020. Tr. Vol. 1 at 153:18–154:8.

37.     By contrast, the Amended Agreement contemplated that the Obligors' New Collateral obligation may not have been satisfied until as late as April 1, 2021. JX 18 ¶ 2(d)(iv).

38.     To ensure that the Obligors continued to make premium payments that became due under the GAIs that were not *past* due during the period where they had satisfied their Total Indebtedness obligation, but not their New Collateral obligation, the parties added paragraph 3(d) to the Amended Agreement.  Tr. Vol. 1 at 63:22–64:18 (Sentman agreeing that he viewed sub-paragraph (d) as bridging a gap in time between satisfaction of the premium obligation and the collateral obligation).

39.     Paragraph 3(d) provides that "[a]t such time as the Total Indebtedness is paid in full, the [Obligors] shall pay Lexon (i) any additional premium due, or (ii) Two Hundred Thousand U.S. dollars ($200,000.00) per month, whichever is greater."  JX 18 ¶ 3(d); see Joint Stip. ¶ 9.

40.     Similar to the Agreement, the Amended Agreement provides: "as a condition precedent to any and all obligations of Lexon under this Amend[ed Agreement], [Senator Justice] shall execute and deliver the . . . Guaranty[.]"  JX 18 ¶ 8; see Joint Stip. ¶ 4.

41.     Consistent with this term, Senator Justice executed an Amended & Restated Limited Commercial Guaranty (the "Guaranty"), dated as of February 4, 2019, "in favor and for the benefit of [Lexon] and its affiliates and subsidiaries."[5]  JX 17; see Joint Stip. ¶ 10.

42.     Pursuant to the Guaranty, Senator Justice "absolutely, unconditionally and irrevocably guarantee[d]," the payment and punctual performance of: (1) the New Collateral Replenishment Obligation, equal to the $20,000,000.00 in New Collateral delineated in the Amended Agreement; and (2) the New Indebtedness Payment Obligation, encompassing "the Total Indebtedness (including any new premiums becoming due during the term of the Amended

---

[5] The parties agree that Lexon drafted the Agreement, the Amended Agreement, and the Guaranty. Joint Stip. ¶ 20.  They further stipulate that the Obligors, Senator Justice, and their counsel had the opportunity to review, and propose revisions to, the terms of each of the Agreement, the Amended Agreement, and the Guaranty before signing.  Id.

[] Agreement)" as articulated in the Amended Agreement (New Collateral Replenishment Obligation and New Indebtedness Payment Obligation, collectively, "Obligations"). JX 17, Recitals ¶¶ 3(i)–(ii).

43. The Guaranty further provides that Senator Justice's obligations under the Guaranty are "continuing in nature and appl[y] until the . . . payment and satisfaction in full of all of the Obligations." Id. ¶ 5(a); see also, id. ¶ 1(c) (providing that if Obligors fail to pay any or all of their Obligations under the Amended Agreement or "any amounts due under any GAI," Senator Justice "shall" pay Lexon "the entire amount . . . as if such amount constituted the direct and primary obligation of [Defendant]"), id. ¶ 8 (stating that the Guaranty "shall be binding upon and inure to the benefit of the parties hereto").

44. Also like the Original Guaranty, the Guaranty provides a limiting principle on the New Collateral Replenishment Obligation, stating:

> Notwithstanding anything contained herein to the contrary, the obligations of Guarantor shall be limited to a total sum equal to (i) fifteen million U.S. dollars ($15,000,000.00) plus (ii) the amount of the Total Indebtedness specified in the Amended Underlying Agreement; (ii[i]) provided that, in the event of any default by Collateral Obligor and/or Indebtedness Obligor with respect to the New Collateral Replenishment Obligation or the New Indebtedness Payment Obligation, including without limitation any failure to timely pay any payment due under either such Obligation, the obligations of Guarantor shall instead be limited to a total sum equal to (i) twenty million U.S. dollars ($20,000,000.00) plus (ii) the amount of the Total Indebtedness specified in the Amended Underlying Agreement.

Id. ¶ 5(e).

45. There is no such liability cap on Senator Justice's liability as to the Total Indebtedness, i.e. premiums, amount. See generally id. ¶¶ 3, 5.

**D.** **The Parties' Subsequent Performance Regarding Premiums**

46. In the months that followed the parties' execution of the Amended Agreement and Guaranty, they proceeded with the understanding that the Obligors were subject to two separate

premium payments: (1) those that became due under the GAIs, but had not yet become 60 days or most past due; and (2) those that were more than 60 days past due, which encompassed the Total Indebtedness.

47.     For example, in October 2019, the Justice Companies requested that Lexon issue a new bond, noting they had been paying the $200,000 monthly installments on the Total Indebtedness per the Amended Agreement.  JX 23 at 2.  In response, Beggs reminded the Justice Companies they were still not in compliance with the Amended Agreement, given they had failed to pay newly accrued premiums in a timely fashion.  Id. at 1; see JX 24 at 1 (Beggs telling Clinton Diers ("Diers"), an insurance agent working on the Justice account, that "[t]he installments were to catch up on late premiums from 2018" and that he "specifically stated in [their] May meetings that the installments were for overdue premiums and we expected [] renewal premiums to be paid, outside of the installments").

48.     The same is reflected in the parties' January 2020 and March 2020 Side Letter Agreements ("Side Letter Agreements").  See JX 26; JX 31; JX 36–37.

49.     In January 2020, the parties elected to adjust the Amended Agreement's payment schedule to give the Obligors additional time to pay the collateral and premium due.  See id.

50.     In executing the January 2020 Side Letter Agreement, Beggs conveyed to the Obligors that Lexon wanted to "suspend the collateral installment" but "increase the premium installment" because the $200,000 installments were "too low" and not "closing the gap" on the Obligors' premium Total Indebtedness debts.  JX 26 at 2; JX 29 at 2.

51.     At the time the parties executed the January 2020 Side Letter Agreement, the Justice Companies had paid $2,200,000 toward the Total Indebtedness.  See JX 73 (premium payments from February 28, 2019 to December 31, 2019).

52. Under the January 2020 Side Letter, Lexon suspended the Obligors' New Collateral payments for six months. JX 31 ¶ 2. In return, the Justice Companies committed to paying five separate $250,000 premium payments to Lexon, totaling $1,500,000, after which premium payments would "revert back to $200,000 as required under the Agreement." Id. ¶ 1. The parties agreed that "all outstanding Total Indebtedness continues to remain due and owning." Id.

53. The additional premium payments totaling $1,500,000, combined with the Obligors' prior premium payments of $2,200,000, constitutes $3,700,000 of Total Indebtedness the Obligors committed to pay Lexon under the January 2020 Side Letter Agreement. See id. This amount is greater than the Total Indebtedness the Obligors had accrued at the time of the execution of the Amended Agreement, $3,538,400.75, demonstrating that Total Indebtedness continued to accrue after the execution of the Amended Agreement because of the Obligors' repeated missed premium payments.[6] See JX 18 ¶ 3.

54. Beggs's testimony at trial was consistent with his communications indicating that premiums continued to accrue, and be added to the Obligors' Total Indebtedness, after the execution of the Amended Agreement. For instance, Beggs noted that the Obligors' failure to pay newly accruing premiums undermined the terms and purpose of the Amended Agreement, which was to eliminate the Obligors' overdue premiums. Tr. Vol. 1 at 138:16–17 (Beggs testifying that "[t]he installment deal was specifically set up to take care of overdue premium payments.").

55. Beggs stated this plainly:

The installment plan was specifically designed to address overdue premiums. But we still had an expectation that they would pay their current[] [premiums that

---

[6] The same is true of the March 2020 Side Letter Agreement, where the parties again amended the premium payment schedule and suspended the Obligors' New Collateral payments for six more months to get the Obligors caught up on premium payments. See JX 37.

became due], because if they didn't, those would be added to the overdue premium balance.

Id. at 140:1–5.

56.     Beggs further testified about the Side Letter Agreements, noting that "if we went at that clip of 200,000 per month, we weren't going to make any real inroads on reducing the overdue [premium] balance." Id. at 143:9–11.

