**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

Kelly L. Stephens
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: October 09, 2026

Ms. Sara Brauerman
Mr. Jason Halper
Ms. Timbre Shriver
Vinson & Elkins
1114 Avenue of the Americas
32nd Floor
New York, NY 10036

Ms. Garrah Carter
Bass, Berry & Sims
21 Platform Way, S.
Suite 3500
Nashville, TN 37203

Mr. Wade Brantley Phillips Jr.
Bass, Berry & Sims
21 Platform Way, S.
Suite 3500
Nashville, TN 37203

Mr. David Pogue
Mr. Steven R. Ruby
Carey, Douglas, Kessler & Ruby
707 Virginia Street, E.
Suite 901 Chase Tower
Charleston, WV 25301

Mr. Peter C. Robison
Lewis Thomason
1201 Demonbreun Street
Suite 1000
Nashville, TN 37203

Re: Case No. 25-6096, *Lexon Insurance Company v. James Justice, II*
Originating Case No. 3:23-cv-00772

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely
Deputy Clerk

cc: Ms. Vicki R Kinkade

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0281p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LEXON INSURANCE COMPANY,

*Plaintiff-Appellee*,

*v*.

JAMES C. JUSTICE, II,

*Defendant-Appellant*.

No. 25-6096

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:23-cv-00772—Waverly D. Crenshaw, Jr., District Judge.

Argued: July 30, 2026

Decided and Filed: October 9, 2026

Before: STRANCH, BUSH, and MURPHY, Circuit Judges.

## COUNSEL

**ARGUED:** David R. Pogue, CAREY DOUGLAS KESSLER & RUBY, PLLC, Charleston, West Virginia, for Appellant. Jason M. Halper, VINSON & ELKINS LLP, New York, New York, for Appellee. **ON BRIEF:** David R. Pogue, Steven R. Ruby, CAREY DOUGLAS KESSLER & RUBY, PLLC, Charleston, West Virginia, Peter C. Robison, LEWIS THOMASON P.C., Nashville, Tennessee, for Appellant. Jason M. Halper, Sara E. Brauerman, Timbre L. Shriver, VINSON & ELKINS LLP, New York, New York, W. Brantley Phillips, Jr., Garrah Carter-Mason, BASS, BERRY & SIMS PLC, Nashville, Tennessee, for Appellee.

## OPINION

MURPHY, Circuit Judge. Senator James C. Justice II and his family own and operate several coal companies. These companies obtained bonds from Lexon Insurance Company.

After the companies fell behind on their premium payments for the bonds, they signed a contract with Lexon agreeing to get up to speed. Senator Justice personally guaranteed these payments as well. But the companies still did not pay the agreed-upon amounts. Lexon thus sued Justice under his personal guaranty. The district court held him liable for about $25 million. Justice now raises arguments about the meaning of the contract and the guaranty to challenge a portion of this award. Yet we agree with the district court's readings of these documents. We thus affirm.

I

States typically prohibit coal companies from mining coal without a permit. To obtain a permit, a company often must secure a surety bond. "A surety bond is a tripartite contract." Tr., R.119, PageID 1956. The insured (typically, a coal company) owes duties of performance to an "obligee" (typically, a state agency). *Id.*, PageID 1956–57. When applying for a permit, for example, coal companies often promise to restore the mined land "to its preexisting condition" after they complete their operations. *Id.*, PageID 1957. And the surety (typically, an insurer) will "guarantee the faithful performance" of the insured's duties, including this reclamation duty. *Id.* Unlike a typical insurer, a surety cannot "cancel[]" a bond on its own if a company fails to pay the premiums. *Id.*, PageID 1959–60. So the bond "remains in full force" until the obligee releases it or the company meets its obligations. *Id.*, PageID 1959–60, 1963. Also unlike a typical insurer, the surety may seek reimbursement from companies if they fail "to honor their obligations" and thereby require the surety to cover them. *Id.*, PageID 1959.

This case involves two of the three parties to the surety-bond relationship. "Lexon is a surety bond provider." *Id.*, PageID 1953. When Lexon issues a surety bond to a coal company, it assumes the risk that the company might breach its reclamation duties at the end of the mining. This bond thus exposes Lexon to potentially massive liability. Lexon takes two steps to mitigate its financial exposure. It requires coal companies seeking a bond to agree to pay annual premiums. And Lexon requires these companies to post adequate collateral that it may use for reimbursement if the companies require it to pay for any of their obligations.

Several coal companies and affiliates owned by Senator Justice and his family (along with one other affiliate) sit on the insured side of the surety relationship. We will call all these entities "the Companies." The Companies began to obtain surety bonds from Lexon in 2010. The bonds exposed Lexon to the Companies' obligations to regulators, which have consistently exceeded $100 million in risk. When creating each bond, Lexon and the Companies entered into general indemnity agreements. These agreements required the Companies to pay annual premiums.