**E.     The Obligors' Default**

57.     The Obligors made $4,210,000.00 in premium payments after February 4, 2019. Joint Stip. ¶ 18.

58.     However, the Obligors failed to make any premium payments as required under the Amended Agreement after March 2021. Id. ¶ 11.

59.     The Guaranty states that if any Obligor "shall fail to pay any amounts due under any GAI immediately when due as provided by any GAI, [Senator Justice] shall, within ten (10) business days of [his] receipt of [Lexon]'s written demand therefor, pay to [Lexon] the entire amount of the amount remaining unpaid[.]" Id. ¶ 16.

60.     In response to the Obligors' nonpayment and pursuant to the Guaranty, Lexon sent Senator Justice a notice of default dated July 24, 2023, demanding payment of $20,000,000.00 in outstanding New Collateral and $6,724,138.66 in then-outstanding premium owed under the Guaranty, plus additional premium amounts continuing to accrue; all fees, expenses, and costs incurred by Lexon in enforcing the Guaranty; and interest. Id. ¶ 12.

61.     Senator Justice did not, and to date has not, paid Lexon any amounts pursuant to the Guaranty. Id. ¶ 13.

**F.** **The Court's December 3, 2024 Summary Judgment Ruling**

62.     On December 3, 2024, the Court held that Senator Justice breached paragraphs 1, 1(a), and 1(b) of Guaranty by failing to make the required payments within three business days of his receipt of Lexon's demand for payment.  (Doc. No. 68 at 13).

63.     Given Senator Justice's breach, the Court further held that "Lexon is entitled to (1) $20 million in collateral payments, less any collateral payments made by the Obligors; plus (2) the Total Indebtedness, which takes into account the New Indebtedness Payment Obligation and any additional premium that became due during the Amended Agreement term."  (Doc. No. 68 at 20–21); see Joint Stip. ¶ 7.

64.     Despite these findings, because the parties had not briefed the term of the Amended Agreement (and, in turn, the Guaranty), the Court could not make a final award of damages, including any applicable pre- and post-judgment interest, in Lexon's favor without the benefit of a trial.  (See Doc. No. 68 at 19 n.12, 22 n.15).

65.     The parties addressed these outstanding issues with the Court during the two-day bench trial.  See Tr. Vol. 1; Tr. Vol. 2.

**II.     CONCLUSIONS OF LAW**

66.     The parties agree that the Amended Agreement and the Guaranty are governed by West Virginia law.  (Doc. No. 68 at 9; see also Doc. No. 17 ¶ 9).

67.     To succeed on a claim for breach of contract under West Virginia law, a plaintiff must prove the following three elements by a preponderance of the evidence: (1) a contract exists between the parties; (2) a defendant failed to comply with a term in the contract; and (3) damage arose from the breach."  Nance v. Huntington W. Virginia Hous. Auth., 2017 WL 2210152, at *5 (W. Va. May 19, 2017) (quoting Wittenberg v. Wells Fargo Bank, N.A., 852 F. Supp. 2d 731, 749 (N.D. W. Va. 2012)).

15

68.     As noted above, the Court concluded in its December 3, 2024 Memorandum Opinion, and the parties do not dispute here, that Senator Justice breached the Amended Agreement and Guaranty, which are both valid and enforceable contracts under West Virginia law. (See Doc. No. 68; see also Doc. No. 93 (Senator Justice not challenging those findings)).

69.     Accordingly, the sole remaining issues in this case are: (1) the term of the Amended Agreement; and (2) the amount of damages, including pre- and post-judgment interest, that Lexon is entitled to.  (See generally Doc. No. 68; see also Doc. No. 107 at 4).  Still, despite the Court's December 3, 2024 ruling, Senator Justice has re-raised the issue of the amount of Total Indebtedness owed to Lexon.  (Doc. No. 93 at 4–5).  For the sake of thoroughness, and with the benefit of a full record and further briefing from the parties, the Court will revisit that issue as well.[7]  As explained below, the Court adheres to its conclusions.

A.     **Total Indebtedness**

70.     The Court starts with the parties' dispute on the definition of Total Indebtedness under the Amended Agreement and Guaranty.

71.     As an initial matter, the Court construes the Amended Agreement and Guaranty as a single agreement in harmony with each, because they were executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction.  See TD Auto Fin. LLC v. Reynolds, 842 S.E.2d 783, 788 (W. Va. 2020) ("written instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument, even though they do not by their terms refer to each other") (citation and quotations omitted); JX 17 ¶ 14 (the

_____

[7] Because Senator Justice does not challenge the Court's December 3, 2024 summary judgment ruling that he is liable for damages for failing to fulfill his other obligation under the Guaranty, the New Collateral Replenishment Obligation, the Court need not address that issue again here.

16

"Guaranty, together with the Amended [] Agreement, constitutes the sole and entire agreement of the parties thereto with respect to the subject matter hereof"); JX 18 ¶ 8 (stating that the Guaranty was executed "[c]ontemporaneously" with the Amended Agreement, and "as a condition precedent to any and all obligations of Lexon" under the Amended Agreement).

72.    Having determined the Amended Agreement and Guaranty are one in the same, the Court turns to their terms pertaining to the definition of Total Indebtedness.

73.    "As a matter of contractual interpretation, to make this determination [the Court] first analyze[s] the contract's language." Lopez v. Erie Ins., 908 S.E.2d 508, 513 (W. Va. Ct. App. 2024). In interpreting the contract, the Court is required to construe the terms in question in accordance with the plain language used. Blake v. State Farm Mut. Auto. Ins. Co., 685 S.E.2d 895, 901 (W. Va. 2009). The Court is also required to read the contract "as a whole, with all [] provisions given effect." Lopez, 908 S.E.2d at 514.

74.    After reading the plain terms of the contract, a court should find language ambiguous only when "it is reasonably susceptible to more than one meaning in light of the surrounding circumstances and after applying the established rules of construction." FOP, Lodge No. 69 v. City of Fairmont, 468 S.E.2d 712, 716 (W. Va. 1996). "[T]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous." Blake, 685 S.E.2d 895 (citations and quotations omitted). Rather, "[t]he question as to whether a contract is ambiguous is a question of law to be determined by the court." Id. (citation and quotations omitted).

75.    On one hand, Lexon asserts that the Court's December 3, 2024 ruling on the definition of Total Indebtedness—that it includes the New Indebtedness Payment Obligation and any additional premium that became 60 days past-due during the Amended Agreement term (see

Doc. No. 68 at 20–21)—is the correct interpretation of Total Indebtedness under the Amended Agreement and Guaranty.

76.     On the other, Senator Justice contends that paragraph 3 of the Amended Agreement defines Total Indebtedness as a fixed amount, $3,538,400.75.  (See Doc. No. 93 at 4).

77.     Despite the parties taking two different positions on the definition of Total Indebtedness, based upon the record before the Court, the credible evidence leads this Court to reaffirm the prior decision: the Total Indebtedness contemplated in the Amended Agreement and Guaranty is unambiguously a dynamic term, subject to changing value based on the amount of overdue premiums owed by the Obligors during the course of the Amended Agreement.  See Blake, 685 S.E.2d at 901 (parties' disagreement on the terms of the contract does not, on its own, demonstrate ambiguity).

        1.  **The Term "Total Indebtedness" is Unambiguous.**

78.     As the Court discussed in its December 3, 2024 Memorandum Opinion, and as the parties addressed at trial, various provisions in the Amended Agreement and Guaranty govern the definition of "Total Indebtedness."

79.     The Court starts with paragraph 3 of the Amended Agreement, which states that "[t]he [p]arties [a]gree the Remaining Indebtedness is equal to One Million Twenty-Five Thousand U.S. dollars ($1,025,000.00)."  JX 18 ¶ 3.

80.     Paragraph 3 of the Amended Agreement goes on to state that "[t]he [p]arties also agree that in addition to the Remaining Indebtedness, additional premium of $2,513,400.75 is now due and owing (the 'New Indebtedness').  The Remaining Indebtedness together with the New Indebtedness is equal to $3,538,400.75 (the 'Total Indebtedness')."  Id.