The Companies' financial condition has deteriorated during their relationship with Lexon. They paid their premiums on time for years. Over the past decade, however, the coal industry has faced a "difficult" environment and "depressed" coal market. Tr., R.120, PageID 2213–14. As a result, the Companies started to miss premium payments around 2016. Lexon responded by requiring them to set aside collateral. This collateral eventually reached almost $20 million. By early 2018, the collateral had declined to about $5 million. And although the Companies still had not made all their required premium payments, they sought to reduce the collateral even more.

In March 2018, therefore, Lexon and the Companies signed an agreement designed to release the Companies' collateral and help them catch up on past-due premiums. Lexon agreed to release $5 million of collateral so that the Companies could pay down certain debts (including reclamation expenses that would reduce various Lexon-backed obligations). In exchange, the Companies agreed to post $5 million in new collateral within six months and to pay the $3 million they owed in past-due premiums within two months. As a condition to this agreement, Lexon required Senator Justice to personally guarantee the Companies' duties to provide the collateral and pay the premiums.

By early 2019, though, the Companies still had not met their obligations under this agreement. They had failed to post any of the $5 million in collateral. And they still owed $1.025 million in past-due premiums.

Lexon and the Companies thus entered what we will call the "Amended Agreement"—the one that matters for this appeal—in February 2019. This agreement modified both the

Companies' collateral obligations and their premium obligations. As for the collateral obligations, the Amended Agreement required the Companies to post $20 million in new collateral by April 1, 2021. They agreed to fund this collateral in the allotted time by paying monthly installments of $250,000, selling some equipment, and making larger periodic payments on certain dates.

As for the premium obligations, the Amended Agreement first identified the amounts that the Companies owed. It calculated the "Remaining Indebtedness" (the amount that the Companies owed under the prior agreement) as $1,025,000. Joint App'x (J.A.) 151. In the meantime, though, the Companies had continued to miss premium payments. The Amended Agreement thus made clear that "additional premium of $2,513,400.75 [was then] due and owing (the 'New Indebtedness')." *Id.* The Amended Agreement also contemplated that "additional amounts for premium may become due during the term of this Agreement," so this New Indebtedness would increase if the Companies missed current premium payments by 60 days. *Id.* at 152–53. The Amended Agreement added: "The Remaining Indebtedness together with the New Indebtedness is equal to $3,538,400.75 (the 'Total Indebtedness')." *Id.* at 151. The Companies agreed to pay $200,000 a month toward this "Total Indebtedness" until it was "paid in full[.]" *Id.*

Before entering into this agreement with the Companies, Lexon required Senator Justice to give another personal guaranty. If the Companies breached the Amended Agreement, Justice promised to repay the amounts of unpaid collateral and premiums due "within three (3) business days" of receiving Lexon's written demand. J.A. 139. But the guaranty capped Justice's payment obligations. As relevant here, it "limited" his liability "to a total sum equal to (i) twenty million U.S. dollars ($20,000,000.00) plus (ii) the amount of the Total Indebtedness specified in the" Amended Agreement. J.A. 141–42.

Unfortunately, the Companies' conditions did not improve after the Amended Agreement. When they continued to struggle to make timely payments, they asked Lexon for an amended payment schedule. Lexon consented twice. In two side letter agreements from January and March 2020, it adjusted the Companies' payment obligations. Lexon suspended the obligation to make the monthly $250,000 collateral payment for six months, pushing back the

requirement to pay the full $20 million to October 1, 2021. But Lexon asked the Companies to temporarily increase their premium payments. The $200,000 monthly amount was not "closing the gap" on the total past-due premiums because the Companies were failing to pay all their current premiums (which became past due after 60 days). J.A. 298. The January 2020 side agreement thus required the Companies to make six monthly premium payments of $250,000 (not $200,000).

Even after entering into these additional letter agreements, the Companies still could not meet their collateral and premium obligations. Ultimately, the Companies paid only $5.75 million of the $20 million they owed in collateral and made no collateral payments after December 2019. Similarly, the Companies paid $4.21 million in premiums starting in February 2019, but they stopped making *any* premium payments in March 2021. Lexon thus sent the Companies default letters that demanded payment on the outstanding collateral and premiums. Yet the Companies never paid the entire amounts owed.

When the Companies did not pay, Lexon turned to Senator Justice. In July 2023, Lexon sent him a letter demanding payment of the outstanding collateral and premium obligations plus interest. Under the guaranty, Justice had three days to satisfy these amounts. But he declined as well.