18

81.     Despite Senator Justice insisting the contrary, the Court cannot stop its analysis there, as it must interpret the meaning of Total Indebtedness by considering the entirety of the Amended Agreement and Guaranty.  See Lopez, 908 S.E.2d at 514.

82.     In doing so, the Court turns to Paragraph 3(c) of the Amended Agreement, which provides that "additional amounts for premium may become due during the term of this Agreement" and that "the New Indebtedness *shall be increased in like amount* (e.g., if new premium is due on March 3, 2019 in the amount of $10,000.00, the New Indebtedness is increased by $10,000.00)."  JX 18 ¶ 3(c) (emphases added).  Paragraph 3(c) goes on to clarify that "[a]dditional amounts for premiums under this sub-paragraph are those premiums that are sixty (60) days or more past due."  Id.

83.     Reading paragraphs 3 and 3(c) together, and giving those terms their plain and ordinary meaning, the Court concludes that the clauses clearly state that: (1) the Total Indebtedness at the time of the Amended Agreement on February 4, 2019 was $3,538,400.75; and (2) such amount was subject to increase for new premiums that become 60 days or more past due.  See id. ¶¶ 3, 3(c).

84.     This interpretation gives all of the words in the Amended Agreement consideration and their intended meaning, as it accounts for the Total Indebtedness that had accrued at the time of the execution of the Amended Agreement, see id. ¶ 3, and also honors paragraph 3(c)'s mandate that premiums that became 60 days overdue during the term of the Amended Agreement be added to the New Indebtedness, see id. ¶ 3(c).  See also Lopez, 908 S.E.2d at 514.  Indeed, the parties would have had no reason to define "additional amounts for premium" in Paragraph 3(c) unless those premiums convert into New Indebtedness (and, in turn, Total Indebtedness).  To ignore these portions of the Amended Agreement in interpreting the term Total Indebtedness, as Senator Justice

invites, would render them improperly meaningless. See Blake, 685 S.E.2d at 901; see also Edwin Miller Invs., LLC v. CGP Dev. Co., 752 S.E.2d 901, 906–07 (W. Va. 2013) (Contracts "should be construed, if possible, as to give meaning to every word, phrase, and clause and also render all its provisions consistent and harmonious.") (citation omitted).

85.    This interpretation is also consistent with the recitals at the beginning of the Amended Agreement. The recitals of the Amended Agreement state the following:

> **WHEREAS**, reference is made to that certain Agreement dated March 26, 2018 by and among the Parties (the "Agreement") which, as modified herein, is incorporated herein by reference as if set forth in full;
>
> **WHEREAS**, more than One Million Twenty-Five Thousand U.S. dollars ($1,025,000.00) of the Indebtedness remains unpaid (the "Remaining Indebtedness");
>
> **WHEREAS**, the Collateral Justice Companies failed to provide New Collateral to Lexon under the terms of the Agreement;
>
> **WHEREAS**, Justice II entered into a Limited Commercial Guaranty dated March 26, 2018 for the benefit of Lexon (the "Guaranty") pursuant to which Justice II guaranteed payment of the Indebtedness and the New Collateral;
>
> **WHEREAS**, as of February 4, 2019, the Remaining Indebtedness and New Collateral remained unpaid in breach of the Agreement;
>
> **WHEREAS**, Lexon issued a written demand to Justice II on January 14, 2019 demanding payment of the remaining Indebtedness and the New Collateral;
>
> **WHEREAS**, Justice II has breached the terms of the Guaranty;
>
> **WHEREAS**, the Collateral Justice Companies, Beech Creek and Justice II have asked Lexon to execute new bonds having a total penal sum of approximately Three Million Five Hundred Thousand U.S. dollars $3,500,000.00;
>
> **WHEREAS**, Lexon has agreed to consider the issuance of such bonds if the Collateral Justice Companies, Beech Creek and Justice II agree to certain amendments to the terms and conditions of the Agreement; and
>
> **WHEREAS**, in connection with the foregoing, the Parties hereto desire to amend the Agreement.

JX 18 at Recitals ¶¶ 1–10.

86.     Per the plain terms of the recitals of the Amended Agreement, its purpose was to ensure that the Obligors paid the Remaining Indebtedness and New Collateral that remained unpaid in breach of the Agreement, pursuant to the terms outlined in the Amended Agreement. See id.

87.     Given that one of the explicit purposes of the Amended Agreement was to ensure that the Obligors paid all of their debts to Lexon with respect to their premium payments, it makes little sense to interpret Total Indebtedness in the Amended Agreement as capping that liability, as Senator Justice suggests.[8] Dunbar Fraternal Ord. of Police, Lodge No. 119 v. City of Dunbar, 218 624 S.E.2d 586, 591 (W. Va. 2005) ("[T]his Court will not interpret a contract in a manner that creates an absurd result.").

88.     Rather, it makes much more sense, reading the recitals with the other terms in the Amended Agreement, to interpret the meaning of Total Indebtedness to include the sum of premium payments overdue by the Obligors to Lexon (that could continue to grow, depending on the Obligors' noncompliance with future payments). See, e.g., Martin v. Rothwell, 95 S.E. 189, 190 (W. Va. 1918) (explaining that recitals can "aid in interpreting any ambiguous language used in expressing [contractual] obligation[s]"); United States v. Cmty. Health Sys., Inc., 666 F. App'x 410, 417 (6th Cir. 2016) (recognizing that recitals "may have a material influence in construing the contract and determining the intent of the parties") (quoting 17A Am. Jur. 2d Contracts § 373).

89.     The Guaranty's recitals support the same interpretation. Similar to the recitals in the Amended Agreement, those in the Guaranty provide that Senator Justice must guarantee "the

---

[8] Of course, courts should look to the definition of terms, where provided, in contracts when interpreting relevant clauses. However, this does not require courts to honor definitions that are "based in piecemeal, out of context interpretations of contract sections" like the one Senator Justice proposes here. Lopez, 908 S.E.2d at 515.

Total Indebtedness (including *any new premiums becoming due during the term of the Amended Agreement*)." JX 17 at Recitals ¶ 3 (ii) (emphases added).

90.    Giving that text its plain and ordinary meaning, it is evident that Total Indebtedness means the same thing in the Guaranty as in the Amended Agreement—$3,538,400.75, *plus* any new premiums that went 60 days or more past due during the course of the Amended Agreement. See Blake, 685 S.E.2d at 901.

91.    Senator Justice's construction of Total Indebtedness as a fixed sum of $3,538,400.75 would render the phrase "including any new premiums becoming due during the term of the Amended Agreement" in the Guaranty's recital useless. See Edwin Miller Invs., 752 S.E.2d at 906–07.

92.    Despite the clear and unambiguous meaning of Total Indebtedness in the Amended Agreement and Guaranty, Senator Justice contends paragraph 3(d) of the Amended Agreement supports his conclusion that the term is fixed.

93.    Paragraph 3(d) provides:

At such time as the Total Indebtedness is paid in full, the [] Justice Companies and Beech Creek shall pay Lexon (i) any additional premium due, or (ii) Two Hundred Thousand U.S. dollars ($200,000.00) per month, whichever is greater. Such payments shall be due on the last day of each month.

JX 18 ¶ 3(d).

94.    According to Senator Justice, because paragraph 3(d) of the Amended Agreement provides for "any additional premium due" that is pending "[a]t such time as the Total Indebtedness is paid in full," such language demonstrates that premium payments that become 60 days past-due during the course of the Amended Agreement are subject to paragraph 3(d), rather than 3(c), and are *not* part of the Total Indebtedness.

95. The Court disagrees. This is a strained reading of the words in paragraph 3(d), as Senator Justice's interpretation continues to ignore the context in which the Amended Agreement was signed. The Court rejects the incredible testimony at trial to the contrary.

96. Had the Obligors consistently made their monthly premium payments and paid their renewal premiums as they became due, they would have paid the Total Indebtedness in full in August 2020. See JX 18 ¶ 3; see also Tr. Vol. 1 at 153:18–154:8 (credibly testifying that the Obligors would have paid the Total Indebtedness as of the date of the Amended Agreement within 18 months). This would have left several months between the time the Obligors satisfied their Total Indebtedness Obligation and the time they had left to satisfy the New Collateral Replenishment Obligation. See JX 18 ¶ 2.