Lexon thus sued Justice to enforce the guaranty. At the summary-judgment stage, the district court largely ruled for Lexon. *See Lexon Ins. Co. v. Justice*, 2024 WL 4960006, at *21 (M.D. Tenn. Dec. 3, 2024). It held that Justice breached the guaranty as a matter of law when he failed to pay upon Lexon's written demand. *See id.* at *5–7. But it also held that a genuine issue of material fact existed on Lexon's damages. *See id.* at *8. The guaranty limited Justice's liability to a combination of $20,000,000.00 for the collateral plus the amount of the Total Indebtedness on the past-due premiums. *See id.* The court concluded as a matter of law that Justice owed $14.25 million for the collateral ($20 million minus the $5.75 million that the Companies already paid). *See id.* at *11. But it found a dispute of fact over the amount of "Total Indebtedness" owed to Lexon for past-due premiums. *See id.*

The court held a two-day bench trial on damages. *See Lexon Ins. Co. v. Justice*, 808 F. Supp. 3d 841, 845 (M.D. Tenn. 2025). It recognized that the initial "Total Indebtedness" (the amount of overdue premiums) equaled $3,538,400.75 at the time of the Amended Agreement. *See id.* at 851. It also recognized that the Companies had paid $4.21 million in premium payments—more than the initial amount of Total Indebtedness. *See id.* at 852. But it interpreted the phrase "Total Indebtedness" to represent a dynamic figure that would increase every time the Companies missed a current premium payment by 60 days. *See id.* at 853–62. It next held that the Amended Agreement's "term" extended until the Companies "paid" the collateral and premium obligations "in full." *Id.* at 863–67. These interpretations clarified the amount of Total Indebtedness owed. Since the Amended Agreement's start in February 2019, the Companies had accrued $7,391,308.49 in additional tardy premiums. *Id.* at 867. The Total Indebtedness thus equaled $10,929,709.24 (the initial $3,538,400.75 plus $7,391,308.49). *See id.* (According to the testimony of a Lexon witness, this figure "account[ed] for any dollars previously paid" by the Companies (which we take to include the $4.21 million). Tr., R.120, PageID 2200.) When combined with the $14.25 million of collateral that Justice owed, the court entered judgment against him for $25,179,709.24 (plus interest). *See Lexon*, 808 F. Supp. 3d at 869–70.

## II

On appeal, the parties debate three questions about the meaning of the Amended Agreement and Senator Justice's personal guaranty. First: Does the Amended Agreement define "Total Indebtedness" as a static amount of $3,538,400.75 (as Justice says) or as a dynamic amount that increases when the Companies miss additional premium payments (as Lexon says)? Second: If Lexon's view of "Total Indebtedness" is correct, does Justice's guaranty nevertheless cap his liability at $3,538,400.75? And third: Does the Amended Agreement's term end on a specific date (as Justice argues) or on the date that the Companies satisfy their obligations (as Lexon argues)?

All three contract questions follow the same ground rules. The parties agree (and so we may assume) that West Virginia contract law governs these questions. *See Dahdah v. Rocket Mortg., LLC*, 166 F.4th 556, 566 (6th Cir. 2026). Under West Virginia law (as under most States' contract laws), courts must decide whether a contract's language has one unambiguous

meaning without resort to evidence outside the contract. *See Miller v. WesBanco Bank, Inc.*, 859 S.E.2d 306, 328 (W. Va. 2021); *cf. VCST Int'l B.V. v. BorgWarner Noblesville, LLC*, 142 F.4th 393, 401 (6th Cir. 2025). If the contract is unambiguous, courts must apply it as written. *See Miller*, 859 S.E.2d at 328. But if a contract is ambiguous, courts may then consider extrinsic evidence to determine its meaning. *See id.*

For each of the three questions at issue on appeal, the district court took two alternative routes to the same answer. To start, the court held—as a matter of law—that the agreements had one unambiguous meaning favoring Lexon. *See Lexon*, 808 F. Supp. 3d at 854–57, 862–65. In the alternative, it found—as a matter of fact—that the extrinsic evidence confirmed its interpretations even assuming the agreements were ambiguous. *See id.* at 857–62, 865–67. We typically review the court's first holding de novo and its second holding under the deferential clear-error standard. *See, e.g.*, *In re AmTrust Fin. Corp.*, 694 F.3d 741, 749 (6th Cir. 2012); *Campbell v. Potash Corp. of Sask., Inc.*, 238 F.3d 792, 797 (6th Cir. 2001). But we need not consider any extrinsic evidence in this case because we agree with the district court's first holding: each of the three contract questions has one unambiguous answer.

### A. Meaning of Total Indebtedness

The parties first disagree over what the phrase "Total Indebtedness" means in the Amended Agreement. Paragraph 3 of the Amended Agreement contains three important terms: "Remaining Indebtedness," "New Indebtedness," and "Total Indebtedness." J.A. 151. The parties do not dispute the meaning of the first two terms. They agree that Paragraph 3 defines the phrase "Remaining Indebtedness" as a fixed amount: "The Parties Agree the Remaining Indebtedness is equal to One Million Twenty Five Thousand U.S. dollars ($1,025,000.00)." *Id.* This number represents the amount of past-due premiums that the Companies had owed at the time of the original agreement in March 2018 and that remained unpaid at the time of the Amended Agreement in February 2019.