97. Accordingly, a natural and plain reading of paragraph 3(d)—and one that gives full meaning and effect to paragraphs 3 and 3(c)—is that it serves to ensure that the Obligors continued to pay their accruing premium payments that became due after the Total Indebtedness had been satisfied but still remained due under the GAIs. See Edwin Miller Invs., 752 S.E.2d at 906–07; see also Tr. Vol. 1 at 63:22–64:18 (Sentman agreeing that he viewed sub-paragraph (d) as bridging a gap in time between satisfaction of the premium obligation and the collateral obligation).

98. Given the foregoing, the Amended Agreement and Guaranty unambiguously define the Total Indebtedness as $3,538,400.75 of Total Indebtedness described in the Amended Agreement *plus* additional premiums that become 60 days past due during the Amended Agreement's term. Because Senator Justice has failed to persuade the Court this interpretation is

incorrect, it reaffirms its prior summary judgment determination on this issue.[9] (See Doc. No. 68 at 19).

**2.  Even if the Term "Total Indebtedness" is Ambiguous, Extrinsic Evidence Supports the Court's Interpretation of the Term as a Dynamic Value.**

99.    Even accepting Senator Justice's contention that there are two reasonable interpretations of Total Indebtedness, its purported ambiguity is still resolved in Lexon's favor when considering extrinsic evidence.

100.    When a contractual term is "inconsistent, confusing or ambiguous on its face, a court must look to extrinsic evidence of the parties' intent to construe" it.  Gastar Expl. Inc. v. Rine, 806 S.E.2d 448, 455 (2017).  "Exploring the intent of the contracting parties often, but not always, involves marshaling facts extrinsic to the language of the contract document."  Fraternal Order of Police, Lodge No. 69 v. City of Fairmont, 468 S.E.2d 712, 716 n.7 (1996).  When such need arises, "these facts together with reasonable inferences extractable therefrom are superimposed on the ambiguous words to reveal the parties' discerned intent."  Id.

101.    In discerning the meaning of an ambiguous term, "[a] trial court may look to a variety of evidence, including the parties' conduct *before and after*" contracting, "to discern the parties' intent[.]"  Gastar, 806 S.E.2d at 455.  This parol evidence "is generally limited to the subject-matter, the relation of the parties thereto, their prior and subsequent conduct, their situation, and all the facts and circumstances existing at the time of the execution of the instrument."  Syl. Pts. 2 and 3, Bank v. Catzen, 60 S.E. 499, 500 (1908).

102.    In looking to that evidence and the testimony during trial, the Court easily concludes that Total Indebtedness includes any new premiums becoming 60-days overdue during

---

[9] While the parties do not dispute this, for the sake of clarity, the Court reaffirms that this total is reduced by any payments made by the Obligors on the New Indebtedness Payment Obligation. (See Doc. No. 68 at 19).

the term, and is subject to increase depending on the Obligors' continued failure to make timely premium payments under the GAIs.

103.    The clearest example of the Obligors' course of conduct reflecting this interpretation is the amount of premium payments the Obligors made to Lexon toward the Total Indebtedness before ceasing payment entirely.  Notably, the Obligors made premium payments totaling $4,210,000 through February 2021, roughly $700,000 more than the $3,538,400.75 of Total Indebtedness existing as of February 4, 2019.  JX 73.  This alone demonstrates that the parties clearly understood that the Total Indebtedness continued to accrue as the Obligors failed to make timely payments on premiums that became past due after the execution of the Amended Agreement.

104.    Other party correspondence also confirms as much.  For instance, read the Obligors' response to Lexon's July 24, 2023 Demand ("Demand") under the Guaranty.  In that Demand, Lexon sought "Total Indebtedness in the amount of $6,724,138.66 U.S. dollars (as of June 30, 2023)," or nearly twice the approximately $3.5 million in Total Indebtedness outstanding when the Amended Agreement was executed.  JX 66 at 1.

105.    Rather than objecting to that amount or suggesting that a significant portion was not subject to the Guaranty, Ball's July 27, 2023 response letter on behalf of Senator Justice and the Obligors acknowledges their "understand[ing] [that] there are premiums continuing to accrue on the bonds."  JX 67 at 3.

106.    The same is reflected in the parties' negotiations of the January and March 2020 Side Letter Agreements, in which the parties agreed to increase the Obligors' premium installments that were previously "too low" to "clos[e] the gap" on the Obligors' premium debts. JX 26 at 2; JX 29 at 2.  Notably, the increased premium payments the Obligors agreed to pay under

25

the Side Letter Agreements would have required the Obligors to pay $3,700,000 in Total Indebtedness at the time—more than the $3,538,400.75 in Total Indebtedness accounted for under the Amended Agreement. See JX 31 ¶ 1.

107. That the Total Indebtedness continued to increase with the Obligors' continued nonpayment of overdue premiums is further supported by Beggs's email correspondence with the Obligors. Indeed, Beggs repeatedly reminded the Obligors post-execution of the Amended Agreement that part of their obligations included paying premiums that became due. See JX 23 at 1 (Beggs telling the Justice Companies that they were still not in compliance with the Amended Agreement because they had not paid currently-due premiums); see also JX 24 at 1 (Beggs telling Diers that "[t]he installments were to catch up on late premiums from 2018" and that he "specifically stated in [their] May meetings that the installments were for overdue premiums and we expected [] renewal premiums to be paid, outside of the installments").

108. The parties' repeated affirmations during their course of conduct that the Total Indebtedness was not a fixed amount under the Amended Agreement and Guaranty was confirmed at trial by Lexon witnesses Beggs and Sentman, who consistently and credibly testified to the same. Neal v. Berghuis, 2006 WL 2270036, at *5 (E.D. Mich. Aug. 8, 2006) ("In a bench trial, it is the trial court's job to assess the credibility of witnesses and weigh the evidence."); see also Butzman v. United States, 205 F.2d 343, 349 (6th Cir. 1953) (in a bench trial, the credibility of witnesses is a question for the district court judge).

109. Both Beggs and Sentman were involved in laying out the terms that Lexon required in the Amended Agreement, making their insight on the definition of Total Indebtedness particularly helpful in this case. See Tr. Vol. 1 at 119:15–120:1 (Beggs testifying that he and Sentman, among others, outlined Lexon's goals with the Amended Agreement).

110.     Consistent with his correspondence with the Obligors and Senator Justice prior to this suit, Beggs testified that he understood Total Indebtedness to include "the original [$]1,025,000; the additional [$]2.5 million, and, going forward, any items that became due during the term of this agreement." Tr. Vol. 1 at 200:19–23. Beggs also explained that the "installment deal" under the Amended Agreement "was specifically set up to take care of overdue premium payments[,]" and Lexon "had an expectation that [Obligors] would pay their current[] [premium payments that became due], because if they didn't, those would be added to the overdue premium balance." Id. at 138:16–17, 140:1–5); see also id. at 145:17–23 (explaining that Lexon would never waive the Obligors' obligation to pay premiums, given that is Lexon's sole source of revenue in connection with the bonds issued for the Obligors). Sentman affirmed Beggs's testimony, as he testified that "Total Indebtedness was the amount of premium that was past due that was owed, and the accruing premium that was due and owing." Id. at 57:2–9.

111.     As a whole, the parties' post-execution conduct fatally undermines Senator Justice's argument that Total Indebtedness is a fixed term. If the Obligors intended for the Amended Agreement and Guaranty to cover only $3,538,400.75 in Total Indebtedness, they would not have proposed modifications to their monthly premium payments in the Side Letter Agreements that would have required Obligors to pay Lexon more than $3,538,400.75. See JX 31 ¶ 1. Nor would they have made a total of $4,210,000 in premium payments toward the Total Indebtedness by February 2021, see JX 73, or failed to object to Lexon's request for $6,724,138.66 in Total Indebtedness in its Demand. See JX 66, 67.