Next, the parties agree that the phrase "New Indebtedness" equals the sum of two components—one of which we will call the "static component" and the other of which we will call the "changing component." As for the static component, the Companies continued to miss

premium payments from the time of the original agreement (March 2018) to the time of the Amended Agreement (February 2019). These missed payments added up to an additional $2,513,400.75. Paragraph 3 of the Amended Agreement included this sum as part of the "New Indebtedness": "The Parties also agree that in addition to the Remaining Indebtedness, additional premium of $2,513,400.75 is now due and owing (the 'New Indebtedness')." J.A. 151.

As for the changing component, Lexon worried that the Companies would continue to miss premium payments after the Amended Agreement's effective date in February 2019. So a later provision of the Amended Agreement—Paragraph 3(c)—says that New Indebtedness would increase for any current premiums that became 60 days or more past due:

> The [Companies] recognize that additional amounts for premium may become due during the term of this Agreement and they hereby agree that the *New Indebtedness shall be increased in like amount* (e.g., if new premium is due on March 2, 2019 in the amount of $10,000.00, the New Indebtedness is increased by $10,000.00). Additional amounts for premiums under this sub-paragraph are those premiums that are sixty (60) days or more past due.

*Id.* at 152–53 (emphasis added).

But the parties part ways once we turn to the third term: "Total Indebtedness." Paragraph 3 of the Amended Agreement introduces this term in parentheses after a critical sentence: "The Remaining Indebtedness together with the New Indebtedness is equal to $3,538,400.75 (the 'Total Indebtedness')." *Id.* at 151. According to Senator Justice, the phrase in parentheses ("Total Indebtedness") modifies—and refers to—only the *specific number* that it sits immediately next to: $3,538,400.75. Under this view, Total Indebtedness equals that precise, and static, amount. According to Lexon, this phrase should modify the *entire sentence*: Remaining Indebtedness + New Indebtedness = Total Indebtedness. Under this alternative view, because New Indebtedness includes additional accrued premiums 60 days or more past due, Total Indebtedness likewise increases to account for these ongoing tardy premiums.

We agree with Lexon for two reasons. *First*, West Virginia contract law requires courts to read a contract "as a whole" and give effect to "all" its provisions. *Antero Res. Corp. v. Directional One Servs. Inc. USA*, 873 S.E.2d 832, 842 (W. Va. 2022) (citations modified); *Bruce McDonald Holding Co. v. Addington, Inc.*, 825 S.E.2d 779, 784–85 (W. Va. 2019). And

Lexon's view better fits the Amended Agreement as a whole. Under Paragraph 3(b), the Companies "agree[d], jointly and severally, to pay Lexon the *Total Indebtedness*" in two particular ways: by paying $200,000 per month and by selling equipment. J.A. 151–52 (emphasis added). The Amended Agreement nowhere made the Companies jointly and severally liable to pay the *New Indebtedness*. So if Total Indebtedness did not include the dynamic component of New Indebtedness, the Companies would not have agreed to pay any past-due bills after February 2019. What, then, would have been the point of Paragraph 3(c), which increases the New Indebtedness to account for these future late payments? Senator Justice's account would make this paragraph futile—something West Virginia courts try to avoid. *See Antero*, 873 S.E.2d at 842.

*Second*, West Virginia law directs courts to read two contracts on the same subject matter in the same way if they have a clear relationship to each other. *See id.* at 841–42; *TD Auto Fin. LLC v. Reynolds*, 842 S.E.2d 783, 788 (W. Va. 2020). Senator Justice does not challenge the district court's conclusion that this rule applies to the Amended Agreement and his personal guaranty. *See Lexon*, 808 F. Supp. 3d at 853. And his personal guaranty removes all doubt over whether Total Indebtedness includes the changing component of New Indebtedness. In particular, the description of the Amended Agreement in the guaranty's general recitals shows that the amount of the "Total Indebtedness" can change. One of the recitals states that the Companies promised to pay $200,000 per month "until the Total Indebtedness (*including any new premiums becoming due during the term of the Amended . . . Agreement*) is paid in full[.]" J.A. 138 (emphasis added). This recital thus confirms that Total Indebtedness could increase with new premiums that become past due while the Amended Agreement remained in effect. That is, it makes clear that Total Indebtedness is not a specific number and includes all components of the New Indebtedness. In short, the phrase "Total Indebtedness" unambiguously encompasses New Indebtedness and thus encompasses additional late payments during the Amended Agreement's term.