112.     To attempt to poke holes in Lexon's evidence, Senator Justice relies on various emails between the parties shortly after the execution of the Amended Agreement. As the Court explained during trial, none support the proposition Senator Justice sets forth here.

113.     For example, Senator Justice relies on a February 25, 2019 email Lexon's Senior

Vice President, Kieran Moran ("Moran"), sent after the execution of the Amended Agreement.

There, Moran emailed other Lexon employees—Beggs and Sentman—summarizing the Amended

Agreement.  JX 21.  As part of that summary, Moran stated in relevant part:

> The Parties Agree the Remaining Indebtedness is equal to One Million Twenty-Five Thousand U.S. dollars ($1,025,000.00). The Parties also agree that in addition to the Remaining Indebtedness, additional premium of $2,513,400.75 is now due and owing (the "New Indebtedness"). The Remaining indebtedness together with the New Indebtedness is equal to $3,538,400.75 (the "Total Indebtedness").
>
> [] The Collateral Justice Parties and Beech Creek agree, jointly and severally, to pay Lexon the Total Indebtedness as follows:
>
> [] On the last day of each month, the Collateral Justice Companies and Beech Creek, jointly and severally, agree to pay Lexon the sum of Two Hundred Thousand U.S. dollars ($200,000.00) per month until the Total Indebtedness is paid in full (the "Premium Payments").
>
> Such Premium Payments will begin on February 28, 2019. Lexon agrees to accept partial payments throughout each month but, in no event shall the amount paid in any given month be less than $200,000.00.

JX 21 at 2.

114.     According to Senator Justice, because this description says nothing about new

premiums that become due being added to the Total Indebtedness, no such payments exist.  But

that is a poor reading of Moran's email.  True, Moran does not explicitly state that any premiums

that become past due are added to the Total Indebtedness.  But Moran *does* acknowledge that the

Obligors' Indebtedness had increased by $2,513,400.75 at the time of the Amended Agreement,

making the Obligors behind $3,538,400.75 on premium payments in total.  See id.  Senator Justice

also takes for granted that Moran's email was sent a mere 21 days after the execution of the

Amended Agreement, making it unlikely that any additional premium payments had become 60

days past due by the Obligors since the execution of the Amended Agreement.  Considering this

context, Moran's email supports the reasonable inference that the Obligors continued to accrue premium debts as they remained unpaid throughout the course of the Amended Agreement.

115.    The same is true of the other emails Senator Justice relies upon. In those emails, Senator Justice points to statements by Beggs differentiating between due premium payments and the Total Indebtedness under the Amended Agreement. Specifically, Senator Justice relies on the following email correspondence:

- Beggs's October 29, 2019 email to Sompo employee Pat Hennesy ("Hennesy") stating that "Justice had met their installment obligations (with a little arm twisting) to pay down overdue past premiums" and "[t]hey have not paid their renewal premiums for 2019 and are $2mm plus in the hole[,]" JX 22 at 1;
- Sompo employee Jack Genet's October 29, 2019 email stating "while Justice has made recent payments for collateral and past due premium as required under the [] Amended agreement, I want to point out that they have not made any payments on new premiums[,]" JX 23 at 2;
- Beggs's October 29, 2019 email to Sompo employees and Diers stating that the Obligors' "for over 90 premiums and completely separate from their obligations to pay renewal premiums[,]" id. at 1; and
- Beggs's October 31, 2019 email to Diers, stating that "[t]he installments were to catch up on late premiums from 2018" and that he specifically informed the Obligors that "the installments were for overdue premiums and [Lexon] expected 2019 renewal premiums to be paid, outside of the installments . . . Normal renewal premiums are not 'additional payments', we expected payment at renewal[,]" id.

116.    Senator Justice contends that the Lexon representatives' statements in these emails differentiating between installment payments under the Amended Agreement and currently-due premium payments shows the latter was not intended to be folded into the former. On this point, Senator Justice is correct. As demonstrated by this email correspondence, the parties agreed that premium payments that became due were the Obligors' responsibility to pay immediately. See JX 2, 23.

117.    What Senator Justice overlooks, however, is that none of this correspondence shows that those premium payments—if *not* paid on time—were not meant to be included in the

Total Indebtedness total once Obligors failed to pay them. This is entirely consistent with Lexon's statements in the above email correspondence, as the Obligors could very well have made consistent installment payments of $200,000 under the Amended Agreement while *also* failing to make premium payments. See JX 22 at 1; JX 23 at 1. That Beggs or Genet did not spell this out in every email sent to the Obligors does not change the Court's conclusion here.

118.    Notably, Senator Justice offers little from his or the Obligors' perspective to demonstrate that they believed the Total Indebtedness.[10] The only testimony Senator Justice provided on this point is that of Mr. Ball.

119.    Specifically, Ball testified that as counsel for the Obligors, he understood the term Total Indebtedness to be defined as $3,538,400.75, and that he would not have recommended the Obligors sign the Amended Agreement or Senator Justice sign the Guaranty if it was not a fixed, known number. Tr. Vol. 2 at 90:12–16, 91:2–9, 99:3–8.

120.    While the Court appreciates Ball's testimony on this issue, it is not credible, and the Court is not persuaded by it.

121.    As an initial matter, Ball admitted at trial that it was Jay Justice—who Senator Justice elected to not call to testify at trial—who negotiated the terms of the Amended Agreement and Guaranty on behalf of the Obligors and Senator Justice. Id. at 141:22–142:21, 142:24–143:6.

---

[10] This lack of evidence may well be because Senator Justice's asserted position here is insincere. Indeed, earlier in this litigation, Senator Justice's Responses to Lexon's Statement of Undisputed Material Facts did not dispute Lexon's statements that "[t]he Amended Agreement provides for the Obligors to pay Lexon $200,000 per month 'until the Total Indebtedness is paid in full (the 'Premium Payments')'" and "[t]he Amended Agreement further provides that 'additional amounts for premium may become due during the term of this Agreement' and that the amount of premiums constituting Total Indebtedness 'shall be increased in like amount.'" Doc. No. 58 ¶¶ 8–9. Consistent with these admissions, Senator Justice failed to make the argument he asserts here in his response to Lexon's motion for summary judgment, or anywhere else in the record prior to trial. (See Doc. No. 61).

This alone makes Ball's testimony on the true meaning of the terms of the Amended Agreement less relevant or reliable than Beggs's and Sentman's testimony, given they both had direct knowledge of the Amended Agreement and Guaranty negotiations.

122.     Second, Ball's personal ties and investment in the Obligors' and Senator Justice's success makes his testimony less credible.  Notably, Ball started working for the Justices more than twenty years ago, when he first graduated from law school.  Id. at 136:18–20.  He has been employed by Senator Justice's family ever since.  Id. at 136:21–137:2.  His personal relationship is obvious, as is his bias.

123.     To be sure, all employees of companies—including Sentman and Beggs—have a certain fidelity to them that must be acknowledged and respected.  Nevertheless, Ball's ties to Senator Justice and the Obligors extend far beyond those of the average employee to their employer.  The Court makes note of Ball's extraordinary connection to the Obligors and Senator Justice that undoubtedly impacted his testimony during trial.

124.     Perhaps as evidence of Ball's bias, his testimony at trial that the Total Indebtedness constituted a fixed amount conflicted with his prior deposition testimony that past-due premiums got added to the definition of New Indebtedness.  JX 75 at 162:2–4; see also Tr. Vol. 2 at 152:24–153:19 (Ball responding "No" when asked whether his deposition testimony "confirm[s] that Total Indebtedness is growing"), 256:16–19 (Ball responding "Yes" when asked "Do you understand that the premiums that comprised the Total Indebtedness, those continued to accrue?").  These inconsistences in Ball's testimony cannot be ignored.

125.     At bottom, the Court does not find Ball's inconsistent, uninformed, and biased testimony about the definition of Total Indebtedness to be credible.  Because of this, and the overwhelming evidence calling for a different interpretation of Total Indebtedness than that Ball

and Senator Justice assert, the Court gives his testimony little weight.  See Neal, 2006 WL 2270036, at *5.