Senator Justice's responses do not convince us otherwise. As we have said, he notes that the key sentence in Paragraph 3 introduces the phrase "Total Indebtedness" in parentheses next to a specific amount: "The Remaining Indebtedness together with the New Indebtedness is equal

to $3,538,400.75 (the 'Total Indebtedness')." J.A. 151. He claims that one could read this sentence to define Total Indebtedness as that specific number rather than the combination of Remaining and New Indebtedness. We agree that the phrase might be ambiguous if we read this sentence in isolation. We also agree that Lexon could have eliminated even this initial uncertainty if it had expressly said that Total Indebtedness means the Remaining Indebtedness plus the New Indebtedness. But West Virginia law requires us to interpret the sentence together with the rest of the Amended Agreement and the related guaranty. *See Antero*, 873 S.E.2d at 841–42. When read through this broader lens, "Total Indebtedness" has a clear meaning. The contrary view would render the changing component of New Indebtedness in Paragraph 3(c) superfluous and read the Amended Agreement to conflict with the guaranty's use of the term "Total Indebtedness."

Justice challenges our claim that his view would render Paragraph 3(c) superfluous. He points to another provision in the Amended Agreement—Paragraph 3(d)—that requires the Companies to make payments even *after* they pay off the Total Indebtedness: "At such time as the Total Indebtedness is paid in full, [the Companies] shall pay Lexon (i) any additional premium due, or (ii) Two Hundred Thousand U.S. dollars ($200,000.00) per month, whichever is greater." J.A. 153. As Justice sees things, the Amended Agreement splits the payment schedule for New Indebtedness. The Companies must pay the fixed component of New Indebtedness under the payment schedule for Total Indebtedness in Paragraph 3(b). But he says that they must pay the changing component of New Indebtedness under Paragraph 3(d)'s schedule.

We see three problems with this argument. For one thing, Paragraph 3(d) nowhere refers to "New Indebtedness." Nor does it refer to the components that make up that phrase: the premium payments that are *past* due by 60 days. So it is hard to see how this paragraph concerns New Indebtedness. Rather, we agree with the district court that Paragraph 3(d) applies to *currently* due premiums that the Companies must timely pay. *See Lexon*, 808 F. Supp. 3d at 857.

For another thing, West Virginia courts presume that the same phrase has the "same meaning" throughout a contract. *Chitwood v. Farm Bureau Mut. Auto. Ins. Co.*, 188 S.E. 493, 495 (W. Va. 1936). Justice's reading violates this presumption. He reads the Amended Agreement to use the same phrase ("New Indebtedness") as defining two distinct payment

obligations with two distinct payment schedules. If the parties had intended his approach, they presumably would have defined the changing component of New Indebtedness using a different phrase—such as "Future Indebtedness."

For a third, contrary to Justice's claim, Paragraph 3(d)'s separate payment provision would not save Paragraph 3(c)'s changing component of New Indebtedness from the superfluity problem that we have identified. Even assuming (contrary to what we have said) that Paragraph 3(d)'s reference to "any additional premium due" included payments past due by 60 days, what would be the point of having a discrete paragraph that defines these past-due payments as "New Indebtedness"? Justice does not say. So only our view gives effect to that paragraph.

Apart from the superfluity problem, Justice offers almost no response to the language in his guaranty treating Total Indebtedness as covering "any new premiums becoming due during the term of the Amended" Agreement. J.A. 138. In his opening brief, he says that this "inconsistency" "cannot serve as the basis for finding" the Amended Agreement "*unambiguous*." Appellant's Br. 18. To the contrary, basic interpretive rules tell us to read that agreement in a way that renders it "harmonious" with the guaranty. *Antero*, 873 S.E.2d at 842 (citation modified). Our reading does so. But Justice's reading creates what he concedes is an "inconsistency." Appellant's Br. 18. In his reply brief, then, he switches to the argument that the guaranty's recital conflicts even with our view of Total Indebtedness because the recital allegedly suggests that this phrase covers *currently* due premiums—not just *past*-due ones. Reply Br. 11. But the recital elsewhere makes clear that it is using the phrase Total Indebtedness "as defined in the" Amended Agreement. J.A. 138. So the language "any new premiums becoming due" is best read as shorthand to refer to the qualifying premiums that become due as a result of the Companies' untimely payment. *Id.*

Out of interpretive arguments, Justice falls back on the canon of contract interpretation requiring us to read ambiguous language in an agreement against the drafter (here, Lexon). *See State ex rel. Richmond Am. Homes of W. Va., Inc. v. Sanders*, 717 S.E.2d 909, 924 & n.61 (W. Va. 2011). Lexon responds that West Virginia courts would not apply this canon to agreements (like those at issue) negotiated by sophisticated parties. But we need not opine on the canon's scope. Because the canon applies only if we find the Amended Agreement ambiguous, it has no

application here. *See Blake v. State Farm Mut. Auto. Ins. Co.*, 685 S.E.2d 895, 900–01 (W. Va. 2009). The phrase "Total Indebtedness" unambiguously includes past-due payments that arise over the life of the Amended Agreement.