126.    Considering all of the extrinsic evidence together and weighing the credibility of the witnesses' testimony, the Court finds that even if the definition of Total Indebtedness is ambiguous, the parties' course of conduct demonstrates that it constitutes $3,538,400.75, *plus* any additional premiums that become 60 days or most past due.[11]  The Court will proceed accordingly with that definition.

**B.      Term**

127.    This brings the Court to the contractual term not addressed in the parties' summary judgment briefing—the length, or term, of the Amended Agreement and Guaranty. (See Doc. No. 68 at 19 n.12).

**1.    The Term Governing the Damages Owed to Lexon is Unambiguous.**

128.    Lexon contends that the unambiguous terms of the Amended Agreement and Guaranty express the parties' intent that the Amended Agreement remains in effect—and, in turn, for unpaid premiums to continue to accrue in the Total Indebtedness—until the Obligors satisfy the Obligations in full.

129.    However, Senator Justice argues that because the Amended Agreement detailed a payment schedule that (1) the New Collateral Replenishment Obligation would conclude in April

---

[11] Because there is no question that the Total Indebtedness is clearly defined in this manner, the Court need not engage with Senator Justice's arguments that the term should be construed against Lexon because it drafted the Amended Agreement and Guaranty.  See Henson v. Lamb, 199 S.E.459, 461–62 (W. Va. 1938) (only "[i]n the case of doubt" is "the construction of a written instrument [] to be taken most strongly against the party preparing it").

2021, JX 18 ¶ 2; and (2) the Total Indebtedness would be paid by October 1, 2021, id. ¶ 3; JX 31, 37, dictating that the terms of the Amended Agreement and Guaranty end on October 1, 2021.[12]

130.     At the summary judgment stage, the Court concluded that the term of the Amended Agreement (and, accordingly, the Guaranty) seemed ambiguous, given the lack of briefing and discussion on the matter.  (See Doc. No. 68 at 19 n.12).

131.     However, now that the Court has the benefit of full briefing and evidence on the terms of the Amended Agreement and Guaranty, the Court concludes that the terms of the Amended Agreement and Guaranty are unambiguous and provide that both continue until the Obligations are paid in full.

132.     The Court begins by applying the same rules of contractual interpretation to the plain language of the Amended Agreement and Guaranty as used above.  See supra, Section II.A.

133.     As relevant here, the Guaranty expressly provides that Senator Justice's obligations thereunder "appl[y] until the . . . payment and satisfaction in full of all of the Obligations."  JX 17 ¶ 5(a).

134.     The Guaranty's recitals specifically define the Obligations as the New Collateral Replenishment Obligation and New Indebtedness Payment Obligation outlined in the Amended Agreement.  JX 17, Recitals ¶¶ 3(i)–(ii).

135.     On the first, the Amended Agreement provides that Obligors must "deliver to Lexon new collateral in the total sum of Twenty Million U.S. dollars ($20,000,000.00) (the 'New Collateral')," and Obligors' obligation to pay $250,000.00 monthly Collateral Payments towards

---

[12] The Amended Agreement contemplates that the Obligors would have paid their premium payments due under the Total Indebtedness obligation by August 2020.  However, Senator Justice concedes that this deadline was extended to October 1, 2021 through the Side Letter Agreements. (See JX 31, 37).

the New Collateral "end[s] on the date that Lexon confirms it has received [the] New Collateral[,]" JX 18 ¶ 2 at 2–5, *i.e.*, the New Collateral Replenishment Obligation. JX 17, Recitals ¶ 3(i).

136. On the second, the Amended Agreement provides that Obligors must "pay Lexon the sum of Two Hundred Thousand U.S. dollars ($200,000) per month until the Total Indebtedness is paid in full (the 'Premium Payments')[,]" JX 18 ¶ 3(b)(i), *i.e.*, the New Indebtedness Payment Obligation. JX 17, Recitals ¶ 3(ii).

137. In reading the plain terms of the Amended Agreement and Guaranty together, it is evident that both the Amended Agreement and Guaranty last until the New Collateral Replenishment Obligation (the $20,000,000.00) and New Indebtedness Payment Obligation (as defined in Section II.A) are paid and satisfied in full. See Blake, 685 S.E.2d at 901; see also M.M. & D.D. Brown v. Western Maryland Ry. Co., 99 S.E. 457, 459 (W. Va. 1919) ("The normal end or termination of every contract is performance in accordance with the agreement, and such a consummation should be the presumptive one."); cf. McCarthy Bldg. Companies, Inc. v. Mt. Hawley Ins. Co., 2021 WL 8533897, at *4 (C.D. Cal. Feb. 24, 2021) (concluding that the plain meaning of the term "life of this Agreement" was "until performance by both parties is complete").

138. Therefore, it follows that neither the Amended Agreement, nor the Guaranty, terminate until Obligors or Senator Justice have fulfilled the purpose of the Amended Agreement and Guaranty—to repay the Obligors' collateral and premium debts as defined under the Amended Agreement. First Nat. Bank of Bluefield v. Clark, 447 S.E.2d 558, 562 (W. Va. Ct. App. 1994) ("It is generally recognized in this State that the failure of parties to fix a time or definite time for performance does not normally defeat a contract. Instead, the law generally indicates that, where a contract fixes no definite time for performance, the law usually implies that performance shall be within a reasonable time."); cf. Sanchez v. Dep't of Veterans Affs., 949 F.3d 734, 737 (Fed.

34

Cir. 2020) (where there is no fixed date to a contract, it continues until the contract's purpose is accomplished); Ctr. of Hope Christian Fellowship, Loc., Church of God in Christ v. Wells Fargo Bank Nevada, N.A., 781 F. Supp. 2d 1075, 1080 (D. Nev. 2011) (noting that "contracts to repay debt . . . terminate only when the debt is satisfied").

139.    This interpretation is also consistent with other facets of the Amended Agreement and Guaranty.  Indeed, that the parties did not include in the Amended Agreement or Guaranty a fixed end-date for the Obligations, especially when the Amended Agreement has multiple specific payment due dates, demonstrates that the parties did not intend for the Amended Agreement to terminate on a specific date.  See Harbert v. Harrison Cnty. Ct., 39 S.E.2d 177, 186 (W. Va. 1946) (explaining that "the well recognized and long established principle of interpretation of written instruments that the express mention of one thing implies the exclusion of another, *expressio unius est exclusio alteriu*s . . . extends to all instruments requiring judicial construction") (emphasis added).

140.    Senator Justice insists this is not the case, given paragraphs 3(c) and 3(d) of the Amended Agreement.

141.    First, Senator Justice argues that because paragraph 3(c) of the Amended Agreement states that additional amounts of premium "may become due during the term of this Agreement" regarding Total Indebtedness, to interpret the Amended Agreement as ending when the Total Indebtedness is paid in full would be circular.

142.    Senator Justice's argument is easily rejected.  In reading the language of paragraph 3(c) as a whole, it contemplates that where additional premiums become 60 days or more past-due during the course of the Amended Agreement, those values are added to the Total Indebtedness. JX 18 ¶ 3(c); see Lopez, 908 S.E.2d at 514.  The use of the word "term" in paragraph 3(c),

therefore, merely contemplates that it would take the Obligors some time to pay off the Total Indebtedness, time during which they may accrue new premium debts. It does not define the term of the Amended Agreement in any manner that contradicts with the Court's conclusion here.

143. Second, Senator Justice asserts that the Court's interpretation is contrary to paragraph 3(d). Specifically, paragraph 3(d) provides that when the Total Indebtedness is paid in full, the Obligors must pay Lexon *either* (1) any additional premiums due, or (2) $200,000 per month, whichever is greater. JX 18 ¶ 3(d).

144. According to Senator Justice, paragraph 3(d) demonstrates that the parties' fulfillment of the Obligations did not terminate the Amended Agreement and Guaranty, given that the Obligors were still required to maintain premium payments after the Total Indebtedness was satisfied.