B. Meaning of the Personal Guaranty

Even if the phrase "Total Indebtedness" in the Amended Agreement has this dynamic meaning, the parties next dispute whether Senator Justice's guaranty covers the entire amount of that debt. The guaranty makes Justice liable "to pay all or any part of the" Total Indebtedness that the Companies fail to cover. J.A. 138–39. But the guaranty also includes a paragraph that limits Justice's liability. The relevant provision limits Justice's guaranty "to a total sum equal to (i) twenty million U.S. dollars ($20,000,000.00) plus (ii) the amount of the Total Indebtedness specified in the Amended . . . Agreement." *Id.* at 141–42.

The parties disagree over the meaning of the phrase "the amount of the Total Indebtedness specified in the Amended . . . Agreement." *Id.* at 142. According to Justice, the precise "amount" of Total Indebtedness "specified" in the Amended Agreement is $3,538,400.75. *Id.* So understood, the limitation caps his lability at this specific amount. According to Lexon, this phrase signals that Justice remains on the hook only for Total Indebtedness—not for other things. It thus caps his liability at the full amount of that indebtedness.

We again agree with Lexon. We must give the words in the limitation on liability their "plain and ordinary meaning" under West Virginia law. *Hull Prop. Grp. v. Quarrier St LLC*, 915 S.E.2d 11, 19 (W. Va. Ct. App. 2025) (citation modified). And the phrase "the amount of the Total Indebtedness specified in the Amended . . . Agreement" unambiguously covers the entire dollar value of that indebtedness—not part of it. J.A. 142. An "amount" is simply a "number," a "sum," or the "total of two or more quantities" in "the aggregate[.]" *Am. Heritage Dictionary of the English Language* 60 (5th ed. 2018). And "specified in the Amended . . . Agreement" is a participle phrase that tells a reader *which* "amount" of Total Indebtedness Justice is liable for: the sum that the Amended Agreement "state[s] explicitly" as the Total Indebtedness. *Id.* at 1682; *see* Chicago Manual of Style ¶¶ 5.94, 5.115 (online ed.

2026). As we have explained, that sum unambiguously equals "Remaining Indebtedness together with the New Indebtedness[.]" J.A. 151. So the words "amount" and "specified" simply direct the reader back to the Amended Agreement to identify the sum that Justice owes. These words do not restrict his liability to only a *part* of the amount of Total Indebtedness specified in the Amended Agreement. *Cf. Fraternal Ord. of Police, Lodge No. 69 v. City of Fairmont*, 468 S.E.2d 712, 718 (W. Va. 1996).

The other half of the limitation on liability confirms this reading. This half does specifically "limit[]" Justice's liability to $20,000,000.00 for the Companies' collateral obligations. J.A. 142. It thus shows that the parties knew how to include a precise number. When it comes to Total Indebtedness, by contrast, the limitation on liability does not list the specific number that Justice prefers: $3,538,400.75. It instead refers generally to the "amount" of Total Indebtedness "specified"—likely because that amount could change over time. *Id*. This "difference" between the two halves of the limitation on liability "impl[ies]" that the parties understood Total Indebtedness not as a static amount, but as a dynamic one that the Amended Agreement identified how to calculate. *Gallo v. Moen Inc.*, 813 F.3d 265, 274 (6th Cir. 2016).

Justice's responses again lack merit. He first claims that the only "amount" of Total Indebtedness "specified" in the Amended Agreement is $3,538,400.75. But just because that amount is the only part of the Total Indebtedness *reduced to numerals* in the Amended Agreement does not make it the *entire* amount specified. Suppose that a contract expressly defined "Total Indebtedness" to mean $5 million plus 5% annual interest. If a separate guaranty then limited a guarantor's liability to the "amount" of Total Indebtedness "specified" in that contract, nobody would read this language as limiting the guarantor's liability to just the $5 million—without the interest. This case should be no different. The Amended Agreement "specifie[s]" the "amount" of Total Indebtedness in part as a precise number and in part as a changing number that depends on future events. J.A. 142. So both "amount[s]" are equally "specified" in the Amended Agreement. *Id.* Nor does this reading make the words "amount" and "specified" superfluous—as Justice also suggests. Those words remove all doubt that the phrase "Total Indebtedness" in the guaranty takes the same meaning as the same phrase in the Amended Agreement.

Justice next claims that this reading "places no cap on" his liability for premiums and thus "defeats the manifest purpose" of the limitation on liability. Appellant's Br. 10–12. As Justice himself points out, however, the Amended Agreement in Paragraph 3(d) requires the Companies to continue to pay premiums even after "Total Indebtedness is paid in full[.]" J.A. 153. The limitation on liability makes clear that Justice is not on the hook for these premiums. Just because it does not limit his liability as much as he would have preferred does not render it meaningless.