145. This argument is as unconvincing as the first, as Senator Justice continues to improperly view the Total Indebtedness terms in a silo. In doing so, Senator Justice takes for granted that paragraph 3(d) served to ensure that the Obligors continued to make premium payments that became due under the GAIs as if they *did* comply with the payment plan, governing the Total Indebtedness in the Amended Agreement and finished paying the Total Indebtedness Obligation before the Collateral Replenishment Obligation. See supra, Section II.A. In fact, this did not and has not occurred.

146. Ultimately, Senator Justice's desire to cut off the Obligations prematurely does not work when viewing the plain terms governing the timeline of the Amended Agreement and Guaranty. Given the foregoing, the Court concludes that the plain terms of the Amended Agreement and Guaranty unambiguously state that their terms continue until the Obligors' Obligations are paid and satisfied in full.

2. **Even if the Term is Ambiguous, Extrinsic Evidence Supports the Court's Interpretation.**

147.     Even if the Amended Agreement and Guaranty are ambiguous on their terms, the documentary and testimonial evidence presented at trial leads the Court to the same interpretation as described above.

148.     The context in which the parties negotiated the Amended Agreement and Guaranty supports a finding that the parties intended for the contracts to continue until the Obligations are paid in full.

149.     The Court starts with where the Obligations arise from: the GAIs.  Under the GAIs, the Obligations continue without a fixed end date until the bond is released or discharged, or replaced with another surety's bond.  See, e.g., JX 4 ¶¶ 1, 3.

150.     As explained above, the Obligors failed to satisfy their collateral and premium obligations under the GAIs.  See JX 3, Recitals ¶ 1 (noting that Lexon previously executed bonds on behalf of Obligors and that Obligors "currently owe premium to Lexon").  In light of their continuing relationship, the parties negotiated the terms reflected in the Amended Agreement and Guaranty to address Obligors' ongoing failure to meet those obligations.

151.     Accordingly, it is only logical that just as the Obligors' underlying collateral and premium obligations continue until they satisfy the obligations secured by a bond, the Amended Agreement and Guaranty continue until the Obligors or Senator Justice satisfy the Obligations thereunder.  See Tr. Vol. 1 at 189:9–10 ("So there is no term. It depends on defendant.").

152.     Understanding that the Obligors did not pay the premiums owed under the Agreement (i.e., the Remaining Indebtedness), and that the Obligors had failed to make premium payments due after the execution of the Agreement (i.e., the New Indebtedness), Lexon sought to ensure that the Obligors' New Indebtedness Payment Obligation would continue until the premium

account was made current.  See JX 6 at 2; Tr. Vol. 1 at 60:17–61:2, 120:11–21, 123:19–22, 126:20–127:2.

153.    Accordingly, Lexon's goals in entering the Amended Agreement, as demonstrated by the undisputed contemporaneous evidence from the parties' negotiations, would not have been served if the Amended Agreement terminated before payment of all outstanding Obligations.  See id.

154.    As explained above in Section II.A.2, the parties' conduct following the signing of the Amended Agreement also evidences that they understood premiums would continue to accrue under the Amended Agreement until those premiums were paid in full.  See Bruce McDonald Holding Co. v. Addington Inc., 825 S.E.2d 779, 785 (W. Va. 2019) (in the context of ambiguous contractual language, the parties' "practical interpretation . . . as shown by their acts and conduct, is entitled to great, if not controlling, weight") (citation omitted).  For instance, if the parties intended for the Amended Agreement to terminate on October 1, 2021 as Senator Justice suggests, regardless of whether the Obligors satisfied their Obligations, the Obligors would not have offered a payment plan proposing payments through December 31, 2021.  See JX 45 at 2 (October 8, 2020 letter from Jay Justice and Ball proposing a "workable solution that addresses Sompo's collateral request" that extended payments through December 31, 2021).

155.    Senator Justice's arguments otherwise advocating for the October 1, 2021 end date to the Amended Agreement and Guaranty are illogical and not supported by admissible parol evidence.

156.    As an initial matter, it would be commercially unreasonable to conclude that the parties intended to end the Amended Agreement on a date when the Obligors were supposed to, but did not, satisfy their New Collateral Replenishment Obligation.  See Dunbar, 218 624 S.E.2d

at 591 (courts should not interpret contracts in a manner that create absurd results). This is particularly so, given that the Amended Agreement was intended to address the Obligors' flawed payment history. See JX 18, Recitals ¶¶ 1–2 (acknowledging that the Obligors breached the Agreement and that Senator Justice breached the Original Guaranty).

157.     Senator Justice's policy arguments fare no better. First, Senator Justice argues that if completion of performance always governed the term of a contract, then every contract breached through nonperformance would continue for an indefinite term. On this point, Senator Justice fails to appreciate that this is a three-party contract, where Lexon remains responsible for the Obligors' performance under the bonds, regardless of whether the Obligors pay. See Tr. Vol. 1 at 25:14–26:15, 26:16–27:2. To allow Senator Justice and the Obligors to push all of the Obligors' Obligations onto Lexon, without solution, would make little commercial or practical sense. See Ctr. of Hope Christian Fellowship, Loc., Church of God in Christ, 781 F. Supp. 2d at 1080 (contracts to repay debts terminate when the debt is satisfied).

158.     Second, Senator Justice points to various pieces of evidence demonstrating that the Obligors will never be able to make premium payments to Lexon, or pay the $14,250,000 balance in New Collateral, indicating the terms of the Amended Agreement and Guaranty may extend in perpetuity if the Court were to find the term continues until the Obligations are repaid in full. See, e.g., Tr. Vol. 2 at 78, 131–132.

159.     True, Senator Justice is correct that "courts should not construe ambiguous writings to create lifetime promise[,]" M & G Polymers USA, LLC v. Tackett, 574 U.S. 427, 441 (2015), and that where a contract does not provide a time for performance, the "law implie[s] a reasonable time." Huminsky v. Gary Nat. Bank, 150 S.E. 9, 10 (W. Va. 1929). But this matters little considering (1) the term here is not ambiguous, see supra, Section II.B.1, and (2) a "reasonable

time" depends on the circumstances of the case.  Id.  Given that the Obligors *continue* to benefit from the tripartite contract between the parties here, it is reasonable that their Obligations—and, in turn, Senator Justice's—continue during the use of the surety bonds.[13]  See JX 4 ¶ 1 at 2; see also Tr. Vol. 1 at 37:14–38:6.

160.    Because the Court remains unconvinced by Senator Justice's arguments that the Amended Agreement and Guaranty concluded on October 1, 2021, this Court finds that the Amended Agreement and Guaranty do not terminate until the Obligors have paid both collateral and premium Obligations in full—*i.e.*, until Lexon receives $20,000,000.00 in collateral and payment of all premiums at least 60-days past due.

### C.    Lexon's Award of Premiums and Collateral Damages

161.    Following summary judgment, this Court awarded Lexon the following amounts: (1) New Collateral Replenishment Obligation: $14,250,000.00; (2) Remaining Indebtedness: $1,025,000.00; and (3) New Indebtedness that accrued between the execution of the Agreement and the Amended Agreement: $2,513,400.75.  (Doc. No. 68).

162.    Thus, for the New Indebtedness Payment Obligation, this Court found on summary judgment that Lexon is entitled to at least $3,583,400.75 (Remaining Indebtedness plus New Indebtedness that accrued between the execution of the Agreement and Amended Agreement). (Doc. No. 68 at 19).  The Court concluded that amount, plus additional premiums that became due during the Amended Agreement's term, minus any payments made of the New Indebtedness Payment Obligation by the Obligors" constitutes Lexon's award.  (Id.).

---

[13] Senator Justice makes two other policy arguments for interpreting the Amended Agreement and Guaranty to end on October 1 2021, asserting the Court's interpretation of their term leads to illogical results.  Because both of Senator Justice's arguments rely on false interpretations of various provisions of the Amended Agreement and Guaranty that the Court has already repeatedly discarded, it need not address them again substantively here.

163.   As demonstrated by Lexon at trial and confirmed by this Court's review of the Premium Tracker, other evidence, and testimony, the additional New Indebtedness that has accrued during the term of the Amended Agreement and is owed by Senator Justice—after accounting for the $3,538,400.75 already awarded by this Court—totals $7,391,308.49.