C. Duration of the Amended Agreement

The parties lastly dispute the term (that is, the duration) of the Amended Agreement. This dispute matters because Paragraph 3(c) of the Amended Agreement defines New Indebtedness to include past-due premiums that arise "*during* the term of this Agreement[.]" J.A. 152 (emphasis added). So Senator Justice's guaranty would not cover past-due premiums that arise *after* that term. Both sides agree that the Amended Agreement does not identify a specific end date. But they disagree over what to make of this fact. According to Justice, the Companies agreed to provide the $20 million in collateral by April 1, 2021—a deadline that the side letter agreements later extended to October 1, 2021. He thus views October 1, 2021, as a "reasonable" end of the term. Appellant's Br. 25. By that date, he adds, the Total Indebtedness approximated only $3 million. According to Lexon, the Amended Agreement continued until the Companies paid the Total Indebtedness in full. Under this view, Justice does not dispute that he would owe the $10.9 million that the district court awarded.

Lexon has the better reading for the third time. Contracts sometimes do not identify a fixed end date and instead make clear that they end "upon the occurrence of an event[.]" 17B C.J.S. *Contracts* § 608, Westlaw (database updated Apr. 2026); 11 Williston on Contracts § 31:5 (4th ed.), Westlaw (database updated May 2026) (discussing *Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*, 178 F. Supp. 655, 661–62 (S.D.N.Y. 1959), *aff'd*, 280 F.2d 197 (2d Cir. 1960)); *Kaufman v. Catzen*, 130 S.E. 292, 295 (W. Va. 1925). This principle applies here. The Amended Agreement does not set a deadline for the Companies' duty to pay "Total Indebtedness." J.A. 151–53. Rather, Paragraph 3(b) states that the Companies must pay $200,000 a month "*until* the Total Indebtedness is paid in full[.]" *Id.* at 151 (emphasis added).

When used as a conjunction, the word "until" means "up to the time that" the identified event occurs. *Am. Heritage*, *supra*, at 1901. This language shows that the Companies' duty to pay continues until their Total Indebtedness sits at zero. So the Amended Agreement's "term" lasts *at least* that long. J.A. 152.

Indeed, the *contingent* end for the $200,000 monthly premium payments stands in contrast to the *fixed* end for the Companies' obligation to pay $20 million in collateral. The Amended Agreement required the Companies to pay $250,000 a month toward collateral and to sell certain equipment to fund this obligation. But the parties recognized that these options might take too long to pay the collateral. So they set hard due dates for larger collateral payments—including the requirement to pay the full $20 million "on or before April 1, 2021." *Id*. at 150–51. And the side letter agreements then extended this deadline to October 1, 2021. *Id*. at 318–20; Tr., R.119, PageID 2090–91. But this fixed due date for collateral does *not* apply to the Companies' duty to pay the Total Indebtedness. And, as we have said, courts presume that a "difference" in language "impl[ies]" a difference in meaning. *Gallo*, 813 F.3d at 274. So, reading the contract "as a whole," the Amended Agreement's term must extend at least "up to the time" that Total Indebtedness is "paid in full" even if the Companies paid the collateral in October 2021. *Antero Res.*, 873 S.E.2d at 842 (citation modified); *Am. Heritage*, *supra*, at 1901; J.A. 151.

The difference between the original agreement (from March 2018) and the Amended Agreement (from February 2019) confirms the same point. The original agreement set a two-month deadline to pay the $3 million in past-due premiums. J.A. 52–55. But the Companies breached this payment obligation. *Id.* at 147–48. The Amended Agreement thus did not contain a similar deadline. It instead contemplated that the Companies might *continue* to breach their duty to make premium payments. And it accounted for this risk by adding these future breaches to the Total Indebtedness that the Companies must pay on an ongoing basis. *See id.* at 151–53. We thus would undercut the Amended Agreement's "main object" (to remedy these breaches) if we read it to end before the Companies paid off the Total Indebtedness. *Henderson Dev. Co. v. United Fuel Gas Co.*, 3 S.E.2d 217, 218 (W. Va. 1939); *see* 11 Williston on Contracts, *supra*,

§ 32:9; Restatement (Second) of Contracts § 202(1) (A.L.I. 1981); 17B C.J.S. *Contracts*, *supra*, § 609.

Justice's contrary view—that the obligation to pay off the Total Indebtedness ended in October 2021 with the obligation to pay the collateral—flouts the Amended Agreement's text. This October 2021 deadline applies only to the collateral. So Justice would have the Amended Agreement end even if the Companies had not paid the Total Indebtedness "in full"—contrary to their agreement "to pay Lexon" $200,000 a month "until" that point. J.A. 151.

Justice next argues that if the Companies had not incurred any New Indebtedness by systematically missing current premiums, they would have paid off the original amount of Total Indebtedness ($3,538,400.75) by August 2020. So he views it as reasonable to assume that the Amended Agreement ended with the October 2021 due date for the collateral. Yet the Amended Agreement also made clear that the Total Indebtedness would grow if the Companies continued to miss current premium payments. It thus contemplated that the Companies might not pay off the Total Indebtedness until after they completed their collateral payments. And it would be unreasonable to read the Amended Agreement's requirement to pay $200,000 per month as ending before the Companies satisfied their Total Indebtedness obligation.

Unable to rely on the Amended Agreement's language, Justice falls back on a canon of contract law. If a contract to perform on some ongoing basis has no fixed end date, courts presume that it operates at the will of the parties or for a reasonable time because of the "traditional" reluctance to "construe ambiguous writings to create lifetime promises." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441 (2015) (citing 3 Arthur L. Corbin, Corbin on Contracts § 553, at 216 (1960)); 17B C.J.S. *Contracts*, *supra*, § 608; *Warner-Lambert Pharm.*, 178 F. Supp. at 661. We see two problems with any reliance on this canon. For starters, we do not find it "ambiguous" that the Amended Agreement continues at least until the Companies pay off the Total Indebtedness. *See Tackett*, 574 U.S. at 441. And besides, the Companies' "promises" to pay $200,000 per month toward Total Indebtedness do not last indefinitely. *Id.* That obligation ends at the occurrence of an "event": the full payment of Total Indebtedness. *Warner-Lambert Pharm.*, 178 F. Supp. at 661. As another court explained, these types of event-based contracts fall "in quite a different category" than ones that "omit any point of time or any

condition which would terminate the promisor's liability[.]" *Id.* And the concerns with contracts that last into "perpetuity" apply only to the latter category, not the former one. *See id.*

Justice responds that the Companies will always lack the resources to pay off their Total Indebtedness, so the Amended Agreement will *practically* last forever even if its language *formally* shows that it can end. But the Companies' unfortunate financial predicament provides no basis to rewrite the contract to help them. As a treatise explains, "the question whether a bargain is smart or foolish, or economically efficient or disastrous, is not ordinarily a legitimate subject of judicial inquiry." 11 Williston on Contracts, *supra*, § 31:5.

Justice next suggests that Paragraph 3(d) of the Amended Agreement shows that it cannot end even when the Companies pay off the Total Indebtedness. After "the Total Indebtedness is paid in full," Paragraph 3(d) says, the Companies must pay the "greater" of "any additional premium due" or "$200,000.00" each month. J.A. 153. Yet this paragraph also undercuts Justice's argument because it shows that the Amended Agreement might continue *after* the full payment of the Total Indebtedness. The paragraph does not show (as Justice claims) that the agreement could end *before* that full payment. As the district court explained, Paragraph 3(d) existed to "bridg[e] a gap" under a scenario where the Companies paid off the Total Indebtedness before they paid off the $20 million in collateral. *Lexon*, 808 F. Supp. 3d at 857. In that scenario, the Companies would have to pay their current premiums or $200,000 until they paid the collateral in full. *See id.* And the Amended Agreement (including Paragraph 3(d)) would end at that point. Justice responds that Paragraph 3(d) does not say that its obligations end with the completion of the collateral payments. True, one might have read this paragraph (unlike the obligation to pay off the Total Indebtedness) to run perpetually. But even Justice does not argue for that more expansive reading. What matters here is that Paragraph 3(d) does not support Justice's reading that the Amended Agreement could end before the Companies repaid the Total Indebtedness. That is all we need to say to reject Justice's claim.

Lastly, Justice argues that we conflate the Companies' *liability* to pay the amounts that the Amended Agreement requires with the agreement's *length* when we read it to endure until they pay these amounts. But, at least for the Total Indebtedness, the Amended Agreement itself commingles these concepts. It makes the Companies liable to pay $200,000 per month "until"

they extinguish the Total Indebtedness. J.A. 151. And it increases that indebtedness for all premiums that "become due during" its "term" if the Companies do not pay them within 60 days. *Id.* at 152–53. The contract thus tied the Companies' liability to the contract's duration.

At day's end, we may not consider whether it was "wise or unwise, reasonable or unreasonable, usual or unusual" for the Companies to sign the Amended Agreement or for Senator Justice to sign the guaranty. *Cotiga Dev. Co. v. United Fuel Gas Co.*, 128 S.E.2d 626, 633 (W. Va. 1962). Rather, we must interpret those contracts as written. *See id.* So the district court correctly followed the contracts' language where it leads: Justice must pay all of the Companies' Total Indebtedness.

We affirm.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 25-6096

LEXON INSURANCE COMPANY,

Plaintiff - Appellee,

v.

JAMES C. JUSTICE, II,

Defendant - Appellant.

FILED
Oct 09, 2026
KELLY L. STEPHENS, Clerk

Before: STRANCH, BUSH, and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Kelly L. Stephens, Clerk