164.   The Court makes this calculation by subtracting $3,538,400.75 (the Total Indebtedness amount this Court already awarded) from the Total Indebtedness owed as of September 30, 2025, as indicated by the Premium Tracker, constituting $10,929,709.24.  JX 76.

165.   Accordingly, the amount due to Lexon by Senator Justice under the Guaranty is determined by adding $10,929,709.24 (the New Indebtedness Payment Obligation) plus $14,250,000.00 (the New Collateral Replenishment Obligation), which equals $25,179,709.24.

166.   Senator Justice is responsible for that unpaid amount in its entirety under the Guaranty.  JX 17 ¶ 5(a) (Senator Justice's "obligations under the Guaranty are 'continuing in nature and appl[y] until the . . . payment and satisfaction in full of all of the Obligations.'"); see also JX 18 ¶ 5(e) ("There is no [] cap on [Senator Justice's] liability with respect to Total Indebtedness, i.e., premiums").

1.  **Prejudgment Interest**

167.   As the prevailing party on its breach of contract claim, Lexon is entitled to seek recovery of prejudgment interest on any damages awarded.  See W. Va. Code Ann. § 56-6-27; see also Ringer v. John, 742 S.E.2d 103, 107 (2013) (in breach of contract actions, claimants are entitled to seek, but are not entitled to a mandatory award for, prejudgment interest); Velasquez v. Roohollahi, 2014 WL 5546140, at *3–4 (W. Va. Nov. 3, 2014) (in a bench trial, the court may award prejudgment interest).

168.   At summary judgment, the Court found that Lexon is entitled to prejudgment damages owed to Lexon under Count I.  (Doc. No. 68 at 22 n.15).  The Court reaffirms that its

decision to award prejudgment interest, and "does so in this case because of the delay in recovering damages." Com. Builders, Inc. v. McKinney Romeo Props., LLC, 2022 WL 16706973, at *14 (N.D. W. Va. May 18, 2022) (awarding prejudgment interest for the same reason).

169.    Senator Justice does not dispute that prejudgment interest is appropriate for the Total Indebtedness portion of Lexon's damages award, but argues that "no prejudgment interest should be awarded on the collateral portion of the judgment because collateral exists for security, not for the holder's use." Doc. No. 93 at 10.

170.    The Court is unconvinced. As Sentman credibly explained at trial, "collateral is held to pay for any claims or any issues that come up during the term of the bond." Tr. Vol. 1 at 29:12–22. If the collateral is depleted, as it was here due to Senator Justice's breach of the Guaranty, Lexon was forced to "come out of pocket" to pay for those claims. Id. at 44:16–23.

171.    Given this, an award of prejudgment interest on the collateral portion of the judgment compensates Lexon for its loss of the use of the collateral. See, e.g., Potts v. Maryland Games, LLC, 2019 WL 4750339, at *4 (D. Md. Sept. 27, 2019) (explaining that "an award of pre-judgment interest" compensated the plaintiff's missed "use of the Collateral").

172.    Accordingly, the Court finds that Lexon is entitled to prejudgment interest on the entire principal amount of $25,179,709.24.

173.    Notably, W. Va. Code Ann. § 56-6-27 does not prescribe how prejudgment interest should be calculated. In general, courts have discretion to choose the rate of prejudgment interest that "will compensate [the prevailing party] for the delay in recovering damages when consideration is given to . . . the money market at the time," even where the underlying claim is rooted in state law. Chesapeake & Ohio Ry. Co. v. Elk Refin. Co., 186 F.2d 30, 35 (4th Cir. 1950); see also Montgomery Ward & Co. v. Collins Estate, Inc., 268 F.2d 830, 839 (4th Cir. 1959).

174.     In making this calculation, courts have observed that "in order to make the injured parties whole, the prejudgment interest should reflect the injured party's borrowing costs." Dijkstra v. Carenbauer, 2015 WL 12750449, at *7 (N.D. W. Va. July 29, 2015) (quoting Zerkel v. Trinity Res. Inc., 2013 WL 3187077, at *2 (N.D. W. Va. June 20, 2013)).

175.     In determining this, it is helpful to look to West Virginia's law instructing the administrative office of the Supreme Court of Appeals of West Virginia to "annually determine the prejudgment interest rate to be paid upon judgment or decrees for the payment of money." W. Va. Code Ann. § 56-6-31(b)(1) (emphasis added); see also Branch Banking & Tr. Co. v. Logan Oncology Care Assocs., LLC, 2019 WL 3928678, at *3 (S.D. W. Va. Aug. 19, 2019) ("Under West Virginia law, prejudgment interest must be awarded on contractual obligations at a rate set in the agreement or at the legal rate set by statute."); W. Virginia Mut. Ins. Co. v. Matulis, 910 S.E.2d 777, 789, 807 (W. Va. Ct. App. 2024) (affirming circuit court's calculation of prejudgment interest on damages for breach of contract pursuant to W. Va. Code § 56-6-31).

176.     In July 2023, when Lexon filed the Complaint, the applicable interest rate was 7.00% per year. 2023 Interest Rate on Judgments and Decrees, Admin. Off. of the Sup. Ct. of Appeals of W. Va. (Jan. 4, 2023), https://www.courtswv.gov/sites/default/pubfilesmnt/2023-08/jan4_23.pdf.

177.     Applying the above principles here, Lexon is therefore entitled to prejudgment interest at an annual rate of 7% as a reasonable proxy for market conditions.

178.     As explained above, Lexon is entitled to an award of damages equal to $25,179,709.24. Accordingly, Lexon is entitled to 7% in prejudgment interest annually on the principal amount of $25,179,709.24, running from July 27, 2023 to the date judgment is entered.

179.     As of October 30, 2025, the prejudgment interest amount is equal to $3,887,333.19.

43

180.    Combining the prejudgment interest amount of $3,887,333.19 with the damages amount of $25,179,709.24, Lexon is entitled to $29,067,042.43 of damages plus prejudgment interest.

### 2. **Post-Judgment Interest**

181.    Having determined prejudgment interest, the Court turns to the final issue posed by the parties during trial: the amount, if any, of post-judgment interest Lexon is entitled to.

182.    While prejudgment interest is governed by West Virginia law, post-judgment interest is a question of federal law. 28 U.S.C. § 1961; see Jack Henry & Assocs., Inc. v. BSC, Inc., 487 F. App'x 246, 260 (6th Cir. 2012) (recognizing the default rule that, "federal law [i.e., § 1961] controls post-judgment interest even while state law governs awards of prejudgment interest") (internal quotation marks omitted).

183.    Section 1961 provides:

(a) Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

(b) Interest shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31, and shall be compounded annually.

184.    Under § 1961, the applicable rate of post-judgment interest is 3.57% per annum for judgment entered on October 30, 2025. See 28 U.S.C. § 1961; see also Selected Interest Rates, Board of Governors of the Federal Reserve System, https://www.federalreserve.gov/releases/h15/ (last visited Oct. 29, 2025). Accordingly, Lexon is entitled to 3.57% post-judgment interest,

44

running from the date of entry of the judgment "to the date of payment," and compounded annually. 28 U.S.C. §§ 1961(a)–(b).

185. This Court retains jurisdiction to ensure that its judgment is properly complied with. See, e.g., Fed. R. Civ. P. 69(a)(2) (permitting judgment creditors to obtain discovery "[i]n aid of the judgment or execution"); Peacock v. Thomas, 516 U.S. 349, 356 (1996) ("We have reserved the use of ancillary jurisdiction in subsequent proceedings for the exercise of a federal court's inherent power to enforce its judgments.").

III.  **CONCLUSION**

For the foregoing reasons, the Court finds that Senator Justice is liable for breaching the Amended Agreement and Guaranty, and under the terms of both must make Lexon whole. Accordingly, Lexon will be awarded $25,179,709.24 in principal, plus $3,887,333.19 in prejudgment interest, and post-judgment interest at 3.57% per annum, compounded annually, running from the date of entry of the judgment to the date of Senator Justice's payment, compounded annually.

An appropriate order will enter.


WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE